# EXHIBIT B

POS-015

| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address): | FOR COURT USE ONLY |
|---|---|
| Rhett T. Francisco (SBN 232749) THE LAW OFFICES OF RHETT T. FRANCISCO 5350 Topanga Canyon Boulevard Woodland Hills, California 91364 TELEPHONE NO: (818) 319-9879      FAX NO. (Optional): E-MAIL ADDRESS (Optional): ATTORNEY FOR (Name): Dennis Travis Romero | |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF Los Angeles
STREET ADDRESS: 111 North Hill Street
MAILING ADDRESS:
CITY AND ZIP CODE: Los Angeles, California 90012
BRANCH NAME: Central District - Stanley Mosk Courthouse

PLAINTIFF/PETITIONER: Dennis Travis Romero

DEFENDANT/RESPONDENT: Jeff Eastin

| NOTICE AND ACKNOWLEDGMENT OF RECEIPT—CIVIL | CASE NUMBER: BC463026 |
|---|---|

TO (Insert name of party being served): TVM Productions, Inc., a Delaware Corporation

**NOTICE**

The summons and other documents identified below are being served pursuant to section 415.30 of the California Code of Civil Procedure. Your failure to complete this form and return it within 20 days from the date of mailing shown below may subject you (or the party on whose behalf you are being served) to liability for the payment of any expenses incurred in serving a summons on you in any other manner permitted by law.

If you are being served on behalf of a corporation, an unincorporated association (including a partnership), or other entity, this form must be signed by you in the name of such entity or by a person authorized to receive service of process on behalf of such entity. In all other cases, this form must be signed by you personally or by a person authorized by you to acknowledge receipt of summons. If you return this form to the sender, service of a summons is deemed complete on the day you sign the acknowledgment of receipt below.

Date of mailing: October 26, 2011

Rhett T. Francisco
_____
(TYPE OR PRINT NAME)

▶ _____
(SIGNATURE OF SENDER—MUST NOT BE A PARTY IN THIS CASE)

**ACKNOWLEDGMENT OF RECEIPT**

This acknowledges receipt of (to be completed by sender before mailing):
1. ☑ A copy of the summons and of the complaint.
2. ☑ Other (specify):

First Amended Complaint; Civil Case Cover Sheet; Civil Case Cover Sheet Addendum and Statement of Location; Notice of Case Assignment; Alternative Dispute Resolution Information Package; Notice of OSC and Continued Case Management Conference; Voluntary Efficient Litigation Stipulations

(To be completed by recipient):

Date this form is signed:

Adam Levin, Attorney for Fox Entities and Individuals ▶
(TYPE OR PRINT YOUR NAME AND NAME OF ENTITY, IF ANY, ON WHOSE BEHALF THIS FORM IS SIGNED)

_____
(SIGNATURE OF PERSON ACKNOWLEDGING RECEIPT, WITH TITLE IF ACKNOWLEDGMENT IS MADE ON BEHALF OF ANOTHER PERSON OR ENTITY)

Form Adopted for Mandatory Use Judicial Council of California POS-015 [Rev. January 1, 2005]

**NOTICE AND ACKNOWLEDGMENT OF RECEIPT — CIVIL**

Page 1 of 1 Code of Civil Procedure, §§ 415.30, 417.10 www.courtinfo.ca.gov

# SUMMONS
## (CITACIÓN JUDICIAL)

CONFORMED COPY
OF ORIGINAL FILED
Los Angeles Superior Court

JUN 08 2011

John A. Clarke, Executive Officer/Clerk
By _____, Deputy
A.E. LaFLEUR-CLAYTON

NOTICE TO DEFENDANT:
*(AVISO AL DEMANDADO):*

JEFF EASTIN, an individual; and DOES 1 through 100, inclusive.

YOU ARE BEING SUED BY PLAINTIFF:
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*

TRAVIS ROMERO, an individual,

NOTICE! You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association. NOTE: The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case. *¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| The name and address of the court is: *(El nombre y dirección de la corte es):* | CASE NUMBER *(Número del Caso):* |
|---|---|
| Stanley Mosk Courthouse, Central District; 111 North Hill Street, Los Angeles, California 90012 | BC463026 |

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Rhett T. Francisco 5350 Topanga Canyon Boulevard, Woodland Hills, California (818) 319-9879

| DATE: *(Fecha)* | JOHN A. CLARKE, CLERK Clerk, by *(Secretario)* | AMBER LaFLEUR-CLAYTON | , Deputy *(Adjunto)* |
|---|---|---|---|

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*

**NOTICE TO THE PERSON SERVED:** You are served

[SEAL]

JUN 08 2011

1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*
3. ☐ on behalf of *(specify):*

 under: ☐ CCP 416.10 (corporation)  ☐ CCP 416.60 (minor)
 ☐ CCP 416.20 (defunct corporation)  ☐ CCP 416.70 (conservatee)
 ☐ CCP 416.40 (association or partnership)  ☐ CCP 416.90 (authorized person)
 ☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

| Form Adopted for Mandatory Use Judicial Council of California SUM-100 [Rev. July 1, 2009] | **SUMMONS** | Code of Civil Procedure §§ 412.20, 485 www.courtinfo.ca.gov American LegalNet, Inc. |
|---|---|---|

CONFORMED COPY
OF ORIGINAL FILED
Los Angeles Superior Court

JUN 08 2011

John A. Clarke, Executive Officer/Cl
By _____ Dep
A. EL LaFLEUR-CLAYTON

5350 Topanga Canyon Boulevard
Woodland Hills, California 91367

TELEPHONE NO: 818-319-9879   FAX NO:
ATTORNEY FOR (Name): TRAVIS ROMERO

SUPERIOR COURT OF CALIFORNIA, COUNTY OF
STREET ADDRESS: 111 North Hill Street
MAILING ADDRESS:
CITY AND ZIP CODE: Los Angeles, CA 90012
BRANCH NAME: Central District, Stanley Mosk Courthouse

CASE NAME:
ROMERO v. EASTIN

| CIVIL CASE COVER SHEET | Complex Case Designation | CASE NUMBER |
|---|---|---|
| [✓] Unlimited   [ ] Limited | [ ] Counter   [ ] Joinder | B C 4 6 3 0 2 6 |
| (Amount demanded exceeds $25,000) (Amount demanded is $25,000 or less) | Filed with first appearance by defendant (Cal. Rules of Court, rule 3.402) | JUDGE   DEPT |

Items 1–6 below must be completed (see instructions on page 2).

1. Check one box below for the case type that best describes this case:

**Auto Tort**
[ ] Auto (22)
[ ] Uninsured motorist (46)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
[ ] Asbestos (04)
[ ] Product liability (24)
[ ] Medical malpractice (45)
[ ] Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
[✓] Business tort/unfair business practice (07)
[ ] Civil rights (08)
[ ] Defamation (13)
[ ] Fraud (16)
[ ] Intellectual property (19)
[ ] Professional negligence (25)
[ ] Other non-PI/PD/WD tort (35)

**Employment**
[ ] Wrongful termination (36)
[ ] Other employment (15)

**Contract**
[ ] Breach of contract/warranty (06)
[ ] Rule 3.740 collections (09)
[ ] Other collections (09)
[ ] Insurance coverage (18)
[ ] Other contract (37)

**Real Property**
[ ] Eminent domain/Inverse condemnation (14)
[ ] Wrongful eviction (33)
[ ] Other real property (26)

**Unlawful Detainer**
[ ] Commercial (31)
[ ] Residential (32)
[ ] Drugs (38)

**Judicial Review**
[ ] Asset forfeiture (05)
[ ] Petition re: arbitration award (11)
[ ] Writ of mandate (02)
[ ] Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
[ ] Antitrust/Trade regulation (03)
[ ] Construction defect (10)
[ ] Mass tort (40)
[ ] Securities litigation (28)
[ ] Environmental/Toxic tort (30)
[ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
[ ] Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
[ ] RICO (27)
[ ] Other complaint (not specified above) (42)

**Miscellaneous Civil Petition**
[ ] Partnership and corporate governance (21)
[ ] Other petition (not specified above) (43)

2. This case [ ] is [✓] is not   complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [ ] Large number of separately represented parties   d. [ ] Large number of witnesses
   b. [ ] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve   e. [ ] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   c. [ ] Substantial amount of documentary evidence   f. [ ] Substantial postjudgment judicial supervision

3. Remedies sought (check all that apply): a. [✓] monetary   b. [✓] nonmonetary; declaratory or injunctive relief   c. [✓] punitive
4. Number of causes of action (specify): 4
5. This case [ ] is [✓] is not   a class action suit.
6. If there are any known related cases, file and serve a notice of related case. (You may use form CM-015.)

Date: June 8, 2011
Rhett T. Francisco
(TYPE OR PRINT NAME)

(SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
CM-010 [Rev. July 1, 2007]

CIVIL CASE COVER SHEET

Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;
Cal. Standards of Judicial Administration, std. 3.10
www.courtinfo.ca.gov
American LegalNet, Inc.

## INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you must complete and file, along with your first paper, the *Civil Case Cover Sheet* contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check one box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the primary cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the *Civil Case Cover Sheet* to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

## CASE TYPES AND EXAMPLES

**Auto Tort**
Auto (22)–Personal Injury/Property Damage/Wrongful Death
Uninsured Motorist (46) *(if the case involves an uninsured motorist claim subject to arbitration, check this item instead of Auto)*

**Other PI/PD/WD (Personal Injury/ Property Damage/Wrongful Death) Tort**
Asbestos (04)
 Asbestos Property Damage
 Asbestos Personal Injury/ Wrongful Death
Product Liability *(not asbestos or toxic/environmental)* (24)
Medical Malpractice (45)
 Medical Malpractice– Physicians & Surgeons
 Other Professional Health Care Malpractice
Other PI/PD/WD (23)
 Premises Liability (e.g., slip and fall)
 Intentional Bodily Injury/PD/WD (e.g., assault, vandalism)
 Intentional Infliction of Emotional Distress
 Negligent Infliction of Emotional Distress
 Other PI/PD/WD

**Non-PI/PD/WD (Other) Tort**
Business Tort/Unfair Business Practice (07)
Civil Rights (e.g., discrimination, false arrest) *(not civil harassment)* (08)
Defamation (e.g., slander, libel) (13)
Fraud (16)
Intellectual Property (19)
Professional Negligence (25)
 Legal Malpractice
 Other Professional Malpractice *(not medical or legal)*
Other Non-PI/PD/WD Tort (35)

**Employment**
Wrongful Termination (36)
Other Employment (15)

**Contract**
Breach of Contract/Warranty (06)
 Breach of Rental/Lease Contract *(not unlawful detainer or wrongful eviction)*
 Contract/Warranty Breach–Seller Plaintiff *(not fraud or negligence)*
 Negligent Breach of Contract/ Warranty
 Other Breach of Contract/Warranty
Collections (e.g., money owed, open book accounts) (09)
 Collection Case–Seller Plaintiff
 Other Promissory Note/Collections Case
Insurance Coverage *(not provisionally complex)* (18)
 Auto Subrogation
 Other Coverage
Other Contract (37)
 Contractual Fraud
 Other Contract Dispute

**Real Property**
Eminent Domain/Inverse Condemnation (14)
Wrongful Eviction (33)
Other Real Property (e.g., quiet title) (26)
 Writ of Possession of Real Property
 Mortgage Foreclosure
 Quiet Title
 Other Real Property *(not eminent domain, landlord/tenant, or foreclosure)*

**Unlawful Detainer**
Commercial (31)
Residential (32)
Drugs (38) *(if the case involves illegal drugs, check this item; otherwise, report as Commercial or Residential)*

**Judicial Review**
Asset Forfeiture (05)
Petition Re: Arbitration Award (11)
Writ of Mandate (02)
 Writ–Administrative Mandamus
 Writ–Mandamus on Limited Court Case Matter
 Writ–Other Limited Court Case Review
Other Judicial Review (39)
 Review of Health Officer Order
 Notice of Appeal–Labor Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal. Rules of Court Rules 3.400–3.403)**
Antitrust/Trade Regulation (03)
Construction Defect (10)
Claims Involving Mass Tort (40)
Securities Litigation (28)
Environmental/Toxic Tort (30)
Insurance Coverage Claims *(arising from provisionally complex case type listed above)* (41)

**Enforcement of Judgment**
Enforcement of Judgment (20)
 Abstract of Judgment (Out of County)
 Confession of Judgment *(non-domestic relations)*
 Sister State Judgment
 Administrative Agency Award *(not unpaid taxes)*
 Petition/Certification of Entry of Judgment on Unpaid Taxes
 Other Enforcement of Judgment Case

**Miscellaneous Civil Complaint**
RICO (27)
Other Complaint *(not specified above)* (42)
 Declaratory Relief Only
 Injunctive Relief Only *(non-harassment)*
 Mechanics Lien
 Other Commercial Complaint Case *(non-tort/non-complex)*
 Other Civil Complaint *(non-tort/non-complex)*

**Miscellaneous Civil Petition**
Partnership and Corporate Governance (21)
Other Petition *(not specified above)* (43)
 Civil Harassment
 Workplace Violence
 Elder/Dependent Adult Abuse
 Election Contest
 Petition for Name Change
 Petition for Relief From Late Claim
 Other Civil Petition

**CIVIL CASE COVER SHEET**

| SHORT TITLE | CASE R | B C 4 6 5 0 2 6 |
|---|---|---|
| ROMERO v. EASTIN | | |

## CIVIL CASE COVER SHEET ADDENDUM AND STATEMENT OF LOCATION
### (CERTIFICATE OF GROUNDS FOR ASSIGNMENT TO COURTHOUSE LOCATION)

**This form is required pursuant to LASC Local Rule 2.0 in all new civil case filings in the Los Angeles Superior Court.**

Item I. Check the types of hearing and fill in the estimated length of hearing expected for this case:

JURY TRIAL? ☑ YES   CLASS ACTION? ☐ YES   LIMITED CASE? ☐ YES   TIME ESTIMATED FOR TRIAL 10 ☐ HOURS/ ☑ DAY

Item II. Select the correct district and courthouse location (4 steps – If you checked "Limited Case", skip to Item III, Pg. 4):

**Step 1:** After first completing the Civil Case Cover Sheet Form, find the main civil case cover sheet heading for your case in the left margin below, and, to the right in Column **A**, the Civil Case Cover Sheet case type you selected.

**Step 2:** Check **one** Superior Court type of action in Column **B** below which best describes the nature of this case.

**Step 3:** In Column **C**, circle the reason for the court location choice that applies to the type of action you have checked. For any exception to the court location, see Los Angeles Superior Court Local Rule 2.0.

---

### Applicable Reasons for Choosing Courthouse Location (see Column C below)

1. Class Actions must be filed in the County Courthouse, Central District.
2. May be filed in Central (Other county, or no Bodily Injury/Property Damage).
3. Location where cause of action arose.
4. Location where bodily injury, death or damage occurred.
5. Location where performance required or defendant resides.
6. Location of property or permanently garaged vehicle.
7. Location where petitioner resides.
8. Location wherein defendant/respondent functions wholly.
9. Location where one or more of the parties reside.
10. Location of Labor Commissioner Office.

---

**Step 4:** Fill in the information requested on page 4 in Item III; complete Item IV. Sign the declaration.

| | A<br>Civil Case Cover Sheet<br>Category No. | B<br>Type of Action<br>(Check only one) | C<br>Applicable Reasons -<br>See Step 3 Above |
|---|---|---|---|
| **Auto Tort** | Auto (22) | ☐ A7100 Motor Vehicle - Personal Injury/Property Damage/Wrongful Death | 1., 2., 4. |
| | Uninsured Motorist (46) | ☐ A7110 Personal Injury/Property Damage/Wrongful Death – Uninsured Motorist | 1., 2., 4. |
| **Other Personal Injury/Property Damage/Wrongful Death Tort** | Asbestos (04) | ☐ A6070 Asbestos Property Damage | 2. |
| | | ☐ A7221 Asbestos - Personal Injury/Wrongful Death | 2. |
| | Product Liability (24) | ☐ A7260 Product Liability (not asbestos or toxic/environmental) | 1., 2., 3., 4., 8. |
| | Medical Malpractice (45) | ☐ A7210 Medical Malpractice - Physicians & Surgeons | 1., 2., 4. |
| | | ☐ A7240 Other Professional Health Care Malpractice | 1., 2., 4. |
| | Other Personal Injury Property Damage Wrongful Death (23) | ☐ A7250 Premises Liability (e.g., slip and fall) | 1., 2., 4. |
| | | ☐ A7230 Intentional Bodily Injury/Property Damage/Wrongful Death (e.g., assault, vandalism, etc.) | 1., 2., 4. |
| | | ☐ A7270 Intentional Infliction of Emotional Distress | 1., 2., 3. |
| | | ☐ A7220 Other Personal Injury/Property Damage/Wrongful Death | 1., 2., 4. |
| **Non-Personal Injury/Property Damage/Wrongful Death Tort** | Business Tort (07) | ☑ A6029 Other Commercial/Business Tort (not fraud/breach of contract) | 1., ②, 3. |
| | Civil Rights (08) | ☐ A6005 Civil Rights/Discrimination | 1., 2., 3. |
| | Defamation (13) | ☐ A6010 Defamation (slander/libel) | 1., 2., 3. |
| | Fraud (16) | ☐ A6013 Fraud (no contract) | 1., 2., 3. |

---

LACIV 109 (Rev. 01/07)
LASC Approved 03-04

### CIVIL CASE COVER SHEET ADDENDUM
### AND STATEMENT OF LOCATION

LASC, rule 2.0
Page 1 of 4

| SHORT TITLE | CASE |
|---|---|
| ROMERO v. EASTIN | |

| | A<br>Civil Case Cover<br>Sheet Category No. | B<br>Type of Action<br>(Check only one) | C<br>Applicable Reasons<br>-See Step 3 Above |
|---|---|---|---|
| **Non-Personal Injury/Property Damage/ Wrongful Death Tort (Cont'd.)** | Professional Negligence (25) | ☐ A6017 Legal Malpractice | 1., 2., 3. |
| | | ☐ A6050 Other Professional Malpractice (not medical or legal) | 1., 2., 3. |
| | Other (35) | ☐ A6025 Other Non-Personal Injury/Property Damage tort | 2.,3. |
| **Employment** | Wrongful Termination (36) | ☐ A6037 Wrongful Termination | 1., 2., 3. |
| | Other Employment (15) | ☐ A6024 Other Employment Complaint Case | 1., 2., 3. |
| | | ☐ A6109 Labor Commissioner Appeals | 10. |
| **Contract** | Breach of Contract/ Warranty (06) (not insurance) | ☐ A6004 Breach of Rental/Lease Contract (not Unlawful Detainer or wrongful eviction) | 2., 5. |
| | | ☐ A6008 Contract/Warranty Breach -Seller Plaintiff (no fraud/negligence) | 2., 5. |
| | | ☐ A6019 Negligent Breach of Contract/Warranty (no fraud) | 1., 2., 5. |
| | | ☐ A6028 Other Breach of Contract/Warranty (not fraud or negligence) | 1., 2., 5. |
| | Collections (09) | ☐ A6002 Collections Case-Seller Plaintiff | 2., 5., 6. |
| | | ☐ A6012 Other Promissory Note/Collections Case | 2., 5. |
| | Insurance Coverage (18) | ☐ A6015 Insurance Coverage (not complex) | 1., 2., 5., 8. |
| | Other Contract (37) | ☐ A6009 Contractual Fraud | 1., 2., 3., 5. |
| | | ☐ A6031 Tortious Interference | 1., 2., 3., 5. |
| | | ☐ A6027 Other Contract Dispute(not breach/insurance/fraud/negligence) | 1., 2., 3., 8. |
| **Real Property** | Eminent Domain/Inverse Condemnation (14) | ☐ A7300 Eminent Domain/Condemnation Number of parcels_____ | 2. |
| | Wrongful Eviction (33) | ☐ A6023 Wrongful Eviction Case | 2, 6. |
| | Other Real Property (26) | ☐ A6018 Mortgage Foreclosure | 2., 6. |
| | | ☐ A6032 Quiet Title | 2., 6. |
| | | ☐ A6060 Other Real Property (not eminent domain, landlord/tenant, foreclosure) | 2., 6. |
| **Unlawful Detainer** | Unlawful Detainer-Commercial (31) | ☐ A6021 Unlawful Detainer-Commercial (not drugs or wrongful eviction) | 2., 6. |
| | Unlawful Detainer-Residential (32) | ☐ A6020 Unlawful Detainer-Residential (not drugs or wrongful eviction) | 2., 6. |
| | Unlawful Detainer-Drugs (38) | ☐ A6022 Unlawful Detainer-Drugs | 2., 6. |
| **Judicial Review** | Asset Forfeiture (05) | ☐ A6108 Asset Forfeiture Case | 2., 6. |
| | Petition re Arbitration (11) | ☐ A6115 Petition to Compel/Confirm/Vacate Arbitration | 2., 5. |

LACIV 109 (Rev. 01/07)
LASC Approved 03-04

**CIVIL CASE COVER SHEET ADDENDUM
AND STATEMENT OF LOCATION**

LASC, rule 2.0
Page 2 of 4

141

| SHORT TITLE: | CASE NUMBER |
|---|---|
| ROMERO v. EASTIN | |

**Judicial Review (Cont'd.)**

| A<br>Civil Case Cover Sheet<br>Category No. | B<br>Type of Action<br>(Check only one) | C<br>Applicable Reasons -<br>See Step 3 Above |
|---|---|---|
| Writ of Mandate<br><br>(02) | ☐ A6151   Writ - Administrative Mandamus<br>☐ A6152   Writ - Mandamus on Limited Court Case Matter<br>☐ A6153   Writ – Other Limited Court Case Review | 2., 8.<br>2.<br>2. |
| Other Judicial Review<br>(39) | ☐ A6150   Other Writ /Judicial Review | 2., 8. |

**Provisionally Complex Litigation**

| | | |
|---|---|---|
| Antitrust/Trade<br>Regulation (03) | ☐ A6003   Antitrust/Trade Regulation | 1., 2., 8. |
| Construction Defect (10) | ☐ A6007   Construction defect | 1., 2., 3. |
| Claims Involving Mass<br>Tort (40) | ☐ A6006   Claims Involving Mass Tort | 1., 2., 8. |
| Securities Litigation (28) | ☐ A6035   Securities Litigation Case | 1., 2., 8. |
| Toxic Tort<br>Environmental  (30) | ☐ A6036   Toxic Tort/Environmental | 1., 2., 3., 8. |
| Insurance Coverage<br>Claims from Complex<br>Case (41) | ☐ A6014   Insurance Coverage/Subrogation (complex case only) | 1., 2., 5., 8. |

**Enforcement of Judgment**

| | | |
|---|---|---|
| Enforcement<br>of Judgment<br><br>(20) | ☐ A6141   Sister State Judgment<br>☐ A6160   Abstract of Judgment<br>☐ A6107   Confession of Judgment (non-domestic relations)<br>☐ A6140   Administrative Agency Award (not unpaid taxes)<br>☐ A6114   Petition/Certificate for Entry of Judgment on Unpaid Tax<br>☐ A6112   Other Enforcement of Judgment Case | 2., 9.<br>2., 6.<br>2., 9.<br>2., 8.<br>2., 8.<br>2., 8., 9. |

**Miscellaneous Civil Complaints**

| | | |
|---|---|---|
| RICO (27) | ☐ A6033   Racketeering (RICO) Case | 1., 2., 8. |
| Other Complaints<br>(Not Specified Above)<br><br>(42) | ☐ A6030   Declaratory Relief Only<br>☐ A6040   Injunctive Relief Only (not domestic/harassment)<br>☐ A6011   Other Commercial Complaint Case (non-tort/non-complex)<br>☐ A6000   Other Civil Complaint (non-tort/non-complex) | 1., 2., 8.<br>2., 8.<br>1., 2., 8.<br>1., 2., 8. |

**Miscellaneous Civil Petitions**

| | | |
|---|---|---|
| Partnership Corporation<br>Governance(21) | ☐ A6113   Partnership and Corporate Governance Case | 2., 8. |
| Other Petitions<br>(Not Specified Above)<br><br>(43) | ☐ A6121   Civil Harassment<br>☐ A6123   Workplace Harassment<br>☐ A6124   Elder/Dependent Adult Abuse Case<br>☐ A6190   Election Contest<br>☐ A6110   Petition for Change of Name<br>☐ A6170   Petition for Relief from Late Claim Law<br>☐ A6100   Other Civil Petition | 2., 3., 9.<br>2., 3., 9.<br>2., 3., 9.<br>2.<br>2., 7.<br>2., 3., 4., 8.<br>2., 9. |

LACIV 109 (Rev. 01/07)    **CIVIL CASE COVER SHEET ADDENDUM**    LASC, rule 2.0
LASC Approved 03-04    **AND STATEMENT OF LOCATION**    Page 3 of 4

| SHORT TITLE | CASE | R |
|---|---|---|
| ROMERO v. EASTIN | | |

Item III. Statement of Location: Enter the address of the accident, party's residence or place of business, performance, or other circumstance indicated in Item II., Step 3 on Page 1, as the proper reason for filing in the court location you selected.

| REASON: CHECK THE NUMBER UNDER COLUMN C WHICH APPLIES IN THIS CASE ☐1. ☒2. ☐3. ☐4. ☐5. ☐6. ☐7. ☐8. ☐9. ☐10. | ADDRESS 5626 Medina Road |
|---|---|

| CITY | STATE | ZIP CODE | |
|---|---|---|---|
| Woodland Hills | CA | 91364 | |

Item IV. *Declaration of Assignment*: I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and that the above-entitled matter is properly filed for assignment to the <u>Stanley Mosk</u> courthouse in the <u>Central</u> District of the Los Angeles Superior Court (Code Civ. Proc., § 392 et seq., and LASC Local Rule 2.0, subds. (b), (c) and (d)).

Dated: <u>June 8, 2011</u>

<u>(SIGNATURE OF ATTORNEY/FILING PARTY)</u>

---

### PLEASE HAVE THE FOLLOWING ITEMS COMPLETED AND READY TO BE FILED IN ORDER TO PROPERLY COMMENCE YOUR NEW COURT CASE:

1. Original Complaint or Petition.

2. If filing a Complaint, a completed Summons form for issuance by the Clerk.

3. Civil Case Cover Sheet form CM-010.

4. Complete Addendum to Civil Case Cover Sheet form LACIV 109 (Rev. 01/07), LASC Approved 03-04.

5. Payment in full of the filing fee, unless fees have been waived.

6. Signed order appointing the Guardian ad Litem, JC form FL-935, if the plaintiff or petitioner is a minor under 18 years of age, or if required by Court.

7. Additional copies of documents to be conformed by the Clerk. Copies of the cover sheet and this addendum must be served along with the summons and complaint, or other initiating pleading in the case.

---

### CIVIL CASE COVER SHEET ADDENDUM AND STATEMENT OF LOCATION

**NOTICE OF CASE ASSIGNMENT — UNLIMITED CIVIL CASE**

Case Number _____

THIS FORM IS TO BE SERVED WITH THE SUMMONS AND COMPLAINT

Your case is assigned for all purposes to the judicial officer indicated below (Local Rule 7.3©). There is additional information on the reverse side of this form.

| ASSIGNED JUDGE | DEPT | ROOM | ASSIGNED JUDGE | DEPT | ROOM |
|---|---|---|---|---|---|
| Hon. Carolyn B. Kuhl | 1 | 534 | Hon. Holly E. Kendig | 42 | 416 |
| Hon. J. Stephen Czuleger | 3 | 224 | Hon. Mel Red Recana | 45 | 529 |
| Hon. Luis A. Lavin | 13 | 630 | Hon. Debre Katz Weintraub | 47 | 507 |
| Hon. Terry A. Green | 14 | 300 | Hon. Elizabeth Allen White | 48 | 506 |
| Hon. Richard Fruin | 15 | 307 | Hon. Deirdre Hill | 49 | 509 |
| Hon. Rita Miller | 16 | 306 | Hon. John Shepard Wiley Jr. | 50 | 508 |
| Hon. Richard E. Rico | 17 | 309 | Hon. Abraham Khan | 51 | 511 |
| Hon. Rex Heeseman | 19 | 311 | Hon. Susan Bryant-Deason | 52 | 510 |
| Hon. Kevin C. Brazile | 20 | 310 | Hon. John P. Shook | 53 | 513 |
| Hon. Zaven V. Sinanian | 23 | 315 | Hon. Ernest M. Hiroshige | 54 | 512 |
| Hon. Robert L. Hess | 24 | 314 | Hon. Malcolm H. Mackey | 55 | 515 |
| Hon. Mary Ann Murphy | 25 | 317 | Hon. Michael Johnson | 56 | 514 |
| Hon. James R. Dunn | 26 | 316 | Hon. Ralph W. Dau | 57 | 517 |
| Hon. Yvette M. Palazuelos | 28 | 318 | Hon. Rolf M. Treu | 58 | 516 |
| Pending Assignment | 30 | 400 | Hon. David L. Minning | 61 | 632 |
| Hon. Alan S. Rosenfield | 31 | 407 | Hon. Michael L. Stern | 62 | 600 |
| Hon. Mary H. Strobel | 32 | 406 | Hon. Kenneth R. Freeman | 64 | 601 |
| Hon. Charles F. Palmer | 33 | 409 | Hon. Mark Mooney | 68 | 617 |
| Hon. Amy D. Hogue | 34 | 408 | Hon. Ramona See | 69 | 621 |
| Hon. Daniel Buckley | 35 | 411 | Hon. Soussan G. Bruguera | 71 | 729 |
| Hon. Gregory Alarcon | 36 | 410 | Hon. Ruth Ann Kwan | 72 | 731 |
| Hon. Joanne O'Donnell | 37 | 413 | Hon. Teresa Sanchez-Gordon | 74 | 735 |
| Hon. Maureen Duffy-Lewis | 38 | 412 | Hon. Willliam F. Fahey | 78 | 730 |
| Hon. Michael C. Solner | 39 | 415 | Hon. Emilie H. Elias* | 324 | CCW |
| Hon. Michelle R. Rosenblatt | 40 | 414 | other | | |
| Hon. Ronald M. Sohigian | 41 | 417 | | | |

**\*Class Actions**
All class actions are initially assigned to Judge Emilie H. Elias in Department 324 of the Central Civil West Courthouse (600 S.Commonwealth Ave., Los Angeles 90005). This assignment is for the purpose of assessing whether or not the case is complex within the meaning of California Rules of Court, rule 3.400. Depending on the Outcome of that assessment, the class action case may be reassigned to one of the judges of the Complex Litigation Program or reassigned randomly to a court in the Central District.

Given to the Plaintiff/Cross-Complainant/Attorney of Record on _____   JOHN A. CLARKE, Executive Officer/Clerk

By _____, Deputy Clerk

LACIV CCH 190 (Rev. 04/10)   NOTICE OF CASE ASSIGNMENT —   Page 1 of 2
LASC Approved 05-06   UNLIMITED CIVIL CASE

## SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
## ALTERNATIVE DISPUTE RESOLUTION (ADR) INFORMATION PACKAGE
[CRC 3.221 Information about Alternative Dispute Resolution]
For additional ADR information and forms visit the Court ADR web application at www.lasuperiorcourt.org (click on ADR).

The plaintiff shall serve a copy of this Information Package on each defendant along with the complaint (Civil only).

**What is ADR:**
Alternative Dispute Resolution (ADR) is the term used to describe all the other options available for settling a dispute which once had to be settled in court. ADR processes, such as arbitration, mediation, neutral evaluation (NE), and settlement conferences, are less formal than a court process and provide opportunities for parties to reach an agreement using a problem-solving approach.

There are many different kinds of ADR. All of them utilize a "neutral", an impartial person, to decide the case or help the parties reach an agreement.

**Mediation:**
In mediation, a neutral person called a "mediator" helps the parties try to reach a mutually acceptable resolution of the dispute. The mediator does not decide the dispute but helps the parties communicate so they can try to settle the dispute themselves. Mediation leaves control of the outcome with the parties.

    **Cases for Which Mediation May Be Appropriate**
    Mediation may be particularly useful when parties have a dispute between or among family members, neighbors, or business partners. Mediation is also effective when emotions are getting in the way of resolution. An effective mediator can hear the parties out and help them communicate with each other in an effective and nondestructive manner.

    **Cases for Which Mediation May Not Be Appropriate**
    Mediation may not be effective if one of the parties is unwilling to cooperate or compromise. Mediation also may not be effective if one of the parties has a significant advantage in power over the other. Therefore, it may not be a good choice if the parties have a history of abuse or victimization.

**Arbitration:**
In arbitration, a neutral person called an "arbitrator" hears arguments and evidence from each side and then decides the outcome of the dispute. Arbitration is less formal than a trial, and the rules of evidence are often relaxed. Arbitration may be either "binding" or "nonbinding." *Binding arbitration* means that the parties waive their right to a trial and agree to accept the arbitrator's decision as final. *Nonbinding* arbitration means that the parties are free to request a trial if they do not accept the arbitrator's decision.

    **Cases for Which Arbitration May Be Appropriate**
    Arbitration is best for cases where the parties want another person to decide the outcome of their dispute for them but would like to avoid the formality, time, and expense of a trial. It may also be appropriate for complex matters where the parties want a decision-maker who has training or experience in the subject matter of the dispute.

    **Cases for Which Arbitration May Not Be Appropriate**
    If parties want to retain control over how their dispute is resolved, arbitration, particularly binding arbitration, is not appropriate. In binding arbitration, the parties generally cannot appeal the arbitrator's award, even if it is not supported by the evidence or the law. Even in nonbinding arbitration, if a party requests a trial and does not receive a more favorable result at trial than in arbitration, there may be penalties.

**Neutral Evaluation:**
In neutral evaluation, each party gets a chance to present the case to a neutral person called an "evaluator." The evaluator then gives an opinion on the strengths and weaknesses of each party's evidence and arguments and about how the dispute could be resolved. The evaluator is often an expert in the subject matter of the dispute. Although the evaluator's opinion is not binding, the parties typically use it as a basis for trying to negotiate a resolution of the dispute.

    **Cases for Which Neutral Evaluation May Be Appropriate**
    Neutral evaluation may be most appropriate in cases in which there are technical issues that require special expertise to resolve or the only significant issue in the case is the amount of damages.

    **Cases for Which Neutral Evaluation May Not Be Appropriate**
    Neutral evaluation may not be appropriate when there are significant personal or emotional barriers to resolving the dispute.

**Settlement Conferences:**
Settlement conferences may be either mandatory or voluntary. In both types of settlement conferences, the parties and their attorneys meet with a judge or a neutral person called a "settlement officer" to discuss possible settlement of their dispute. The judge or settlement officer does not make a decision in the case but assists the parties in evaluating the strengths and weaknesses of the case and in negotiating a settlement. Settlement conferences are appropriate in any case where settlement is an option. Mandatory settlement conferences are often held close to the date a case is set for trial.

# VOLUNTARY EFFICIENT LITIGATION STIPULATIONS



**Superior Court of California
County of Los Angeles**



**Los Angeles County
Bar Association
Litigation Section**

**Los Angeles County
Bar Association Labor and
Employment Law Section**



**Consumer Attorneys
Association of Los Angeles**



**Southern California
Defense Counsel**



**Association of
Business Trial Lawyers**



**California Employment
Lawyers Association**

The Early Organizational Meeting Stipulation, Discovery Resolution Stipulation, and Motions in Limine Stipulation are voluntary stipulations entered into by the parties. The parties may enter into one, two, or all three of the stipulations; however, they may not alter the stipulations as written, because the Court wants to ensure uniformity of application. These stipulations are meant to encourage cooperation between the parties and to assist in resolving issues in a manner that promotes economic case resolution and judicial efficiency.

*The following organizations endorse the goal of promoting efficiency in litigation and ask that counsel consider using these stipulations as a voluntary way to promote communications and procedures among counsel and with the court to fairly resolve issues in their cases.*

◆**Los Angeles County Bar Association Litigation Section**◆

◆ **Los Angeles County Bar Association
Labor and Employment Law Section**◆

◆**Consumer Attorneys Association of Los Angeles**◆

◆**Southern California Defense Counsel**◆

◆**Association of Business Trial Lawyers**◆

◆**California Employment Lawyers Association**◆

| NAME AND ADDRESS OF ATTORNEY OR PARTY WITHOUT ATTORNEY: | STATE BAR NUMBER | Reserved for Clerk's File Stamp |
|---|---|---|
| | | |

TELEPHONE NO.:  
E-MAIL ADDRESS (Optional):  
ATTORNEY FOR (Name):   FAX NO. (Optional):

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES**

COURTHOUSE ADDRESS:

PLAINTIFF:

DEFENDANT:

| **STIPULATION – EARLY ORGANIZATIONAL MEETING** | CASE NUMBER: |
|---|---|

**This stipulation is intended to encourage cooperation among the parties at an early stage in the litigation and to assist the parties in efficient case resolution.**

**The parties agree that:**

1. The parties commit to conduct an initial conference (in-person or via teleconference or via videoconference) within 15 days from the date this stipulation is signed, *to discuss and consider whether there can be agreement on the following*:

   a. Are motions to challenge the pleadings necessary? If the issue can be resolved by amendment as of right, or if the Court would allow leave to amend, could an amended complaint resolve most or all of the issues a demurrer might otherwise raise? If so, the parties agree to work through pleading issues so that a demurrer need only raise issues they cannot resolve. Is the issue that the defendant seeks to raise amenable to resolution on demurrer, or would some other type of motion be preferable? Could a voluntary targeted exchange of documents or information by any party cure an uncertainty in the pleadings?

   b. Initial mutual exchanges of documents at the "core" of the litigation. (For example, in an employment case, the employment records, personnel file and documents relating to the conduct in question could be considered "core." In a personal injury case, an incident or police report, medical records, and repair or maintenance records could be considered "core.");

   c. Exchange of names and contact information of witnesses;

   d. Any insurance agreement that may be available to satisfy part or all of a judgment, or to indemnify or reimburse for payments made to satisfy a judgment;

   e. Exchange of any other information that might be helpful to facilitate understanding, handling, or resolution of the case in a manner that preserves objections or privileges by agreement;

   f. Controlling issues of law that, if resolved early, will promote efficiency and economy in other phases of the case. Also, when and how such issues can be presented to the Court;

   g. Whether or when the case should be scheduled with a settlement officer, what discovery or court ruling on legal issues is reasonably required to make settlement discussions meaningful, and whether the parties wish to use a sitting judge or a private mediator or other options as

discussed in the "Alternative Dispute Resolution (ADR) Information Package" served with the complaint;

h.  Computation of damages, including documents not privileged or protected from disclosure, on which such computation is based;

i.  Whether the case is suitable for the Expedited Jury Trial procedures (see information at *www.lasuperiorcourt.org* under "*Civil*" and then under "*General Information*").

2.  The time for a defending party to respond to a complaint or cross-complaint will be extended to _____ for the complaint, and _____ for the cross-
    (INSERT DATE)                               (INSERT DATE)
    complaint, which is comprised of the 30 days to respond under Government Code § 68616(b), and the 30 days permitted by Code of Civil Procedure section 1054(a), good cause having been found by the Civil Supervising Judge due to the case management benefits provided by this Stipulation.

3.  The parties will prepare a joint report titled "Joint Status Report Pursuant to Initial Conference and Early Organizational Meeting Stipulation, and if desired, a proposed order summarizing results of their meet and confer and advising the Court of any way it may assist the parties' efficient conduct or resolution of the case. The parties shall attach the Joint Status Report to the Case Management Conference statement, and file the documents when the CMC statement is due.

4.  References to "days" mean calendar days, unless otherwise noted. If the date for performing any act pursuant to this stipulation falls on a Saturday, Sunday or Court holiday, then the time for performing that act shall be extended to the next Court day

The following parties stipulate:

Date:

_____          ➢ _____
     (TYPE OR PRINT NAME)                        (ATTORNEY FOR PLAINTIFF)
Date:

_____          ➢ _____
     (TYPE OR PRINT NAME)                        (ATTORNEY FOR DEFENDANT)
Date:

_____          ➢ _____
     (TYPE OR PRINT NAME)                        (ATTORNEY FOR DEFENDANT)
Date:

_____          ➢ _____
     (TYPE OR PRINT NAME)                        (ATTORNEY FOR DEFENDANT)
Date:

_____          ➢ _____
     (TYPE OR PRINT NAME)                        (ATTORNEY FOR _____)
Date:

_____          ➢ _____
     (TYPE OR PRINT NAME)                        (ATTORNEY FOR _____)
Date:

_____          ➢ _____
     (TYPE OR PRINT NAME)                        (ATTORNEY FOR _____)

LACIV 229 (new)
LASC Approved 04/11                **STIPULATION – EARLY ORGANIZATIONAL MEETING**                Page 2 of 2

| NAME AND ADDRESS OF ATTORNEY OR PARTY WITHOUT ATTORNEY: | STATE BAR NUMBER | Reserved for Clerk's File Stamp |
|---|---|---|
| TELEPHONE NO.:                    FAX NO. (Optional): <br> E-MAIL ADDRESS (Optional): <br> ATTORNEY FOR (Name): | | |

### SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
COURTHOUSE ADDRESS:

PLAINTIFF:

DEFENDANT:

| STIPULATION – DISCOVERY RESOLUTION | CASE NUMBER: |
|---|---|

This stipulation is intended to provide a fast and informal resolution of discovery issues through limited paperwork and an informal conference with the Court to aid in the resolution of the issues.

The parties agree that:

1. Prior to the discovery cut-off in this action, no discovery motion shall be filed or heard unless the moving party first makes a written request for an Informal Discovery Conference pursuant to the terms of this stipulation.

2. At the Informal Discovery Conference the Court will consider the dispute presented by parties and determine whether it can be resolved informally. Nothing set forth herein will preclude a party from making a record at the conclusion of an Informal Discovery Conference, either orally or in writing.

3. Following a reasonable and good faith attempt at an informal resolution of each issue to be presented, a party may request an Informal Discovery Conference pursuant to the following procedures:

    a. The party requesting the Informal Discovery Conference will:

        i. File a Request for Informal Discovery Conference with the clerk's office on the approved form (copy attached) and deliver a courtesy, conformed copy to the assigned department;

        ii. Include a brief summary of the dispute and specify the relief requested; and

        iii. Serve the opposing party pursuant to any authorized or agreed method of service that ensures that the opposing party receives the Request for Informal Discovery Conference no later than the next court day following the filing.

    b. Any Answer to a Request for Informal Discovery Conference must:

        i. Also be filed on the approved form (copy attached);

        ii. Include a brief summary of why the requested relief should be denied;

    iii.    Be filed within two (2) court days of receipt of the Request; and

    iv.    Be served on the opposing party pursuant to any authorized or agreed upon method of service that ensures that the opposing party receives the Answer no later than the next court day following the filing.

  c.  No other pleadings, including but not limited to exhibits, declarations, or attachments, will be accepted.

  d.  If the Court has not granted or denied the Request for Informal Discovery Conference within ten (10) days following the filing of the Request, then it shall be deemed to have been denied. If the Court acts on the Request, the parties will be notified whether the Request for Informal Discovery Conference has been granted or denied and, if granted, the date and time of the Informal Discovery Conference, which must be within twenty (20) days of the filing of the Request for Informal Discovery Conference.

  e.  If the conference is not held within twenty (20) days of the filing of the Request for Informal Discovery Conference, unless extended by agreement of the parties and the Court, then the Request for the Informal Discovery Conference shall be deemed to have been denied at that time.

4.  If (a) the Court has denied a conference or (b) one of the time deadlines above has expired without the Court having acted or (c) the Informal Discovery Conference is concluded without resolving the dispute, then a party may file a discovery motion to address unresolved issues.

5.  The parties hereby further agree that the time for making a motion to compel or other discovery motion is tolled from the date of filing of the Request for Informal Discovery Conference until (a) the request is denied or deemed denied or (b) twenty (20) days after the filing of the Request for Informal Discovery Conference, whichever is earlier, unless extended by Order of the Court.

It is the understanding and intent of the parties that this stipulation shall, for each discovery dispute to which it applies, constitute a writing memorializing a "specific later date to which the propounding [or demanding or requesting] party and the responding party have agreed in writing," within the meaning of Code Civil Procedure sections 2030.300(c), 2031.320(c), and 2033.290(c).

6.  Nothing herein will preclude any party from applying *ex parte* for appropriate relief, including an order shortening time for a motion to be heard concerning discovery.

7.  Any party may terminate this stipulation by giving twenty-one (21) days' notice of intent to terminate the stipulation.

8.  References to "days" mean calendar days, unless otherwise noted. If the date for performing any act pursuant to this stipulation falls on a Saturday, Sunday or Court holiday, then the time for performing that act shall be extended to the next Court day.

| SHORT TITLE: | | CASE NUMBER: |
|---|---|---|

**The following parties stipulate:**

Date:

_____
(TYPE OR PRINT NAME)

Date:

_____
(TYPE OR PRINT NAME)

Date:

_____
(TYPE OR PRINT NAME)

Date:

_____
(TYPE OR PRINT NAME)

Date:

_____
(TYPE OR PRINT NAME)

Date:

_____
(TYPE OR PRINT NAME)

> _____
(ATTORNEY FOR PLAINTIFF)

> _____
(ATTORNEY FOR DEFENDANT)

> _____
(ATTORNEY FOR DEFENDANT)

> _____
(ATTORNEY FOR DEFENDANT)

> (ATTORNEY FOR _____ )

> (ATTORNEY FOR _____ )

> (ATTORNEY FOR _____ )

| NAME AND ADDRESS OF ATTORNEY OR PARTY WITHOUT ATTORNEY: | STATE BAR NUMBER | Reserved for Clerk's File Stamp |
|---|---|---|
| TELEPHONE NO.:<br>E-MAIL ADDRESS (Optional):<br>ATTORNEY FOR (Name): | FAX NO. (Optional): | |

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES**

COURTHOUSE ADDRESS:

PLAINTIFF:

DEFENDANT:

| STIPULATION AND ORDER – MOTIONS IN LIMINE | CASE NUMBER: |
|---|---|

**This stipulation is intended to provide fast and informal resolution of evidentiary issues through diligent efforts to define and discuss such issues and limit paperwork.**

**The parties agree that:**

1. At least _____ days before the final status conference, each party will provide all other parties with a list containing a one paragraph explanation of each proposed motion in limine. Each one paragraph explanation must identify the substance of a single proposed motion in limine and the grounds for the proposed motion.

2. The parties thereafter will meet and confer, either in person or via teleconference or videoconference, concerning all proposed motions in limine. In that meet and confer, the parties will determine:

   a. Whether the parties can stipulate to any of the proposed motions. If the parties so stipulate, they may file a stipulation and proposed order with the Court.

   b. Whether any of the proposed motions can be briefed and submitted by means of a short joint statement of issues. For each motion which can be addressed by a short joint statement of issues, a short joint statement of issues must be filed with the Court 10 days prior to the final status conference. Each side's portion of the short joint statement of issues may not exceed three pages. The parties will meet and confer to agree on a date and manner for exchanging the parties' respective portions of the short joint statement of issues and the process for filing the short joint statement of issues.

3. All proposed motions in limine that are not either the subject of a stipulation or briefed via a short joint statement of issues will be briefed and filed in accordance with the California Rules of Court and the Los Angeles Superior Court Rules.

LACIV 075 (new)
LASC Approved 04/11     **STIPULATION AND ORDER – MOTIONS IN LIMINE**     Page 1 of 2

SHORT TITLE:                                                          CASE NUMBER:

## The following parties stipulate:

Date:

_____       ➣   _____
(TYPE OR PRINT NAME)                        (ATTORNEY FOR PLAINTIFF)

Date:
                                        ➣   _____
_____            (ATTORNEY FOR DEFENDANT)
(TYPE OR PRINT NAME)

Date:
                                        ➣   _____
_____            (ATTORNEY FOR DEFENDANT)
(TYPE OR PRINT NAME)

Date:
                                        ➣   _____
_____            (ATTORNEY FOR DEFENDANT)
(TYPE OR PRINT NAME)

Date:
                                        ➣   _____
_____            (ATTORNEY FOR _____ )
(TYPE OR PRINT NAME)

Date:
                                        ➣   _____
_____            (ATTORNEY FOR _____ )
(TYPE OR PRINT NAME)

Date:
                                        ➣   _____
_____            (ATTORNEY FOR _____ )
(TYPE OR PRINT NAME)

## THE COURT SO ORDERS.

Date: _____       _____
                                            JUDICIAL OFFICER

LACIV 075 (new)
LASC Approved 04/11          **STIPULATION AND ORDER – MOTIONS IN LIMINE**          Page 2 of 2

| NAME AND ADDRESS OF ATTORNEY OR PARTY WITHOUT ATTORNEY: | STATE BAR NUMBER | Reserved for Clerk's File Stamp |
|---|---|---|

TELEPHONE NO.:  FAX NO. (Optional):
E-MAIL ADDRESS (Optional):
ATTORNEY FOR (Name):

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES**

COURTHOUSE ADDRESS:

PLAINTIFF:

DEFENDANT:

| **INFORMAL DISCOVERY CONFERENCE**<br>(pursuant to the Discovery Resolution Stipulation of the parties) | CASE NUMBER: |
|---|---|

1. This document relates to:
   ☐ Request for Informal Discovery Conference.
   ☐ Answer to Request for Informal Discovery Conference
2. Deadline for Court to decide on Request: _____ (insert date 10 calendar days following filing of the Request).
3. Deadline for Court to hold Informal Discovery Conference: _____ (insert date 20 calendar days following filing of the Request).
4. For a Request for Informal Discovery Conference, <u>briefly</u> describe the nature of the discovery dispute, including the facts and legal arguments at issue.  For an Answer to Request for Informal Discovery Conference, <u>briefly</u> describe why the Court should deny the requested discovery, including the facts and legal arguments at issue.

RHETT T. FRANCISCO, SBN 232749
THE LAW OFFICES OF RHETT T. FRANCISCO
5350 TOPANGA CANYON BOULEVARD
WOODLAND HILLS, CALIFORNIA 91364
TEL: (818) 319-9879

PAWEL R. SASIK, SBN 240672
THE LAW OFFICES OF PAWEL R. SASIK
5350 TOPANGA CANYON BOULEVARD
WOODLAND HILLS, CALIFORNIA 91364
TEL: (310) 571-5206

Attorneys for Plaintiff, Travis Romero

JUN 08 2011

John A. Clarke, Executive Officer/Clerk
By _____, Deputy
A.E. LaFLEUR-CLAYTON

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

### FOR THE COUNTY OF LOS ANGELES – CENTRAL DISTRICT
(UNLIMITED JURISDICTION)

BC463026

| | |
|---|---|
| TRAVIS ROMERO, an individual, <br><br> Plaintiff, <br><br> v. <br><br> JEFF EASTIN, an individual; and DOES 1 through 100, inclusive, <br><br> Defendants. | Case No.: <br><br> COMPLAINT FOR <br><br> 1. Accounting; <br> 2. Breach of Fiduciary Duty; <br> 3. Declaratory Relief; and <br> 4. Declaratory Relief. <br><br> JURY TRIAL DEMANDED |

**COMES NOW** Plaintiff TRAVIS ROMERO and alleges as follows:

## COMMON ALLEGATIONS

1.     In some special instances two individuals come together and have such complimentary skills that together they are capable of achieving much more than either one could on their own. This type of partnership holds true in many of our great American success stories, many of which reach great heights, have humble beginnings, and often manifest their raison d'etre in a garage, a back room or even a hot tub; such is the story of Travis Romero (hereinafter "ROMERO" or "PLAINTIFF") and Jeff Eastin (hereinafter "EASTIN" or "DEFENDANT").

2.     The friendship between ROMERO and EASTIN's began in 1991 at a YMCA where they both worked as camp counselors. They were two young men with nothing to lose, everything to

COMPLAINT

1 gain, and dreams of Hollywood success. After some time EASTIN left his job at the YMCA to

2 begin work as a screen writer. Over the next many years ROMERO and EASTIN's friendship

3 blossomed.

4 3. Around 1993, EASTIN was already working substantially in the entertainment industry as a

5 writer and had been focusing on making connections in the industry that would allow him to pitch

6 his own ideas; with these connections came a level of sophistication and understanding of the

7 entertainment industry. At this point, EASTIN and ROMERO had been very close friends for

8 some time, and when an opportunity for EASTIN to pitch a studio arose, he informally discussed

9 the opportunity with ROMERO. ROMERO and EASTIN, without any written agreement,

10 discussed the project and brainstormed ideas for EASTIN to pitch. As between the two, ROMERO

11 was more of the "idea guy" and EASTIN was more of the "pitch guy". They soon realized that as

12 a creative writing team they had chemistry and worked well together, with ROMERO's creativity

13 and EASTIN's more technical skills. EASTIN's pitch was not picked up. However, EASTIN's

14 and ROMERO's work allowed EASTIN access to Hollywood decision makers.

15 4. Over the next many years, ROMERO and EASTIN would continue, on and off, as a writing

16 team. The two entered into numerous ventures, with ROMERO and EASTIN creating a television

17 show concept, EASTIN pitching the concept to various Hollywood entities, and ROMERO and

18 EASTIN then further developing the story, the characters, the situations, and story arcs, and

19 defining the show and the series for even further development, sale and production.

20 5. In 1995, EASTIN and ROMERO were about to have their first taste of true success. Again,

21 they began a new venture, along with EASTIN's soon-to-be wife Maral Adams, on an initial idea

22 that EASTIN came up with that required further development. After much work by ROMERO,

23 EASTIN, and Adams, the idea became the concept for Shasta McNasty, a television show about

24 three "slacker dudes" who also make up a rock band named Shasta, and, instead of working on

25 their music, spend most of their time hanging out. ROMERO, EASTIN, and Adams were very

26 close friends and worked without a written agreement. ROMERO considered EASTIN his best

27 friend and trusted him completely. Unfortunately, that was often to ROMERO's detriment. For,

28 although ROMERO, EASTIN, and Adams worked as equals on defining concept, characters, story

<div align="center">COMPLAINT</div>

<div align="right">2</div>

1  line, and a variety of plot lines that could be incorporated into the Shasta McNasty television

2  series, and although all three participated in the development of the show with the hopes of it

3  being picked up (i.e. purchased or optioned) by a production studio, EASTIN ultimately claimed

4  to be the sole creator.

5  6.      Once ROMERO, EASTIN and Adams agreed they had a pilot for the Shasta McNasty

6  television show that they felt could be pitched to a production studio, EASTIN took the concept

7  and pitched it. Shasta McNasty was green lit sometime in 1995 and EASTIN assumed a position

8  of control, acting as point man for communications with the production studio and facilitating

9  writing positions for both ROMERO and Adams. Even though the efforts to create the show were

10  equal among the three participants EASTIN took sole creator credit for Shasta McNasty.

11  7.      ROMERO, EASTIN and Adams worked on Shasta McNasty from 1994 to 1995. EASTIN

12  relied heavily on both ROMERO and Adams in continued concept, character, and plot definition

13  for Shasta McNasty. This was only natural since the three of them played equal parts in the origins

14  of the show. With the success of Shasta McNasty, EASTIN solidified his Hollywood presence and

15  EASTIN became known as an Executive Producer / Show Runner[1]. Because EASTIN claimed

16  sole credit for creating the shows that he worked on with ROMERO and Adams, including Shasta

17  McNasty. EASTIN was put in the position of Show Runner by the studios and networks.

18  ROMERO and Adams, were relegated to the background and were not paid, or otherwise

19  recognize as creators of the shows, including Shasta McNasty. Pursuant to EASTIN's direction,

20  ROMERO and Adams were known and paid only as writers.

21  8.      In large part, EASTIN's rise to the position of Executive Produce / Show Runner would not

22  have occurred without ROMERO's efforts and his work with EASTIN to develop the Shasta

23  McNasty television show.

24  9.      During that same period, and due to the success of Shasta McNasty, EASTIN was able to

25  purchase a house in Woodland Hills California. Along with the home came a hot tub, and this hot

26  tub served as a catalyst for a plethora of concepts, stories, and characters, as well as an overall

27

28      [1] A Show Runner is someone who is responsible for the day-to-day operations of a television show and is often credited as an Executive Producer.

COMPLAINT                                                                                  3

1   cauldron for ROMERO's and EASTIN's television concepts and ideas. ROMERO and EASTIN

2   often worked in the hot tub and it became a topic of conversation and teasing on various future

3   projects.

4   10.   The Shasta McNasty venture, between ROMERO, EASTIN and Adams ended at some point

5   in 1995. On the heals of the success of Shasta McNasty, EASTIN, ROMERO and Adams, started

6   a new venture to develop a new show that they called "Hawaii". The Hawaii television show was

7   based on the original television series Hawaii Five-0. ROMERO, EASTIN, and Adams believed

8   that the Hawaii concept would appeal to television audiences and, much like with Shasta

9   McNasty, the three brainstormed, nurtured ideas, and developed the characters, and storyline.

10   11.   As with Shasta McNasty, EASTIN pitched Hawaii to the studios and the television show

11   was green lit. Once again, EASTIN took control, acted as the point man for communications with

12   the studios, and claimed to be the sole creator of the Hawaii television show. Not surprisingly,

13   EASTIN was put in the position of Show Runner for the series; he again relegated ROMERO and

14   Adams to being paid and positioned as writers.

15   12.   At the time the Hawaii television show was green lit, Adams (then EASTIN's wife) asked

16   EASTIN why ROMERO and she were not being compensated as co-creators of the television

17   show Hawaii. In response, EASTIN told Adams, "If I gave you credit, then I would have to give

18   Travis [ROMERO] credit, and that would mean less money for us."

19   13.   As with Shasta McNasty, ROMERO was essential to the creation, development and ultimate

20   success of the show. In fact, EASTIN needed ROMERO to be present during all stages of

21   development because EASTIN could not do it on his own and required ROMERO's creative input.

22   EASTIN needed ROMERO to be the "idea guy".

23   14.   ROMERO's role in the creation of Hawaii was so important that he was flown out to Hawaii

24   to guide the production of the show. Having witnessed ROMERO's intimate involvement in the

25   production and development of the Hawaii television show, as well as EASTIN's reliance on,

26   and need for, ROMERO's ideas various actors and employees of the show thought ROMERO was

27   a producer of the show. Even though ROMERO was relegated to being paid as a writer

28   ROMERO's actual contributions were much greater. Although EASTIN relegated ROMERO to

COMPLAINT                                              4

1  being paid as a writer, EASTIN often recognized ROMERO's actual contribution, by referring to,
2  and introducing ROMERO to others as, his, EASTIN's, writing partner.

3  15.    Hawaii began airing on NBC in 2004, but aired only eight episodes through approximately
4  November 2004. The work and creative energy spent on the show by each of ROMERO and
5  EASTIN was intense and the show's lack of commercial success was an incredible disappointment
6  to both ROMERO and EASTIN who considered the show their hot tub love child. ROMERO and
7  EASTIN were both very sad to see the Hawaii venture end.

8  16.    Because EASTIN positioned himself so he was in control of the show and the point man
9  with the production studios, after the Hawaii television show failed commercially, people within
10 the entertainment industry abandoned EASTIN. However, ROMERO was loyal, and stuck by
11 EASTIN. Even in the hard lean times when both were unemployed, not working on any particular
12 show, and not making any money, ROMERO was willing to work as a writing partner with his
13 friend EASTIN.

14 17.    Shortly after the end of Hawaii, ROMERO (as he often was) was sitting in EASTIN's hot
15 tub with EASTIN, discussing among other things, the state of the market for the entertainment
16 industry and their prospects. During that conversation, EASTIN stated that he believed that from
17 that point forward it was going to be difficult for the two of them to sell their television shows. In
18 this moment of honesty, away from the temptations, pressures, seductions of the television studios,
19 EASTIN told ROMERO that he and ROMERO were a great team, and he wanted to, and needed
20 to, continue working with ROMERO on new concepts because he could not do it on his own. As
21 he reminisced, EASTIN talked about the pair's history and accomplishments, and he admitted to
22 ROMERO that ROMERO should have received more compensation for the previous shows they
23 worked on. EASTIN went on to say that in the future ROMERO would receive equal
24 compensation and equal share of the compensation for their work.

25 18.    Immediately thereafter, the hot tub provided stage for a brand new venture that would
26 ultimately become the "White Collar" television show.

27 19.    Consistent with EASTIN's recognition that ROMERO should have been entitled to greater
28 compensation for work on their previous shows, ROMERO and EASTIN agreed that they would

COMPLAINT                                                                    5

1  both share equally, anything and everything that they created , and that they would share equally

2  the fruits of their labor.

3  20.  As before, EASTIN needed ROMERO's creative thought and ability to generate concepts,

4  storylines, characters, plot and show definition. ROMERO and EASTIN worked in concert to

5  further their business endeavor. At that point ROMERO and EASTIN formed a general

6  partnership pertaining to this new venture that became the "White Collar" television series, and

7  EASTIN thus owed to ROMERO a fiduciary duty to act in the utmost good faith and in the best

8  interests of ROMERO from that day forth with regard to the "White Collar" television series.

9  21.  Because the two recognized that ROMERO was more of the "idea guy" and EASTIN was

10  more of the "pitch guy", ROMERO and EASTIN agreed that EASTIN would act as the front man

11  / pitch man for the venture and that ROMERO would concentrate on generating ideas, concepts,

12  storylines and show definition.

13  22.  Throughout the months that followed ROMERO's and EASTIN's hot tub agreement to work

14  together, as equals, going forward, ROMERO and EASTIN brainstormed a number of ideas and

15  concepts, but did not identify any particular idea or concept as worthy of a pitch to any studio.

16  23.  Then, in or about the beginning of 2007, ROMERO and EASTIN engaged in efforts to

17  brainstorm specific ideas aimed at Fox Studios. After quite a bit of collaboration and

18  brainstorming, two ideas arose to the surface that ROMERO and EASTIN considered worthy of

19  presentation to studios. One of the ideas was a premise based on the question: "What would

20  happen if Vick Mackey (from the Shield) had been arrested for being a corrupt cop and was later

21  released to help police in a gang war?" EASTIN and ROMERO called the concept "Redemption".

22  In fact, the original title for the concept "Redemption" was introduced by ROMERO and inspired

23  by a Johnny Cash music video. (Eventually "Redemption" blossomed into "White Collar").

24  24.  The concept "Redemption" was novel, and ROMERO and EASTIN decided push forward

25  and to develop the story, characters, and settings. ROMERO and EASTIN spent countless hours

26  doing so over the next few months.

27  25.  From April 2007 through July 2007, ROMERO and EASTIN continued to collaborate on the

28  "Redemption" concept, spending hundreds of hours, discussing, outlining and fleshing out ideas.

COMPLAINT                                                   -6-

1    In late July of that year, EASTIN began pitching the "Redemption" theme to Fox Studios. Fox

2    Studios expressed interest in the concept, but Fox Studios wanted ROMERO and EASTIN to

3    pursue a "Blue Sky" theme, instead of the dark and gritty concept. The new concept developed by

4    ROMERO and EASTIN focused more on white-collar criminals. In developing the "White Collar"

5    concept, ROMERO and EASTIN researched, reworked, rethought, and retooled the "Redemption"

6    theme.

7    26.    In or about early September 2007, after hundreds of hours of collaborative work and

8    revision, EASTIN began pitching the "Blue Sky" version of the concept that was originally titled

9    "Redemption". ROMERO and EASTIN were calling the new, blue sky version, of the concept

10   "Half Way". Later, "Half Way" was re-named "Commuted", and then "Commuted" was re-named

11   "White Collar".

12   27.    In early September of 2007, ROMERO and EASTIN scheduled numerous, meetings, phone

13   calls, and writing sessions to "break the story" together. As a result of those meetings, phone calls

14   and writing sessions, and through both parties' equal efforts, ROMERO and EASTIN produced an

15   outline that detailed much of the "White Collar" concept, including the inspiration and the story

16   for what became the "White Collar" pilot and television series. The discussions, collaborations,

17   and meeting sessions during this period were extensive and numerous, and they involved a great

18   amount of detail from ROMERO's and EASTIN's contributions to the project.

19   28.    Around September of 2007, EASTIN pitched the "White Collar" idea to the USA Network

20   and ROMERO's and EASTIN's concept received a favorable response.

21   29.    On or about October 3, 2007 ROMERO and EASTIN submitted to Fox Studios a Character

22   Recap / Pilot Synopsis for the television show / concept that was entitled "Stokes & Caffrey"

23   which was later entitled "White Collar". The Character Recap / Pilot Synopsis is dated 10/3/07

24   and states that it is by Jeff Eastin and Travis Romero. (A true and correct copy of the Character

25   Recap / Pilot Synopsis, pages 1-3 is attached to this Complaint as Exhibit A)

26   30.    In or about March 2008, ROMERO and EASTIN, decided to perform an emergency redraft

27   for the pilot episode for the concept that was then known as "White Collar". Although they had

28   received positive feedback from the USA Network regarding the "White Collar" concept and the

COMPLAINT                                                    7

1  Pilot scrip for the concept, ROMERO and EASTIN thought that the USA Network might not pick
2  up the show without a redraft of the pilot. ROMERO and EASTIN then reviewed the current state
3  of the script and decided that it would be in their best interests, even with a looming deadline, to
4  rework and redraft the script so that they would have a better chance of having Fox Studios and
5  the USA Network pick up the series for production. Over the next five (5) nights and four (4) days
6  ROMERO and EASTIN worked together virtually non-stop reworking the Pilot script. ROMERO
7  and EASTIN discussed the scenes, the characters, the plot, and the concept as they revised, re-
8  wrote, and re-structured "White Collar". Also during this time, EASTIN reiterated to ROMERO
9  that ROMERO should be glad that he (ROMERO) would be paid as a creator of "White Collar".
10 After they completed the revisions of the "White Collar" Pilot ROMERO and EASTIN submitted
11 the Pilot for approval by Fox Studios and the USA Network. In or about May 2008, Fox Studios
12 and the USA Network agreed to produce the "White Collar" television series, as created by
13 ROMERO and EASTIN.

14 31.   Thereafter, ROMERO and EASTIN further developed and defined, characters, storylines and
15 episodes for the "White Collar" television series. EASTIN continuously sought out, relied on, and
16 needed ROMERO's creative ideas / input regarding the evolution and development of the "White
17 Collar" television series, including, but not limited to, casting, locations, character clothing, story
18 lines, story arcs, relationships, relationships with other characters, story necessary props, and other
19 things critical to the success of "White Collar" television series.

20 32.   EASTIN's work with, and reliance on ROMERO is documented, in part, in hundreds of e-
21 mails exchanged between EASTIN and ROMERO. As a partnership, ROMERO and EASTIN
22 were present on numerous calls with studio executives, and followed-up on most of those calls
23 with working sessions, in order to elaborate on, and incorporate studio and network notes into, the
24 final versions of the "White Collar" television series scripts.

25 33.   ROMERO is informed and believes, and, on that basis alleges that after USA picked up the
26 television show "White Collar" for airing, EASTIN and DEFENDANTS, and each of them,
27 realized or became informed that the television show "White Collar" stood to generate millions of
28 dollars through such means and mechanisms as distribution, licensing, syndication, merchandising

1   and other forms of compensation.

2   34.   Throughout the process leading up to the USA Network and Fox Studios picking up the

3   "White Collar" television series for airing, EASTIN assumed control over the "White Collar"

4   television series as between himself and ROMERO, because he inserted himself as the point man

5   for communication between Fox Studios and the USA Network.

6   35.   After the "White Collar" television series was picked up for airing EASTIN relegated

7   ROMERO to being compensated as a writer instead of as a partner in the creation of the show. Not

8   surprisingly, EASTIN installed himself as Executive Producer / Show Runner. However,

9   throughout the production of the television series ROMERO and EASTIN worked with studio

10  executives, writers, and directors to further develop, refine and guide the "White Collar" television

11  series that they created. The collaborative efforts between ROMERO and EASTIN during this

12  time are documented in numerous e-mails between the two on virtually all subjects and details of

13  the "White Collar" television series, including but not limited to, casting, staging, direction,

14  directors, story lines, and story arcs.

15  36.   On or about May 08, 2008 EASTIN sent ROMERO a copy of the Pilot script for "White

16  Collar" the title page of which stated the "White Collar" television series was by *only* Jeff

17  EASTIN and no longer by Jeff EASTIN and Travis ROMERO. (A true and correct copy of the

18  May 8, 2008 "White Collar" script, cover page, page 1 and the last page, page 79 are attached to

19  this Complaint as Exhibit B)[2]. Then again on October 30, 2008 EASTIN e-mailed a version of the

20  Pilot script to ROMERO, and the two lead actors, Tim DeKay and Matt Bomer. The title page of

21  this script once again stated that the "White Collar" television series was by *only* Jeff EASTIN

22  and no longer by Jeff EASTIN and Travis ROMERO. (A true and correct copy of the October 30,

23  2008 email and the attached "White Collar" script, cover page, page 1 and the last page, page 78,

24  are attached to this Complaint as Exhibit C) EASTIN's manipulation of the title page for the

25  "White Collar" television series Pilot shows that he was trying to push ROMERO out as a co-

26  creator and co-owner of the television series "White Collar". It is no coincidence that at this time,

27

28  [2] EASTIN manipulated the title page of the "White Collar" television series Pilot to reflect that the television series was "by" *only* Jeff EASTIN with a "story by" Jeff EASTIN and Travis ROMERO.

COMPLAINT

9

1    after the "White Collar" television series was picked up by the studio and network for airing,

2    EASTIN began attempts to push ROMERO out as a co-creator and thus co-owner of "White

3    Collar".

4    37.    Throughout the next many months ROMERO and EASTIN continued their "White Collar"

5    venture and worked with the studio and the network and employees of the studio and network to

6    film episodes of the "White Collar" television series for airing in late 2009.

7    38.    Despite some initial attempts to quietly reduce the significance of ROMERO's contribution

8    to the creation of the "White Collar" television series, EASTIN had another moment of honesty on

9    or about October 18, 2009. During an interview with Kathryn Shattuck of the New York Times,

10   which took place shortly before October 18, 2009, EASTIN admitted to Shattuck that the idea for

11   the "White Collar" television series came from ROMERO. (A true and correct copy of the October

12   18, 2009 New York Times Article is attached to this complaint as Exhibit D) Specifically, in

13   response to Shattuck's question, "'White Collar'" seems so timely; Who or what, was your

14   inspiration?", EASTIN replied,

15               "The idea really came from a friend of mine, Travis Romero,

16               who I broke the story with."

17   39.    Around late October, 2009 EASTIN was called into a meeting with USA to discuss the

18   October 18, 2009 interview. After that meeting EASTIN told ROMERO that the article created a

19   lot of trouble for him. Around this time ROMERO again asked EASTIN about his ownership of

20   "White Collar". EASTIN told ROMERO that at this point it would be a difficult subject to bring

21   up given everything that was happening and that it could potentially affect his ability to bring

22   ROMERO back as a writer for another season. In light of EASTIN's indirect threats ROMERO

23   worried not only about his friendship with EASTIN but also about his job as a writer for "White

24   Collar" and the partnership that he had with EASTIN in the "White Collar" venture. Despite the

25   fact that potentially millions of dollars were at stake, ROMERO did not fear losing out on

26   compensation pertaining to "White Collar" and returning to his relatively poor lifestyle, so much

27   as he feared losing his best friend.

28   40.    ROMERO is informed and believes, and, on that basis alleges, on or about October 18, 2009,

1 and after EASTIN's comments to the New York Times, EASTIN realized that he would have to

2 share the benefits, profits, and compensation of the lucrative deals he entered into with Fox and

3 USA, pertaining to the television show White Collar.

4 41.   Over the next two months, from late October to late December 2009, EASTIN alienated

5 ROMERO and the relationship between the two deteriorated swiftly, because EASTIN did not

6 want to share compensation with ROMERO pertaining to the "White Collar" television series.

7 EASTIN made false accusations on ROMERO's abilities and contributions to the television show

8 "White Collar".

9 42.   Even though he was ostracized by EASTIN, ROMERO continued to further the development

10 and production of "White Collar". ROMERO did so not only because he believed in his "White

11 Collar" venture, and he wanted his venture to succeed, but also because he hoped to save his

12 friendship with EASTIN.

13 43.   In or about November 2009, the "White Collar" Pilot aired, which blossomed into a series

14 that continues to air new episodes as of the filing of this complaint.

15 44.   In response to EASTIN's sudden change in demeanor and tone towards ROMERO,

16 ROMERO wrote EASTIN an e-mail in late November 2009. ROMERO wrote that email to the

17 guy he considered his best friend (at least until White Collar took off). In fact, ROMERO

18 desperately hoped he could continue to consider EASTIN his best friend. ROMERO addressed the

19 early success of "White Collar" and the good times that he and EASTIN had as friends before that

20 success and before big money became a real possibility. ROMERO wrote,

21           "Got to say I enjoy the positive reviews and good ratings.[of White Collar]

22           And we should cause (sic) God knows we've endured our share of the

23           other. Miss hanging with you. Hope you are doing well. And just

24           remember, before any of this at some point we were both pretty happy

25           having adventures in the Mazda Protégé."

26 45.   On or about December 21, 2009 EASTIN wrote ROMERO an email stating that he was in a

27 meeting with Fox and USA regarding ROMERO and that there were issues with ROMERO. At

28 the same time the relationship between ROMERO and EASTIN continued to degrade, what used

1    to be a constant back and forth of e-mails between ROMERO and EASTIN reduced to a trickle

2    and then a one sided communication coming only from ROMERO. EASTIN shut ROMERO out.

3    46.    ROMERO continued his attempts to contact EASTIN to resolve the issues around the

4    ownership of the television show "White Collar" and ROMERO's due compensation for his

5    efforts in the shows creation. EASTIN never contacted ROMERO back with any intent to resolve

6    their issues and left ROMERO without an informal avenue to resolve their differences.

7    47.    At the end of 2009 ROMERO's contract with "White Collar" was not renewed and

8    ROMERO went back to California. Despite EASTIN's repeated and severe bad behavior towards

9    ROMERO, ROMERO continued to contact EASTIN on numerous occasions to resolve their

10    issues, including ROMERO's ownership of the television show "White Collar" and ROMERO's

11    compensation for creating the television show. Unfortunately, EASTIN never attempted to contact

12    ROMERO to resolve the issues and EASTIN left ROMERO with no ability to resolve their issues

13    informally.

14    48.    For much of 2010 ROMERO worked on other projects, one of which he produced himself.

15    However, throughout this period of time ROMERO was bothered by what happened with his

16    friendship with EASTIN and the television show "White Collar". ROMERO's mental anguish

17    about his relationship with EASTIN and the television show "White Color" came to a head when

18    he saw the film "The Social Network". As he watched that movie ROMERO realized that

19    EASTIN took advantage of him much like Mark Zuckerberg took advantage of Eduardo Saverin.

20    Somewhat inspired, ROMERO told himself that he would not be taken advantage anymore; that

21    he needed to stand up for his rights.

22    49.    After significant soul searching and contemplation ROMERO finally decided to contact an

23    attorney, although he did not want to. he was ultimately forced to; EASTIN left him no choice.

24    50.    ROMERO is informed and believes, and, on that basis alleges that the White Collar

25    television show has been distributed throughout the United States, as well as at least 28 foreign

26    countries[3].

27

28    [3]The foreign countries include, but may not be limited to, Canada, Mexico, Australia, Austria, Belgium, Brazil, Chili, Columbia, Denmark, Finland, France, Greece, Israel, India, Iceland, Italy, Japan, Latvia, The Netherlands, Norway, Philippines, Portugal, Slovenia, Singapore, South Africa, Sweden, Thailand, United Kingdom, and Latin American countries.

COMPLAINT                 12

51.  ROMERO is informed and believes that the television show "White Collar" has generated revenue, money, proceeds and other compensation through its domestic and foreign distribution both on broadcast television, via DVD and other means.

52.  As the filing date of this complaint "White Collar" is an ongoing business venture in its third season and scheduled for broadcasting on June 6. 2011. EASTIN continues to acquire and accumulate, money, compensation, remuneration as a result of the "White Collar" television show, and in light of the fact that it is one of the highest rated cable television series, (including the highest rated original programming series) EASTIN will continue to do so for the foreseeable future.

53.  ROMERO is informed and believes, and, on that basis, alleges that as of March 17, 2011 the "White Collar" television show was the top drama on cable to that date in the eighteen to forty-nine year old demographic, as well as the top Tuesday night drama among all key demographics.[4]

54.  ROMERO imposed confidence in the integrity of DEFENDANTS, and each of them, and DEFENDANTS, and each of them, voluntarily accepted ROMERO's confidence and agreed not to take advantage of ROMERO or to take any act relating to the interest of ROMERO without ROMERO's knowledge or consent.

55.  When it came to deal making, EASTIN never provided ROMERO with any details of the deals that EASTIN, and DEFENDANTS, and each of them, entered into regarding the television show "White Collar" and did not include ROMERO in the negotiation of such deals.

56.  ROMERO has not been provided with any information pertaining to the money, revenue profits, expenses, and, costs pertaining to or associated with the "White Collar" venture.

57.  ROMERO, through his work with EASTIN on the creation of the show "White Collar", has performed, has been excused from performing, or has been prevented from performing, all of the work he and EASTIN agreed upon.  As the show "White Collar" has been picked up and is currently in its third season EASTIN's obligation to compensate ROMERO has arisen and has

---

[4] Romero is informed and believes, and, on that basis, alleges that on Tuesday's at ten P.M. the "White Collar" television show delivered more twenty-five to fifty-four year old total viewers and households for the USA network than any other network on cable, and out-performed ABC and CBS among eighteen to thirty-four year olds.

COMPLAINT

13

1  been ongoing. To this date, ROMERO has not received his portion of the proceeds, remuneration,

2  and/or compensation for his creation and ownership of "White Collar" and the creative and

3  intellectual property associated therewith. This in turn has resulted with ROMERO being harmed

4  financially and emotionally.

5  58.  ROMERO is informed and believes, and, on that basis, alleges that EASTIN received

6  compensation from Fox Studios pertaining to the creation, development, production, and

7  exploitation of the "White Collar" television series.

8  59.  ROMERO is informed and believes, and, on that basis, alleges that EASTIN received

9  compensation from the USA Network pertaining to the creation, development, production, and

10  exploitation of the "White Collar" television series.

11  60.  Even though EASTIN received some monetary compensation, from the USA Network and

12  or from Fox Studios, to continue developing the show; ROMERO, has not received any

13  compensation. In fact, EASTIN had a fiduciary duty to share equally with ROMERO in any

14  proceeds derived from their mutual efforts on the venture "White Collar"; and, even though

15  EASTIN knew that ROMERO's financial position was dire, to the point that ROMERO was

16  borrowing money from friends and family just to house, clothe, and feed himself, he never shared

17  with ROMERO any of the proceeds he (EASTIN) received for "White Collar". ROMERO, even

18  though times were extremely difficult continued to work with EASTIN on their venture.

19  61.  Throughout the ROMERO EASTIN general partnership, EASTIN has not satisfied his

20  obligations pursuant to the general partnership, and his fiduciary duty to ROMERO, and has

21  denied ROMERO the benefits of the general partnership.

22

23  ## JURISDICTIONAL AND DOE ALLEGATIONS

24  62.  ROMERO is, and at all times mentioned in this complaint was, a resident of Los Angeles

25  County California.

26  63.  EASTIN is, and at all times relevant to this complaint was, a resident of Los Angeles County

27  California, with his primary residence at 5026 Medina Road, Woodland Hills, CA 91364.

28  64.  ROMERO is, and at all times relevant to this complaint was, doing business within the

1   County of Los Angeles in California.

2   65.   EASTIN is and at all times relevant to this complaint was, doing business within the County

3   of Los Angeles in California.

4   66.   Upon information and belief, at all times mentioned in this Complaint, each of Defendants

5   DOES 1 through 100, inclusive, was the agent and employee of the other defendants, and in doing

6   the things alleged herein was acting within the course and scope of that agency and employment.

7   Each of DOES 1 through 100, inclusive has ratified, approved, and authorized the acts of each of

8   the remaining defendants with full knowledge of said acts.

9   67.   ROMERO does not know the true names of Defendants DOES 1 through 100, inclusive, and

10  therefore sues them by those fictitious names.

11  68.   The capacities of DOES 51-100 are also unknown to ROMERO; each is in some manner or

12  capacity, and to some degree, legally responsible and liable for the damages of which ROMERO

13  complains.  ROMERO will amend this Complaint to allege the true names and capacities of these

14  DOE Defendants once they are ascertained.

15  69.   The monetary damages sought by ROMERO exceed the minimal jurisdictional limits of this

16  Court and will be established according to proof at trial.

17

18              **FIRST CAUSE OF ACTION FOR ACCOUNTING**

19                        **(Against all Defendants)**

20  70.   ROMERO refers to paragraphs 1 through 69, above, and hereby incorporates such

21  paragraphs herein by this reference as though said paragraphs were set forth in full herein.

22  71.   ROMERO and EASTIN agreed on working together to develop television shows aimed at

23  Fox Studios and the USA Network with the purpose of selling the shows to Fox Studios and the

24  USA Network.

25  72.   As a result of their venture to make money through the creation production and development

26  of the "White Collar" television series, ROMERO and EASTIN formed a general partnership.

27  73.   As a result of the fruits of the aforementioned general partnership, the television show

28  "White Collar" was created and produced. In turn, as a result of the distribution, licensing,

COMPLAINT                                                15

1  syndication, merchandising and other forms of compensation the television show "White Collar"

2  has generated and produced, money, revenue, remuneration, benefits and proceeds.

3  74.   As a result of the aforementioned partnership, Defendants, and each of them, have benefitted

4  from the production of "White Collar" and have received money, revenue, remuneration, benefits

5  and proceeds, a portion of which is due to ROMERO.

6  75.   Per the general partnership formed by ROMERO and EASTIN to develop and exploit, for

7  profit, the television show "White Collar" EASTIN owed ROMERO a fiduciary duty.

8  76.   The amount of money due from Defendants, and each of them to Plaintiff is unknown to

9  Plaintiff and cannot be ascertained without an accounting of the money, revenue, remuneration,

10  benefits and proceeds generated, and or other compensation received by Defendants, and each of

11  them, from the exploitation, sale, development, licensing, use, dispensation, of the television

12  show "White Collar".

13  77.   ROMERO is informed and believes and on that basis alleges that the amounts due Plaintiff

14  exceed the jurisdictional limits of this Court. In light of the television distribution of "White

15  Collar" both foreign and domestic, as well as the DVD distribution of the television show "White

16  Collar" and the licensing deals that appear to be associated with the television show "White

17  Collar" including deals with the auto manufacturer Ford, Plaintiff is informed and believes the

18  amounts due to plaintiff are in the millions.

19  78.   Plaintiff has demanded an accounting of the aforementioned monies from Defendant and

20  payment of the amount found due, but Defendant has failed and refused, and continues to fail and

21  refuse, to render such an accounting and to pay such sum.

22

23  ## SECOND CAUSE OF ACTION FOR BREACH OF FIDUCIARY DUTY

24  ### (Defendant Jeff Eastin)

25

26  79.   ROMERO refers to paragraphs 1 through 69, above, and hereby incorporates such

27  paragraphs herein by this reference as though said paragraphs were set forth in full herein.

28  80.   As a general partner in the "White Collar" television show EASTIN owed ROMERO

COMPLAINT                                                                16

1    fiduciary duties, including but not limited to. the duty of loyalty, the duty of good faith and fair

2    dealing, and the duty of care.

3    81.   EASTIN violated the above-mentioned fiduciary duties to ROMERO in that EASTIN,

4    among other things, failed to satisfy his fiduciary duties to ROMERO by not acting in in

5    ROMERO's·best interests when dealing with the sale, distribution and exploitation of the

6    television show "White Collar".

7    82.   As a direct and legal result of the misconduct of EASTIN, including the breach of fiduciary

8    duties owed from EASTIN to ROMERO, ROMERO sustained damages in an amount in excess of

9    the jurisdictional threshold of this Court, in an amount to be proven at trial.

10

11    **THIRD CAUSE OF ACTION FOR DECLARATORY RELIEF**

12    **(Defendant Jeff Eastin)**

13

14    83.   ROMERO refers to paragraphs 1 through 69, above, and hereby incorporates such

15    paragraphs herein by this reference as though said paragraphs were set forth in full herein.

16    84.   A controversy and dispute has arisen between ROMERO and EASTIN concerning the

17    validity of the ROMERO EASTIN general partnership.

18    85.   A judicial declaration concerning the validity, and existence of the ROMERO EASTIN

19    general partnership is necessary and proper at this time.

20

21    **FOURTH CAUSE OF ACTION FOR DECLARATORY RELIEF**

22    **(Defendant Jeff Eastin)**

23

24    86.   ROMERO refers to paragraphs 1 through 69, above, and hereby incorporates such

25    paragraphs herein by this reference as though said paragraphs were set forth in full herein.

26    87.   A controversy and dispute has arisen between ROMERO and EASTIN concerning

27    EASTIN's fiduciary duty owed to ROMERO as a general partner.

28    88.   A judicial declaration concerning the existence of EASTIN's fiduciary duty to ROMERO is

COMPLAINT      17.

1   necessary and proper at this time.

2

3                              **PRAYER FOR RELIEF**

4   WHEREFORE, ROMERO prays for relief and judgment against Defendants, and each of them, as

5   follows:

6   ON THE FIRST CAUSE OF ACTION

7   1.    For an accounting;

8   2.    For the amount due to Plaintiff as a result of the Accounting;

9   3.    For interest on any and all amounts found to be due;

10  4.    For reasonable attorney fees and costs of suit herein incurred;

11  5.    For such other and further relief as the court may deem proper.

12

13  ON THE SECOND CAUSE OF ACTION

14  1.    For compensatory damages in an amount to be proven at trial;

15  2.    For costs of suit herein;

16  3.    For punitive damages; and

17  4.    For such other and further relief as this court may deem just and proper.

18

19  ON THE THIRD CAUSE OF ACTION

20  1.    For a judicial declaration that a general partnership exists between ROMERO and EASTIN

21  for the venture that is the television show "White Collar";

22  2.    For reasonable attorney's fees and costs of suit herein; and

23  3.    For such other and further relief as this Court may deem just and proper.

24  ///

25  ///

26  ///

27  ///

28  ///

                              COMPLAINT                                          18

1  <u>ON THE FOURTH CAUSE OF ACTION</u>

2  1.   For a judicial declaration that EASTIN owes ROMERO fiduciary duties in regard to all

3  activities, dealings and decisions made with respect to the venture that is the television show

4  "White Collar".

5  2.   For reasonable attorney's fees and costs of suit herein; and

6  3.   For such other and further relief as this Court may deem just and proper.

7

8

9  DATED: June 8, 2011            THE LAW OFFICES OF RHETT T. FRANCISCO
                                  THE LAW OFFICES OF PAWEL R. SASIK

10

11                              By: _____
                                    Rhett T. Francisco,
12                                  Pawel R. Sasik
                                    Attorneys for Plaintiff
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT                                                    19

# EXHIBIT A

# Stokes & Caffrey

### Character Recap / Pilot Synopsis
### 10/3/07

by
**Jeff Eastin**
**Travis Romero**

**Peter Stokes**



**Neal Caffrey**

"You can have caviar and champagne
every day if you're not picking up the
check."

     – Neal Caffrey.


"You can lie to them. Never lie to me."

     – Kate


"I'm not jealous. I don't get jealous.
Shut up and drive."

     – Peter Stokes

# Our Characters



### Neal Caffery

Conman, imposter and forger extraordinaire. Neal likes nice things, and he usually gets them through charm and intelligence. He is serving the remaining 5 years of a federal fraud conviction as an FBI Special Consultant under the supervision of the man who caught him, Peter Stokes... a man Neal respects, detests and annoys in equal measure.

Neal likes the ladies, but throughout the series he will search for his true love, Kate, who's criminal talents may equal his own.



### Peter Stokes, FBI

Head of the FBI Fraud & Forgery Unit, San Diego. He's smart. He believes in hard work and trusts his gut. He's funny after a few beers and infamous for his temper. Neal was his white whale.

He is a happy family man with a wife and son he adores, although he feels an unsettling attraction to his junior agent Diane Berrigan and finds himself jealous of her fascination with Neal.



### Diane Berrigan, FBI

She is a junior agent, which means she does the grunt work Stokes doesn't have time for.

Following in Stokes' footsteps she joined the FBI as a forensic accountant then transferred to the field when she got bored crunching numbers. She is opinionated and justifiably conceited. She has a wicked sense of humor. She idolizes Stokes and finds her attraction to Neal disquieting.



### Kate Perdu

Neal was her partner, lover and soul mate. She believed in him completely until he lied to her and destroying her trust. She changed her identity and disappeared from his life.

Kate is beautiful and tragic. She can't let go of Neal but can't let herself get hurt again. She keeps tabs on Neal through rare secret communications with Stokes.

2

# The Pilot

### The Tease:

We open on the most low-key prison escape in history as NEAL CAFFREY simply walks out the front door. He's wearing a guard uniform that he ordered off the Internet using the Warden's gold MasterCard number. He hotwires an old truck in the parking lot and drives out the gate. But a battered pickup belching smoke is not how Neal Caffrey travels. He finds three dollars in the ashtray. Time for an upgrade.

We cut to Neal inside a thrift store trying on cheap windbreakers. He picks a particularly loud yellow one and pays the clerk the three bucks.

We reveal Neal wearing his new yellow jacket and the brown prison guard pants and shoes as he waits at the long term parking garage at the airport. A man pulls up in a Mercedes SL65 convertible and tosses Neal the keys. "Take care of my car. I'll be back in a month."

Cut to Neal cruising on the freeway in his new Mercedes, top down, wind in his hair, Vivaldi pumping out of the speakers. Three minutes in and now we know how Neal Caffrey rolls.

We move to the other side of the law and introduce PETER STOKES, head of the FBI Fraud and Forgery Unit and the man responsible for sending Neal to prison in the first place. Stokes and his junior agent DIANE BERRIGAN are with the Warden as guards tear Neal's cell apart. Stokes orders up the usual manhunt but doesn't think it will do much good. Neal is too smart. Probably the smartest guy Stokes has ever met. But Neal has his Achilles heel and Stokes has a hunch he knows were he's going. Neal Caffrey is going home.

We cut to a small rundown apartment complex. The Mercedes is parked at the curb as Stokes' own car pulls in next to it.

Inside the apartment Neal is sitting on the empty floor staring at the bare walls.

"Kate's gone," Stokes says as he walks in. "She changed her name, erased herself. Disappeared."

3

# EXHIBIT B

# White Collar

By

Jeff Eastin

Story by

Jeff Eastin
&
Travis Romero

May 8, 2008

"WHITE COLLAR"

IN BLACK:

We hear the SNICK SNICK of scissors.

FADE IN:

INT. WE DON'T KNOW WHERE - CLOSE ON

A MAN'S HEAVILY BEARDED FACE. Just his face. Eyes deep and
intelligent, but with a slight desperation and resolve.

SNICK SNICK SNICK.

He keeps the scissors moving. Rough-trimming the beard.
Rushing but not panicking. Revealing more of his face.

CLOSE ON:

Toilet Bowl -- as clumps of hair fall into the water.

CLOSE ON:

The Man. The beard is roughly trimmed short. We're beginning
to see the face underneath. It's an exceptional face.

He holds up a shard of mirror with taped edges and a
disposable razor and goes to work on the remaining stubble.

EXTREMELY CLOSE ON:

The razor as the man cleans it in the water on the back of
the toilet tank.

WIDER:

Reveal we're in a bathroom stall. The man is seated backward
on the toilet, his back to us. He's wearing the orange
jumpsuit of a federal prisoner.

The lid of the tank is off. He finishes with the razor.
Splashes water from the tank on his face.

CLOSE ON:

The mirror. The image in it steadies on his face. This is
NEAL CAFFREY. Another time, another place, he might give
Cary Grant a run for his money. He is a man at whom you will
look twice.

WIDER:

Neal reaches deep into the tank and pulls out two ziplock
bags.

180

79.

                    PETER
          Good, because next Saturday I've got
          some follow-up work on a case in
          Boulder, thought I'd drag you along.

Neal just looks at him, not sure he heard correctly.

                    NEAL
          Boulder?

                    PETER
          Any problem with that?

                    NEAL
          No. I just... why are you doing this?

Peter doesn't answer immediately. He looks over at his wife.
She catches his eye and smiles and we see it... Peter gets
the arrow straight through the heart all over again.

                    PETER
          Because you're right. When she's the
          one you can never let go.

They sit in comfortable silence for a moment.

                    PETER (CONT'D)
          By the way... I would have caught
          you.

OFF both of them grinning at that--

                                        FADE OUT.

          THE END

# EXHIBIT C

# White Collar

By

Jeff Eastin

Story by

Jeff Eastin
&
Travis Romero

October 30, 2008

"WHITE COLLAR"

IN BLACK:

We hear the SNICK SNICK of scissors.

FADE IN:

INT. WE DON'T KNOW WHERE - CLOSE ON

A MAN'S HEAVILY BEARDED FACE. Just his face. Eyes deep and
intelligent, but with a slight desperation and resolve.

SNICK SNICK SNICK.

He keeps the scissors moving. Rough-trimming the beard.
Rushing but not panicking. Revealing more of his face.

CLOSE ON:

Toilet Bowl -- as clumps of hair fall into the water.

CLOSE ON:

The Man. The beard is roughly trimmed short. We're beginning
to see the face underneath. It's an exceptional face.

He holds up a shard of mirror with taped edges and a
disposable razor and goes to work on the remaining stubble.

EXTREMELY CLOSE ON:

The razor as the man cleans it in the water on the back of
the toilet tank.

WIDER:

Reveal we're in a bathroom stall. The man is seated backward
on the toilet, his back to us. He's wearing the orange
jumpsuit of a federal prisoner.

The lid of the tank is off. He finishes with the razor.
Splashes water from the tank on his face.

CLOSE ON:

The mirror. The image in it steadies on his face. This is
NEAL CAFFREY. Another time, another place, he might give
Cary Grant a run for his money.

WIDER:

Neal reaches deep into the tank and pulls out two ziplock
bags. One contains a pair of brown dress shoes, another holds
a package from the Quartermaster Uniform Supply company.

184

78.

She's happy, laughing and glowing like a teenager.

Without a word, Peter reaches into his pocket and pulls out
a leather ID wallet and hands it to Neal. Inside is Neal's
picture and a card that reads: NEAL CAFFREY, FBI CONSULTANT.

                    PETER
          Figured if we didn't give you this,
          you'd end up making one of your own.

                    NEAL
               (touched)
          I'm official?

                    PETER
          Yeah. It's not going to be easy. How
          do you feel about working weekends?

                    NEAL
          I'm all yours.

                    PETER
          Good, because next Saturday I've got
          some follow-up work on a case in
          Boulder, thought I'd drag you along.

Neal just looks at him, not sure he heard correctly.

                    NEAL
          Boulder?

                    PETER
          Any problem with that?

                    NEAL
          No. I just... why are you doing this?

Peter doesn't answer immediately. He looks over at his wife.
She catches his eye and smiles and we see it... Peter gets
the arrow straight through the heart all over again.

                    PETER
          Because you're right. When she's the
          one you can never let go.

They sit in comfortable silence for a moment.

                    PETER (CONT'D)
          By the way... I would have caught
          you.

OFF both of them grinning at that--

                                        FADE OUT.

                    THE END

# EXHIBIT D

# A Crime Show Charles Ponzi Could Love



**B**ERNARD L. MADOFF was so far below the public's radar when Jeff Eastin pitched the crime series "White Collar" to USA two years ago that he described the main character as "an evil Donald Trump."

Luckily for Mr. Eastin the corporate misdeeds of financiers like Mr. Madoff and the miscalculations of others have provided a topical backdrop for "White Collar," a show about Neal Caffrey (Matt Bomer), a bond forger just escaped from prison, and Peter Burke (Tim DeKay), the agent who put him behind bars. The show's pilot episode, shot before the Madoff scandal unfolded, has its premiere on USA on Friday night at 10. Mr. Eastin's credits include creator and executive producer of the NBC series "Hacked" and screenwriter for the 1999 Jamie Foxx comedy "Held Up."

The new show's cat-and-mouse game becomes a partnership when Neal, spared again by Peter, offers his criminal expertise to the Feds rather than returning to prison. In the crime Neal has finagled his way out of the government's fleabag housing and into a penthouse with a closet full of gently used St. Devore suits.

"I work hard," Peter blusters in a scene in which he takes in Neal's surroundings, accompanied by Sinatra's recording of "The Good Life." "I do my job well, and I don't have a $18 million view of Manhattan that I share with a 22-year-old art student while we sip espresso."

"To which Neal replies, without a hint of irony: 'Why not?'"

Following are excerpts from Mr. Eastin's recent interview with Kathryn Shattuck, in which he spoke about those who toil in other people's dough.

**Q. "White Collar" seems so timely. Who, or what, was your inspiration?**

A. The idea really came from a friend's mishap. Jamie Kennedy, who I broke this story with, this was just before the writers' strike, and we were sitting around his house but not like we usually do, trying to figure...

...ure out what's next. The whole idea of the buddy comedy was something I was pretty familiar with, and I wanted to do television. And after the show is renegotiating you write a new one at a time. If you want to do that dark ending stuff, you can't beat it.

But I really wanted to do the other way, with white-collar crime. It's the one place where the crime feels kind of beautiful. If you force the "Sopranos" idea, kind of spectacular. Actually we were shooting the pilot when Madoff got arrested and literally had 30 people call me that day and say, "Hey, you got a great story for you."

**Q. What was Neal like anyway?**

A. I've always been fascinated by guys you could drop anywhere in the world with nothing but a pen in their pocket... just the clothes on their back and by the end of the... one day they'd be driving a Maserati, staying at the Plaza and dating the most beautiful woman in the world. They love it. What else are they going to do by sheer force of personality. Neal is someone you could easily hate. Instead, Matt Bomer brings to much both charm to him that you end up liking the guy despite that.

**Q. Do Peter and Neal start enjoying each other's lives as they go on?**

Envy is an interesting word. I don't know if it's envy as much as it is that Peter can't understand Neal. And when Neal sees the relationship between Peter and his wife, Elizabeth (Tiffani Thiessen), I think it really kills him that the one thing he desperately wants, which is Kate (his ex-girlfriend, played by Alexandra Daddario) and a normal life, he can't achieve.

**Q. What's the story behind Kate?**

A. In the mythology of the show they're together, working for this Madoff-type character, who pulls a Ponzi scheme and takes them for everything. They're two people in love, life was perfect, and then the rug's pulled out from under them. That's when Neal became a criminal.

**Q. And Elizabeth?**

A. Tiffani asked where Elizabeth came from, and I said, "Honestly, I based this character on Abigail Adams." I'd seen the John Adams mini-series and what I found

fascinating about Abigail Adams is that you had a woman who was very strong on her own right but at the same time a passionate, devoted to her husband by all accounts was an incredible person. Elizabeth is the same. She's what she was getting into when she married Peter.

**Q. You said the character of Peter Burke's your alter ego. How did someone like that end up in Hollywood?**

A. I grew up in Longmont, Colo., a town right next to Boulder. One day I decided I wanted to make movies, packed up an old Volkswagen, drove out to California, and on my drive out in 1987.5 — because that's where gas and Lucas were. I parked on the corner when I came back, my bus was wrong with everything else I had in my life, my darkly eternal credit, I called from a pay phone, siren in ground, and I said, "I want to come." And he said, "Well, get a job, do it," the road trip thing for the Harrison thing he'll ever done for me. I do not done that, I'd probably be strung out in Longmont right now.

**ONLINE: VIDEO**

A preview of "White Collar": nytimes.com/television

From left: Alexandra Daddario, Matt Bomer and Tim DeKay in "White Collar," a series beginning Friday on USA in which a convicted forger helps the Feds.

187

From: "eastin.jeff" <eastin.jeff@yahoo.com>
Subject: New York times today
Date: October 18, 2009 11:36:13 AM PDT
Cc: recipient list not shown: ;
1 Attachment, 481 KB

# A Crime Show Charles Ponzi Could Love

[illegible]





Case 2:11-cv-10275-SJO-RZ  Document 1-2  Filed 12/13/11  Page 55 of 124  Page ID
Jeff Eastin on His New U___ eries, 'White Colla #:200estion - NYTimes.
Page 1 of 3

## The New York Times

This copy is for your personal, noncommercial use only. You can order presentation-ready copies for distribution to
your colleagues, clients or customers here or use the "Reprints" tool that appears next to any article. Visit
www.nytreprints.com for samples and additional information. Order a reprint of this article now.



October 18, 2009

# A Crime Show Charles Ponzi Could Love

By KATHRYN SHATTUCK

BERNARD L. MADOFF was so far off the public's radar when Jeff Eastin pitched the crime series "White Collar" to USA two years ago that he described the main character as "an evil Donald Trump."

Luckily for Mr. Eastin the corporate misdeeds of financiers like Mr. Madoff and the miscalculations of others have provided a topical backdrop for "White Collar," a show about Neal Caffrey (Matt Bomer), a bond forger just escaped from prison, and Peter Burke (Tim DeKay), the agent who put him behind bars. The show's pilot episode, shot before the Madoff scandal unfolded, has its premiere on USA on Friday night at 10. Mr. Eastin's credits include creator and executive producer of the NBC series "Hawaii," now defunct, and screenwriter for the 1999 Jamie Foxx comedy "Held Up."

The new show's cat-and-mouse game becomes a partnership when Neal, snared again by Peter, offers his criminal expertise to the Feds rather than return to prison. In no time Neal has finagled his way out of the government's fleabag housing and into a penthouse with a closet full of gently used Sy Devore suits.

"I work hard," Peter blusters in a scene in which he takes in Neal's surroundings, accompanied by Sinatra's recording of "The Good Life." "I do my job well, and I don't have a $10 million view of Manhattan that I share with a 22-year-old art student while we sip espresso."

To which Neal replies, without a hint of irony, "Why not?"

Following are excerpts from Mr. Eastin's recent interview with Kathryn Shattuck, in which he spoke about those who roll in other people's dough.

Q. "White Collar" seems so timely. Who, or what, was your inspiration?

A. The idea really came from a friend of mine, Travis Romero, who I broke the story with. This was just before the writers' strike, and we were sitting around in the hot tub like we usually do, trying to figure out what's next. The whole idea of the buddy comedy was

Case 2:11-cv-10275-SJO-RZ Document 1-2 Filed 12/13/11 Page 56 of 124 Page ID #:2Q
Jeff Eastin on His New U___ eries, 'White Collar' - NYTimes.
Page 2 of 3

something I was pretty familiar with and wanted to do for television. And "The Shield" is probably my favorite show of all time. If you want to do that dark and dirty stuff, you can't beat it.

But I really wanted to go the other way. With white-collar crime, it's the one place where the crime itself can be beautiful. If you forge the Mona Lisa, that's kind of spectacular. Actually we were shooting the pilot when Madoff got arrested, and I literally had 30 people call me that day and say, "Hey, I've got a great story for you."

Q. What gives Neal his allure?

A. I've always been fascinated by guys you could drop anywhere in the world with nothing, not a penny in their wallet, just the clothes on their back, and by the end of one day they'd be driving a Mercedes, staying at the Plaza and dating the most beautiful woman in the world. They get to where they're going by sheer force of personality. Neal is someone you could easily hate, but I think Matt Bomer brings so much boyish charm to him that you end up liking the guy despite that.

Q. Do Peter and Neal start envying each other's lives as they go on?

A. Envy is an interesting word. I don't know if it's envy as much as it is that Peter can't understand Neal. And when Neal sees the relationship between Peter and his wife, Elizabeth [Tiffani Thiessen], I think it really kills him that the one thing he desperately wants, which is Kate [his ex-girlfriend, played by Alexandra Daddario] and a normal life, he can't achieve.

Q. What's the story behind Kate?

A. In the mythology of the show they're together, working for this Madoff-type character, who pulls a Ponzi scheme and takes them for everything. They're two people in love, life was perfect, and then the rug's pulled out from under them. That's when Neal became a criminal.

Q. And Elizabeth?

A. Tiffani asked where Elizabeth came from, and I said, "Honestly, I based this character on Abigail Adams." I'd seen the John Adams mini-series, and what I found fascinating about Abigail Adams is that you had a woman who was very strong in her own right but at the same time was a passionate defender of her husband, who by all accounts was an incredible workaholic. Elizabeth is the same. She knew what she was getting into when she married Peter.

Q. You said the character of Peter Burke is your alter ego. How did someone like that end up in Hollywood?

A. I grew up in Longmont, Colo., a little town right next to Boulder. One day I decided I wanted to make movies, so I packed up an old Volkswagen bus, drove out to California, and on my first day went to U.S.C., because that's where Spielberg and Lucas were. I parked off campus, and when I came back, my bus was gone, along with everything else I had in the world. To my dad's eternal credit, I called crying from a pay phone, sirens in the background, and I said, "I want to come home." And he said, "Well, get a job, buy a ticket and come home." He told me later it was the hardest thing he'd ever done, but had he not done that, I'd probably be selling insurance in Longmont right now.

This article has been revised to reflect the following correction:

Correction: November 8, 2009
A picture caption on Oct. 18 with excerpts of an interview with Jeff Eastin, creator of the television show "White Collar," misidentified the actress shown with Matt Bomer and Tim DeKay. She is Marsha Thomason — not Alexandra Daddario, who also appears in the series.

Copyright 2009 The New York Times Company

1  RHETT T. FRANCISCO, SBN 232749
   THE LAW OFFICES OF RHETT T. FRANCISCO
2  5350 TOPANGA CANYON BOULEVARD
   WOODLAND HILLS, CALIFORNIA 91364
3  TEL: (818) 319-9879

4  PAWEL R. SASIK, SBN 240672
   THE LAW OFFICES OF PAWEL R. SASIK
5  5350 TOPANGA CANYON BOULEVARD
   WOODLAND HILLS, CALIFORNIA 91364
6  TEL: (310) 571-5206

7  Attorneys for Plaintiff, Dennis Travis Romero

CONFORMED COPY
OF ORIGINAL FILED
Los Angeles Superior Court

SEP 08 2011

John A. Clarke, Executive Officer/Clerk
By _____, Deputy
Roman Hernandez

8              SUPERIOR COURT OF THE STATE OF CALIFORNIA

9          FOR THE COUNTY OF LOS ANGELES — CENTRAL DISTRICT
                        (UNLIMITED JURISDICTION)
10

11 DENNIS TRAVIS ROMERO a.k.a. TRAVIS
   ROMERO, an individual,
12

13              Plaintiff,

14 v.

15 JEFF EASTIN, an individual; KARL R. AUSTEN,
   an individual; JACKOWAY TYERMAN
16 WERTHEIMER AUSTEN MANDELBAUM
   MORRIS & KLEIN, A PROFESSIONAL
17 CORPORATION, a California Professional
   Corporation; ROB KENNEALLY, an individual;
18 TOM YOUNG, an individual; CREATIVE
   ARTISTS AGENCY, LLC, a Delaware Limited
19 Liability Company; FOX TELEVISION STUDIOS,
   INC., a Delaware Corporation; FOX TELEVISION
20 STUDIOS PRODUCTIONS, INC., a Delaware
   Corporation; TWENTIETH CENTURY FOX
21 INTERNATIONAL TELEVISION, INC. a New
   York Corporation; TVM PRODUCTIONS, INC., a
22 Delaware Corporation; MATT LOZE, an
   individual; DAVID MADDEN, an individual; and
23 DOES 1 through 100, inclusive,

24
                Defendants.
25

26

27

28

Case No.: BC 463026

FIRST AMENDED COMPLAINT FOR

1. Accounting;
2. Fraud: Intentional Misrepresentation;
3. Fraud: Negligent Misrepresentation;
4. Fraud: Promise Without Intent to Perform;
5. Conspiracy to Defraud;
6. Unfair Business Practices in Violation of Business & Professions code § 17000, and 17200;
7. Violation of the Talent Agency Act (California Labor Code § 1700 et seq.;
8. Professional Malpractice;
9. Professional Malpractice;
10. Breach of Fiduciary Duty;
11. Breach of Fiduciary Duty;
12. Breach of Fiduciary Duty;
13. Intentional Interference With Prospective Business Advantage;
14. Negligent Interference With Prospective Business Advantage;
15. Declaratory Relief; and
16. Declaratory Relief.

JURY TRIAL DEMANDED

---

FIRST AMENDED COMPLAINT                                    1

192

COMES NOW Plaintiff DENNIS TRAVIS ROMERO (hereinafter "ROMERO" or

"PLAINTIFF") and alleges as follows:

## COMMON ALLEGATIONS

1.      In some special instances two individuals come together and have such complementary skills

that together they are capable of achieving much more than either one could on their own. This

type of partnership holds true in many of our great American success stories, many of which reach

great heights, have humble beginnings, and often manifest their raison d'etre in a garage, a back

room or even a hot tub; such is the story of Travis Romero (hereinafter "ROMERO" or

"PLAINTIFF") and Jeff Eastin (hereinafter "EASTIN" or "DEFENDANT").

2.      The friendship between ROMERO and EASTIN's began in 1991 at a YMCA where they

both worked as camp counselors. They were two young men with nothing to lose, everything to

gain, and dreams of Hollywood success. After some time EASTIN left his job at the YMCA to

begin work as a screen writer. Over the next many years ROMERO and EASTIN's friendship

blossomed.

3.      Around 1993, EASTIN was already working substantially in the entertainment industry as a

writer and had been focusing on making connections in the industry that would allow him to pitch

his own ideas; with these connections came a level of sophistication and understanding of the

entertainment industry.  At this point, EASTIN and ROMERO had been very close friends for

some time, and when an opportunity for EASTIN to pitch a studio arose, he informally discussed

the opportunity with ROMERO. ROMERO and EASTIN, without any written agreement,

discussed the project and brainstormed ideas for EASTIN to pitch. As between the two, ROMERO

was more of the "idea guy" and EASTIN was more of the "pitch guy". They soon realized that as

a creative writing team they had chemistry and worked well together, with ROMERO's creativity

and EASTIN's more technical skills. EASTIN's pitch was not picked up. However, EASTIN's

and ROMERO's work allowed EASTIN access to Hollywood decision makers.

4.      Over the next many years, ROMERO and EASTIN would continue, on and off, as a writing

team. The two entered into numerous ventures, with ROMERO and EASTIN creating a television

show concept, EASTIN pitching the concept to various Hollywood entities, and ROMERO and

FIRST AMENDED COMPLAINT                                    2

1    EASTIN then further developing the story, the characters, the situations, and story arcs, and

2    defining the show and the series for even further development, sale and production.

3    5.    In 1995, EASTIN and ROMERO were about to have their first taste of true success. Again,

4    they began a new venture, along with EASTIN's soon-to-be wife Maral Adams, on an initial idea

5    that EASTIN came up with that required further development. After much work by ROMERO,

6    EASTIN, and Adams, the idea became the concept for Shasta McNasty, a television show about

7    three "slacker dudes" who also make up a rock band named Shasta, and, instead of working on

8    their music, spend most of their time hanging out. ROMERO, EASTIN, and Adams were very

9    close friends and worked without a written agreement. ROMERO considered EASTIN his best

10   friend and trusted him completely. Unfortunately, that was often to ROMERO's detriment. For,

11   although ROMERO, EASTIN, and Adams worked as equals on defining concept, characters, story

12   line, and a variety of plot lines that could be incorporated into the Shasta McNasty television

13   series, and although all three participated in the development of the show with the hopes of it

14   being picked up (i.e. purchased or optioned) by a production studio, EASTIN ultimately claimed

15   to be the sole creator.

16   6.    Once ROMERO, EASTIN and Adams agreed they had a pilot for the Shasta McNasty

17   television show that they felt could be pitched to a production studio, EASTIN took the concept

18   and pitched it. Shasta McNasty was green lit sometime in 1995 and EASTIN assumed a position

19   of control, acting as point man for communications with the production studio and facilitating

20   writing positions for both ROMERO and Adams. Even though the efforts to create the show were

21   equal among the three participants EASTIN took sole creator credit for Shasta McNasty.

22   7.    ROMERO, EASTIN and Adams worked on Shasta McNasty from 1994 to 1995. EASTIN

23   relied heavily on both ROMERO and Adams in continued concept, character, and plot definition

24   for Shasta McNasty. This was only natural since the three of them played equal parts in the origins

25   of the show. With the success of Shasta McNasty, EASTIN solidified his Hollywood presence and

26   EASTIN became known as an Executive Producer / Show Runner[1]. Because EASTIN claimed

27

28        [1] A Show Runner is someone who is responsible for the day-to-day operations of a television show and is often credited as an Executive Producer.

FIRST AMENDED COMPLAINT                                              3

1   sole credit for creating the shows that he worked on with ROMERO and Adams, including Shasta

2   McNasty. EASTIN was put in the position of Show Runner by the studios and networks.

3   ROMERO and Adams, were relegated to the background and were not paid, or otherwise

4   recognize as creators of the shows, including Shasta McNasty. Pursuant to EASTIN's direction,

5   ROMERO and Adams were known and paid only as writers.

6   8.    In large part, EASTIN's rise to the position of Executive Produce / Show Runner would not

7   have occurred without ROMERO's efforts and his work with EASTIN to develop the Shasta

8   McNasty television show.

9   9.    During that same period, and due to the success of Shasta McNasty, EASTIN was able to

10  purchase a house in Woodland Hills California. Along with the home came a hot tub, and this hot

11  tub served as a catalyst for a plethora of concepts, stories, and characters, as well as an overall

12  cauldron for ROMERO's and EASTIN's television concepts and ideas. ROMERO and EASTIN

13  often worked in the hot tub and it became a topic of conversation and teasing on various future

14  projects.

15  10.   The Shasta McNasty venture, between ROMERO, EASTIN and Adams ended at some point

16  in 1995. On the heels of the success of Shasta McNasty, EASTIN, ROMERO and Adams, started

17  a new venture to develop a new show that they called "Hawaii". The Hawaii television show was

18  based on the original television series Hawaii Five-0. ROMERO, EASTIN, and Adams believed

19  that the Hawaii concept would appeal to television audiences and, much like with Shasta

20  McNasty, the three brainstormed, nurtured ideas, and developed the characters, and storyline.

21  11.   At the time ROMERO and EASTIN were working on the television show HAWAII,

22  EASTIN engaged the services of CARL AUSTEN (hereinafter "AUSTEN") and the law firm

23  Jackoway Tyerman Wertheimer Austen Mandelbaum Morris & Klein, A Professional

24  Corporation, (hereinafter "JACKOWAY" or "JTWA") to represent EASTIN as EASTIN's

25  attorney. At or about the same time as EASTIN engaged AUSTEN, EASTIN also engaged the

26  services of ROB KENNEALLY (hereinafter "KENNEALLY") a talent agent employed by

27  Creative Artists Agency, (hereinafter "CAA") to represent EASTIN as EASTIN's talent agent.

28  12.   At or about the same time, ROMERO, being actively involved in the creation of HAWAII,

FIRST AMENDED COMPLAINT                                    4

1    also required the services of an attorney. EASTIN suggested to ROMERO that ROMERO use his

2    (EASTIN's) attorney to negotiate his (ROMERO's) deal for HAWAII. ROMERO did just that and

3    requested that AUSTEN negotiate ROMERO's deal for his work on HAWAII. AUSTEN did

4    negotiate ROMERO's deal for HAWAII.

5    13.    As with Shasta McNasty, EASTIN pitched Hawaii to the studios and the television show

6    was green lit. Once again, EASTIN took control, acted as the point man for communications with

7    the studios, and claimed to be the sole creator of the Hawaii television show. Not surprisingly,

8    EASTIN was put in the position of Show Runner for the series; he again relegated ROMERO and

9    Adams to being paid and positioned as writers.

10    14.    At the time the Hawaii television show was green lit, Adams (then EASTIN's wife) asked

11    EASTIN why ROMERO and she were not being compensated as co-creators of the television

12    show Hawaii. In response, EASTIN told Adams, "If I gave you credit, then I would have to give

13    Travis [ROMERO] credit, and that would mean less money for us."

14    15.    As with Shasta McNasty, ROMERO was essential to the creation, development and ultimate

15    success of the show. In fact, EASTIN needed ROMERO to be present during all stages of

16    development because EASTIN could not do it on his own and required ROMERO's creative input.

17    EASTIN needed ROMERO to be the "idea guy".

18    16.    ROMERO's role in the creation of Hawaii was so important that he was flown out to Hawaii

19    to guide the production of the show. Having witnessed ROMERO's intimate involvement in the

20    production and development of the Hawaii the television show, as well as EASTIN's reliance on,

21    and need for, ROMERO's ideas various actors and employees of the show thought ROMERO was

22    a producer of the show. Even though ROMERO was relegated to being paid as a writer

23    ROMERO's actual contributions were much greater. Although EASTIN relegated ROMERO to

24    being paid as a writer, EASTIN often recognized ROMERO's actual contribution, by referring to,

25    and introducing ROMERO to others as, his, EASTIN's, writing partner.

26    17.    Hawaii began airing on NBC in 2004, but aired only eight episodes through approximately

27    November 2004. The work and creative energy spent on the show by each of ROMERO and

28    EASTIN was intense and the show's lack of commercial success was an incredible disappointment

FIRST AMENDED COMPLAINT                                                5

1  to both ROMERO and EASTIN who considered the show their hot tub love child. ROMERO and

2  EASTIN were both very sad to see the Hawaii venture end.

3  18.    Because EASTIN positioned himself so he was in control of the show and the point man

4  with the production studios, after the Hawaii television show failed commercially, people within

5  the entertainment industry abandoned EASTIN. However, ROMERO was loyal, and stuck by

6  EASTIN. Even in the hard lean times when both were unemployed, not working on any particular

7  show, and not making any money, ROMERO was willing to work as a writing partner with his

8  friend EASTIN.

9  19.    Shortly after the end of Hawaii, ROMERO (as he often was) was sitting in EASTIN's hot

10  tub with EASTIN, discussing among other things, the state of the market for the entertainment

11  industry and their prospects. During that conversation, EASTIN stated that he believed that from

12  that point forward it was going to be difficult for the two of them to sell their television shows. In

13  this moment of honesty, away from the temptations, pressures, seductions of the television studios,

14  EASTIN told ROMERO that he and ROMERO were a great team, and he wanted to, and needed

15  to, continue working with ROMERO on new concepts because he could not do it on his own. As

16  he reminisced, EASTIN talked about the pair's history and accomplishments, and he admitted to

17  ROMERO that ROMERO should have received more compensation for the previous shows they

18  worked on. EASTIN went on to say, and promised ROMERO, that in the future ROMERO would

19  receive equal compensation and equal share of the compensation for their work.

20  20.    Immediately thereafter, the hot tub provided stage for a brand new venture that would

21  ultimately become the "White Collar" television show.

22  21.    Consistent with EASTIN's recognition that ROMERO should have been entitled to greater

23  compensation for work on their previous shows, ROMERO and EASTIN agreed that they would

24  both share equally, anything and everything that they created , and that they would share equally

25  the fruits of their labor.

26  22.    As before, EASTIN needed ROMERO's creative thought and ability to generate concepts,

27  storylines, characters, plot and show definition. ROMERO and EASTIN worked in concert to

28  further their business endeavor. At that point ROMERO and EASTIN formed a general

FIRST AMENDED COMPLAINT                                          6

1    partnership pertaining to this new venture that became the "White Collar" television series, and

2    EASTIN thus owed to ROMERO a fiduciary duty to act in the utmost good faith and in the best

3    interests of ROMERO from that day forth with regard to the "White Collar" television series.

4    23.    Because the two recognized that ROMERO was more of the "idea guy" and EASTIN was

5    more of the "pitch guy", ROMERO and EASTIN agreed that EASTIN would act as the front man

6    / pitch man for the venture and that ROMERO would concentrate on generating ideas, concepts,

7    storylines and show definition.

8    24.    Throughout the months that followed ROMERO's and EASTIN's hot tub agreement to work

9    together, as equals, going forward, ROMERO and EASTIN brainstormed a number of ideas and

10   concepts, but did not identify any particular idea or concept as worthy of a pitch to any studio.

11   25.    Then, in or about the beginning of 2007, ROMERO and EASTIN engaged in efforts to

12   brainstorm specific ideas aimed at Fox Studios. After quite a bit of collaboration and

13   brainstorming, two ideas arose to the surface that ROMERO and EASTIN considered worthy of

14   presentation to studios. One of the ideas was a premise based on the question: "What would

15   happen if Vick Mackey (from the Shield) had been arrested for being a corrupt cop and was later

16   released to help police in a gang war?" EASTIN and ROMERO called the concept "Redemption".

17   In fact, the original title for the concept "Redemption" was introduced by ROMERO and inspired

18   by a Johnny Cash music video. (Eventually "Redemption" blossomed into "White Collar").

19   26.    The concept "Redemption" was novel, and ROMERO and EASTIN decided push forward

20   and to develop the story, characters, and settings. ROMERO and EASTIN spent countless hours

21   doing so over the next few months.

22   27.    From April 2007 through July 2007, ROMERO and EASTIN continued to collaborate on the

23   "Redemption" concept, spending hundreds of hours, discussing, outlining and fleshing out ideas.

24   In late July of that year, EASTIN began pitching the "Redemption" theme to Fox Studios.  Fox

25   Studios expressed interest in the concept, but Fox Studios wanted ROMERO and EASTIN to

26   pursue a "Blue Sky" theme, instead of the dark and gritty concept. The new concept developed by

27   ROMERO and EASTIN focused more on white-collar criminals. In developing the "White Collar"

28   concept, ROMERO and EASTIN researched, reworked, rethought, and retooled the "Redemption"

FIRST AMENDED COMPLAINT

7

theme.

28.   In or about early September 2007, after hundreds of hours of collaborative work and revision, EASTIN began pitching the "Blue Sky" version of the concept that was originally titled "Redemption". ROMERO and EASTIN were calling the new, blue sky version, of the concept "Half Way". Later, "Half Way" was re-named "Commuted", and then "Commuted" was re-named "White Collar".

29.   In early September of 2007, ROMERO and EASTIN scheduled numerous, meetings, phone calls, and writing sessions to "break the story" together.  As a result of those meetings, phone calls and writing sessions, and through both parties' equal efforts, ROMERO and EASTIN produced an outline that detailed much of the "White Collar" concept, including the inspiration and the story for what became the "White Collar" pilot and television series. The discussions, collaborations, and meeting sessions during this period were extensive and numerous, and they involved a great amount of detail from ROMERO's and EASTIN's contributions to the project.

30.   Around September of 2007, EASTIN pitched the "White Collar" idea to the USA Network and ROMERO's and EASTIN's concept received a favorable response.

31.   On or about October 3, 2007 ROMERO and EASTIN submitted to Fox Studios a Character Recap / Pilot Synopsis for the television show / concept that was entitled "Stokes & Caffrey" which was later entitled "White Collar". The Character Recap / Pilot Synopsis is dated 10/3/07 and states that it is by Jeff Eastin and Travis Romero. (A true and correct copy of the Character Recap / Pilot Synopsis, pages 1-3 is attached to this Complaint as Exhibit A)

In or about March 2008, ROMERO and EASTIN, decided to perform an emergency redraft for the pilot episode for the concept that was then known as "White Collar". Although they had received positive feedback from the USA Network regarding the "White Collar" concept and the Pilot scrip for the concept, ROMERO and EASTIN thought that the USA Network might not pick up the show without a redraft of the pilot. ROMERO and EASTIN then reviewed the current state of the script and decided that it would be in their best interests, even with a looming deadline, to rework and redraft the script so that they would have a better chance of having Fox Studios and the USA Network pick up the series for production. Over the next five (5) nights and four (4) days

FIRST AMENDED COMPLAINT                                   8

1  ROMERO and EASTIN worked together virtually non-stop reworking the Pilot script. ROMERO

2  and EASTIN discussed the scenes, the characters, the plot, and the concept as they revised, re-

3  wrote, and re-structured "White Collar". Also during this time, EASTIN reiterated to ROMERO

4  that ROMERO should be glad that he (ROMERO) would be paid as a creator of "White Collar".

5  After they completed the revisions of the "White Collar" Pilot ROMERO and EASTIN submitted

6  the Pilot for approval by Fox Studios and the USA Network.

7  ROB KENNEALLY and CAA and LOZE and FOX

8  32.   In late March of 2008, KENNEALLY had been EASTIN's agent for close to seven years.

9  33.   As the final draft of the television show "White Collar" was being developed by EASTIN

10  and ROMERO, EASTIN continued to communicate with his agent KENNEALLY updating him

11  on progress. EASTIN, through his agent KENNEALLY communicated with various executives at

12  FOX, one main contact for EASTIN was Matt Loze (hereinafter "LOZE"), Senior Vice President

13  at Fox Television Studios. LOZE worked very closely with David Madden the Executive Vice

14  President for Fox Television Studios, and David Madden was one of the main decision makers in

15  regard to the television show "White Collar".

16  34.   EASTIN, KENNEALLY and LOZE stayed very close, and communicated often about

17  getting "White Collar" produced. The three of them were the main players on the business side of

18  "White Collar". PLAINTIFF is informed and believes and on that basis alleges, that even though

19  EASTIN forwarded some of the communications that EASTIN, KENNEALLY, and LOZE had,

20  he kept ROMERO very much in the dark in terms of how EASTIN represented ownership of the

21  television show "White Collar".

22  35.   PLAINTIFF is informed and believes and on that basis alleges that KENNEALLY had been

23  aware of EASTIN's venture with ROMERO for quite some time, if not from the very beginning of

24  and at all times understood ROMERO's involvement as much more than just a writer.

25  36.   PLAINTIFF is informed and believes and on that basis alleges that LOZE had been aware of

26  EASTIN's venture with ROMERO from at least December 5, 2008 if not from the very beginning

27  and at all times understood ROMERO's involvement as much more than just a writer.

28

1    37.    In or about May 2008, Fox Studios and the USA Network agreed to produce the "White

2    Collar" television series, as created by ROMERO and EASTIN.

3    38.    Thereafter, ROMERO and EASTIN further developed and defined, characters, storylines and

4    episodes for the "White Collar" television series. EASTIN continuously sought out, relied on, and

5    needed ROMERO's creative ideas / input regarding the evolution and development of the "White

6    Collar" television series, including, but not limited to, casting, locations, character clothing, story

7    lines, story arcs, relationships, relationships with other characters, story necessary props, and other

8    things critical to the success of "White Collar" television series.

9    39.    As the ROMERO and EASTIN continued to work on the television show "White Collar"

10    and as the studios became more serious, ROMERO's presence had to be accounted for.

11    40.    EASTIN, holding the pivotal role as the face of the business venture, used his contacts to

12    down play ROMERO's involvement in the venture and relegate ROMERO, with the help of

13    KENNEALLY, AUSTEN and LOZE to a mere story editor position on the television show

14    "White Collar."

15    41.    EASTIN's work with, and reliance on ROMERO is documented, in part, in hundreds of e-

16    mails exchanged between EASTIN and ROMERO. As a partnership, ROMERO and EASTIN

17    were present on numerous calls with studio executives, and followed-up on most of those calls

18    with working sessions, in order to elaborate on, and incorporate studio and network notes into, the

19    final versions of the "White Collar" television series scripts.

20    42.    ROMERO is informed and believes, and, on that basis alleges that after USA picked up the

21    television show "White Collar" for airing, EASTIN and DEFENDANTS, and each of them,

22    realized or became informed that the television show "White Collar" stood to generate millions of

23    dollars through such means and mechanisms as distribution, licensing, syndication, merchandising

24    and other forms of compensation.

25    43.    Throughout the process leading up to the USA Network and Fox Studios picking up the

26    "White Collar" television series for airing, EASTIN assumed control over the "White Collar"

27    television series as between himself and ROMERO, because he inserted himself as the point man

28    for communication between Fox Studios and the USA Network. After the "White Collar"

FIRST AMENDED COMPLAINT                                10

1  television series was picked up for airing EASTIN relegated ROMERO to being compensated as a

2  story editor instead of as a partner in the creation of the show. Not surprisingly, EASTIN installed

3  himself as Executive Producer / Show Runner. However, throughout the production of the

4  television series ROMERO and EASTIN worked with studio executives, writers, and directors to

5  further develop, refine and guide the "White Collar" television series that they created. The

6  collaborative efforts between ROMERO and EASTIN during this time are documented in

7  numerous e-mails between the two on virtually all subjects and details of the "White Collar"

8  television series, including but not limited to, casting, staging, direction, directors, story lines, and

9  story arcs.

10  44.   On or about May 08, 2008 EASTIN sent ROMERO a copy of the Pilot script for "White

11  Collar" the title page of which stated the "White Collar" television series was by *only* Jeff

12  EASTIN and no longer by Jeff EASTIN and Travis ROMERO. (A true and correct copy of the

13  May 8, 2008 "White Collar" script, cover page, page 1 and the last page, page 79 are attached to

14  this Complaint as Exhibit B)[2]. Then again on October 30, 2008 EASTIN e-mailed a version of the

15  Pilot script to ROMERO, and the two lead actors, Tim DeKay and Matt Bomer.  The title page of

16  this script once again stated that the "White Collar" television series was by *only* Jeff EASTIN

17  and no longer by Jeff EASTIN and Travis ROMERO. (A true and correct copy of the October 30,

18  2008 email and the attached "White Collar" script, cover page, page 1 and the last page, page 78,

19  are attached to this Complaint as Exhibit C) EASTIN's manipulation of the title page for the

20  "White Collar" television series Pilot shows that he was trying to push ROMERO out as a co-

21  creator and co-owner of the television series "White Collar". It is no coincidence that at this time,

22  after the "White Collar" television series was picked up by the studio and network for airing,

23  EASTIN began attempts to push ROMERO out as a co-creator and thus co-owner of "White

24  Collar".

25  45.   In early June of 2009, AUSTEN had been EASTIN's attorney for many years and AUSTEN

26  had, at that point, already initiated representation of EASTIN with regard to the television show

27

28  [2] EASTIN manipulated the title page of the "White Collar" television series Pilot to reflect that the television series was "by" *only* Jeff EASTIN with a "story by" Jeff EASTIN and Travis ROMERO.

FIRST AMENDED COMPLAINT     11

1  "White Collar" . EASTIN again recommended the legal services of AUSTEN to ROMERO to

2  have AUSTEN work on ROMERO's agreements in regard to the television show "White Collar".

3  46.   ROMERO, is informed and believes and on that basis alleges that AUSTEN and JTWA were

4  working with EASTIN on negotiating EASTIN's agreements for the television show "White

5  Collar" as they had done many times in the past.

6  47.   PLAINTIFF is informed and believes and on that basis alleges that AUSTEN never inquired

7  about ROMERO's participation in the creation of the television show "White Collar".

8  48.   PLAINTIFF is informed and believes and on that basis alleges that AUSTEN never

9  interviewed ROMERO, nor questioned or discussed any terms with ROMERO in regard to

10  ROMERO's agreement for the "White Collar" television show.

11  49.   PLAINTIFF is informed and believes and on that basis alleges that AUSTEN never called or

12  spoke to ROMERO regarding "White Collar" and only AUSTEN's secretary, Laurie Anderson,

13  ever spoke with ROMERO regarding his agreement for "White Collar". PLAINTIFF is informed

14  and believes and on that basis alleges that the one brief email that AUSTEN sent to ROMERO, in

15  regard to the television show "White Collar", stated only the following "I'm doing your

16  [ROMERO's] deal again (and happy to do so) on White Collar".

17  50.   PLAINTIFF is informed and believes and on that basis alleges that he never received any

18  further counsel from AUSTEN nor from JTWA regarding the television show "White Collar" and

19  his ownership of the television show "White Collar".

20  51.   PLAINTIFF is informed and believes and on that basis alleges that AUSTEN and JTWA

21  never explained, nor sought input from ROMERO, in negotiating ROMERO's agreement with

22  TVN Productions, and in the end only provided him with a story editor agreement for his

23  signature.

24  52.   PLAINTIFF is informed and believes and on that basis alleges that AUSTEN and JTWA

25  never inquired as to ROMERO's participation in the endeavor that was the television show "White

26  Collar" nor did they inquire about ROMERO's role as EASTIN's partner.

27  53.   AUSTEN and JTWA benefitted from their work on ROMERO's agreement by taking five

28  5% of ROMERO's earnings from the television show "White Collar".

FIRST AMENDED COMPLAINT                                          12

54.   In mid June 2009 KENNEALLY and CAA had been representing EASTIN as EASTIN's agent and agency for a number of years and through numerous projects.

55.   ROMERO, is informed and believes and on that basis alleges that KENNEALLY was working with EASTIN on negotiating EASTIN's agreements for the television show "White Collar".

56.   ROMERO, in furtherance of his venture with EASTIN, and ROMERO's absolute trust of EASTIN, asked EASTIN if he should find and engage his own talent agent. PLAINTIFF is informed and believes and on that basis alleges that EASTIN responded stating that ROMERO could just use EASTIN's agent KENNEALLY and that it would be more cost effective this way.

57.   At this same time, EASTIN had already communicated to ROMERO and to his (EASTIN's) long time agent KENNEALLY that ROMERO would require representation for the television show "White Collar".

58.   KENNEALLY, and CAA never informed ROMERO of the conflict of interest that KENNEALLY had in representing both EASTIN and ROMERO. PLAINTIFF is informed and believes and on that basis alleges that, KENNEALLY provided some services for ROMERO but never fully represented ROMERO's best interests in regard to the television show "White Collar", and that he (KENNEALLY) was well aware that EASTIN and ROMERO worked hand in hand in the development of the television show "White Collar" and that ROMERO was entitled to co-ownership of the venture.

59.   PLAINTIFF is informed and believes and on that basis alleges that EASTIN had earned KENNEALLY and CAA substantial sums of money through their representation of EASTIN.

60.   Throughout the next many months ROMERO and EASTIN continued their "White Collar" venture and worked with the studio and the network and employees of the studio and network to film episodes of the "White Collar" television series for airing in late 2009.

61.   Despite some initial attempts to quietly reduce the significance of ROMERO's contribution to the creation of the "White Collar" television series, EASTIN had another moment of honesty on or about October 18, 2009. During an interview with Kathryn Shattuck of the New York Times, which took place shortly before October 18, 2009, EASTIN admitted to Shattuck that the idea for

1  the "White Collar" television series came from ROMERO. (A true and correct copy of the October

2  18, 2009 New York Times Article is attached to this complaint as Exhibit D) Specifically, in

3  response to Shattuck's question, "'White Collar'" seems so timely, Who or what, was your

4  inspiration?", EASTIN replied,

5          "The idea really came from a friend of mine, Travis Romero,

6          who I broke the story with."

7  62.   Around late October, 2009 EASTIN was called into a meeting with USA to discuss the

8  October 18, 2009 interview. After that meeting EASTIN told ROMERO that the article created a

9  lot of trouble for him. Around this time ROMERO again asked EASTIN about his ownership of

10  "White Collar". EASTIN told ROMERO that at this point it would be a difficult subject to bring

11  up given everything that was happening and that it could potentially affect his ability to bring

12  ROMERO back as a story editor for another season. In light of EASTIN's indirect threats

13  ROMERO worried not only about his friendship with EASTIN but also about his job as a story

14  editor for "White Collar" and the partnership that he had with EASTIN in the "White Collar"

15  venture. Despite the fact that potentially millions of dollars were at stake, ROMERO did not fear

16  losing out on compensation pertaining to "White Collar" and returning to his relatively poor

17  lifestyle, so much as he feared losing his best friend.

18  63.   ROMERO is informed and believes, and, on that basis alleges, on or about October 18, 2009,

19  and after EASTIN's comments to the New York Times, EASTIN realized that he would have to

20  share the benefits, profits, and compensation of the lucrative deals he entered into with Fox and

21  USA, pertaining to the television show White Collar.

22  64.   Over the next two months, from late October to late December 2009, EASTIN alienated

23  ROMERO and the relationship between the two deteriorated swiftly, because EASTIN did not

24  want to share compensation with ROMERO pertaining to the "White Collar" television series.

25  EASTIN made false accusations on ROMERO's abilities and contributions to the television show

26  "White Collar".

27  65.   Even though he was ostracized by EASTIN, ROMERO continued to further the development

28  and production of "White Collar". ROMERO did so not only because he believed in his "White

FIRST AMENDED COMPLAINT

14

1   Collar" venture, and he wanted his venture to succeed, but also because he hoped to save his

2   friendship with EASTIN.

3   66.   In or about November 2009, the "White Collar" Pilot aired, which blossomed into a series

4   that continues to air new episodes as of the filing of this complaint.

5   67.   In response to EASTIN's sudden change in demeanor and tone towards ROMERO,

6   ROMERO wrote EASTIN an e-mail in late November 2009. ROMERO wrote that email to the

7   guy he considered his best friend (at least until White Collar took off). In fact, ROMERO

8   desperately hoped he could continue to consider EASTIN his best friend. ROMERO addressed the

9   early success of "White Collar" and the good times that he and EASTIN had as friends before that

10  success and before big money became a real possibility. ROMERO wrote,

11                  "Got to say I enjoy the positive reviews and good ratings.[of White Collar]

12                  And we should cause (*sic*) God knows we've endured our share of the

13                  other. Miss hanging with you. Hope you are doing well. And just

14                  remember, before any of this at some point we were both pretty happy

15                  having adventures in the Mazda Protégé."

16  68.   On or about December 21, 2009 EASTIN wrote ROMERO an email stating that he was in a

17  meeting with Fox and USA regarding ROMERO and that there were issues with ROMERO. At

18  the same time the relationship between ROMERO and EASTIN continued to degrade, what used

19  to be a constant back and forth of e-mails between ROMERO and EASTIN reduced to a trickle

20  and then a one sided communication coming only from ROMERO. EASTIN shut ROMERO out.

21  69.   ROMERO continued his attempts to contact EASTIN to resolve the issues around the

22  ownership of the television show "White Collar" and ROMERO's due compensation for his

23  efforts in the shows creation. EASTIN never contacted ROMERO back with any intent to resolve

24  their issues and left ROMERO without an informal avenue to resolve their differences.

25  70.   At the end of 2009 ROMERO's contract with "White Collar" was not renewed and

26  ROMERO went back to California. Despite EASTIN's repeated and severe bad behavior towards

27  ROMERO, ROMERO continued to contact EASTIN on numerous occasions to resolve their

28  issues, including ROMERO's ownership of the television show "White Collar" and ROMERO's

FIRST AMENDED COMPLAINT                                              15

1   compensation for creating the television show. Unfortunately, EASTIN never attempted to contact

2   ROMERO to resolve the issues and EASTIN left ROMERO with no ability to resolve their issues

3   informally.

4   71.   For much of 2010 ROMERO worked on other projects, one of which he produced himself.

5   However, throughout this period of time ROMERO was bothered by what happened with his

6   friendship with EASTIN and the television show "White Collar". ROMERO's mental anguish

7   about his relationship with EASTIN and the television show "White Color" came to a head when

8   he saw the film "The Social Network". As he watched that movie ROMERO realized that

9   EASTIN took advantage of him much like Mark Zuckerberg took advantage of Eduardo Saverin.

10   Somewhat inspired, ROMERO told himself that he would not be taken advantage anymore; that

11   he needed to stand up for his rights.

12   72.   After significant soul searching and contemplation ROMERO finally decided to contact an

13   attorney, although he did not want to, he was ultimately forced to; EASTIN left him no choice.

14   73.   ROMERO is informed and believes, and, on that basis alleges that the White Collar

15   television show has been distributed throughout the United States, as well as at least 28 foreign

16   countries[3].

17   74.   ROMERO is informed and believes that the television show "White Collar" has generated

18   revenue, money, proceeds and other compensation through its domestic and foreign distribution

19   both on broadcast television, via DVD and other means.

20   75.   As the filing date of this complaint "White Collar" is an ongoing business venture in its third

21   season and scheduled for broadcasting on June 6, 2011. EASTIN continues to acquire and

22   accumulate, money, compensation, remuneration as a result of the "White Collar" television show,

23   and in light of the fact that it is one of the highest rated cable television series, (including the

24   highest rated original programming series) EASTIN will continue to do so for the foreseeable

25   future.

26

27     [3]The foreign countries include, but may not be limited to, Canada, Mexico, Australia,
Austria, Belgium, Brazil, Chili, Columbia, Denmark, Finland, France, Greece, Israel, India,

28   Iceland, Italy, Japan, Latvia, The Netherlands, Norway, Philippines, Portugal, Slovenia,
Singapore, South Africa, Sweden, Thailand, United Kingdom, and Latin American countries.

76. ROMERO is informed and believes, and, on that basis, alleges that as of March 17, 2011 the "White Collar" television show was the top drama on cable to that date in the eighteen to forty-nine year old demographic, as well as the top Tuesday night drama among all key demographics.[4]

77. ROMERO imposed confidence in the integrity of DEFENDANTS, and each of them, and DEFENDANTS, and each of them, voluntarily accepted ROMERO's confidence and agreed not to take advantage of ROMERO or to take any act relating to the interest of ROMERO without ROMERO's knowledge or consent.

78. When it came to deal making, EASTIN never provided ROMERO with any details of the deals that EASTIN, and DEFENDANTS, and each of them, entered into regarding the television show "White Collar" and did not include ROMERO in the negotiation of such deals.

79. ROMERO has not been provided with any information pertaining to the money, revenue profits, expenses, and, costs pertaining to or associated with the "White Collar" venture.

80. ROMERO, through his work with EASTIN on the creation of the show "White Collar", has performed, has been excused from performing, or has been prevented from performing, all of the work he and EASTIN agreed upon. As the show "White Collar" has been picked up and is currently in its third season EASTIN's obligation to compensate ROMERO has arisen and has been ongoing. To this date, ROMERO has not received his portion of the proceeds, remuneration, and/or compensation for his creation and ownership of "White Collar" and the creative and intellectual property associated therewith. This in turn has resulted with ROMERO being harmed financially and emotionally.

81. ROMERO is informed and believes, and, on that basis, alleges that EASTIN received compensation from Fox Studios pertaining to the creation, development, production, and exploitation of the "White Collar" television series.

82. ROMERO is informed and believes, and, on that basis, alleges that EASTIN received compensation from the USA Network pertaining to the creation, development, production, and

---

[4] Romero is informed and believes, and, on that basis, alleges that on Tuesday's at ten P.M. the "White Collar" television show delivered more twenty-five to fifty-four year old total viewers and households for the USA network than any other network on cable, and out-performed ABC and CBS among eighteen to thirty-four year olds.

FIRST AMENDED COMPLAINT                                        17

1    exploitation of the "White Collar" television series.

2    83.    Even though EASTIN received some monetary compensation, from the USA Network and

3    or from Fox Studios, to continue developing the show; ROMERO, has not received any

4    compensation. In fact, EASTIN had a fiduciary duty to share equally with ROMERO in any

5    proceeds derived from their mutual efforts on the venture "White Collar"; and, even though

6    EASTIN knew that ROMERO's financial position was dire, to the point that ROMERO was

7    borrowing money from friends and family just to house, clothe, and feed himself, he never shared

8    with ROMERO any of the proceeds he (EASTIN) received for "White Collar". ROMERO, even

9    though times were extremely difficult continued to work with EASTIN on their venture.

10   84.    Throughout the ROMERO EASTIN general partnership, EASTIN has not satisfied his

11   obligations pursuant to the general partnership, and his fiduciary duty to ROMERO, and has

12   denied ROMERO the benefits of the general partnership.

13   85.    ROMERO was not provided an opportunity to pursue his rights as a co-creator of the "White

14   Collar" television show because ROMERO was not provided with any Notice of Tentative

15   Writing Credits pertaining to the television show.

16   86.    In an e-mail, dated December 5, 2008, from MATT LOZE to EASTIN, LOZE stated, "per

17   our lawyer folks, a bunch of issues associated with your giving up partial story credit, not least of

18   which is giving USA power to remove you as showrunner. We'll talk tomorrow, but not sure we

19   can [allow you to give ROMERO partial story credit] at this late date."

20   87.    In a series of e-mails, dated from March 19 through March 25, 2009, between DAVID

21   MADDEN and EASTIN, MADDEN stated that he understood ROMERO's significant

22   contribution to the creation of the "White Collar" television show, and that ROMERO is

23   extraordinarily strong at breaking stories. MADDEN even recognized ROMERO's role in

24   creating the story for the "White Collar" television show. But MADDEN suggested to EASTIN

25   that EASTIN take credit for ROMERO's story ideas, and that ROMERO should not even be a part

26   of the "White Collar" television show, despite ROMERO's contribution to the creation of the

27   show.

28

## JURISDICTIONAL AND DOE ALLEGATIONS

88.   ROMERO is, and at all times mentioned in this complaint was, a resident of Los Angeles County California.

89.   ROMERO is, and at all times relevant to this complaint was, doing business within the County of Los Angeles in California.

90.   EASTIN is, and at all times relevant to this complaint was, a resident of Los Angeles County California, with his primary residence at 5026 Medina Road, Woodland Hills, CA 91364.EASTIN is and at all times relevant to this complaint was, doing business within the County of Los Angeles in California.

91.   Karl.Austen is, and at all times relevant to this complaint was, doing business within the County of Los Angeles in California with his principal place of business at 1925 Century Park East 22nd Floor, Century City, California 90067.

92.   Jackoway Tyerman Wertheimer Austen Mandelbaum Morris & Klein A Professional Corporation is, and at all times relevant in this complaint was, doing business within the County of Los Angeles in California with its principal place of business at 1925 Century Park East 22nd Floor, Los Angeles, California 90067.

93.   MATT LOZE is, and at all times relevant to this complaint was, doing business within the County of Los Angeles in California with his principal place of business at 10201 West Pico Boulevard, Los Angeles, California 90064.

94.   DAVID MADDEN is, and at all times relevant to this complaint was, doing business within the County of Los Angeles in California with his principal place of business at 10201 West Pico Boulevard, Los Angeles, California 90064.

95.   TOM YOUNG is, and at all times relevant to this complaint was, doing business within the County of Los Angeles in California with his principal place of business at 2000 avenue of the stars, Los Angeles, California 90067.

96.   ROB KENNEALLY is, and at all times relevant to this complaint was, doing business within the County of Los Angeles in California with his principal place of business at 2000 avenue of the stars, Los Angeles, California 90067.

FIRST AMENDED COMPLAINT

19

97.   Creative Artists Agency is, and at all times relevant in this complaint was, doing business within the County of Los Angeles in California with its principal place of business at 2000 avenue of the stars, Los Angeles, California 90067.

98.   Fox Television Studios Productions, Inc. is, and at all times relevant in this complaint was, doing business within the County of Los Angeles in California with its principal place of business at 10201 W. Pico Boulevard, Los Angeles, California 90035.

99.   Fox Television Studios, Inc. is, and at all times relevant in this complaint was, doing business within the County of Los Angeles in California with its principal place of business at 10201 W. Pico Boulevard, Los Angeles, California 90035.

100.   Fox Television Studios, Inc. is, and at all times relevant in this complaint was, doing business within the County of Los Angeles in California with its principal place of business at 10201 W. Pico Boulevard, Los Angeles, California 90035.

101.   TVM Productions, Inc. is, and at all times relevant in this complaint was, doing business within the County of Los Angeles in California with its principal place of business at 10201 W. Pico Boulevard, Los Angeles, California 90035.

102.   Upon information and belief, at all times mentioned in this Complaint, each of Defendants DOES 1 through 100, inclusive, was the agent and employee of the other defendants, and in doing the things alleged herein was acting within the course and scope of that agency and employment. Each of DOES 1 through 100, inclusive has ratified, approved, and authorized the acts of each of the remaining defendants with full knowledge of said acts.

103.   ROMERO does not know the true names of Defendants DOES 1 through 100, inclusive, and therefore sues them by those fictitious names.

104.   The capacities of DOES 51-100 are also unknown to ROMERO; each is in some manner or capacity, and to some degree, legally responsible and liable for the damages of which ROMERO complains. ROMERO will amend this Complaint to allege the true names and capacities of these DOE Defendants once they are ascertained.

105.   The monetary damages sought by ROMERO exceed the minimal jurisdictional limits of this Court and will be established according to proof at trial.

FIRST AMENDED COMPLAINT                                             20

1

2

# FIRST CAUSE OF ACTION FOR ACCOUNTING

## (Against Defendant Jeff Eastin)

3

4   106.  ROMERO refers to paragraphs 1 through 105, above, and hereby incorporates such

5   paragraphs herein by this reference as though said paragraphs were set forth in full herein.

6   107.  ROMERO and EASTIN agreed on working together to develop television shows aimed at

7   Fox Studios and the USA Network with the purpose of selling the shows to Fox Studios and the

8   USA Network.

9   108.  As a result of their venture to make money through the creation production and development

10  of the "White Collar" television series, ROMERO and EASTIN formed a general partnership.

11  109.  As a result of the fruits of the aforementioned general partnership, the television show

12  "White Collar" was created and produced. In turn, as a result of the distribution, licensing,

13  syndication, merchandising and other forms of compensation the television show "White Collar"

14  has generated and produced, money, revenue, remuneration, benefits and proceeds.

15  110.  As a result of the aforementioned partnership, Defendants, and each of them, have benefitted

16  from the production  of "White Collar" and have received money, revenue, remuneration, benefits

17  and proceeds, a portion of which is due to ROMERO.

18  111.  Per the general partnership formed by ROMERO and EASTIN to develop and exploit, for

19  profit, the television show "White Collar" EASTIN owed ROMERO a fiduciary duty.

20  112.  The amount of money due from Defendants, and each of them to Plaintiff is unknown to

21  Plaintiff and cannot be ascertained without an accounting of the money, revenue, remuneration,

22  benefits and proceeds generated, and or other compensation received by Defendants, and each of

23  them, from the exploitation, sale, development, licensing, use, dispensation,  of the television

24  show "White Collar".

25  113.   ROMERO is informed and believes and on that basis alleges that the amounts due Plaintiff

26  exceed the jurisdictional limits of this Court. In light of the television distribution of "White

27  Collar" both foreign and domestic, as well as the DVD distribution of the television show "White

28  Collar" and the licensing deals that appear to be associated with the television show "White

1  Collar" including deals with the auto manufacturer Ford, Plaintiff is informed and believes the

2  amounts due to plaintiff are in the millions.

3  114. Plaintiff has demanded an accounting of the aforementioned monies from Defendant and

4  payment of the amount found due, but Defendant has failed and refused, and continues to fail and

5  refuse, to render such an accounting and to pay such sum.

6

7  SECOND CAUSE OF ACTION FOR FRAUD: INTENTIONAL MISREPRESENTATION.

8  (Against All Defendants)

9  115. ROMERO refers to paragraphs 1 through 105, above, and hereby incorporates such

10  paragraphs herein by this reference as though said paragraphs were set forth in full herein.

11  116. DEFENDANTS, and each of them, made, or conspired to make, representations of material

12  fact to ROMERO that were in fact false.

13  117. Among other things, EASTIN represented to ROMERO that if ROMERO worked with

14  EASTIN on the "White Collar" television show, ROMERO and EASTIN were partners, equal in

15  the partnership. EASTIN and other DEFENDANTS, including KENNEALLY, YOUNG, CAA,

16  AUSTEN, JACKOWAY, represented to ROMERO that ROMERO would be recognized and

17  compensated as a co-creator of the "White Collar" television show. DEFENDANTS, and each of

18  them, further conspired among themselves to represent to ROMERO that ROMERO would be

19  recognized and compensated as a co-creator of the "White Collar" television show.

20  118. AUSTEN and JACKOWAY represented to ROMERO that AUSTEN and JACKOWAY

21  were representing ROMERO and ROMERO's interests in dealings with various individuals and

22  entities, including EASTIN, KENNEALLY, YOUNG, CAA, MATT LOZE, DAVID MADDEN,

23  FOX TELEVISION STUDIONS, INC., FOX TELEVISION STUDIOS PRODUCTIONS, INC.,

24  TWENTIETH CENTURY FOX INTERNATIONAL TELEVISION, INC., TVM

25  PRODUCTIONS, INC., and USA Network.

26  119. KENNEALLY, YOUNG, and CAA represented to ROMERO that KENNEALLY, YOUNG,

27  and CAA were representing ROMERO and ROMERO's interests in dealings with various

28  individuals and entities, including EASTIN, AUSTEN, JACKOWAY, MATT LOZE, DAVID

1  MADDEN, FOX TELEVISION STUDIONS, INC., FOX TELEVISION STUDIOS

2  PRODUCTIONS, INC., TWENTIETH CENTURY FOX INTERNATIONAL TELEVISION,

3  INC., TVM PRODUCTIONS, INC., and USA Network.

4  120.  MATT LOZE, DAVID MADDEN, FOX TELEVISION STUDIONS, INC., FOX

5  TELEVISION STUDIOS PRODUCTIONS, INC., TWENTIETH CENTURY FOX

6  INTERNATIONAL TELEVISION, INC., TVM PRODUCTIONS, INC. represented, or conspired

7  with individuals such as EASTIN (as well as each other) to represent, to ROMERO that

8  ROMERO would be recognized and compensated as a co-creator of the "White Collar" television

9  show.

10  121.  KENNEALLY, YOUNG, and CAA represented, or conspired with individuals such as

11  EASTIN (as well as each other) to represent, to ROMERO that ROMERO would be recognized

12  and compensated as a co-creator of the "White Collar" television show.

13  122.  The truth is that, EASTIN and the other DEFENDANTS, and each of them, did not intend to

14  honor any partnership or equality between EASTIN and ROMERO.  EASTIN and other

15  DEFENDANTS, including KENNEALLY, YOUNG, CAA, AUSTEN, JACKOWAY, did not

16  intend to recognize or compensate ROMERO as a co-creator of the "White Collar" television

17  show.

18  123.  The truth is further that AUSTEN and JACKOWAY did not represent ROMERO and

19  ROMERO's interests in dealings with various individuals and entities, including EASTIN,

20  KENNEALLY, YOUNG, CAA, MATT LOZE, DAVID MADDEN, FOX TELEVISION

21  STUDIONS, INC., FOX TELEVISION STUDIOS PRODUCTIONS, INC., TWENTIETH

22  CENTURY FOX INTERNATIONAL TELEVISION, INC., TVM PRODUCTIONS, INC., and

23  USA Network.

24  124.  The truth is further that KENNEALLY, YOUNG, and CAA did not represent ROMERO and

25  ROMERO's interests in dealings with various individuals and entities, including EASTIN,

26  AUSTEN, JACKOWAY, MATT LOZE, DAVID MADDEN, FOX TELEVISION STUDIONS,

27  INC., FOX TELEVISION STUDIOS PRODUCTIONS, INC., TWENTIETH CENTURY FOX

28  INTERNATIONAL TELEVISION, INC., TVM PRODUCTIONS, INC., and USA Network.

FIRST AMENDED COMPLAINT                                    23

1   125.  The truth is further that MATT LOZE, DAVID MADDEN, FOX TELEVISION

2   STUDIONS, INC., FOX TELEVISION STUDIOS PRODUCTIONS, INC., TWENTIETH

3   CENTURY FOX INTERNATIONAL TELEVISION, INC., TVM PRODUCTIONS, INC. did not

4   intend to recognize and compensate ROMERO as a co-creator of the "White Collar" television

5   show.

6   126.  The truth is further that KENNEALLY, YOUNG, and CAA did not intend to recognize and

7   compensate ROMERO as a co-creator of the "White Collar" television show.

8   127.  When DEFENDANTS, and each of them, made the representations, DEFENDANTS, and

9   each of them, knew the representations were false.

10  128.  DEFENDANTS, and each of them, made the representations with the intent to defraud and

11  induce plaintiff to act and expend efforts in the creation of the "White Collar" television show.

12  DEFENDANTS, and each of them, further made the representations to pacify ROMERO and

13  induce him not to take action to pursue his rights as a co-creator of the "White Collar" television

14  show.

15  129.  At the times that DEFENDANTS, and each of them, made the representations, ROMERO

16  did not know the representations were false and believed they were true.

17  130.  ROMERO acted in justifiable reliance on the representations because ROMERO is, in fact, a

18  co-creator of the "White Collar" television show.  Additionally, ROMERO had no reason not to

19  believe the representations when they were made because, among other things, AUSTEN is an

20  attorney and JACKOWAY is a law firm in California, and KENNEALLY and YOUNG are agents

21  at CAA, a very large and well established talent agency.

22  131.  As a direct and legal result of the misrepresentations by DEFENDANTS, and each of them,

23  PLAINTIFF has been damaged in an amount exceeding the jurisdictional limits of this court, in an

24  amount to be proven at trial.

25

26  **THIRD CAUSE OF ACTION FOR FRAUD: NEGLIGENT MISREPRESENTATION.**

27  **(Against All Defendants)**

28  132.  ROMERO refers to paragraphs 1 through 105, above, and hereby incorporates such

FIRST AMENDED COMPLAINT                                    24

1   paragraphs herein by this reference as though said paragraphs were set forth in full herein.

2   133.  DEFENDANTS, and each of them, made, or conspired to make, representations of material

3   fact to ROMERO that were in fact false.

4   134.  Among other things, EASTIN represented to ROMERO that if ROMERO worked with

5   EASTIN on the "White Collar" television show, ROMERO and EASTIN were partners, equal in

6   the partnership.  EASTIN and other DEFENDANTS, including KENNEALLY, YOUNG, CAA,

7   AUSTEN, JACKOWAY, represented to ROMERO that ROMERO would be recognized and

8   compensated as a co-creator of the "White Collar" television show.  DEFENDANTS, and each of

9   them, further conspired among themselves to represent to ROMERO that ROMERO would be

10  recognized and compensated as a co-creator of the "White Collar" television show.

11  135.  AUSTEN and JACKOWAY represented to ROMERO that AUSTEN and JACKOWAY

12  were representing ROMERO and ROMERO's interests in dealings with various individuals and

13  entities, including EASTIN, KENNEALLY, YOUNG, CAA, MATT LOZE, DAVID MADDEN,

14  FOX TELEVISION STUDIONS, INC., FOX TELEVISION STUDIOS PRODUCTIONS, INC.,

15  TWENTIETH CENTURY FOX INTERNATIONAL TELEVISION, INC., TVM

16  PRODUCTIONS, INC., and USA Network.

17  136.  KENNEALLY, YOUNG, and CAA represented to ROMERO that KENNEALLY, YOUNG,

18  and CAA were representing ROMERO and ROMERO's interests in dealings with various

19  individuals and entities, including EASTIN, AUSTEN, JACKOWAY, MATT LOZE, DAVID

20  MADDEN, FOX TELEVISION STUDIONS, INC., FOX TELEVISION STUDIOS

21  PRODUCTIONS, INC., TWENTIETH CENTURY FOX INTERNATIONAL TELEVISION,

22  INC., TVM PRODUCTIONS, INC., and USA Network.

23  137.  MATT LOZE, DAVID MADDEN, FOX TELEVISION STUDIONS, INC., FOX

24  TELEVISION STUDIOS PRODUCTIONS, INC., TWENTIETH CENTURY FOX

25  INTERNATIONAL TELEVISION, INC., TVM PRODUCTIONS, INC. represented, or conspired

26  with individuals such as EASTIN (as well as each other) to represent, to ROMERO that

27  ROMERO would be recognized and compensated as a co-creator of the "White Collar" television

28  show.

FIRST AMENDED COMPLAINT                                    25

1   138. KENNEALLY, YOUNG, and CAA represented, or conspired with individuals such as

2   EASTIN (as well as each other) to represent, to ROMERO that ROMERO would be recognized

3   and compensated as a co-creator of the "White Collar" television show.

4   139. The truth is that, EASTIN and the other DEFENDANTS, and each of them, did not intend to

5   honor any partnership or equality between EASTIN and ROMERO. EASTIN and other

6   DEFENDANTS, including KENNEALLY, YOUNG, CAA, AUSTEN, JACKOWAY, did not

7   intend to recognize or compensate ROMERO as a co-creator of the "White Collar" television

8   show.

9   140. The truth is further that AUSTEN and JACKOWAY did not represent ROMERO and

10  ROMERO's interests in dealings with various individuals and entities, including EASTIN,

11  KENNEALLY, YOUNG, CAA, MATT LOZE, DAVID MADDEN, FOX TELEVISION

12  STUDIONS, INC., FOX TELEVISION STUDIOS PRODUCTIONS, INC., TWENTIETH

13  CENTURY FOX INTERNATIONAL TELEVISION, INC., TVM PRODUCTIONS, INC., and

14  USA Network.

15  141. The truth is further that KENNEALLY, YOUNG, and CAA did not represent ROMERO and

16  ROMERO's interests in dealings with various individuals and entities, including EASTIN,

17  AUSTEN, JACKOWAY, MATT LOZE, DAVID MADDEN, FOX TELEVISION STUDIONS,

18  INC., FOX TELEVISION STUDIOS PRODUCTIONS, INC., TWENTIETH CENTURY FOX

19  INTERNATIONAL TELEVISION, INC., TVM PRODUCTIONS, INC., and USA Network.

20  142. The truth is further that MATT LOZE, DAVID MADDEN, FOX TELEVISION

21  STUDIONS, INC., FOX TELEVISION STUDIOS PRODUCTIONS, INC., TWENTIETH

22  CENTURY FOX INTERNATIONAL TELEVISION, INC., TVM PRODUCTIONS, INC. did not

23  intend to recognize and compensate ROMERO as a co-creator of the "White Collar" television

24  show.

25  143. The truth is further that KENNEALLY, YOUNG, and CAA did not intend to recognize and

26  compensate ROMERO as a co-creator of the "White Collar" television show.

27  144. When DEFENDANTS, and each of them, made the representations, DEFENDANTS, and

28  each of them, knew the representations were false.

FIRST AMENDED COMPLAINT                    26

1  145. DEFENDANTS, and each of them, made the representations negligently. They should have

2  known that the representations they were making were false. DEFENDANTS, and each of them,

3  further should have known that the representations they made would serve to pacify ROMERO

4  and induce him not to take action to pursue his rights as a co-creator of the "White Collar"

5  television show.

6  146. At the times that DEFENDANTS, and each of them, made the representations, ROMERO

7  did not know the representations were false and believed they were true.

8  147. ROMERO acted in justifiable reliance on the representations because ROMERO is, in fact, a

9  co-creator of the "White Collar" television show. Additionally, ROMERO had no reason not to

10  believe the representations when they were made because, among other things, AUSTEN is an

11  attorney and JACKOWAY is a law firm in California, and KENNEALLY and YOUNG are agents

12  at CAA, a very large and well established talent agency.

13  148. As a direct and legal result of the misrepresentations by DEFENDANTS, and each of them,

14  PLAINTIFF has been damaged in an amount exceeding the jurisdictional limits of this court, in an

15  amount to be proven at trial.

16

17  **FOURTH CAUSE OF ACTION FOR FRAUD: PROMISE WITHOUT INTENT TO**

18  **PERFORM.**

19  **(Against All Defendants)**

20  149. ROMERO refers to paragraphs 1 through 105, above, and hereby incorporates such

21  paragraphs herein by this reference as though said paragraphs were set forth in full herein.

22  150. DEFENDANTS, and each of them, made, or conspired to make, promises to ROMERO that

23  were in fact false.

24  151. Among other things, EASTIN promised ROMERO that if ROMERO worked with EASTIN

25  on the "White Collar" television show, ROMERO and EASTIN were partners, equal in the

26  partnership. EASTIN and other DEFENDANTS, including KENNEALLY, YOUNG, CAA,

27  AUSTEN, JACKOWAY, promised ROMERO that ROMERO would be recognized and

28  compensated as a co-creator of the "White Collar" television show. DEFENDANTS, and each of

FIRST AMENDED COMPLAINT

27

1  them, further conspired among themselves to promise ROMERO that ROMERO would be

2  recognized and compensated as a co-creator of the "White Collar" television show.

3  152. AUSTEN and JACKOWAY promised ROMERO that AUSTEN and JACKOWAY were

4  representing ROMERO and ROMERO's interests in dealings with various individuals and

5  entities, including EASTIN, KENNEALLY, YOUNG, CAA, MATT LOZE, DAVID MADDEN,

6  FOX TELEVISION STUDIONS, INC., FOX TELEVISION STUDIOS PRODUCTIONS, INC.,

7  TWENTIETH CENTURY FOX INTERNATIONAL TELEVISION, INC., TVM

8  PRODUCTIONS, INC., and USA Network.

9  153. KENNEALLY, YOUNG, and CAA promised ROMERO that KENNEALLY, YOUNG, and

10  CAA were representing ROMERO and ROMERO's interests in dealings with various individuals

11  and entities, including EASTIN, AUSTEN, JACKOWAY, MATT LOZE, DAVID MADDEN,

12  FOX TELEVISION STUDIONS, INC., FOX TELEVISION STUDIOS PRODUCTIONS, INC.,

13  TWENTIETH CENTURY FOX INTERNATIONAL TELEVISION, INC., TVM

14  PRODUCTIONS, INC., and USA Network.

15  154. MATT LOZE, DAVID MADDEN, FOX TELEVISION STUDIONS, INC., FOX

16  TELEVISION STUDIOS PRODUCTIONS, INC., TWENTIETH CENTURY FOX

17  INTERNATIONAL TELEVISION, INC., TVM PRODUCTIONS, INC. promised, or conspired

18  with individuals such as EASTIN (as well as each other) to promise, ROMERO that ROMERO

19  would be recognized and compensated as a co-creator of the "White Collar" television show.

20  155. KENNEALLY, YOUNG, and CAA promised, or conspired with individuals such as

21  EASTIN (as well as each other) to promise, ROMERO that ROMERO would be recognized and

22  compensated as a co-creator of the "White Collar" television show.

23  156. The truth is that, EASTIN and the other DEFENDANTS, and each of them, did not intend to

24  honor any promise they made regarding any partnership or equality between EASTIN and

25  ROMERO. EASTIN and other DEFENDANTS, including KENNEALLY, YOUNG, CAA,

26  AUSTEN, JACKOWAY, did not intend to honor their promise(s) to recognize or compensate

27  ROMERO as a co-creator of the "White Collar" television show.

28  157. The truth is further that AUSTEN and JACKOWAY did not intend to represent ROMERO

FIRST AMENDED COMPLAINT

28

1  and ROMERO's interests in dealings with various individuals and entities, including EASTIN,

2  KENNEALLY, YOUNG, CAA, MATT LOZE, DAVID MADDEN, FOX TELEVISION

3  STUDIONS, INC., FOX TELEVISION STUDIOS PRODUCTIONS, INC., TWENTIETH

4  CENTURY FOX INTERNATIONAL TELEVISION, INC., TVM PRODUCTIONS, INC., and

5  USA Network.

6  158.  The truth is further that KENNEALLY, YOUNG, and CAA did not intend to represent

7  ROMERO and ROMERO's interests in dealings with various individuals and entities, including

8  EASTIN, AUSTEN, JACKOWAY, MATT LOZE, DAVID MADDEN, FOX TELEVISION

9  STUDIONS, INC., FOX TELEVISION STUDIOS PRODUCTIONS, INC., TWENTIETH

10  CENTURY FOX INTERNATIONAL TELEVISION, INC., TVM PRODUCTIONS, INC., and

11  USA Network.

12  159.  The truth is further that MATT LOZE, DAVID MADDEN, FOX TELEVISION

13  STUDIONS, INC., FOX TELEVISION STUDIOS PRODUCTIONS, INC., TWENTIETH

14  CENTURY FOX INTERNATIONAL TELEVISION, INC., TVM PRODUCTIONS, INC. did not

15  intend to honor their promise(s) to recognize and compensate ROMERO as a co-creator of the

16  "White Collar" television show.

17  160.  The truth is further that KENNEALLY, YOUNG, and CAA did not intend to honor their

18  promise(s) to recognize and compensate ROMERO as a co-creator of the "White Collar"

19  television show.

20  161.  When DEFENDANTS, and each of them, made the promises, DEFENDANTS, and each of

21  them, knew the promises were false.

22  162.  DEFENDANTS, and each of them, made the promises intentionally.  They knew that the

23  promises they were making were false.  DEFENDANTS, and each of them, further knew that the

24  promises they made would serve to pacify ROMERO and induce him not to take action to pursue

25  his rights as a co-creator of the "White Collar" television show.

26  163.  At the times that DEFENDANTS, and each of them, made the promises, ROMERO did not

27  know the promises were false and believed they were true.

28  164.  ROMERO acted in justifiable reliance on the promises because ROMERO is, in fact, a co-

FIRST AMENDED COMPLAINT

29

1   creator of the "White Collar" television show. Additionally, ROMERO had no reason not to

2   believe the promises when they were made because, among other things, AUSTEN is an attorney

3   and JACKOWAY is a law firm in California, and KENNEALLY and YOUNG are agents at CAA,

4   a very large and well established talent agency.

5   165. As a direct and legal result of the false promises made by DEFENDANTS, and each of them,

6   PLAINTIFF has been damaged in an amount exceeding the jurisdictional limits of this court, in an

7   amount to be proven at trial.

8

9                    **FIFTH CAUSE OF ACTION FOR CONSPIRACY TO DEFRAUD.**

10                                    **(Against All Defendants)**

11  166. ROMERO refers to paragraphs 1 through 105, 115 through 131, and 149 through 165,

12  above, and hereby incorporates such paragraphs herein by this reference as though said paragraphs

13  were set forth in full herein.

14  167. DEFENDANTS, and each of them, engaged in a conspiracy among themselves to make

15  misrepresentations and false promises to ROMERO, and thus to defraud ROMERO pertaining to

16  ROMERO's work pertaining to, and co-creation of, the "White Collar" television show.

17  168. As a direct and legal result of the conspiracy of DEFENDANTS, and each of them,

18  PLAINTIFF has been damaged in an amount exceeding the jurisdictional limits of this court, in an

19  amount to be proven at trial.

20

21  **SIXTH CAUSE OF ACTION FOR UNFAIR BUSINESS PRACTICES IN VIOLATION OF**

22        **BUSINESS AND PROFESSIONS CODE § 17000, and 17200 ET SEQ.**

23                                    **(Against All Defendants)**

24  169. ROMERO refers to paragraphs 1 through 105, above, and hereby incorporates such

25  paragraphs herein by this reference as though said paragraphs were set forth in full herein.

26  170. DEFENDANTS, and each of them, are "persons" as defined under Business & Professions

27  Code section 17201.

28  171. DEFENDANTS, and each of them, provide services to the public as defined in Business &

                                    FIRST AMENDED COMPLAINT                              30

1  Professions Code section 17000, et seq.

2  172.  DEFENDANTS, and each of them, violated numerous provisions of California law,

3  including, but not limited to, the California Labor Code Section 1700.32 and California

4  Corporations Code Section 16404.

5  173.  Upon information and belief, and among other things, DEFENDANTS, and each of them,

6  acted wrongfully in disrupting, diverting, and derailing PLAINTIFF's business relationships and

7  economic advantages pertaining to his work as a co-creator of the White Collar television show.

8  Such conduct is illegal under Business & Professions Code sections 17000, et seq. and 17200, et

9  seq.

10  174.  Upon information and belief, and among other things, DEFENDANTS, and each of them,

11  have committed malpractice and/or breached fiduciary duties owed to ROMERO.  Such conduct is

12  illegal under Business & Professions Code sections 17000, et seq. and 17200, et seq.

13  175.  Upon information and belief, and among other things, DEFENDANTS, and each of them,

14  have defrauded or conspired to defraud ROMERO.  Such conduct is illegal under Business &

15  Professions Code sections 17000, et seq. and 17200, et seq.

16  176.  Upon information and belief, by disrupting, diverting, and derailing PLAINTIFF's business

17  relationships and economic advantages pertaining to his work as a co-creator of the White Collar,

18  and by engaging in malpractice and breach of fiduciary duties, and by defrauding and conspiring

19  to defraud ROMERO, DEFENDANTS, and each of them, have engaged in business and profited

20  from their bad acts within the State of California.

21  177.  Pursuant to Business & Professions Code sections 17071 and 17075, the allegations set forth

22  in the Complaint, and the facts underlying those allegations, show DEFENDANTS', and each of

23  their, intent to violate the Unfair Practices Act.

24  178.  Pursuant to Business & Professions Code section 17082, ROMERO requests treble damages

25  and attorney fees, as well as costs of suit.

26  179.  Pursuant to Business & Professions Code sections 17078 and 17079, ROMERO seeks

27  injunctive relief in the form of an order requiring DEFENDANTS, and each of them, to recognize

28  and compensate ROMERO as a co-creator of the "White Collar" television show.

FIRST AMENDED COMPLAINT

31

1

2 ## SEVENTH CAUSE OF ACTION FOR VIOLATION OF THE TALENT AGENCY ACT

3 ## (CALIFORNIA LABOR CODE § 1700.32 ET SEQ.)

4 ### (Against Defendants Creative Artists Agency LLC, Tom Young, and Rob Kenneally)

5 180. ROMERO refers to paragraphs 1 through 105, above, and hereby incorporates such

6 paragraphs herein by this reference as though said paragraphs were set forth in full herein.

7 181. Section 1700.32 of the California Labor Code states "All advertisements of a talent

8 agency by means of cards, circulars, or signs, and in newspapers and other publications

9 and all letterheads, receipts, and blanks shall be printed and contain the licensed name and

10 address of the talent agency and the words 'talent agency.'"

11 182. In advertisements, promotional pieces, and correspondence issued by KENNEALLY,

12 YOUNG, and CAA, some of which were issued to PLAINTIFF, from at least the first

13 quarter of 2009 to the present, KENNEALLY, YOUNG, and CAA have failed to comply

14 with Section 1700.32 of the California Labor Code because the advertisements,

15 promotional pieces, and correspondence did not, and do not, contain the licensed name of

16 the talent agency and the words "talent agency."

17 183. Additionally, KENNEALLY, YOUNG, and CAA failed to comply with the statutory

18 requirements of section 1700.32 by using letterhead that does not contain the words "talent

19 agency", that does not contain the licensed name of the talent agency, and that does not

20 contain the address of the talent agency.

21 184. PLAINTIFF is informed and believes and on that basis alleges that KENNEALLY,

22 YOUNG, and CAA, and each of them, interact with, network with, socialize with, work

23 with, communicate with, and advertise to thousands of individuals and entities (including

24 PLAINTIFF), and that KENNEALLY, YOUNG, and CAA have distributed, issued,

25 mailed, or shared multiple tens of thousands of advertisements, promotional pieces, and

26 correspondence ( including cards, circulars, signs, letters, correspondence, and copy in

27 publications) that violate Section 1700.32 of the California Labor Code to such individual

28 and entities (including PLAINTIFF). .

1   185. KENNEALLY, YOUNG, and CAA violated Labor Code Section 1700.32, and, in

2   doing so, deceived PLAINTIFF, concealed their true identities from PLAINTIFF,

3   concealed their true intent from PLAINTIFF, and injured PLAINTIFF as set forth in this

4   Complaint.

5   186. Pursuant to the allegations of this Complaint, including those specifically set forth in

6   this cause of action, PLAINTIFF seeks actual damages, as well as attorney fees, treble

7   damages, and an injunction pursuant to Section 1704.2.

8

9              **EIGHTH CAUSE OF ACTION FOR PROFESSIONAL MALPRACTICE**

10        **(Against Defendants Karl R. Austen and Jackoway Tyerman Wertheimer Austen**

11                **Mandelbaum Morris & Klein, a Professional Corporation.)**

12   187. ROMERO refers to paragraphs 1 through 105, above, and hereby incorporates such

13   paragraphs herein by this reference as though said paragraphs were set forth in full herein.

14   188. PLAINTIFF is informed and believes and thereon alleges that, at all times mentioned

15   herein, Karl Austen was an attorney licensed to practice law in California and was an

16   employee of the law firm Jackoway Tyerman Wertheimer Austen Mandelbaum Morris &

17   Klein, a Professional Corporation.

18   189. AUSTEN and JTWA approached PLAINTIFF, at EASTIN's request, to provide legal

19   services for PLAINTIFF, including negotiation and representation of PLAINTIFF's best

20   interests in regard to the television show "White Collar.

21   190. On or about June 2009, AUSTEN and JTWA, and each of them, convinced

22   ROMERO to allow AUSTEN and JTWA to provide such legal services for ROMERO.

23   190. Pursuant to the direction of, and in concert with, EASTIN, AUSTEN and JTWA, and

24   each of them, negotiated a position for ROMERO as a story editor for the television show

25   "White Collar".

26   191. At all times after accepting employment, AUSTEN and JTWA, and each of them,

27   failed to exercise reasonable care and skill in advising PLAINTIFF of his valuable rights to

28

1  the television show "White Collar" and to the valuable partnership between EASTIN and

2  PLAINTIFF, and failed to negotiate in PLAINTIFF's best interests.

3  192. At all times after accepting employment, AUSTEN and JTWA, and each of them,

4  failed to exercise reasonable skill and diligence in representing PLAINTIFF, in that they

5  neglected to interview PLAINTIFF in regard to PLAINTIFF's ownership of the endeavor

6  that is the television show "White Collar" and they neglected to disclose to PLAINTIFF

7  their conflict of interest between their long-term client EASTIN and PLAINTIFF

8  193. PLAINTIFF is informed and believes and thereon alleges that had AUSTEN and

9  JTWA used reasonable skill to interview ROMERO they would have discovered that

10  ROMERO was much more than just a story edtior for the television show "White Collar"

11  and that they had a conflict of interest in representing ROMERO and that they could not

12  appropriately and fully represent both ROMERO and EASTIN in such a matter.

13  194. If PLAINTIFF had been informed and represented competently, PLAINTIFF would

14  have owned 50% of the endeavor that is the television show "White Collar". A television

15  show that is, as of the date of this First Amended Complaint, in its third season and,

16  PLAINTIFF is informed and believes and on that basis alleges, has earned EASTIN

17  millions of dollars.

18  195. As a direct and legal result of the carelessness and negligence of AUSTEN and JTWA, and

19  each of them, as herein alleged, PLAINTIFF has been deprived of the full value of his work and

20  involvement in the endeavor that is the television show "White Collar".

21  196. AUSTEN and JTWA, and each of them, continue to represent PLAINTIFF in regard to the

22  television show "White Collar".

23  197. PLAINTIFF is a layperson, unfamiliar with the intricacies, and complexities of the

24  entertainment industry and the complexities around business formation.

25  198. PLAINTIFF has suffered general and special damages in an amount according to proof at

26  time of trial.

27

28

## NINTH CAUSE OF ACTION FOR PROFESSIONAL MALPRACTICE

### (Against Defendants Rob Kenneally, Tom Young, and Creative Artists Agency LLC)

199. ROMERO refers to paragraphs 1 through 105, above, and hereby incorporates such paragraphs herein by this reference as though said paragraphs were set forth in full herein.

200. PLAINTIFF is informed and believes and thereon alleges that, at all times mentioned herein, Rob Kenneally was, and is, a talent agent working for Creative Artists Agency, a talent agency licensed in the state of California.

201. At the direction of EASTIN, KENNEALLY, YOUNG, and CAA approached ROMERO to be PLAINTIFF's talent agent and to negotiate and represent PLAINTIFF in regard to the television show "White Collar.

202. On or about June 2009, KENNEALLY, YOUNG, and CAA, and each of them, convinced ROMERO to allow them to engage in such efforts on behalf of ROMERO.

203. At the direction of, and in concert with, EASTIN, KENNEALLY, YOUNG, and CAA, and each of them, represented ROMERO as ROMERO's talent agent and agency for the endeavor that was the television show "White Collar".

204. At all times after accepting employment, KENNEALLY, YOUNG, and CAA, and each of them, failed to exercise reasonable care and skill in advising PLAINTIFF of his valuable rights to the endeavor that is the television show "White Collar" and failed to negotiate, and represent PLAINTIFF's best interests.

205. At all times after accepting employment, KENNEALLY, YOUNG, and CAA, and each of them, failed to exercise reasonable skill and diligence in representing PLAINTIFF, in that they neglected to ascertain PLAINTIFF's ownership of the endeavor that is the television show "White Collar" and they neglected to disclose to PLAINTIFF a conflict of interest between their long-term client EASTIN and PLAINTIFF in regard to the endeavor that is the television show "White Collar".

206. PLAINTIFF is informed and believes and thereon alleges that had KENNEALLY, YOUNG, and CAA, and each of them, used reasonable skill to interview ROMERO they would have discovered that ROMERO was much more than just a story editor for the

1   endeavor that is the television show "White Collar" and that they had a conflict of interest

2   in representing ROMERO and that they could not appropriately and fully represent both

3   ROMERO and EASTIN in such a matter.

4   207. If PLAINTIFF had been informed and represented competently, PLAINTIFF would

5   have owned 50% of the endeavor that is the television show "White Collar". A television

6   show that is, as of the date of this First Amended Complaint, in its third season and,

7   PLAINTIFF is informed and believes and on that basis alleges, has earned EASTIN, his

8   partner, millions of dollars.

9   208.   As a direct and legal result of the carelessness and negligence of KENNEALLY, YOUNG,

10  and CAA, and each of them, as herein alleged, PLAINTIFF has been deprived of the full value of

11  his work and involvement in the endeavor that is the television show "White Collar".

12  209.  PLAINTIFF is a layperson, unfamiliar with the intricacies, and complexities of the

13  entertainment industry and the complexities around business formation.

14  210.  PLAINTIFF has suffered general and special damages in an amount according to proof at

15  time of trial.

16

17              **TENTH CAUSE OF ACTION FOR BREACH OF FIDUCIARY DUTY**

18        **(Against Defendants Karl R. Austen and Jackoway Tyerman Wertheimer Austen**

19               **Mandelbaum Morris & Klein, a Professional Corporation)**

20  211.  ROMERO refers to paragraphs 1 through 105, above, and hereby incorporates such

21  paragraphs herein by this reference as though said paragraphs were set forth in full herein.

22  212.  As PLAINTIFF's attorney and representative for the "White Collar" television show

23  AUSTEN, and JTWA, and each of them, owed ROMERO fiduciary duties, including but not

24  limited to, the duty of loyalty, the duty of good faith and fair dealing, and the duty of care.

25  213.  AUSTEN, and JTWA, and each of them, violated the above-mentioned fiduciary duties to

26  ROMERO in that AUSTEN, and JTWA, and each of them, among other things, failed to satisfy

27  his and their fiduciary duties to ROMERO by not acting in ROMERO's best interests when

28  dealing with the negotiation, sale, distribution and exploitation of the television show "White

1   Collar".

2   214.  As a direct and legal result of the misconduct of AUSTEN, and JTWA, and each of them,

3   including the breach of fiduciary duties owed from AUSTEN, and JTWA, and each of them to

4   ROMERO, ROMERO sustained damages in an amount in excess of the jurisdictional threshold of

5   this Court, in an amount to be proven at trial.

6

7   **ELEVENTH CAUSE OF ACTION FOR BREACH OF FIDUCIARY DUTY**

8   **(Against Defendants Rob Kenneally, Tom Young, and Creative Artists Agency LLC)**

9   215.  ROMERO refers to paragraphs 1 through 105, above, and hereby incorporates such

10  paragraphs herein by this reference as though said paragraphs were set forth in full herein.

11  216.  As PLAINTIFF's talent agent and representative for the endeavor that is the "White Collar"

12  television show KENNEALLY and CAA, and each of them, owed ROMERO fiduciary duties,

13  including but not limited to, the duty of loyalty, the duty of good faith and fair dealing, and the

14  duty of care.

15  217.  KENNEALLY and CAA, and each of them, violated the above-mentioned fiduciary duties

16  to ROMERO in that KENNEALLY and CAA, and each of them, among other things, failed to

17  satisfy their fiduciary duties to ROMERO by not acting in ROMERO's best interests when dealing

18  with the negotiation, sale, distribution and exploitation of the endeavor that is the television show

19  "White Collar".

20  218.  As a direct and legal result of the misconduct of KENNEALLY and CAA, and each of them,

21  including the breach of fiduciary duties owed from KENNEALLY and CAA, and each of them, to

22  ROMERO, ROMERO sustained damages in an amount in excess of the jurisdictional threshold of

23  this Court, in an amount to be proven at trial.

24

25  **TWELFTH CAUSE OF ACTION FOR BREACH OF FIDUCIARY DUTY**

26  **(Against Defendant Jeff Eastin)**

27  219.  ROMERO refers to paragraphs 1 through 105, above, and hereby incorporates such

28  paragraphs herein by this reference as though said paragraphs were set forth in full herein.

220. As a general partner in the "White Collar" television show EASTIN owed ROMERO fiduciary duties, including but not limited to, the duty of loyalty, the duty of good faith and fair dealing, and the duty of care.

221. EASTIN violated the above-mentioned fiduciary duties to ROMERO in that EASTIN, among other things, failed to act in ROMERO's best interests with regard to the sale, distribution and exploitation of the television show "White Collar", as well as the distribution of money, proceeds, remuneration, and benefits pertaining the television show.

222. EASTIN also violated the above-mentioned fiduciary duties to ROMERO by failing to account to ROMERO pertaining to the television show "White Collar."

223. Eastin also violated the above-mentioned fiduciary duties to ROMERO by failing to hold as trustee for ROMERO the property, profit, and benefits derived as a result of the efforts expended by EASTIN and ROMERO pertaining to the television show "White Collar".

224. Eastin also violated the above-mentioned fiduciary duties to ROMERO by failing to include ROMERO is business and economic opportunities related or pertaining to the television show "White Collar".

225. Eastin also violated the above-mentioned fiduciary duties to ROMERO by dealing with ROMERO as though EASTIN had an interest adverse to ROMERO and the partnership that existed between ROMERO and EASTIN pertaining to the television show "White Collar".

226. Eastin also violated the above-mentioned fiduciary duties to ROMERO by competing with the partnership that existed between ROMERO and EASTIN pertaining to the television show "White Collar".

227. Eastin also violated the above-mentioned fiduciary duties to ROMERO by engaging in intentional misconduct, reckless misconduct, and knowing violations of the law with regard to the partnership that existed between ROMERO and EASTIN pertaining to the television show "White Collar".

228. Eastin also violated the above-mentioned fiduciary duties to ROMERO by not treating ROMERO with good faith and fair dealing.

229. As a direct and legal result of the misconduct of EASTIN, including EASTIN's various

FIRST AMENDED COMPLAINT

1   breaches of fiduciary duties owed from EASTIN to ROMERO, ROMERO sustained damages in

2   an amount in excess of the jurisdictional threshold of this Court, in an amount to be proven at trial.

3

4   **THIRTEENTH CAUSE OF ACTION FOR INTENTIONAL INTERFERENCE WITH**

5   **PROSPECTIVE BUSINESS/ECONOMIC ADVANTAGE**

6   **(Against All Defendants)**

7   230. ROMERO refers to paragraphs 1 through 105, above, and hereby incorporates such

8   paragraphs herein by this reference as though said paragraphs were set forth in full herein.

9   231. DEFENDANTS, and each of them, intentionally disrupted, diverted, and derailed

10   PLAINTIFF's business relationships and economic advantages pertaining to his work as a co-

11   creator of the White Collar television show, and DEFENDANTS, and each of them, did so with

12   knowledge of PLAINTIFF's business relationships and economic advantages pertaining to his

13   work as a co-creator of the White Collar television show.

14   232. Until PLAINTIFF was forced out of his position working on the White Collar television

15   show in or about December 2009 and deprived of his rights as a creator or the White Collar

16   television show beginning in or about 2009 (and continuing through the present), PLAINTIFF had

17   prospective business and economic relationships, and prospective economic advantages related to

18   the White Collar television show.

19   233. PLAINTIFF's writing successes, including those pertaining to the White Collar television

20   show, and the success of the White Collar television show in particular, resulted in a probability of

21   future economic benefit from business and economic relationships, and economic advantages, in

22   the entertainment industry (i.e. PLAINTIFF stood to earn and benefit from substantial income

23   from his co-creation and exploitation of the White Collar television show, including that

24   pertaining to the airing of the television show on various networks throughout the world, including

25   USA Network in the United States).

26   234. As a direct and proximate result of DEFENDANTS, and each of their, interference with,

27   disruption of, diversion of, and derailing of PLAINTIFF's business relationships and economic

28   advantages pertaining to his work as a co-creator of the White Collar television show, PLAINTIFF

FIRST AMENDED COMPLAINT

39

1   has been, and continues to be, injured.  Among other things, PLAINTIFF has not received any

2   compensation whatsoever for his role as a co-creator of the White Collar television show.

3

4   ## FOURTEENTH CAUSE OF ACTION FOR NEGLIGENT INTERFERENCE WITH

5   ## PROSPECTIVE BUSINESS/ECONOMIC ADVANTAGE

6   ### (Against All Defendants)

7   235. ROMERO refers to paragraphs 1 through 105, above, and hereby incorporates such

8   paragraphs herein by this reference as though said paragraphs were set forth in full herein.

9   236. DEFENDANTS, and each of them, acted unreasonably and wrongfully and negligently

10   disrupted, diverted, and derailed PLAINTIFF's business relationships and economic advantages

11   pertaining to his work as a co-creator of the White Collar television show, and DEFENDANTS.

12   237. As set forth in this Complaint, special relationships existed between PLAINTIFF and

13   DEFENDANTS, and each of them, such that DEFENDANTS, and each of them, owed (and all

14   DEFENDANTS except AUSTEN, JACKOWAY, KENNEALLY, YOUNG, and CAA continue to

15   owe) PLAINTIFF a duty of care.

16   238. Until PLAINTIFF was forced out of his position working on the White Collar television

17   show in or about December 2009 and deprived of his rights as a creator or the White Collar

18   television show beginning in or about 2009 (and continuing through the present), PLAINTIFF had

19   prospective business and economic relationships, and prospective economic advantages, related to

20   the White Collar television show.

21   239. PLAINTIFF's writing successes, including those pertaining to the White Collar television

22   show, and the success of the White Collar television show in particular, resulted in a probability of

23   future economic benefit from business and economic relationships, and economic advantages, in

24   the entertainment industry (i.e. PLAINTIFF stood to earn and benefit from substantial income

25   from his co-creation and exploitation of the White Collar television show, including that

26   pertaining to the airing of the television show on various networks throughout the world, including

27   USA Network in the United States).

28   240. DEFENDANTS, and each of them, wrongfully interfered with PLAINTIFF's prospective

FIRST AMENDED COMPLAINT                                    40

1  business and economic relationships, and prospective economic advantages, related to the White

2  Collar television show.

3  241. As a direct and proximate result of DEFENDANTS, and each of their, interference with,

4  disruption of, diversion of, and derailing of PLAINTIFF's business relationships and economic

5  advantages pertaining to his work as a co-creator of the White Collar television show, PLAINTIFF

6  has been, and continues to be, injured. Among other things, PLAINTIFF has not received any

7  compensation whatsoever for his role as a co-creator of the White Collar television show.

8

9                    **FIFTEENTH CAUSE OF ACTION FOR DECLARATORY RELIEF**

10                                    **(Defendant Jeff Eastin)**

11  242. ROMERO refers to paragraphs 1 through 105, above, and hereby incorporates such

12  paragraphs herein by this reference as though said paragraphs were set forth in full herein.

13  243. A controversy and dispute has arisen between ROMERO and EASTIN concerning the

14  validity of the ROMERO EASTIN general partnership.

15  244. A judicial declaration concerning the validity, and existence of the ROMERO EASTIN

16  general partnership is necessary and proper at this time.

17

18                    **SIXTEENTH CAUSE OF ACTION FOR DECLARATORY RELIEF**

19                                    **(Defendant Jeff Eastin)**

20  245. ROMERO refers to paragraphs 1 through 105, above, and hereby incorporates such

21  paragraphs herein by this reference as though said paragraphs were set forth in full herein.

22  246. A controversy and dispute has arisen between ROMERO and EASTIN concerning

23  EASTIN's fiduciary duty owed to ROMERO as a general partner.

24  247. A judicial declaration concerning the existence of EASTIN's fiduciary duty to ROMERO is

25  necessary and proper at this time.

26  ///

27

28

## PRAYER FOR RELIEF

WHEREFORE, ROMERO prays for relief and judgment against Defendants, and each of them, as follows:

### ON THE FIRST CAUSE OF ACTION

1. For an accounting;

2. For the amount due to Plaintiff as a result of the Accounting;

3. For interest on any and all amounts found to be due;

4. For reasonable attorney fees and costs of suit herein incurred;

5. For such other and further relief as the court may deem proper.

### ON THE SECOND CAUSE OF ACTION

1. For general and compensatory damages according to proof at trial, including all actual, consequential, and incidental losses, including, but not limited to, loss of income, together with prejudgment interest.

2. For punitive damages.

3. For pre-judgment interest.

4. For reasonable attorney's fees and costs of suit herein; and

5. For such other relief as this court may deem just and proper.

### ON THE THIRD CAUSE OF ACTION

1. For general and compensatory damages according to proof at trial, including all actual, consequential, and incidental losses, including, but not limited to, loss of income, together with prejudgment interest.

2. For pre-judgment interest.

3. For reasonable attorney's fees and costs of suit herein; and

4. For such other relief as this court may deem just and proper.

FIRST AMENDED COMPLAINT

42

## ON THE FOURTH CAUSE OF ACTION

1. For general and compensatory damages according to proof at trial, including all actual, consequential, and incidental losses, including, but not limited to, loss of income, together with prejudgment interest.

2. For punitive damages.

3. For pre-judgment interest.

4. For reasonable attorney's fees and costs of suit herein; and

5. For such other relief as this court may deem just and proper.

## ON THE FIFTH CAUSE OF ACTION

1. For general and compensatory damages according to proof at trial, including all actual, consequential, and incidental losses, including, but not limited to, loss of income, together with prejudgment interest.

2. For punitive damages.

3. For pre-judgment interest.

4. For reasonable attorney's fees and costs of suit herein; and

5. For such other relief as this court may deem just and proper.

## ON THE SIXTH CAUSE OF ACTION

1. For restitution.

2. For treble damages.

3. For pre-judgment interest.

4. For reasonable attorney's fees and costs of suit herein;

5. For a declaration that the business practices alleged herein are a violation of the public policy of the State of California, including but not limited to, California Business & Professions Code sections 17000 et seq.

6. For a preliminary and permanent injunction to prevent the use of each practice alleged herein and found to be unfair, unlawful, and/or a fraudulent business practice.

FIRST AMENDED COMPLAINT                43

7. For a further order to restore PLAINTIFF and any person in interest, any money or property which the DEFENDANT may have acquired by means of any practice alleged and found herein to be unfair, unlawful, and/or a fraudulent business practice.

8. or a further order to restore PLAINTIFF and any person of interest, the value of any compensation and benefit of which they were deprived by virtue of DEFENDANT's conduct, in engaging in any practice alleged and found herein to be unfair, unlawful, and/or a fraudulent business practice.

## ON THE SEVENTH CAUSE OF ACTION

1. For pre-judgment interest.

2. For treble damages.

3. For reasonable attorney's fees and costs of suit herein; and

4. For injunctive relief and such other relief as this court may deem just and proper.

## ON THE EIGHTH CAUSE OF ACTION

1. For general and compensatory damages according to proof at trial, including all actual, consequential, and incidental losses, including, but not limited to, loss of income, together with prejudgment interest.

2. For pre-judgment interest.

3. For reasonable attorney's fees and costs of suit herein; and

4. For such other relief as this court may deem just and proper.

## ON THE NINTH CAUSE OF ACTION

1. For general and compensatory damages according to proof at trial, including all actual, consequential, and incidental losses, including, but not limited to, loss of income, together with prejudgment interest.

2. For pre-judgment interest.

3. For reasonable attorney's fees and costs of suit herein; and.

4.    For such other relief as this court may deem just and proper.

## ON THE TENTH CAUSE OF ACTION

1.    For general and compensatory damages according to proof at trial, including all actual, consequential, and incidental losses, including, but not limited to, loss of income, together with prejudgment interest.

2.    For pre-judgment interest.

3.    For reasonable attorney's fees and costs of suit herein; and

4.    For such other relief as this court may deem just and proper.

## ON THE ELEVENTH CAUSE OF ACTION

1.    For general and compensatory damages according to proof at trial, including all actual, consequential, and incidental losses, including, but not limited to, loss of income, together with prejudgment interest.

2.    For pre-judgment interest.

3.    For reasonable attorney's fees and costs of suit herein; and

4.    For such other relief as this court may deem just and proper.

## ON THE TWELFTH CAUSE OF ACTION

1.    For general and compensatory damages according to proof at trial, including all actual, consequential, and incidental losses, including, but not limited to, loss of income, together with prejudgment interest.

2.    For pre-judgment interest.

3.    For reasonable attorney's fees and costs of suit herein; and

4.    For such other relief as this court may deem just and proper.

## ON THE THIRTEENTH CAUSE OF ACTION

1.    For compensatory damages in an amount to be proven at trial, including all actual,

1  consequential, and incidental losses, including, but not limited to, loss of income, together with

2  prejudgment interest;

3  2.   For costs of suit herein;

4  3.   For punitive damages; and

5  4.   For such other and further relief as this court may deem just and proper.

6

7  **ON THE FOURTEENTH CAUSE OF ACTION**

8  1.   For compensatory damages in an amount to be proven at trial;

9  2.   For costs of suit herein; and

10  3.   For such other and further relief as this court may deem just and proper.

11

12  **ON THE FIFTEENTH CAUSE OF ACTION**

13  1.   For compensatory damages in an amount to be proven at trial;

14  2.   For costs of suit herein;

15  3.   For such other and further relief as this court may deem just and proper.

16

17  **ON THE SIXTEENTH CAUSE OF ACTION**

18  1.   For compensatory damages in an amount to be proven at trial;

19  2.   For costs of suit herein;

20  3.   For such other and further relief as this court may deem just and proper.

21

22  DATED:  September 20, 2011          THE LAW OFFICES OF RHETT T. FRANCISCO

23                                     and
                                       THE LAW OFFICES OF PAWEL R. SASIK

24

25                                     By:
                                           Rhett T. Francisco,
26                                         Pawel R. Sasik
                                           Attorneys for Plaintiff
27

28

FIRST AMENDED COMPLAINT                                                    46

# EXHIBIT A

# Stokes & Caffrey

### Character Recap / Pilot Synopsis
### 10/3/07





**Peter Stokes**

**Neal Caffrey**

"You can have caviar and champagne
every day if you're not picking up the
check."

    — Neal Caffrey.

"You can lie to them. Never lie to me."

    — Kate

"I'm not jealous. I don't get jealous.
Shut up and drive."

    — Peter Stokes

# Our Characters



### Neal Caffery

Conman, imposter and forger extraordinaire. Neal likes nice things, and he usually gets them through charm and intelligence. He is serving the remaining 5 years of a federal fraud conviction as an FBI Special Consultant under the supervision of the man who caught him, Peter Stokes... a man Neal respects, detests and annoys in equal measure.

Neal likes the ladies, but throughout the series he will search for his true love, Kate, whose criminal talents may equal his own.



### Peter Stokes, FBI

Head of the FBI Fraud & Forgery Unit, San Diego. He's smart. He believes in hard work and trusts his gut. He's funny after a few beers and infamous for his temper. Neal was his white whale.

He is a happy family man with a wife and son he adores, although he feels an unsettling attraction to his junior agent Diane Berrigan and finds himself jealous of her fascination with Neal.



### Diane Berrigan, FBI

She is a junior agent, which means she does the grunt work Stokes doesn't have time for.

Following in Stokes' footsteps she joined the FBI as a forensic accountant then transferred to the field when she got bored crunching numbers. She is opinionated and justifiably conceited. She has a wicked sense of humor. She idolizes Stokes and finds her attraction to Neal disquieting.



### Kate Perdu

Neal was her partner, lover and soul mate. She believed in him completely until he lied to her and destroying her trust. She changed her identity and disappeared from his life.

Kate is beautiful and tragic. She can't let go of Neal but can't let herself get hurt again. She keeps tabs on Neal through rare secret communications with Stokes.

2



**The Tease:**

We open on the most low-key prison escape in history as NEAL CAFFREY simply walks out the front door. He's wearing a guard uniform that he ordered off the Internet using the Warden's gold MasterCard number. He hotwires an old truck in the parking lot and drives out the gate. But a battered pickup belching smoke is not how Neal Caffrey travels. He finds three dollars in the ashtray. Time for an upgrade.

We cut to Neal inside a thrift store trying on cheap windbreakers. He picks a particularly loud yellow one and pays the clerk the three bucks.

We reveal Neal wearing his new yellow jacket and the brown prison guard pants and shoes as he waits at the long term parking garage at the airport. A man pulls up in a Mercedes SL65 convertible and tosses Neal the keys. "Take care of my car. I'll be back in a month."

Cut to Neal cruising on the freeway in his new Mercedes, top down, wind in his hair, Vivaldi pumping out of the speakers. Three minutes in and now we know how Neal Caffrey rolls.

We move to the other side of the law and introduce PETER STOKES, head of the FBI Fraud and Forgery Unit and the man responsible for sending Neal to prison in the first place. Stokes and his junior agent DIANE BERRIGAN are with the Warden as guards tear Neal's cell apart. Stokes orders up the usual manhunt but doesn't think it will do much good. Neal is too smart. Probably the smartest guy Stokes has ever met. But Neal has his Achilles heel and Stokes has a hunch he knows were he's going. Neal Caffrey is going home.

We cut to a small rundown apartment complex. The Mercedes is parked at the curb as Stokes' own car pulls in next to it.

Inside the apartment Neal is sitting on the empty floor staring at the bare walls.

"Kate's gone," Stokes says as he walks in. "She changed her name, erased herself. Disappeared."

3

# EXHIBIT B

# White Collar

By

Jeff Eastin

Story by

Jeff Eastin
&
Travis Romero

May 3, 2008

"WHITE COLLAR"

IN BLACK:

We hear the SNICK SNICK of scissors.

FADE IN:

INT. WE DON'T KNOW WHERE - CLOSE ON

A MAN'S HEAVILY BEARDED FACE. Just his face. Eyes deep and intelligent, but with a slight desperation and resolve.

SNICK SNICK SNICK.

He keeps the scissors moving. Rough-trimming the beard. Rushing but not panicking. Revealing more of his face.

CLOSE ON:

Toilet Bowl -- as clumps of hair fall into the water.

CLOSE ON:

The Man. The beard is roughly trimmed short. We're beginning to see the face underneath. It's an exceptional face.

He holds up a shard of mirror with taped edges and a disposable razor and goes to work on the remaining stubble.

EXTREMELY CLOSE ON:

The razor as the man cleans it in the water on the back of the toilet tank.

WIDER:

Reveal we're in a bathroom stall. The man is seated backward on the toilet, his back to us. He's wearing the orange jumpsuit of a federal prisoner.

The lid of the tank is off. He finishes with the razor. Splashes water from the tank on his face.

CLOSE ON:

The mirror. The image in it steadies on his face. This is NEAL CAFFREY. Another time, another place, he might give Cary Grant a run for his money. He is a man at whom you will look twice.

WIDER:

Neal reaches deep into the tank and pulls out two ziplock bags.

79.

                    PETER
          Good, because next Saturday I've got
          some follow-up work on a case in
          Boulder, thought I'd drag you along.

Neal just looks at him, not sure he heard correctly.

                    NEAL
          Boulder?

                    PETER
          Any problem with that?

                    NEAL
          No. I just... why are you doing this?

Peter doesn't answer immediately. He looks over at his wife.
She catches his eye and smiles and we see it... Peter gets
the arrow straight through the heart all over again.

                    PETER
          Because you're right. When she's the
          one you can never let go.

They sit in comfortable silence for a moment.

                    PETER (CONT'D)
          By the way... I would have caught
          you.

OFF both of them grinning at that--

                                        FADE OUT.


                    THE END

# EXHIBIT C

# White Collar

By

Jeff Eastin

Story by

Jeff Eastin
&
Travis Romero

October 30, 2008

"WHITE COLLAR"

IN BLACK:

We hear the SNICK SNICK of scissors.

FADE IN:


INT. WE DON'T KNOW WHERE - CLOSE ON

A MAN'S HEAVILY BEARDED FACE. Just his face. Eyes deep and
intelligent, but with a slight desperation and resolve.

SNICK SNICK SNICK.

He keeps the scissors moving. Rough-trimming the beard.
Rushing but not panicking. Revealing more of his face.

CLOSE ON:

Toilet Bowl -- as clumps of hair fall into the water.

CLOSE ON:

The Man. The beard is roughly trimmed short. We're beginning
to see the face underneath. It's an exceptional face.

He holds up a shard of mirror with taped edges and a
disposable razor and goes to work on the remaining stubble.

EXTREMELY CLOSE ON:

The razor as the man cleans it in the water on the back of
the toilet tank.

WIDER:

Reveal we're in a bathroom stall. The man is seated backward
on the toilet, his back to us. He's wearing the orange
jumpsuit of a federal prisoner.

The lid of the tank is off. He finishes with the razor.
Splashes water from the tank on his face.

CLOSE ON:

The mirror. The image in it steadies on his face. This is
NEAL CAFFREY. Another time, another place, he might give
Cary Grant a run for his money.

WIDER:

Neal reaches deep into the tank and pulls out two ziplock
bags. One contains a pair of brown dress shoes, another holds
a package from the Quartermaster Uniform Supply company.

78.

She's happy, laughing and glowing like a teenager.

Without a word, Peter reaches into his pocket and pulls out a leather ID wallet and hands it to Neal. Inside is Neal's picture and a card that reads: NEAL CAFFREY, FBI CONSULTANT.

                    PETER
          Figured if we didn't give you this,
          you'd end up making one of your own.

                    NEAL
              (touched)
          I'm official?

                    PETER
          Yeah. It's not going to be easy. How
          do you feel about working weekends?

                    NEAL
          I'm all yours.

                    PETER
          Good, because next Saturday I've got
          some follow-up work on a case in
          Boulder, thought I'd drag you along.

Neal just looks at him, not sure he heard correctly.

                    NEAL
          Boulder?

                    PETER
          Any problem with that?

                    NEAL
          No. I just... why are you doing this?

Peter doesn't answer immediately. He looks over at his wife. She catches his eye and smiles and we see it... Peter gets the arrow straight through the heart all over again.

                    PETER
          Because you're right. When she's the
          one you can never let go.

They sit in comfortable silence for a moment.

                    PETER (CONT'D)
          By the way... I would have caught
          you.

OFF both of them grinning at that--

                                        FADE OUT.

                    THE END

# EXHIBIT D

# A Crime Show Charles Ponzi Could Love



251

From: "eastin.jeff" <eastin.jeff@yahoo.com>
Subject: New York times today
Date: October 18, 2009 11:36:13 AM PDT
Cc: recipient list not shown: ;
➤   1 Attachment, 481 KB



**The New York Times**

this copy is for your personal, noncommercial use only. You can order presentation-ready copies for distribution to your colleagues, clients or customers here or use the "Reprints" tool that appears next to any article. Visit www.nytreprints.com for samples and additional information. Orders expire of this article now.



October 18, 2009

# A Crime Show Charles Ponzi Could Love

By KATHRYN SHATTUCK

BERNARD L. MADOFF was so far off the public's radar when Jeff Eastin pitched the crime series "White Collar" to USA two years ago that he described the main character as "an evil Donald Trump."

Luckily for Mr. Eastin the corporate misdeeds of financiers like Mr. Madoff and the miscalculations of others have provided a topical backdrop for "White Collar," a show about Neal Caffrey (Matt Bomer), a bond forger just escaped from prison, and Peter Burke (Tim DeKay), the agent who put him behind bars. The show's pilot episode, shot before the Madoff scandal unfolded, has its premiere on USA on Friday night at 10. Mr. Eastin's credits include creator and executive producer of the NBC series "Hawaii," now defunct, and screenwriter for the 1999 Jamie Foxx comedy "Held Up."

The new show's cat-and-mouse game becomes a partnership when Neal, snared again by Peter, offers his criminal expertise to the Feds rather than return to prison. In no time Neal has finagled his way out of the government's fleabag housing and into a penthouse with a closet full of gently used Sy Devore suits.

"I work hard," Peter blusters in a scene in which he takes in Neal's surroundings, accompanied by Sinatra's recording of "The Good Life." "I do my job well, and I don't have a $10 million view of Manhattan that I share with a 22-year-old art student while we sip espresso."

To which Neal replies, without a hint of irony, "Why not?"

Following are excerpts from Mr. Eastin's recent interview with Kathryn Shattuck, in which he spoke about those who roll in other people's dough.

■ Where did the idea for this show come from, and what took so long for it to come to fruition?

■ I'd really always wanted to do a show about cops and robbers, smart guys on both sides.

This was just before the writers' strike, and we were sitting around in the hot tub like we usually do, trying to figure out what's next. The whole idea of the buddy comedy was

something I was pretty familiar with and wanted to do for television. And "The Shield" is probably my favorite show of all time. If you want to do that dark and dirty stuff, you can't beat it.

But I really wanted to go the other way. With white-collar crime, it's the one place where the crime itself can be beautiful. If you forge the Mona Lisa, that's kind of spectacular. Actually we were shooting the pilot when Madoff got arrested, and I literally had 30 people call me that day and say, "Hey, I've got a great story for you."

Q. What gives Neal his allure?

A. I've always been fascinated by guys you could drop anywhere in the world with nothing, not a penny in their wallet, just the clothes on their back, and by the end of one day they'd be driving a Mercedes, staying at the Plaza and dating the most beautiful woman in the world. They get to where they're going by sheer force of personality. Neal is someone you could easily hate, but I think Matt Bomer brings so much boyish charm to him that you end up liking the guy despite that.

Q. Do Peter and Neal start envying each other's lives as they go on?

A. Envy is an interesting word. I don't know if it's envy as much as it is that Peter can't understand Neal. And when Neal sees the relationship between Peter and his wife, Elizabeth [Tiffani Thiessen], I think it really kills him that the one thing he desperately wants, which is Kate [his ex-girlfriend, played by Alexandra Daddario] and a normal life, he can't achieve.

Q. What's the story behind Kate?

A. In the mythology of the show they're together, working for this Madoff-type character, who pulls a Ponzi scheme and takes them for everything. They're two people in love, life was perfect, and then the rug's pulled out from under them. That's when Neal became a criminal.

Q. And Elizabeth?

A. Tiffani asked where Elizabeth came from, and I said, "Honestly, I based this character on Abigail Adams." I'd seen the John Adams mini-series, and what I found fascinating about Abigail Adams is that you had a woman who was very strong in her own right but at the same time was a passionate defender of her husband, who by all accounts was an incredible workaholic. Elizabeth is the same. She knew what she was getting into when she married Peter.

Q. You said the character of Peter Burke is your alter ego. How did someone like that end up in Hollywood?

A. I grew up in Longmont, Colo., a little town right next to Boulder. One day I decided I wanted to make movies, so I packed up an old Volkswagen bus, drove out to California, and on my first day went to U.S.C., because that's where Spielberg and Lucas were. I parked off campus, and when I came back, my bus was gone, along with everything else I had in the world. To my dad's eternal credit, I called crying from a pay phone, sirens in the background, and I said, "I want to come home." And he said, "Well, get a job, buy a ticket and come home." He told me later it was the hardest thing he'd ever done, but had he not done that, I'd probably be selling insurance in Longmont right now.

This article has been revised to reflect the following correction:

Correction: November 8, 2009
A picture caption on Oct. 18 with excerpts of an interview with Jeff Eastin, creator of the television show "White Collar," misidentified the actress shown with Matt Bomer and Tim DeKay. She is Marsha Thomason — not Alexandra Daddario, who also appears in the series.

Copyright 2009 The New York Times Company

Privacy Policy | Terms of Service | Search | Corrections | RSS | First Look | Help | Contact Us | Work for Us | Site Map

http://www.nytimes.com/2009/10/18/arts/television/18shat.html?pagewanted=print          2/16/2011

255

RHETT T. FRANCISCO, SBN 232749
THE LAW OFFICES OF RHETT T. FRANCISCO
5350 TOPANGA CANYON BOULEVARD
WOODLAND HILLS, CALIFORNIA 91364
TEL: (818) 319-9879

Attorney for Plaintiff, Cherie Brown

**CONFORMED COPY**
C F ORIGINAL FILED
Los Angeles Superior Court

OCT 1 2 2011

John A. Clouke, Exec ... Officer/Cl.

By _____ Dep
RAUL SANCHEZ

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## FOR THE COUNTY OF LOS ANGELES – CENTRAL DISTRICT

| | |
|---|---|
| DENNIS TRAVIS ROMERO a.k.a. TRAVIS ROMERO, an individual, <br><br> Plaintiff, <br><br> v. <br><br> JEFF EASTIN, an individual; KARL R. AUSTEN, an individual; JACKOWAY TYERMAN WERTHEIMER AUSTEN MANDELBAUM MORRIS & KLEIN, A PROFESSIONAL CORPORATION, a California Professional Corporation; ROB KENNEALLY, an individual; TOM YOUNG, an individual; CREATIVE ARTISTS AGENCY, LLC, a Delaware Limited Liability Company; FOX TELEVISION STUDIOS, INC., a Delaware Corporation; FOX TELEVISION STUDIOS PRODUCTIONS, INC., a Delaware Corporation; TWENTIETH CENTURY FOX INTERNATIONAL TELEVISION, INC. a New York Corporation; TVM PRODUCTIONS, INC., a Delaware Corporation; MATT LOZE, an individual; DAVID MADDEN, an individual; and DOES 1 through 100, inclusive, <br><br> Defendants. | Case No. BC463026 <br><br> **NOTICE OF OSC RE: FAILURE TO SERVE DEFENDANTS AND CONTINUED CASE MANAGEMENT CONFERENCE** <br><br> The Hon. Ernest M. Hiroshige Department 54 <br><br> Date: November 15, 2011 Time: 9:00 a.m. <br><br> F.A.C Filed: September 20, 2011 <br><br> Trial Date: Not Set |

TO ALL PARTIES AND THEIR ATTORNEYS, PLEASE TAKE NOTICE THAT on

October 11, 2011 at 9:00 a.m. in Department 54 of the Stanley Mosk Courthouse, located at

111 North Hill Street, Los Angeles, California 90012, the Court in Department 54 called the

NOTICE OF CONTINUED CASE MANAGEMENT CONFERENCE                    1

1  above-referenced matter for a Case Management Conference. Max J. Sprecher appeared for

2  Defendant Jeff Eastin. Rhett T. Francisco appeared for Plaintiff Dennis Travis Romero. No

3  other appearances were made.

4       After calling the matter for hearing and inquiring about whether all parties had been

5  served with the Complaint, the Court set an Order to Show Cause re: Failure to Serve

6  Defendants and Continued Case Management Conference for November 15, 2011 at 9:00 a.m.

7  in Department 54 of the Stanley Mosk Courthouse, located at 111 North Hill Street, Los

8  Angeles, California, 90012.

9

10  Dated:   October 11, 2011          THE LAW OFFICES OF RHETT T. FRANCISCO

11

12                      By:

13                        Rhett T. Francisco

14                        Attorney for Plaintiff,
                      Dennis Travis Romero

15

16

17

18

19

20

21

22

23

24

25

26

27

28

NOTICE OF CONTINUED CASE MANAGEMENT CONFERENCE     2

# PROOF OF SERVICE

1

2    I reside in the County of Los Angeles; I am over the age of eighteen years and not a party to the within action; my business address is: 5350 Topanga Canyon Boulevard, Woodland

3    Hills, California 91364.

4    On October 11, 2011, I served the following documents described as NOTICE OF OSC RE: FAILURE TO SERVE DEFENDANTS AND CONTINUED CASE MANAGEMENT

5    CONFERENCE on the interested parties to be noticed in said action, by delivering a true copy, via the method indicated below, to the following recipient(s):

6

7                The Law Offices of Max J. Sprecher
                 Max J. Sprecher

8                5850 Canoga Avenue, 4th Floor
                 Woodland Hills, CA 91367

9

10   ☒ BY MAIL I am "readily familiar" with the firm's practice for collection and processing of correspondence for mailing; under the practice it would be deposited with the United States Postal Service on the same day with postage thereon fully prepaid at Los Angeles,

11   California in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if the postal cancellation date or postage meter date is more than one

12   day after date of deposit for mailing an affidavit.

13

14   ☐ BY FACSIMILE I transmitted the foregoing document via facsimile to the recipient(s) listed above at

15

16   ☐ BY EXPRESS SERVICE CARRIER I am "readily familiar" with the firm's practice for collection and processing of correspondence for overnight mail/FedEx; under the practice it is deposited in a box or other facility regularly maintained by the express service carrier, or

17   delivered to an authorized courier or driver authorized by the express service carrier to receive documents, in an envelope or package designated by the express service carrier with delivery

18   fees paid or provided for to the recipient(s) listed above.

19

20   ☐ BY PERSONAL SERVICE I caused the foregoing document to be hand delivered to the offices of the recipient(s) listed above.

21

22   ☒ STATE I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and that this declaration was executed on October 11, 2011

23   at Los Angeles, California.

24

25                                      Joshua Maxman

26

27

28

99541                          SERVICE LIST

258