# EXHIBIT F

1 | Max J. Sprecher, Esq. (SBN: 169285)
LAW OFFICES OF MAX J. SPRECHER
2 | 5850 Canoga Avenue, 4th Floor
Woodland Hills, CA 91367
3 | P: 818.996.2255
F: 818.996.4204
4 | E-Mail: max@sprecherlaw.com

5 | Attorneys for Defendant JEFF EASTIN

6

7

8 | SUPERIOR COURT OF THE STATE OF CALIFORNIA

9 | COUNTY OF LOS ANGELES, CENTRAL DISTRICT

10

| | |
|---|---|
| 11 | TRAVIS ROMERO, an individual, |
| 12 | Plaintiff, |
| 13 | vs. |
| 14 | JEFF EASTIN, an individual; KARL R. AUSTEN, an individual; JACKOWAY |
| 15 | TYERMAN WERTHEIMER AUSTEN MANDELBAUM MORRIS & KLEIN, A |
| 16 | PROFESSIONAL CORPORATION, a California Professional Corporation; ROB KENNEALLY, |
| 17 | an individual; TOM YOUNG, an individual; CREATIVE ARTISTS AGENCY, LLC, a |
| 18 | Delaware Limited Liability Company; FOX TELEVISION STUDIOS, INC., a Delaware |
| 19 | Corporation; FOX TELEVISION STUDIOS PRODUCTIONS, INC., a Delaware Corporation; |
| 20 | TWENTIETH CENTURY FOX INTERNATIONAL TELEVISION, INC., a New |
| 21 | York Corporation; TVM PRODUCTIONS, INC., a Delaware Corporation; MATT LOZE, an |
| 22 | individual; DAVID MADDEN, an individual; and DOES 1 through 100, inclusive, |
| 23 | |
| 24 | Defendants. |

Case No. BC463026

Filed:        June 8, 2011
Assigned:   Hon. Ernest Hiroshige
                  Dept. 54

**DEFENDANT JEFF EASTIN'S NOTICE OF DEMURRERS TO FIRST AMENDED COMPLAINT; DEMURRERS TO FIRST AMENDED COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES**

**[Request for Judicial Notice Filed Concurrently Herewith]**

Date:   January 23, 2012
Time:   8:30 a.m.
Place:  Dept. 54

Trial:  N/A

25 | **TO THIS HONORABLE COURT AND TO PLAINTIFF AND HIS COUNSEL OF**

26 | **RECORD HEREIN:**

27 |      PLEASE TAKE NOTICE that on January 23, 2012, at 8:30 a.m., in Department 54 of the

28 | above-captioned Court located at 111 N. Hill Street, Los Angeles, CA 90012, Defendant Jeff Eastin

1
Case No. BC463026
DEFENDANT JEFF EASTIN'S NOTICE OF DEMURRERS TO FIRST AMENDED COMPLAINT; DEMURRERS
TO FIRST AMENDED COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES

1  ("Eastin" or "Defendant") will, and hereby does, demur to Plaintiff Travis Romero's ("Plaintiff" or

2  "Romero") First Amended Complaint ("FAC")[1], as specifically identified in the attached

3  Demurrers and Memorandum of Points and Authorities.

4        The Demurrers are based on the grounds that Plaintiff has not corrected any of the

5  deficiencies identified in the initial Demurrers[2]; in particular, the FAC is subject to demurrer on the

6  following grounds:

7        1.   Lack of Jurisdiction / Federal Preemption:  The Court lacks jurisdiction to proceed

8  because the underlying basis for Plaintiff's claims, *i.e.*, that he is a co-creator/co-author of a

9  television program, requires construction of the Copyright Act, and the Federal Court has exclusive

10 jurisdiction to consider and construct the application of the Federal Copyright laws under 17 U.S.C.

11 §301.

12        2.   Statute of Limitations:  The "primary purpose" and gravamen of the entire action is

13 the enforcement and/or claim for breach of the alleged oral partnership agreement – a cause of

14 action that Plaintiff scrupulously avoided pleading, but which still controls all aspects of this

15 action.  As such, the two-year statute of limitations applies to this proceeding, and the allegations in

16 the FAC (which are unchanged from the initial Complaint) reflect that Plaintiff was aware of

17 significant breaches and the apparent repudiation of the alleged oral partnership more than three

18 years before this action was filed.  Even if the Court considers the three-year fraud statute of

19

20  [1] For the Court's convenience, a copy of the FAC is attached hereto as Exhibit 1. The copy attached has been marked -- by hand -- to indicate the changes between the original Complaint and the FAC. No computer generated redline is available because Plaintiff's counsel has refused to provide electronic copies

21  of the two versions from which a computer-generated redline may be produced.
    [2] In the original Complaint, Plaintiff asserted four causes of action against Defendant Jeff Eastin

22  (accounting, breach of fiduciary duty, declaratory relief as to the duty to account, and declaratory relief as to the existence of the fiduciary duty).  Eastin filed Demurrers to the Complaint on the same basic grounds as

23  asserted herein.  In response, Plaintiff filed the FAC.  The FAC now alleges 16 causes of action against ten additional defendants, 11 of which are asserted against Eastin.  In addition to the original causes of action

24  against Eastin for accounting (now the 1st cause of action), breach of fiduciary duty (now the 12th), declaratory relief as to the duty to account (now the 15th), and declaratory relief as to the existence of a

25  fiduciary duty based upon the alleged oral partnership (now the 16th), Plaintiff added seven new causes of action against Eastin, including four fraud causes of action (2nd-5th), a cause of action under B&P §17200

26  (6th), and two causes of action for interference (13th-14th).  The remaining causes of action (7th-11th) are asserted against the new defendants only.

27  However, Plaintiff made no material changes to the core allegations and, in particular, made no changes in response to or to address the legal defects identified in the original Demurrers.

28

2                                    Case No. BC463026
DEFENDANT JEFF EASTIN'S NOTICE OF DEMURRERS TO FIRST AMENDED COMPLAINT; DEMURRERS
TO FIRST AMENDED COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES

510

1   limitations as applicable to any of the causes of action, the facts as alleged in both the original and

2   amended Complaints confirm knowledge as to events triggering accrual more than three years

3   before the action was filed.

4         3.      Lack of Adequate Pleading - the Terms of the Alleged Partnership:  Plaintiff has

5   failed to adequately allege the terms of the alleged oral partnership agreement – an issue that is a

6   necessary predicate for each of the eleven causes of action alleged in Plaintiff's FAC.  On that

7   basis, the eleven causes of action asserted against Eastin for an Accounting (1st), Intentional

8   Misrepresentations (2nd), Negligent Misrepresentation (3rd), Fraud: Promise Without Intent to

9   Perform (4th), Conspiracy to Defraud (5th), Unfair Business Practices (6th), Breach of Fiduciary

10  Duty (12th), Intentional Interference With Prospective Business / Economic Advantage (13th),

11  Negligent Interference With Prospective Business / Economic Advantage (14th), Declaratory

12  Relief as to the obligation for an accounting (15th), and Declaratory Relief as to the existence of a

13  Fiduciary Duty (16th) are subject to general demurrers.

14        4       Lack of Adequate Pleading - the Existence of the Alleged Partnership Agreement:

15  Plaintiff has failed to adequately allege the existence of the alleged oral partnership – an issue that

16  is a necessary predicate for each of the causes of action alleged against Eastin in Plaintiff's FAC.

17  On that basis, the eleven causes of action alleged against Eastin are subject to general demurrers.

18        5.      Lack of Adequate Pleading - The Elements of Each Cause of Action:  Plaintiff has

19  failed to adequately plead each of his eleven causes of action against Eastin, and each of the causes

20  of action is uncertain.  Specifically, Romero has failed to adequately allege causes of action for

21  Accounting (1st), Intentional Misrepresentations (2nd), Negligent Misrepresentation (3rd), Fraud:

22  Promise Without Intent to Perform (4th), Conspiracy to Defraud (5th), Unfair Business Practices

23  (6th), Breach of Fiduciary Duty (12th), Intentional Interference With Prospective Business /

24  Economic Advantage (13th), Negligent Interference With Prospective Business / Economic

25  Advantage (14th), Declaratory Relief as to the obligation for an accounting (15th), and Declaratory

26  Relief as to the existence of a Fiduciary Duty (16th).

27

28

---

3                                    Case No. BC463026

DEFENDANT JEFF EASTIN'S NOTICE OF DEMURRERS TO FIRST AMENDED COMPLAINT; DEMURRERS
TO FIRST AMENDED COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES

1    Defendant's motion is based upon this Notice of Demurrers, the attached Demurrers, the

2  attached Memorandum of Points and Authorities in support thereof, the Request for Judicial Notice

3  filed concurrently herewith, and upon such further evidence and argument as may be submitted and

4  considered by the Court.

5

6  DATED: November 16, 2011               LAW OFFICES OF MAX J. SPRECHER

7

8                                          Max J. Sprecher
                                           Attorney for Defendant JEFF EASTIN

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

---

4                                                    Case No. BC463026

DEFENDANT JEFF EASTIN'S NOTICE OF DEMURRERS TO FIRST AMENDED COMPLAINT; DEMURRERS
TO FIRST AMENDED COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES

# TABLE OF CONTENTS

DEMURRERS .................................................................................................. v

I.     INTRODUCTION ................................................................................. 1

II.    PLAINTIFF'S ALLEGATIONS............................................................ 2

III.   PLAINTIFF'S KEY AND CONTROLLING ADMISSIONS............................ 4

IV.    THE DEFECTS ON THE FACE OF THE FAC REQUIRE DISMISSAL ...................... 5

       A.    Plaintiff's Claims Are Preempted By The Copyright Act..................................... 5

       B.    The Two-Year (and Three-Year) Statute(s) Of Limitations Bar(s)
             This Action ........................................................................................ 7

             1.    The Statute Of Limitations Is Controlled By The Primary
                   Right At Issue ........................................................................ 7

             2.    The Two-Year Oral Contract Statute Applies To Romero's
                   Claims 8

             3.    All Eleven Of Mr. Romero's Causes Of Action Arise Under
                   The Same Primary Right – Breach Of The Alleged Oral
                   Partnership Agreement .......................................................... 9

       C.    Plaintiff Fails To Adequately Allege Each Of The Causes Of Action
             By Failing To Adequately Allege The Existence Of A Partnership
             Agreement And Its Terms Or The Formation Of A Partnership ......................... 11

       D.    Plaintiff's Claims For Fraud, Unfair Business Practices, and
             Interference Are Not Adequately Alleged .......................................... 14

V.     CONCLUSION.................................................................................... 15

# TABLE OF AUTHORITIES

Page(s)

CASES

*580 Folsom Associates v. Prometheus Development Co.,*
  223 Cal.App.3d 1 (1990) .................................................................................. 14

*Adams Manufacturing and Engineering Co. v. Coast Centerless Grinding Co.,*
  184 Cal.App.2d 649 (1960) ............................................................................... 14

*Aerojet General Corp. v. Superior Court,*
  177 Cal.App.3d 950 (1986) .................................................................................. 7

*April Enterprises, Inc. v. KTTV,*
  147 Cal.App.3d 805 (1983) ............................................................................... 14

*Barton v. New United Motor Manufacturing Inc.,*
  43 Cal.App.4th 1200 (1996) ................................................................................ 7

*Bustamante v. Intuit Inc.,*
  141 Cal.App.4th 199 (2006) .............................................................................. 14

*Cambridge Literary Properties, Ltd. v. W. Goebel Porzellanfabrik G.m.b.H. & Co. Kg.,*
  448 F.Supp.2d 244 (D.Mass 2006), *affirmed* 510 F.3d 77 (1st Cir. 2007) ......... 6

*Celador International Ltd. v. The Walt Disney Co.,*
  347 F.Supp.2d 846 (C.D.Cal. 2004) ................................................................. 14

*Committee on Children's Television, Inc. v. General Foods Corp.,*
  35 Cal.3d 197 (1983) ........................................................................................ 14

*Crowley v. Katleman*
  (1994) 8 Cal.4th 666 [34 Cal. Rptr. 2d 386, 881 P.2d 1083] *(Crowley)* ............. 8

*Daar v. Yellow Cab Co.,*
  67 Cal.2d 695 (1967) .......................................................................................... 5

*Davies v. Krasna,*
  14 Cal.3d 502 (1975) .......................................................................................... 9

*Estate of Peebles,*
  27 Cal.App.3d 163 (1972) ................................................................................... 8

*Faulkner v. California Toll Bridge Authority,*
  40 Cal. 2d 317 (1952) ......................................................................................... 5

*Freeman v. San Diego Ass'n. of Realtors,*
  77 Cal.App.4th 171 (1999) .................................................................................. 5

ii

Case No. BC463026

DEFENDANT JEFF EASTIN'S DEMURRERS TO FIRST AMENDED COMPLAINT

*Goodman v. Lee*,
   815 F.2d 1030 (5th Cir. 1987) ................................................................................6

*Hatch v. Collins*,
   225 Cal.App.3d 1104 (1990) .............................................................................7, 8

*Hensler v. City of Glendale*,
   8 Cal.4th 1 (1994) ................................................................................................7

*Hindin v. Rust*,
   118 Cal.App.4th 1247 (2004) ...........................................................................7, 8

*Hydro-Mill Co., Inc. v. Hayward, Tilton & Rolapp Ins. Associates, Inc.*,
   115 Cal.App.4th 1145 (2004) .............................................................................7

*Iverson, Yoakum, Papiano & Hatch v. Berwald*,
   76 Cal.App.4th 990 (1999) ................................................................................7

*Jefferson v. J.E. French Co.*,
   54 Cal.2d 717 (1960) ...............................................................................7, 9, 11

*Jenkins v. Pope*,
   217 Cal.App.3d 1292 (1990) ..............................................................................7

*Kenworthy v. Brown*,
   248 Cal.App.2d 298 (1967) ................................................................................7

*Kesmodel v. Rand*,
   119 Cal.App.4th 1128 (2004) ...........................................................................14

*Kruse v. Bank of America*,
   202 Cal.App.3d 38 (1988) .................................................................................12

*Leeper v. Beltrami*,
   53 Cal.2d 195 (1959) ..........................................................................................7

*Louis Lesser Enterprises, Ltd. v. Roeder*,
   209 Cal.App.2d 401 (1962) .....................................................................12, 13, 14

*Maguire v. Hibernia S. & L. Soc.*,
   23 Cal.2d 719 (1944) ..........................................................................................7

*McCoy v. Gustafson*,
   180 Cal.App.4th 56 (2009) ...........................................................................7, 11

*Ponti v. Farrell*,
   194 Cal.App.2d 676 (1961) ................................................................................7

*Small v. Fritz Companies, Inc.*,
   30 Cal.4th 167 502-503 (2000)..........................................................................14

iii

DEFENDANT JEFF EASTIN'S DEMURRERS TO FIRST AMENDED COMPLAINT

1   *Stoll v. Superior Court,*
2     9 Cal.App.4th 1362 (1992) .......................................................................8

3   *Terry v. Conlan,*
    131 Cal.App.4th 1445 (2005) .............................................................12, 13

4   *Weddington Prods., Inc. v. Flick,*
5     60 Cal.App.4th 793 (1998) ....................................................................12

6   *Wilhelm v. Pray, Price, Williams & Russell,*
7     196 Cal.App.3d 1324 (1986) .................................................................14

8   *Youst v. Longo,*
    43 Cal.3d 64 (1987) ...............................................................................15

9   STATUTES

10  17 U.S.C. §301 ...........................................................................................6

11  Cal. Bus. & Prof. Code §17071 ...............................................................15

12  Cal. Bus. & Prof. Code §17075 ...............................................................15

13  Cal. Code of Civ. Proc. §338 ...................................................................11

14  Cal. Code of Civ. Proc. §339 .....................................................................8

15  Cal. Code of Civ. Proc. §343 .....................................................................9

16  Cal. Corp. Code §16404 ...........................................................................11

17  Cal. Corp. Code §16405 .............................................................................9

18  Cal. Labor Code §1700.32 .......................................................................11

20  OTHER AUTHORITIES

21  9 Witkin, *Summary of Cal. Law, Partnership* §34 (10th Ed. 2005) ...........9

22  Weil & Brown, *Cal. Prac. Guide: Civ. Proc. Before Trial,* §7:47 ..............4

23
24
25
26
27
28

---

iv        Case No. BC463026
DEFENDANT JEFF EASTIN'S DEMURRERS TO FIRST AMENDED COMPLAINT

1                               **DEMURRERS**

2  **Demurrer To The Entire First Amended Complaint – Copyright Preemption/Lack of**

3  **Jurisdiction**

4          1.       All of the claims against Eastin in Romero's First Amended Complaint raise issues

5  as to co-authorship and/or determination of whether the television series was a work for hire –

6  issues that require construction of the Copyright Act and for which the Federal Courts have

7  exclusive jurisdiction. As such, the Complaint fails to allege any viable cause of action in this

8  Court. Cal. Code of Civ. Proc. §430.10(e).

9  **Demurrer To The Entire First Amended Complaint – Statute of Limitations**

10         2.       Romero's First Amended Complaint concedes knowledge of the facts triggering

11  accrual of each of his claims more than three years before this action was filed. As the primary

12  purpose/gravamen of this action is the alleged breach of an oral partnership agreement, the

13  applicable statute of limitations is the two-year oral contract statute of limitations. Moreover, even

14  if the three-year statute of limitations is applicable, Romero concedes knowledge of the claim more

15  than three years before filing this proceeding. As such, the Complaint fails to allege any viable

16  cause of action in this Court. Cal. Code of Civ. Proc. §430.10(e).

17  **Demurrer To The Entire First Amended Complaint – Failure to Adequately Allege The**

18  **Existence and Terms of the Alleged Underlying Partnership Agreement**

19         3.       Romero's entire Complaint fails to allege any cause of action against Eastin because

20  Romero has failed (a) to adequately allege the terms of the underlying oral partnership agreement,

21  and (b) to adequately allege the existence of the alleged oral partnership -- both of which are the

22  necessary and predicate elements for all of the theories of recovery alleged against Eastin.. Cal.

23  Code of Civ. Proc. §430.10(e).

24  **Demurrer to the First Cause Of Action For Accounting**

25         4.       Romero's First Cause of Action for Accounting fails to state facts sufficient to

26  constitute a cause of action against Eastin because, among other reasons, the claim is barred by the

27  applicable two-year statute of limitation (Cal. Code of Civ. Proc. §339), by the lack of adequate

28  pleading as to the existence of the alleged underlying oral partnership, and by the lack of adequate

---

v                                                Case No.  BC463026

DEFENDANT JEFF EASTIN'S DEMURRERS TO FIRST AMENDED COMPLAINT

1   pleading as to the terms of the alleged oral partnership agreement. Cal. Code of Civ. Proc.

2   §§430.10(e) and (f).

3   **Demurrer to the Second Cause Of Action For Intentional Misrepresentation**

4        5.     Romero's Second Cause of Action for Intentional Misrepresentation fails to state

5   facts sufficient to constitute a cause of action as against Eastin and is uncertain because, among

6   other reasons, Romero has failed to adequately plead the fraud, and the claim is barred by the

7   applicable two-year (or three-year) statute of limitation. Cal. Code of Civ. Proc. §§430.10(e) and

8   (f).

9   **Demurrer to the Third Cause Of Action For Negligent Misrepresentation**

10        6.     Romero's Third Cause of Action for Negligent Misrepresentation fails to state facts

11   sufficient to constitute a cause of action as against Eastin and is uncertain because, among other

12   reasons, Romero has failed to adequately plead the fraud, and the claim is barred by the applicable

13   two-year (or three-year) statute of limitation. Cal. Code of Civ. Proc. §§430.10(e) and (f).

14   **Demurrer to the Fourth Cause Of Action For Fraud: Promise Without Intent to Perform**

15        7.     Romero's Fourth Cause of Action for Fraud: Promise Without Intent to Perform fails

16   to state facts sufficient to constitute a cause of action as against Eastin and is uncertain because,

17   among other reasons, Romero has failed to adequately plead the fraud, and the claim is barred by

18   the applicable two-year (or three-year) statute of limitation. Cal. Code of Civ. Proc. §§430.10(e)

19   and (f).

20   **Demurrer to the Fifth Cause Of Action For Conspiracy to Defraud**

21        8.     Romero's Fifth Cause of Action for Conspiracy to Defraud fails to state facts

22   sufficient to constitute a cause of action as against Eastin and is uncertain because, among other

23   reasons, Conspiracy does not constitute a separate cause of action. Moreover, Romero has failed to

24   adequately plead the fraud, and the claim is barred by the applicable two-year (or three-year)

25   statute of limitation. Cal. Code of Civ. Proc. §§430.10(e) and (f).

26   **Demurrer to the Sixth Cause Of Action For Unfair Business Practices**

27        9.     Romero's Sixth Cause of Action for Unfair Business Practices fails to state facts

28   sufficient to constitute a cause of action as against Eastin and is uncertain because, among other

DEFENDANT JEFF EASTIN'S DEMURRERS TO FIRST AMENDED COMPLAINT

1 | reasons, Romero has failed to adequately plead the basis of any "unfair business practice" and has

2 | asserted statutory claims under Cal. Bus. & Prof. Code §17500 that have no rational relationship to

3 | any claim in this matter. In addition, the claim is barred by the applicable two-year (or three-year)

4 | statute of limitation, as well as by the defects in the allegations as to the basis for the alleged claim.

5 | Cal. Code of Civ. Proc. §§430.10(e) and (f).

6 | **Demurrer to the Twelfth Cause Of Action For Breach of Fiduciary Duty**

7 |         10.        Romero's Twelfth Cause of Action for Breach of Fiduciary Duty fails to state facts

8 | sufficient to constitute a cause of action and is uncertain because, among other reasons, Romero

9 | has failed to adequately plead the basis for the existence of any fiduciary duty by failing to

10 | adequately allege the existence and terms of the alleged oral partnership agreement. Moreover, the

11 | claim is barred by the applicable two-year statute of limitation. Cal. Code of Civ. Proc.

12 | §§430.10(e) and (f).

13 | **Demurrer to the Thirteenth Cause Of Action For Intentional Interference With Prospective**

14 | **Business / Economic Advantage**

15 |         11.        Romero's Thirteenth Cause of Action for Intentional Interference With Prospective

16 | Business / Economic Advantage fails to state facts sufficient to constitute a cause of action and is

17 | uncertain because, among other reasons, it is premised upon the rights asserted as a co-author

18 | which may not be adjudicated by the Superior Court, and Romero fails to adequately allege the

19 | elements of the tort, specifically the existence of any cognizable prospective economic benefit.

20 | Cal. Code of Civ. Proc. §§430.10(e) and (f).

21 | **Demurrer to the Fourteenth Cause Of Action For Negligent Interference With Prospective**

22 | **Business / Economic Advantage**

23 |         12.        Romero's Fourteenth Cause of Action for Negligent Interference With Prospective

24 | Business / Economic Advantage fails to state facts sufficient to constitute a cause of action and is

25 | uncertain because, among other reasons, it is premised upon the rights asserted as a co-author,

26 | which may not be adjudicated by the Superior Court, and Romero fails to adequately allege the

27 | elements of the tort, specifically the existence of any cognizable prospective economic benefit.

28 | Cal. Code of Civ. Proc. §§430.10(e) and (f).

vii                                                    Case No. BC463026
DEFENDANT JEFF EASTIN'S DEMURRERS TO FIRST AMENDED COMPLAINT

1  **Demurrer To The Fifteenth Cause Of Action For Declaratory Relief as to the Validity of the**

2  **Alleged Oral Partnership**

3       13.    Romero's Fifteenth Cause of Action for Declaratory Relief as to the validity and

4  existence of the alleged oral partnership fails to state facts sufficient to constitute a cause of action

5  because, among other reasons, the claim is barred by the two-year statute of limitation, by the lack

6  of adequate pleading as to the existence of the alleged underlying oral partnership, and by the lack

7  of adequate pleading as to the terms of the alleged oral partnership agreement.  Cal. Code of Civ.

8  Proc. §430.10(e).

9  **Demurrer To The Sixteenth Cause Of Action For Declaratory Relief as to Fiduciary Duty**

10  **Owed as a Partner**

11       14.    Romero's Sixteenth Cause of Action for Declaratory Relief as to the existence of

12  any alleged fiduciary duty as a partner fails to state facts sufficient to constitute a cause of action

13  because, among other reasons, the claim is barred by the two-year statute of limitation, and by the

14  lack of adequate pleading as to the existence of the alleged underlying oral partnership, and by the

15  lack of adequate pleading as to the terms of the alleged oral partnership agreement.  Cal. Code of

16  Civ. Proc. §430.10(e).

17  DATED: November 16, 2011          LAW OFFICES OF MAX J. SPRECHER

18

19                                    Max J. Sprecher
                                  Attorney for Defendant JEFF EASTIN

20

21

22

23

24

25

26

27

28

I.    **INTRODUCTION**

The gravamen of this action is Plaintiff Travis Romero's allegation that he was a co-author/co-creator and/or a partner in the creation of the television series "White Collar" and, thereby, was entitled to compensation or a share in the profits from the series. Romero's distorted perception as to his role in the creation of the series and his fanciful recitation of events may be colorful reading, but it fails to plead any viable claims.

In response to the demurrers to the original four defective causes of action, Romero elected to file a First Amended Complaint ("FAC"), alleging 11 additional (and contrived) causes of action and adding 9 more defendants. However, Romero made no changes to the substantive allegations that rendered his original Complaint defective. Instead, the FAC reflects an obvious shotgun effort to splatter enough mud on the wall in the hopes that "something will stick." It does not. Even if the allegations are taken at face value – as required on demurrer – the FAC is subject to demurrers on multiple grounds.

First, the underlying basis for each and every one of Romero's claims is Romero's factual assertion that he is a co-author of the series -- raising authorship issues under the Copyright Act, for which the Federal Courts have exclusive jurisdiction. Second, even if this Court believes that authorship is not at issue and the primary right is based solely on Romero's alleged status as a "partner," the express allegations (and the facts upon which this Court may take judicial notice) establish that the claims accrued more than three years before filing and that the applicable statutes of limitations bar the claims.[3] Third, Romero has failed to adequately allege the terms and existence of the alleged partnership with Eastin. Finally, Romero has failed to adequately plead any of the causes of action in his FAC. As Romero made no material changes with respect to Eastin in his FAC, the demurrers should be sustained without further leave to amend.

---

[3] First, although Plaintiff scrupulously attempts to avoid the primary right (*e.g.*, breach of oral partnership) underlying his claims against Eastin, the reality of his claims shines through. Aside from the authorship issue that must be dealt with in Federal Court, the core of Plaintiff's claims against Eastin is that Eastin breached an alleged oral partnership agreement, excluded Romero from the alleged partnership, and failed to pay Romero his share of partnership profits. Second, although enumerated as claims for accounting, fraud, breach of fiduciary duty, unfair business practices, and tortious interference, the primary right on which this action is based is the alleged formation, existence, and breach of an alleged oral partnership.

---

1

Case No. BC463026
DEFENDANT JEFF EASTIN'S DEMURRERS TO FIRST AMENDED COMPLAINT

## II.   PLAINTIFF'S ALLEGATIONS

Setting aside Plaintiff's self-aggrandizement[4] and the outrageous,[5] and often emotional, allegations, the FAC alleges the following "facts" and conclusions, which are accepted as true solely for the purposes of this motion.

Romero and Eastin were close friends from 1991 (FAC, ¶¶2-3) until late 2009. FAC, ¶64. Romero was more of an "idea guy," while Eastin was more of a technician and "pitch guy." Around 1993, the parties began to collaborate in the development of concepts. FAC, ¶¶ 3-4. In 1995, Eastin came up with a concept that required further development, and Romero worked with Eastin to develop the concept into a final product (*Shasta McNasty*). FAC, ¶5. Despite Romero's alleged efforts, Romero was relegated to a background position (FAC, ¶¶6-7), while Eastin owes his rise to "showrunner" status to Romero's efforts. FAC, ¶8.[6] *Shasta McNasty* was followed by a second series (*Hawaii*), for which Romero asserts similar allegations. FAC, ¶¶10-16.

After *Hawaii* (approximately 2005/2006), Romero alleges that Eastin told Romero that they should continue to work as a "team" and that "ROMERO would receive equal compensation and equal share of the compensation for their work" on a going-forward basis. FAC, ¶19. Romero goes on to allege that the parties "agreed that they would share equally, anything and everything they created, and that they would share equally the fruits of their labor." FAC, ¶21. Romero further alleges that "[a]t that point in time ROMERO and EASTIN formed a general partnership pertaining to this new venture that became the 'White Collar' television series, and EASTIN thus owed to ROMERO a fiduciary duty to act in the utmost good faith and in the best interests of ROMERO from that day forth with regard to the 'White Collar' television series." FAC, ¶¶22.

---

[4] For example, Romero self-importantly alleges that his role on the series *Hawaii* was so important that he was flown out to Hawaii to "guide production." FAC, ¶16. In fact, the on-set staff position is one of the lowest in the writing staff. The purpose of the on-set person is to make certain that the script as written by others is being followed. As such, writing staff personnel with the least experience (*i.e.*, people who really cannot write) are detailed to this position.

[5] Romero's distortions are egregious. For example, in paragraph Romero refers to (but does not quote) an email exchange with Eastin. The actual email reflects Romero's understanding that he was at fault for his own termination from the show and demonstrates that Romero did not make any claim of ownership or the existence of any partnership. *See* Request for Judicial Notice, ¶2, and Ex. C.

[6] A showrunner is the producer in charge of overseeing production of a series. Typically, showrunners are experienced writers, and the initial showrunner is usually the writer who developed the project.

1      Having allegedly agreed upon the formation of the foregoing "partnership," Romero alleges

2  that over the following months, the parties brainstormed various ideas, and that beginning in 2007,

3  the parties spent significant time developing one particular idea that was, in fact, the underlying

4  concept-theme for the series presently known as *White Collar*. FAC, ¶¶24-27. Eastin began

5  pitching the concept in late 2007, found interest at USA Network (FAC, ¶¶28-30), and on October

6  3, 2007, submitted a synopsis to third parties that identified Romero as a co-creator. FAC, ¶31 and

7  Ex. A thereto.

8      Romero continues by alleging that in March 2008, the parties undertook a major rewrite

9  over the course of five consecutive days and that during that time period, Eastin "reiterated to

10  ROMERO that ROMERO should be glad that he (ROMERO) would be paid as a creator of 'White

11  Collar.'" FAC, ¶31. Finally, with respect to his own "creative" participation, Romero alleges that

12  he continued his cooperative development and that Eastin sought out Romero's input and ideas.

13  *E.g.*, FAC, ¶¶38, 41, and 43.[2]

14      These allegations form the backbone of Romero's claims concerning the formation of the

15  alleged partnership and his alleged participation in the creation and development of *White Collar*.

16  On their face, the allegations clearly and unequivocally reflect that (a) the basis for each of

17  Romero's claims is the allegation that he is a co-author and that his rights arise from such status,

18  and (b) the existence and breach of the alleged partnership agreement are foundational to all of

19  Romero's theories. As explained below, the co-authorship issue cannot be addressed by this Court,

20  and the action must be dismissed on that basis.

21      Moreover, the additional allegations and admissions described below and, in particular, the

22  admissions peppered throughout the FAC as to timing and Eastin's alleged conduct – as detailed

23  below – establish that even if the Court could consider any claims against Eastin, the FAC is barred

24  by various statutes of limitations.

25

26

---

27  [2] The remaining allegations regarding Eastin reflect Romero's view of the continued development after USA
Network expressed interest, the production of the first season, Romero's exclusion, and his alleged efforts to
28  resolve the creator issue.

1   **III.   PLAINTIFF'S KEY AND CONTROLLING ADMISSIONS**

2        First, Romero has conceded in discovery that his claims are premised on joint authorship

3   theories under the Copyright Act.[8]  Here, the Court should consider Plaintiff's "response" to

4   Request for Admission No. 31, which asked of Plaintiff the following: "Admit that YOU do not

5   contend that any draft of the pilot script for WHITE COLLAR was a work of joint authorship

6   under the Copyright Act."  *See* Plaintiff's Request for Judicial Notice, ¶1, and Ex. A.

7        Plaintiff deliberately avoided any response and, instead, provided the following

8   meaningless objections:

9             "Responding party objects to this Request on the ground that Request
             is vague and ambiguous. Responding party further objects to this
10            interrogatory on the grounds that it is overbroad and seeks
             information protected by the attorney-client and/or attorney work
11            product privilege and seeks information protected by CCP section
             2034.210. Discovery has just begun, Responding Party has not yet
12            completed discovery, and Responding Party reserves the right to
             supplement this response at a later date."

13

14  *See* Request for Judicial Notice, ¶1, and Ex. B.  Romero's refusal to respond constitutes an effective

15  admission that joint authorship issues must be addressed in connection with his claims.  Moreover,

16  the express allegations (as added to the FAC) now specifically state that Romero was denied the

17  right to pursue his rights as a "co-creator." FAC, ¶85.

18        Second, Romero alleges that as early as 1995, he could not trust Eastin because (a) Eastin

19  improperly claimed sole creator credit for the series *Shasta McNasty,* (b) Eastin assumed total

20  control over the project, (c) Eastin relegated Romero to the background, and (d) Eastin barred

21  Romero from being recognized or paid as a creator.  FAC, ¶¶5-7.  Romero also admits that the

22  same usurpation took place in connection with the second television series, *Hawaii.* FAC, ¶¶13-16.

23  These admissions establish that Romero knew he could not impose any trust, and any claims

24  against Eastin were triggered and accrued at the earliest notice of any potential issue.  Thus, when

25  Romero alleges that he knew in May 2008 that Eastin removed the credit that indicated Romero

26  was a co-creator (FAC ¶44), the statute of limitations began to run on all of Romero's claims

27

28  [8] The Court may consider those facts for which judicial notice is appropriate, including responses to requests
    for admissions.  *See* Weil & Brown, *Cal. Prac. Guide: Civ. Proc. Before Trial,* §7:47.

1 against Eastin. Romero further alleges that the changes to the title pages "show[ed] that [Eastin]

2 was trying to push ROMERO out as co-creator and co-owner of the television series 'White Collar'"

3 and that "[i]t is no coincidence that at this time, *after* the 'White Collar' television was picked up by

4 the studio and network for airing, EASTIN began attempts to push ROMERO out as a co-creator

5 and thus co-owner of 'White Collar.'" FAC, ¶44 (emphasis added).[2]

6 IV.    **THE DEFECTS ON THE FACE OF THE FAC REQUIRE DISMISSAL**

7        In examining the sufficiency of a complaint, the court treats as true all material facts

8 properly pleaded, "but not contentions, deductions or conclusions of fact or law." *Freeman v. San*

9 *Diego Ass'n. of Realtors*, 77 Cal.App.4th 171, 178 n.3 (1999). Broad characterizations that any

10 conduct was purportedly wrongful or unlawful are given no weight. A demurrer admits "all

11 material and issuable facts properly pleaded . . . [but] does not admit contentions, deductions or

12 conclusions of fact or law alleged therein." *Daar v. Yellow Cab Co.*, 67 Cal.2d 695, 713 (1967);

13 *see also, Faulkner v. California Toll Bridge Authority*, 40 Cal. 2d 317, 329 (1952).

14       A.    Plaintiff's Claims Are Preempted By The Copyright Act

15       Romero is faced with a "catch-22" situation. Either the primary right is based upon the

16 alleged oral partnership (and, therefore, untimely as explained below), or the rights Romero seeks

17 to protect arise solely from his work as a co-author, Plaintiff's claims are preempted by the

18 Copyright Act. Here, Romero repeatedly claims that he was a co-creator (and, thus, a co-owner) of

19 the series and that his rights arise from that status. Romero thereby admits that the joint authorship

20 is an issue for determination in this matter.

21

22 [2]Similarly, Romero alleges that "[t]hroughout the process leading up to USA Network and Fox Studios picking up the 'White Collar' television series for airing, EASTIN assumed control" (FAC, ¶43). Elsewhere,

23 Romero concedes that the pick-up for the initial pilot occurred sometime prior to November 2008. FAC, ¶44 (identifying events prior to November 2008 as occurring *after* the pick-up). Thus, Romero knew

24 (again) by the end of October 2008 that Eastin did not intend to abide by the alleged partnership agreement. These allegations lock in the accrual as to any breach claim as early as May 8, 2008, and no later than

25 October 30, 2008. Romero also concedes that Eastin never disclosed any details of the deals made for the program – effectively excluding Romero from all management and control of the alleged partnership

26 property from the beginning. FAC, ¶78. When considered with Romero's knowledge as early as October 2007 that Eastin was pitching the project, Romero apparently knew between October 2007 and October

27 2008 that Eastin was in breach of his partnership obligations by excluding Romero from management. *Compare* FAC, ¶¶28, 30, and 78; *see also* FAC, ¶84 ("Throughout the ROMERO EASTIN general.

28 partnership, EASTIN has not satisfied his obligations pursuant to the general partnership, and his fiduciary duty to ROMERO, and has denied ROMERO the benefits of the general partnership.")

1    Under 17 U.S.C. §301, "claims involving the validity of a copyright interest which is not

2  premised on the parties' contractual agreement, constitute federal copyright claims." *Cambridge*

3  *Literary Properties, Ltd. v. W. Goebel Porzellanfabrik G.m.b.H. & Co. Kg.*, 448 F.Supp.2d 244,

4  255 (D.Mass 2006), *affirmed* 510 F.3d 77 (1st Cir. 2007). In affirming the district court, the First

5  Circuit stated:

6          "Cambridge attempts to avoid this conclusion by arguing that 'the
           Act's limitations do not apply to actions for accounting between
7          co-owners.' As we have said, that is not the issue. Cambridge argues
           that it is the fact that the action is one which the complaint labels as
8          being for an accounting that makes the difference. [fn7[10]] If
           co-ownership were conceded and the only question was a claim for
9          accounting of profits from the other joint owner, then Cambridge
           could argue the suit was only for an accounting of profits under state
10         law. *Gaiman [v.. McFarlane]*, 360 F.3d [644] at 652 [7th Cir. 2004].
           But under a long line of federal cases, Cambridge must first establish
11         that it is a co-owner, and the answer to that lies in the application of
           the Copyright Act and subjects that claim to the Act's statute of
12         limitations. *See id.* at 652-53. Cambridge cannot avoid this by the
           stratagem of failing to ask for a declaration of ownership as a method
13         of avoiding the federal limitations period for an ownership claim
           governed by the federal Act. [fn8]"

14

15  *Id.* at 86-87. *See also, Goodman v. Lee*, 815 F.2d 1030, 1031 (5th Cir. 1987) (finding that

16  "exclusive federal court jurisdiction exists in an action for a declaratory judgment to establish joint

17  authorship of a copyrighted work. . . ."). As the Federal Courts have exclusive jurisdiction to apply

18  the Copyright Act, this Court lacks the authority to consider or determine any issues as to Romero's

19  purported status as a joint author. Finally, since the issue as to Romero's status underlies each and

20  every theory of recovery, this action cannot be maintained in Superior Court.[11]

21

22

[10] Footnote 7 states, in pertinent part:

23

24          ". . . Our holding rests on the fact that the issue of ownership must be addressed
            first and is controlled by the Copyright Act's limitations period. This is true
            whether or not the claim for an accounting under state law is preempted."

25

[11] For example, all of the accounting and fiduciary duty claims against Eastin (1st, 12th, 15th, and 16th) are

26  based upon Romero's alleged status as a co-creator. *E.g.*, FAC, ¶¶6, 7, 13, 14, 31, 44, 85, 107-109, 221-225,
    and 242-247. Similarly, all of the fraud, interference, and unfair practices claims are based upon the

27  assertion that Romero has an interest as a co-creator, but that the defendants never intended to recognize
    Romero as a co-creator or interfered with his interest as an owner. *E.g.*, FAC, ¶¶117, 134, 151, 167, 176,

28  230, 236.

---

                                        6                           Case No. BC463026
              DEFENDANT JEFF EASTIN'S DEMURRERS TO FIRST AMENDED COMPLAINT

B. **The Two-Year (and Three-Year) Statute(s) Of Limitations Bar(s) This Action**

    1.    The Statute Of Limitations Is Controlled By The Primary Right At Issue

"The fundamental purpose of the statute of limitations is to afford a defendant timely notice of the claim against him so that he may assemble a defense while the facts are still fresh." *Aerojet General Corp. v. Superior Court,* 177 Cal.App.3d 950, 954 (1986). Where, as here, a complaint shows "on its face the cause of action is barred by the statute of limitations," it is subject to general demurrer. *Iverson, Yoakum, Papiano & Hatch v. Berwald,* 76 Cal.App.4th 990, 995 (1999).

"To determine the statute of limitations which applies to a cause of action it is necessary to identify the nature of the cause of action, *i.e.,* the 'gravamen' of the cause of action. '[T]he nature of the right sued upon and not the form of action nor the relief demanded determines the applicability of the statute of limitations under our code.'" *Hensler v. City of Glendale,* 8 Cal.4th 1, 22-23 (1994), *citing, Leeper v. Beltrami,* 53 Cal.2d 195, 214 (1959), and *Maguire v. Hibernia S. & L. Soc.,* 23 Cal.2d 719, 733 (1944).[12] Based upon the gravamen of a claim, the California courts apply shorter statutes of limitation where appropriate. *See, e.g., Leeper v. Beltrami,* 53 Cal.2d 195 (1959) (applying the three-year statute instead of the five-year statute for quiet title on the basis that the gravamen was duress); *Jefferson v. J.E. French Co.,* 54 Cal.2d 717, 718 (1960) (seminal decision discussing the application of the primary rights theory to statutes of limitations).

"For pleading purposes, whether a complaint in fact asserts one or more discrete causes of action depends on whether it alleges an invasion of one or more primary rights." *Hindin v. Rust,* 118 Cal.App.4th 1247, 1255-1258 (2004); *see also, Barton v. New United Motor Manufacturing Inc.,* 43 Cal.App.4th 1200, 1207 (1996) ("What is significant for statute of limitations purposes is

---

[12] "The violation of a single primary right still gives rise to only one 'cause of action,' even if a plaintiff seeks various forms or theories of relief." *McCoy v. Gustafson,* 180 Cal.App.4th 56, 103 (2009), *citing, Jenkins v. Pope,* 217 Cal.App.3d 1292, 1300, fn. 3 (1990). *See also, Kenworthy v. Brown,* 248 Cal.App.2d 298, 303 (1967); *Hydro-Mill Co., Inc. v. Hayward, Tilton & Rolapp Ins. Associates, Inc.,* 115 Cal.App.4th 1145, 1158-59 (2004); *Hatch v. Collins,* 225 Cal.App.3d 1104, 1110 (1990) ("the applicable statute of limitations is determined by the substance or gravamen of the action rather than the form of the pleading."); *Ponti v. Farrell,* 194 Cal.App.2d 676, 683 (1961) ("the criterion for determining the particular statute of limitations applicable, is not the form of the action, but the substance of it and the nature of the right, the violation of which creates the right of action.").

Case No. BC463026
DEFENDANT JEFF EASTIN'S DEMURRERS TO FIRST AMENDED COMPLAINT

1   the primary interest invaded by the defendant's wrongful conduct"). Thus, under California law:

2      "The primary right theory is a theory of code pleading that has long been

3      followed in California. It provides that a 'cause of action' is comprised of a 'primary right' of the plaintiff, a corresponding 'primary duty' of the

4      defendant, and a wrongful act by the defendant constituting a breach of that duty. The most salient characteristic of a primary right is that it is

5      indivisible: the violation of a single primary right gives rise to but a single cause of action.' (*Crowley v. Katleman* (1994) 8 Cal.4th 666, 681 [34 Cal.

6      Rptr. 2d 386, 881 P.2d 1083] (*Crowley*) [suit for malicious prosecution lies for bringing an action charging multiple grounds of liability when some but

7      not all of those grounds were asserted with malice and without probable cause].) 'As far as its content is concerned, the primary right is simply the

8      plaintiff's right to be free from the particular injury suffered. It must therefore be distinguished from the legal theory on which liability for that

9      injury is premised.' (*Ibid.*) ¶The manner in which a plaintiff elects to organize his or her claims within the body of the complaint is irrelevant to

10      determining the number of causes of action alleged under the primary right theory."

11   *Hindin v. Rust,* 118 Cal.App.4th at 1257, *quoting from, Crowley v. Katleman,* 8 Cal.4th 666, 681

12   (1994) (internal citations and quotes omitted).

13      Finally, a plaintiff cannot avoid the statute of limitations for a cause of action merely by

14   leaving that cause of action out of the complaint. Indeed, courts repeatedly have held that the

15   statute of limitations for an unasserted claim may bar an asserted one. *E.g., Stoll v. Superior Court,*

16   9 Cal.App.4th 1362 (1992) (one-year limitation period for unstated malpractice claim applied to

17   generic breach of fiduciary duty claim). The same application exists here. Romero purposefully

18   avoids the breach of contract claim and asserts more generalized claims that are wholly dependent

19   on the underlying contract. As in *Stoll,* the stylization of the theory does not alter the gravamen or

20   primary right that governs the statute of limitations. *Id.* at 1366 and 1369. Similarly, in *Hatch,* 225

21   Cal.App.3d 1104, the court applied the statute of limitations for fraudulent conspiracy, which was

22   not pleaded, on the basis that "the applicable statute of limitations is determined by the substance

23   or gravamen of the action rather than the form of the pleading." *Id.* at 1110.

24        2.    The Two-Year Oral Contract Statute Applies To Romero's Claims

25      A claim seeking to enforce the terms or existence of an oral agreement is governed by a

26   two-year statute of limitations. Cal. Code of Civ. Proc. §339(1); *see also, Estate of Peebles,* 27

27   Cal.App.3d 163, 166 (1972) ("if it be considered that the primary purpose of the action here was to

28   recover money under an oral contract, then the two year provision of Cal. Code of Civ. Proc. §339,

Case No. BC463026

DEFENDANT JEFF EASTIN'S DEMURRERS TO FIRST AMENDED COMPLAINT

1    subd. (1) may be applicable since 'the nature of the right sued upon, not the form of action or relief

2    demanded determines the applicability of the statute of limitations.'"), *citing, Jefferson,* 54 Cal.2d

3    at 718-719.[13]

4        In *Jefferson,* 54 Cal.2d 717, the California Supreme Court affirmed the dismissal of an

5    accounting claim as time barred where the true nature of the action was for the breach of an oral

6    employment agreement. In doing so, the Court specifically rejected the plaintiff's argument that

7    his accounting action was essentially "equitable in nature" and, therefore, governed by the

8    four-year limitation of Cal. Code of Civ. Proc. §343. *Id.* at 718. The Court held that "[t]he

9    accounting is merely ancillary to the perfection of plaintiff's right under the oral contract, and that

10    aspect of the action should not operate to avoid the effect of a statute prescribing a period of

11    limitation with respect to the right basically in issue." *Id.* at 719. The law further provides that

12    "the period of limitation of section 339, subdivision 1, governs not only actions for breach of oral

13    or implied contracts, but also both quasi-contractual actions and those tort actions, including any

14    tort of violation of confidence, which do not fall within the scopes of other statutes of limitation."

15    *Davies v. Krasna,* 14 Cal.3d 502, 510 n. 6 (1975) (holding that a claim for constructive fraud was

16    barred by the two-year statute of limitation).

17             3.     <u>All Eleven Of Mr. Romero's Causes Of Action Arise Under The Same</u>

18                 <u>Primary Right – Breach Of The Alleged Oral Partnership Agreement</u>

19        All of Romero's claims are based upon the same primary interest/right – the alleged

20    formation and existence of a partnership and Eastin's alleged failure to fulfill his obligations

21    thereunder. *E.g.,* FAC, ¶¶78-84. No matter how Romero has sought to dress the FAC, he has

22    refused to plead the most obvious (and, in fact, necessary and predicate) cause of action – breach of

23    oral contract. Regardless, Romero's allegations repeatedly focus on the contractual nature of the

24    relationship. *See, e.g.,* FAC, ¶80 (Romero's performance of the agreement has been excused;

25

26    [13] The Revised UPA provides that "[a] partner may sue another for legal or equitable relief, with or without
an accounting regarding partnership business" during the term of the partnership. 9 Witkin, *Summary of*

27    *Cal. Law, Partnership* §34 (10th Ed. 2005). More significantly, under Cal. Corp. Code §16405, a partner is
now specifically allowed to "maintain an action against a partner for a breach of the partnership

28    agreement . . ." and seek legal relief to "[e]nforce the partner's rights under the partnership agreement." Cal.
Corp. Code §§16405(a) and 16405(b)(1).

1   Eastin's contractual obligations are ongoing); ¶¶21-24 (alleging the circumstances in which the
2   agreement was reached); ¶107 (alleging that Romero and Eastin reached an agreement "to work
3   together to develop television shows . . .").

4        The absence of a cause of action for breach of contract is not surprising because of the
5   admissions in the FAC as to the numerous breaches triggering accrual as early as May 2008 – more
6   than three years before the action was filed.  In lieu of a breach of contract claim directly alleging a
7   violation of the primary right, Romero has asserted the eleven causes of action identified above. [14]

8        In the First Cause of Action, Romero specifically alleges that the parties reached an
9   agreement to work together to develop and sell a television show to specified buyers (FAC, ¶107),
10  that a partnership was formed as a result of the agreement (FAC, ¶108), and that the partnership
11  sold such a project to the designated buyers.  Romero further alleges that as a result of the
12  formation of the partnership (per an express agreement), Eastin owed Romero a fiduciary duty and
13  that Eastin has received monies from the production, a portion of which belonged to Romero.
14  Although stated as an accounting, the reality is that the allegations do nothing more than assert a
15  simple breach of contract, and without the proof as to the existence and breach of such a contract,
16  no claim can exist.  In his Fifteenth Cause of Action, Romero concedes the last point by seeking a
17  declaration as to the validity of the alleged general partnership (FAC, ¶243) formed as a result of
18  the express oral agreement (FAC, ¶¶22-24,107, and 108).

19       Romero's fiduciary duty claims repeat the same theme.  First, in the Twelfth Cause of
20  Action, Romero asserts a breach based upon the contention that Eastin owed the duty as a general
21  partner (FAC, ¶220), an allegation directly premised upon the existence of the alleged agreement.
22  Then, in the Fourth Cause of Action, Romero seeks a declaration as to the existence of such a duty
23  – a claim predicated on the existence and breach of the underlying agreement.

24       Romero's fraud based claims are also based upon the same vague statements purportedly
25  made by the defendants, including Eastin, that "ROMERO and EASTIN were partners, equal in the

26
27  [14] All eleven causes of action asserted against Eastin boil down to the same alleged primary right/interest – that the parties agreed to share equally in the ownership, control, and profits from the series, and that after initial development, Eastin excluded Romero at all levels.  E.g., FAC, ¶¶21-24, 78-84, 107-108, 120, 121, 134, 151, and 167.
28

1 partnership" and that "ROMERO would be recognized and compensated as a co-creator of the

2 'WHITE COLLAR' television show." FAC, ¶¶ 120, 121, 134, 151, 167. As such, the allegations

3 do not establish a separate primary right, and the same two-year limit should apply. Similarly, the

4 fraud allegations also fail to provide a separate statute of limitations as to Romero's additional

5 tortious interference claims and claim for unfair business practices. *See* FAC, ¶¶ 175, 230, 236.[15]

6 As the same primary right governs all of the asserted contract and tort-based claims, they each are

7 subject to a two-year statute of limitation and, therefore, fail.

8    Finally, even if this Court applies the three-year statute of limitations generally applicable

9 to fraud claims (Cal. Code of Civ. Proc. §338), Romero's allegations that he knew as early as May

10 2008 that Eastin sought to eliminate Romero (FAC, ¶44) bars this action from proceeding any

11 further. Based upon the allegations that Eastin had previously diverted credit, Romero had no

12 reasonable basis to impose any trust in Eastin. Therefore, Eastin's alleged act of eliminating

13 Romero's name from the credits in May 2008 triggered the accrual of all claims alleged herein.

14  C. <u>Plaintiff Fails To Adequately Allege Each Of The Causes Of Action By Failing</u>

15    <u>To Adequately Allege The Existence Of A Partnership Agreement And Its</u>

16    <u>Terms Or The Formation Of A Partnership</u>

17    In addition to the statute of limitations, there is an additional patent and obvious defect.

18 Plaintiff has failed to adequately allege the oral partnership agreement and the existence of an oral

19 partnership on which the purported claims are based. Although Plaintiff has not alleged a claim for

20 breach of contract, the primary rights asserted are based upon that claim. *McCoy,* 180 Cal.App.4th

21 at 102 ("[t]he violation of a single primary right still gives rise to only one 'cause of action' even if

22 a plaintiff seeks various forms or theories of relief."). Thus, a defect as to the pleading of the

23 underlying basis for all of the theories presented supports a demurrer. *Jefferson,* 54 Cal.2d at

24 718-719. This would be especially applicable to the 1st, 12th, 15th, and 16th causes of action (*i.e.,*

25 accounting, breach of fiduciary duty, and declaratory relief claims related thereto) -- each of which

26

27 [15] The unfair business practices claim also is deficient insofar as it relies on violations of *Labor Code* Section 1700.32 and *Corporations Code* Section 16404 -- neither of which is alleged to even apply to an

28 individual such as Eastin. *See* FAC, ¶ 172.

<hr>

11

Case No. BC463026

DEFENDANT JEFF EASTIN'S DEMURRERS TO FIRST AMENDED COMPLAINT

1   is expressly and unequivocally premised upon the formation and existence of an alleged oral

2   partnership. The same is true as to the purported interference claims that are based upon Romero's

3   alleged ownership interest.

4          Essential to the formation of a contract is the meeting of minds on the material terms;

5   therefore, when "the only (and the complete) subject matter that is under consideration is left for

6   further negotiation and agreement, there is no contract, not for vagueness or indefiniteness of terms

7   but for lack of any terms." *Kruse v. Bank of America*, 202 Cal.App.3d 38, 59 (1988)

8   ("[p]reliminary negotiations or an agreement for future negotiations are not the functional

9   equivalent of a valid, subsisting agreement"). Thus, "if an essential element is reserved for the

10  future agreement of both parties, the promise can give rise to no legal obligation until such future

11  agreement." *Weddington Prods., Inc. v. Flick*, 60 Cal.App.4th 793, 812 (1998); *see also, Louis*

12  *Lesser Enterprises, Ltd. v. Roeder*, 209 Cal.App.2d 401, 408 (1962) (holding no contract for joint

13  venture in an action for accounting under the claimed joint venture).

14         In *Weddington*, the Second Appellate District held (in reversing the Los Angeles Superior

15  Court) that a settlement agreement could not possibly exist where the parties, former partners in a

16  sound-effect editing business, were unable to reach agreement on critical terms of a sound library

17  license following termination of their partnership. *Weddington*, 60 Cal.App.4th at 815. The court

18  first held that a license agreement for the sound library was a material term of the broader

19  settlement agreement, and, "[t]herefore, if there was no licensing contract, there was no contract at

20  all." *Id.* at 815. The court went on to hold that "no specifically enforceable license contract was

21  ever formed" because the purported contract lacked material terms, including "the scope of the

22  license, permitted uses, grounds and procedures for termination, indemnity provisions, [and]

23  whether the license would contain an arbitration clause or whether the right to jury trial would be

24  preserved." *Id.* at 815.[16]

25

26  [16] In another decision discussing facts that are similar to *Weddington*, the Court of Appeals reversed an order
    enforcing a settlement agreement wherein the parties had agreed to certain "goals" of the settlement (that

27  each party would receive a particular property and that one property would be held in trust), but had not
    agreed to the "means of achieving the goals" (whether the property in trust would be managed by an

28  independent trustee, and what type of trust would be created). *Terry v. Conlan*, 131 Cal.App.4th 1445

---

12                                                    Case No. BC463026
DEFENDANT JEFF EASTIN'S DEMURRERS TO FIRST AMENDED COMPLAINT

1       Finally, in *Louis*, the Second Appellate District held that no contract existed where a series

2  of signed letters called for the payment of an identified sum of money to be later deposited by

3  defendants in a joint entity, which would develop "buildings of various types which it is proposed

4  should be either sold or rented" on 200 acres of land. *Louis*, 209 Cal.App.2d at 409. The court

5  found that this agreement lacked numerous material terms, for example, with respect to "their

6  proposed business venture for future agreement -- the nature of their mutual association

7  (partnership, joint venture, corporation or other entity); the manner and form of transfer of

8  defendants' 'options and vestings' in the property; the maximum cash contribution by each party;

9  [and] the nature of the development of the land." *Id.* at 406. In particular, the court noted that the

10  parties did not "agree upon the ultimate total contribution of each or how or when the amount

11  would be determined and paid" and that "there [was] no understanding of the kind of

12  improvements, type or number of buildings to be constructed, proposed cost, or the nature of the

13  development." *Id.* at 409.

14       Similarly, in this case, Plaintiff alleges the existence of an oral agreement by claiming that

15  Romero and Eastin worked as a "team" and that "ROMERO would receive equal compensation and

16  equal share of the compensation for their work" on a going-forward basis. FAC, ¶19. Romero

17  goes on to allege specifically that the parties "agreed that they would share equally, anything and

18  everything they created, and that they would share equally the fruits of their labor." FAC, ¶21.

19  Romero further vaguely alleges that Eastin would act as "the front man / pitch man for the venture

20  and that ROMERO would concentrate on generating ideas, concepts, storylines and show

21  definition." FAC, ¶23. This is the extent of Romero's allegations as to any terms of the purported

22  agreement. FAC, ¶ 24.

23       Critically lacking are such material terms as what exact services each party must perform,

24  how much the parties would be paid, who pays, when payment is due, the time for performance,

25  and, most importantly, how the parties' respective rights are impacted by the involvement of third

26  parties. Since these terms would have to be worked out between each party and the third-party

27

___

28  (2005). The court held that these "means" were material because they "had a significant financial impact on the parties"; therefore, there were no meeting of the minds and no enforceable agreement, *Id.* at 1459.

---

1  studio or producer who actually makes the television show at issue, the absence of these terms from

2  the alleged contract, such as in *Kruse, Weddington, Terry,* and *Louis,* as well as numerous other

3  consistent California authorities, similarly renders it an unenforceable agreement. *E.g., Bustamante*

4  *v. Intuit Inc.,* 141 Cal.App.4th 199, 213-214 (2006) (holding that an alleged oral partnership

5  agreement regarding a business venture that required "significant third-party involvement in the

6  enterprise" was, at best, an unenforceable "agreement to agree").

7       Finally, Romero does not adequately allege the existence of a partnership.  In order to plead

8  a joint venture or partnership, plaintiff must allege: (1) a joint interest in a common business

9  enterprise; (2) an understanding to share in the profits and losses; and (3) a right to joint control.

10  *E.g., April Enterprises, Inc. v. KTTV,* 147 Cal.App.3d 805 (1983).[17]  Here, Plaintiff fails to plead

11  the third necessary element, *i.e.,* a right to joint control.

12      **D.**    <u>Plaintiff's Claims For Fraud, Unfair Business Practices, and Interference Are</u>

13             <u>Not Adequately Alleged</u>

14      In addition to the defects detailed above, the newly added tort claims are defective for

15  various reasons as briefly addressed below.

16      <u>The Fraud Claims (2nd-5th Causes of Action)</u>:  Plaintiff's vague allegations as to Eastin's

17  purported fraudulent statements (FAC, ¶¶ 120, 121, 134, 151, 167) ignore California's strict

18  pleading requirements of particularity in fraud claims. *Committee on Children's Television, Inc. v.*

19  *General Foods Corp.,* 35 Cal.3d 197, 215-216 (1983); *Small v. Fritz Companies, Inc.,* 30 Cal.4th

20  167 502-503 (2000); *Wilhelm v. Pray, Price, Williams & Russell,* 196 Cal.App.3d 1324, 1331

21  (1986).  As to Romero's claim for Conspiracy to Defraud, no such cause of action exists.

22  "Conspiracy is not a cause of action, but a legal doctrine that imposes liability on persons who,

23  although not actually committing a tort themselves, share with the immediate tortfeasors a common

24  plan or design in its perpetration." *Kesmodel v. Rand,* 119 Cal.App.4th 1128, 1141 (2004).

25      <u>The Unfair Business Practices Claim (6th Cause of Action)</u>:  The unfair business practices

26

27  [17] *See also, 580 Folsom Associates v. Prometheus Development Co.,* 223 Cal.App.3d 1, 15-16 (1990); Cal.
Civ. Jury Instr. 3712; *Adams Manufacturing and Engineering Co. v. Coast Centerless Grinding Co.,* 184

28  Cal.App.2d 649, 655 (1960); *Celador International Ltd. v. The Walt Disney Co.,* 347 F.Supp.2d 846, 854
(C.D.Cal. 2004).

1   claim also is deficient for a variety of reasons. Among other things, the cause of action is

2   incomprehensible and uncertain. Plaintiff fails to specify the basis for the claim. Instead, Plaintiff

3   simply asserts that the other (albeit inadequately) alleged torts constitute illegal or unfair acts

4   necessary to support the claim. More significantly, Plaintiff asserts violations of specific statutes

5   that absolutely have no meaning or relationship to any of the alleged facts in this case.[18]

6          The Interference Claims (13th and 14th Causes of Action): Finally, the pleading of these

7   claims is defective because Plaintiff fails to adequately allege and define the existence of any

8   economic relationship with any third party with the probability of future economic benefit. Vague

9   references and descriptions of possible future economic advantage are totally inadequate under

10  California law. *Youst v. Longo,* 43 Cal.3d 64 (1987).

11  V.     CONCLUSION

12         As Plaintiff failed to correct any of the deficiencies identified in the original Demurrers, the

13  entire FAC is similarly subject to demurrers. On its face, the gravamen of the FAC is the claim of

14  co-authorship -- a claim that must be determined under federal law in Federal Court. More

15  importantly, all of the claims are barred by the passage of time. Finally, as explained above, each

16  claim is defective on its face. As Plaintiff already has amended the original Complaint (by simply

17  adding more egregious and frivolous allegations), no further leave should be granted, and all claims

18  against Eastin should be dismissed.

19

20  DATED: November 16, 2011                    LAW OFFICES OF MAX J. SPRECHER

21

22                                              Max J. Sprecher
                                                Attorney for Defendant JEFF EASTIN

23

24

25

26

27

28

---

[18] For example, Eastin is at a loss as to how Business and Professions Code §§17071 and 17075 (selling below cost or at discriminatory prices) apply to this action.

# EXHIBIT 1

# EXHIBIT 1

1
RHETT T. FRANCISCO, SBN 232749
THE LAW OFFICES OF RHETT T. FRANCISCO
2
5350 TOPANGA CANYON BOULEVARD
WOODLAND HILLS, CALIFORNIA 91364
3
TEL: (818) 319-9879

4
PAWEL R. SASIK, SBN 240672
THE LAW OFFICES OF PAWEL R. SASIK
5350 TOPANGA CANYON BOULEVARD
5
WOODLAND HILLS, CALIFORNIA 91364
TEL: (310) 571-5206
6

7
Attorneys for Plaintiff, Dennis Travis Romero

| Additions are highlighted. |
| Deletions or other alterations are described in the margins. |
| Changes in paragraph numbers after 11 are not notated. |

8
SUPERIOR COURT OF THE STATE OF CALIFORNIA

9
FOR THE COUNTY OF LOS ANGELES – CENTRAL DISTRICT
10
(UNLIMITED JURISDICTION)

11
DENNIS TRAVIS ROMERO a.k.a. TRAVIS
12
ROMERO, an individual,

13
                Plaintiff,

14
v.

15
JEFF EASTIN, an individual; KARL P. AUSTEN,
16
an individual; JACKOWAY TYERMAN
WERTHEIMER AUSTEN MANDELBAUM
MORRIS & KLEIN, A PROFESSIONAL
17
CORPORATION, a California Professional
Corporation; ROB KENNEALLY, an individual;
18
TOM YOUNG, an individual; CREATIVE
ARTISTS AGENCY, LLC, a Delaware Limited
19
Liability Company; FOX TELEVISION STUDIOS,
20
INC., a Delaware Corporation; FOX TELEVISION
STUDIOS PRODUCTIONS, INC., a Delaware
21
Corporation; TWENTIETH CENTURY FOX
INTERNATIONAL TELEVISION, INC., a New
22
York Corporation; FVM PRODUCTIONS, INC., a
Delaware Corporation; MATT BOZE, an
23
individual; DAVID MADDEN, an individual; and
DOES 1 through 100, inclusive,

24
                Defendants.
25

26

27

28

Case No.: BC 463026

FIRST AMENDED COMPLAINT FOR

1.  Accounting;
2.  Fraud: Intentional Misrepresentation;
3.  Fraud: Negligent Misrepresentation;
4.  Fraud: Promise Without Intent to Perform;
5.  Conspiracy to Defraud;
6.  Unfair Business Practices in Violation of Business & Professions code §§ 17000 and 17200;
7.  Violation of the Talent Agency Act (California Labor Code § 1700 et seq.)
8.  Professional Malpractice;
9.  Professional Malpractice;
10. Breach of Fiduciary Duty;
11. Breach of Fiduciary Duty;
12. Breach of Fiduciary Duty;
13. Intentional Interference With Prospective Business Advantage;
14. Negligent Interference With Prospective Business Advantage;
15. Declaratory Relief; and
16. Declaratory Relief.

JURY TRIAL DEMANDED

FIRST AMENDED COMPLAINT

1

1       **COMES NOW** Plaintiff DENNIS TRAVIS ROMERO (hereinafter "ROMERO" or

2       "PLAINTIFF") and alleges as follows:

3                   **COMMON ALLEGATIONS**

4   1.     In some special instances two individuals come together and have such complementary skills

5 that together they are capable of achieving much more than either one could on their own. This

6 type of partnership holds true in many of our great American success stories, many of which reach

7 great heights, have humble beginnings, and often manifest their raison d'etre in a garage, a back

8 room or even a hot tub; such is the story of Travis Romero (hereinafter "ROMERO" or

9 "PLAINTIFF") and Jeff Eastin (hereinafter "EASTIN" or "DEFENDANT").

10   2.     The friendship between ROMERO and EASTIN's began in 1991 at a YMCA where they

11 both worked as camp counselors. They were two young men with nothing to lose, everything to

12 gain, and dreams of Hollywood success. After some time EASTIN left his job at the YMCA to

13 begin work as a screen writer. Over the next many years ROMERO and EASTIN's friendship

14 blossomed.

15   3.     Around 1993, EASTIN was already working substantially in the entertainment industry as a

16 writer and had been focusing on making connections in the industry that would allow him to pitch

17 his own ideas; with these connections came a level of sophistication and understanding of the

18 entertainment industry.  At this point, EASTIN and ROMERO had been very close friends for

19 some time, and when an opportunity for EASTIN to pitch a studio arose, he informally discussed

20 the opportunity with ROMERO. ROMERO and EASTIN, without any written agreement,

21 discussed the project and brainstormed ideas for EASTIN to pitch. As between the two, ROMERO

22 was more of the "idea guy" and EASTIN was more of the "pitch guy". They soon realized that as

23 a creative writing team they had chemistry and worked well together, with ROMERO's creativity

24 and EASTIN's more technical skills. EASTIN's pitch was not picked up. However, EASTIN's

25 and ROMERO's work allowed EASTIN access to Hollywood decision makers.

26   4.     Over the next many years, ROMERO and EASTIN would continue, on and off, as a writing

27 team. The two entered into numerous ventures, with ROMERO and EASTIN creating a television

28 show concept, EASTIN pitching the concept to various Hollywood entities, and ROMERO and

1   EASTIN then further developing the story, the characters, the situations, and story arcs, and

2   defining the show and the series for even further development, sale and production.

3       5.   In 1995, EASTIN and ROMERO were about to have their first taste of true success. Again,

4   they began a new venture, along with EASTIN's soon-to-be wife Maral Adams, on an initial idea

5   that EASTIN came up with that required further development. After much work by ROMERO,

6   EASTIN, and Adams, the idea became the concept for Shasta McNasty, a television show about

7   three "slacker dudes" who also make up a rock band named Shasta, and, instead of working on

8   their music, spend most of their time hanging out. ROMERO, EASTIN, and Adams were very

9   close friends and worked without a written agreement. ROMERO considered EASTIN his best

10  friend and trusted him completely. Unfortunately, that was often to ROMERO's detriment. For,

11  although ROMERO, EASTIN, and Adams worked as equals on defining concept, characters, story

12  line, and a variety of plot lines that could be incorporated into the Shasta McNasty television

13  series, and although all three participated in the development of the show with the hopes of it

14  being picked up (i.e. purchased or optioned) by a production studio, EASTIN ultimately claimed

15  to be the sole creator.

16      6.   Once ROMERO, EASTIN and Adams agreed they had a pilot for the Shasta McNasty

17  television show that they felt could be pitched to a production studio, EASTIN took the concept

18  and pitched it. Shasta McNasty was green lit sometime in 1995 and EASTIN assumed a position

19  of control, acting as point man for communications with the production studio and facilitating

20  writing positions for both ROMERO and Adams. Even though the efforts to create the show were

21  equal among the three participants EASTIN took sole creator credit for Shasta McNasty.

22      7.   ROMERO, EASTIN and Adams worked on Shasta McNasty from 1994 to 1995. EASTIN

23  relied heavily on both ROMERO and Adams in continued concept, character, and plot definition

24  for Shasta McNasty. This was only natural since the three of them played equal parts in the origins

25  of the show. With the success of Shasta McNasty, EASTIN solidified his Hollywood presence and

26  EASTIN became known as an Executive Producer / Show Runner[1]. Because EASTIN claimed

27

28      [1] A Show Runner is someone who is responsible for the day-to-day operations of a
    television show and is often credited as an Executive Producer.

1   sole credit for creating the shows that he worked on with ROMERO and Adams, including Shasta

2   McNasty, EASTIN was put in the position of Show Runner by the studios and networks.

3   ROMERO and Adams, were relegated to the background and were not paid, or otherwise

4   recognize as creators of the shows, including Shasta McNasty. Pursuant to EASTIN's direction,

5   ROMERO and Adams were known and paid only as writers.

6   8.    In large part, EASTIN's rise to the position of Executive Produce / Show Runner would not

7   have occurred without ROMERO's efforts and his work with EASTIN to develop the Shasta

8   McNasty television show.

9   9.    During that same period, and due to the success of Shasta McNasty, EASTIN was able to

10  purchase a house in Woodland Hills California. Along with the home came a hot tub, and this hot

11  tub served as a catalyst for a plethora of concepts, stories, and characters, as well as an overall

12  cauldron for ROMERO's and EASTIN's television concepts and ideas. ROMERO and EASTIN

13  often worked in the hot tub and it became a topic of conversation and teasing on various future

14  projects.

15  10.    The Shasta McNasty venture, between ROMERO, EASTIN and Adams ended at some point

16  in 1995. On the heels of the success of Shasta McNasty, EASTIN, ROMERO and Adams, started

17  a new venture to develop a new show that they called "Hawaii". The Hawaii television show was

18  based on the original television series Hawaii Five-0. ROMERO, EASTIN, and Adams believed

19  that the Hawaii concept would appeal to television audiences and, much like with Shasta

20  McNasty, the three brainstormed, nurtured ideas, and developed the characters, and storyline.

21  11.    At the time ROMERO and EASTIN were working on the television show HAWAII,

22  EASTIN engaged the services of CARL AUSTEN (hereinafter "AUSTEN") and the law firm

23  Jackoway Tyerman Wertheimer Austen Mandelbaum Morris & Klein; A Professional

24  Corporation (hereinafter "JACKOWAY" or "JTWA") to represent EASTIN as EASTIN's

25  attorney. At or about the same time as EASTIN engaged AUSTEN, EASTIN also engaged the

26  services of ROB KENNEALLY (hereinafter "KENNEALLY"), a talent agent employed by

27  Creative Artists Agency (hereinafter "CAA") to represent EASTIN as EASTIN's talent agent.

28  12.    At or about the same time, ROMERO, being actively involved in the creation of HAWAII,

FIRST AMENDED COMPLAINT                                      4

1   also required the services of an attorney. EASTIN suggested to ROMERO that ROMERO use his

2   (EASTIN's) attorney to negotiate his (ROMERO's) deal for HAWAII. ROMERO did just that and

3   requested that AUSTEN negotiate ROMERO's deal for his work on HAWAII. AUSTEN did

4   negotiate ROMERO's deal for HAWAII.

Was 11   13.   As with Shasta McNasty, EASTIN pitched Hawaii to the studios and the television show

6   was green lit. Once again, EASTIN took control, acted as the point man for communications with

7   the studios, and claimed to be the sole creator of the Hawaii television show. Not surprisingly,

8   EASTIN was put in the position of Show Runner for the series; he again relegated ROMERO and

9   Adams to being paid and positioned as writers.

10   14.   At the time the Hawaii television show was green lit, Adams (then EASTIN's wife) asked

11   EASTIN why ROMERO and she were not being compensated as co-creators of the television

12   show Hawaii. In response, EASTIN told Adams, "If I gave you credit, then I would have to give

13   Travis [ROMERO] credit, and that would mean less money for us."

14   15.   As with Shasta McNasty, ROMERO was essential to the creation, development and ultimate

15   success of the show. In fact, EASTIN needed ROMERO to be present during all stages of

16   development because EASTIN could not do it on his own and required ROMERO's creative input.

17   EASTIN needed ROMERO to be the "idea guy".

18   16.   ROMERO's role in the creation of Hawaii was so important that he was flown out to Hawaii

19   to guide the production of the show. Having witnessed ROMERO's intimate involvement in the

20   production and development of the Hawaii the television show, as well as EASTIN's reliance on,

21   and need for, ROMERO's ideas various actors and employees of the show thought ROMERO was

22   a producer of the show. Even though ROMERO was relegated to being paid as a writer

23   ROMERO's actual contributions were much greater. Although EASTIN relegated ROMERO to

24   being paid as a writer, EASTIN often recognized ROMERO's actual contribution, by referring to,

25   and introducing ROMERO to others as, his, EASTIN's, writing partner.

26   17.   Hawaii began airing on NBC in 2004, but aired only eight episodes through approximately

27   November 2004. The work and creative energy spent on the show by each of ROMERO and

28   EASTIN was intense and the show's lack of commercial success was an incredible disappointment

1    to both ROMERO and EASTIN who considered the show their hot tub love child. ROMERO and

2    EASTIN were both very sad to see the Hawaii venture end.

3    18.   Because EASTIN positioned himself so he was in control of the show and the point man

4    with the production studios, after the Hawaii television show failed commercially, people within

5    the entertainment industry abandoned EASTIN. However, ROMERO was loyal, and stuck by

6    EASTIN. Even in the hard lean times when both were unemployed, not working on any particular

7    show, and not making any money, ROMERO was willing to work as a writing partner with his

8    friend EASTIN.

9    19.   Shortly after the end of Hawaii, ROMERO (as he often was) was sitting in EASTIN's hot

10    tub with EASTIN, discussing among other things, the state of the market for the entertainment

11    industry and their prospects. During that conversation, EASTIN stated that he believed that from

12    that point forward it was going to be difficult for the two of them to sell their television shows. In

13    this moment of honesty, away from the temptations, pressures, seductions of the television studios,

14    EASTIN told ROMERO that he and ROMERO were a great team, and he wanted to, and needed

15    to, continue working with ROMERO on new concepts because he could not do it on his own. As

16    he reminisced, EASTIN talked about the pair's history and accomplishments, and he admitted to

17    ROMERO that ROMERO should have received more compensation for the previous shows they

18    worked on. EASTIN went on to say, and promised ROMERO, that in the future ROMERO would

19    receive equal compensation and equal share of the compensation for their work.

20    20.   Immediately thereafter, the hot tub provided stage for a brand new venture that would

21    ultimately become the "White Collar" television show.

22    21.   Consistent with EASTIN's recognition that ROMERO should have been entitled to greater

23    compensation for work on their previous shows, ROMERO and EASTIN agreed that they would

24    both share equally, anything and everything that they created , and that they would share equally

25    the fruits of their labor.

26    22.   As before, EASTIN needed ROMERO's creative thought and ability to generate concepts,

27    storylines, characters, plot and show definition. ROMERO and EASTIN worked in concert to

28    further their business endeavor. At that point ROMERO and EASTIN formed a general

FIRST AMENDED COMPLAINT      6

1  partnership pertaining to this new venture that became the "White Collar" television series, and

2  EASTIN thus owed to ROMERO a fiduciary duty to act in the utmost good faith and in the best

3  interests of ROMERO from that day forth with regard to the "White Collar" television series.

4  23. Because the two recognized that ROMERO was more of the "idea guy" and EASTIN was

5  more of the "pitch guy", ROMERO and EASTIN agreed that EASTIN would act as the front man

6  / pitch man for the venture and that ROMERO would concentrate on generating ideas, concepts,

7  storylines and show definition.

8  24. Throughout the months that followed ROMERO's and EASTIN's hot tub agreement to work

9  together, as equals, going forward, ROMERO and EASTIN brainstormed a number of ideas and

10  concepts, but did not identify any particular idea or concept as worthy of a pitch to any studio.

11  25. Then, in or about the beginning of 2007, ROMERO and EASTIN engaged in efforts to

12  brainstorm specific ideas aimed at Fox Studios. After quite a bit of collaboration and

13  brainstorming, two ideas arose to the surface that ROMERO and EASTIN considered worthy of

14  presentation to studios. One of the ideas was a premise based on the question: "What would

15  happen if Vick Mackey (from the Shield) had been arrested for being a corrupt cop and was later

16  released to help police in a gang war?" EASTIN and ROMERO called the concept "Redemption".

17  In fact, the original title for the concept "Redemption" was introduced by ROMERO and inspired

18  by a Johnny Cash music video. (Eventually "Redemption" blossomed into "White Collar").

19  26. The concept "Redemption" was novel, and ROMERO and EASTIN decided push forward

20  and to develop the story, characters, and settings. ROMERO and EASTIN spent countless hours

21  doing so over the next few months.

22  27. From April 2007 through July 2007, ROMERO and EASTIN continued to collaborate on the

23  "Redemption" concept, spending hundreds of hours, discussing, outlining and fleshing out ideas.

24  In late July of that year, EASTIN began pitching the "Redemption" theme to Fox Studios. Fox

25  Studios expressed interest in the concept, but Fox Studios wanted ROMERO and EASTIN to

26  pursue a "Blue Sky" theme, instead of the dark and gritty concept. The new concept developed by

27  ROMERO and EASTIN focused more on white-collar criminals. In developing the "White Collar"

28  concept, ROMERO and EASTIN researched, reworked, rethought, and retooled the "Redemption"

FIRST AMENDED COMPLAINT

7

543

1  theme.

2  28.  In or about early September 2007, after hundreds of hours of collaborative work and

3  revision, EASTIN began pitching the "Blue Sky" version of the concept that was originally titled

4  "Redemption". ROMERO and EASTIN were calling the new, blue sky version, of the concept

5  "Half Way". Later, "Half Way" was re-named "Commuted", and then "Commuted" was re-named

6  "White Collar".

7  29.  In early September of 2007, ROMERO and EASTIN scheduled numerous, meetings, phone

8  calls, and writing sessions to "break the story" together.  As a result of those meetings, phone calls

9  and writing sessions, and through both parties' equal efforts, ROMERO and EASTIN produced an

10  outline that detailed much of the "White Collar" concept, including the inspiration and the story

11  for what became the "White Collar" pilot and television series. The discussions, collaborations,

12  and meeting sessions during this period were extensive and numerous, and they involved a great

13  amount of detail from ROMERO's and EASTIN's contributions to the project.

14  30.  Around September of 2007, EASTIN pitched the "White Collar" idea to the USA Network

15  and ROMERO's and EASTIN's concept received a favorable response.

16  31.  On or about October 3, 2007 ROMERO and EASTIN submitted to Fox Studios a Character

17  Recap / Pilot Synopsis for the television show / concept that was entitled "Stokes & Caffrey"

18  which was later entitled "White Collar". The Character Recap / Pilot Synopsis is dated 10/3/07

19  and states that it is by Jeff Eastin and Travis Romero. (A true and correct copy of the Character

20  Recap / Pilot Synopsis, pages 1-3 is attached to this Complaint as Exhibit A)

21  In or about March 2008, ROMERO and EASTIN, decided to perform an emergency redraft for the

22  pilot episode for the concept that was then known as "White Collar". Although they had received

23  positive feedback from the USA Network regarding the "White Collar" concept and the Pilot scrip

24  for the concept, ROMERO and EASTIN thought that the USA Network might not pick up the

25  show without a redraft of the pilot. ROMERO and EASTIN then reviewed the current state of the

26  script and decided that it would be in their best interests, even with a looming deadline, to rework

27  and redraft the script so that they would have a better chance of having Fox Studios and the USA

28  Network pick up the series for production. Over the next five (5) nights and four (4) days

¶ # missing

FIRST AMENDED COMPLAINT                                                            8

1  ROMERO and EASTIN worked together virtually non-stop reworking the Pilot script. ROMERO

2  and EASTIN discussed the scenes, the characters, the plot, and the concept as they revised, re-

3  wrote, and re-structured "White Collar". Also during this time, EASTIN reiterated to ROMERO

4  that ROMERO should be glad that he (ROMERO) would be paid as a creator of "White Collar".

5  After they completed the revisions of the "White Collar" Pilot ROMERO and EASTIN submitted

6  the Pilot for approval by Fox Studios and the USA Network.

Move: Last sentence moved to new ¶37.

7  ROB KENNEALLY and CAA and LOZE and FOX

8  32.  In late March of 2008, KENNEALLY had been EASTIN's agent for close to seven years.

9  33.  As the final draft of the television show "White Collar" was being developed by EASTIN

10  and ROMERO, EASTIN continued to communicate with his agent KENNEALLY updating him

11  on progress. EASTIN, through his agent KENNEALLY communicated with various executives at

12  FOX, one main contact for EASTIN was Matt Loze (hereinafter "LOZE"), Senior Vice President

13  at Fox Television Studios. LOZE worked very closely with David Madden the Executive Vice

14  President for Fox Television Studios, and David Madden was one of the main decision makers in

15  regard to the television show "White Collar".

16  34.  EASTIN, KENNEALLY and LOZE stayed very close, and communicated often about

17  getting "White Collar" produced. The three of them were the main players on the business side of

18  "White Collar". PLAINTIFF is informed and believes and on that basis alleges, that even though

19  EASTIN forwarded some of the communications that EASTIN, KENNEALLY, and LOZE had,

20  he kept ROMERO very much in the dark in terms of how EASTIN represented ownership of the

21  television show "White Collar".

22  35.  PLAINTIFF is informed and believes and on that basis alleges that KENNEALLY had been

23  aware of EASTIN's venture with ROMERO for quite some time, if not from the very beginning of

24  and at all times understood ROMERO's involvement as much more than just a writer.

25  36.  PLAINTIFF is informed and believes and on that basis alleges that LOZE had been aware of

26  EASTIN's venture with ROMERO from at least December 5, 2008 if not from the very beginning

27  and at all times understood ROMERO's involvement as much more than just a writer.

28

FIRST AMENDED COMPLAINT

9

1  37.  In or about May 2008, Fox Studios and the USA Network agreed to produce the "White

2  Collar" television series, as created by ROMERO and EASTIN.

3  38.  Thereafter, ROMERO and EASTIN further developed and defined, characters, storylines and

4  episodes for the "White Collar" television series. EASTIN continuously sought out, relied on, and

5  needed ROMERO's creative ideas / input regarding the evolution and development of the "White

6  Collar" television series, including, but not limited to, casting, locations, character clothing, story

7  lines, story arcs, relationships, relationships with other characters, story necessary props, and other

8  things critical to the success of "White Collar" television series.

9  39.  As the ROMERO and EASTIN continued to work on the television show "White Collar"

10  and as the studios became more serious, ROMERO's presence had to be accounted for.

11  40.  EASTIN, holding the pivotal role as the face of the business venture, used his contacts to

12  down play ROMERO's involvement in the venture and relegate ROMERO, with the help of

13  KENNEALLY, AUSTEN and LOZE to a mere story editor position on the television show

14  "White Collar."

15  41.  EASTIN's work with, and reliance on ROMERO is documented, in part, in hundreds of e-

16  mails exchanged between EASTIN and ROMERO. As a partnership, ROMERO and EASTIN

17  were present on numerous calls with studio executives, and followed-up on most of those calls

18  with working sessions, in order to elaborate on, and incorporate studio and network notes into, the

19  final versions of the "White Collar" television series scripts.

20  42.  ROMERO is informed and believes, and, on that basis alleges that after USA picked up the

21  television show "White Collar" for airing, EASTIN and DEFENDANTS, and each of them,

22  realized or became informed that the television show "White Collar" stood to generate millions of

23  dollars through such means and mechanisms as distribution, licensing, syndication, merchandising

24  and other forms of compensation.

25  43.  Throughout the process leading up to the USA Network and Fox Studios picking up the

26  "White Collar" television series for airing, EASTIN assumed control over the "White Collar"

27  television series as between himself and ROMERO, because he inserted himself as the point man

28  for communication between Fox Studios and the USA Network. After the "White Collar"

⟍┘ ¶ break removed

Del: "writer"

1  television series was picked up for airing EASTIN relegated ROMERO to being compensated as a

2  story editor instead of as a partner in the creation of the show. Not surprisingly, EASTIN installed

3  himself as Executive Producer / Show Runner. However, throughout the production of the

4  television series ROMERO and EASTIN worked with studio executives, writers, and directors to

5  further develop, refine and guide the "White Collar" television series that they created. The

6  collaborative efforts between ROMERO and EASTIN during this time are documented in

7  numerous e-mails between the two on virtually all subjects and details of the "White Collar"

8  television series, including but not limited to, casting, staging, direction, directors, story lines, and

9  story arcs.

10  44.  On or about May 08, 2008 EASTIN sent ROMERO a copy of the Pilot script for "White

11  Collar" the title page of which stated the "White Collar" television series was by *only* Jeff

12  EASTIN and no longer by Jeff EASTIN and Travis ROMERO. (A true and correct copy of the

13  May 8, 2008 "White Collar" script, cover page, page 1 and the last page, page 79 are attached to

14  this Complaint as Exhibit B)[2]. Then again on October 30, 2008 EASTIN e-mailed a version of the

15  Pilot script to ROMERO, and the two lead actors, Tim DeKay and Matt Bomer. The title page of

16  this script once again stated that the "White Collar" television series was by *only* Jeff EASTIN

17  and no longer by Jeff EASTIN and Travis ROMERO. (A true and correct copy of the October 30,

18  2008 email and the attached "White Collar" script, cover page, page 1 and the last page, page 78,

19  are attached to this Complaint as Exhibit C) EASTIN's manipulation of the title page for the

20  "White Collar" television series Pilot shows that he was trying to push ROMERO out as a co-

21  creator and co-owner of the television series "White Collar". It is no coincidence that at this time,

22  after the "White Collar" television series was picked up by the studio and network for airing,

23  EASTIN began attempts to push ROMERO out as a co-creator and thus co-owner of "White

24  Collar".

25  45.  In early June of 2009, AUSTEN had been EASTIN's attorney for many years and AUSTEN

26  had, at that point, already initiated representation of EASTIN with regard to the television show

27  _____

28  [2] EASTIN manipulated the title page of the "White Collar" television series Pilot to reflect that the television series was "by" *only* Jeff EASTIN with a "story by" Jeff EASTIN and Travis ROMERO.

FIRST AMENDED COMPLAINT                    11

1  "White Collar." EASTIN again recommended the legal services of AUSTEN to ROMERO to

2  have AUSTEN work on ROMERO's agreements in regard to the television show "White Collar."

3  46. ROMERO is informed and believes and on that basis alleges that AUSTEN and JTWA were

4  working with EASTIN on negotiating EASTIN's agreements for the television show "White

5  Collar," as they had done many times in the past.

6  47. PLAINTIFF is informed and believes and on that basis alleges that AUSTEN never inquired

7  about ROMERO's participation in the creation of the television show "White Collar."

8  48. PLAINTIFF is informed and believes and on that basis alleges that AUSTEN never

9  interviewed ROMERO, nor questioned or discussed any terms with ROMERO in regard to

10  ROMERO's agreement for the "White Collar" television show.

11  49. PLAINTIFF is informed and believes and on that basis alleges that AUSTEN never called or

12  spoke to ROMERO regarding "White Collar" and only AUSTEN's secretary, Laurie Anderson,

13  ever spoke with ROMERO regarding his agreement for "White Collar." PLAINTIFF is informed

14  and believes and on that basis alleges that the one brief email that AUSTEN sent to ROMERO, in

15  regard to the television show "White Collar," stated only the following: "I'm doing your

16  [ROMERO's] deal again (and happy to do so) on White Collar."

17  50. PLAINTIFF is informed and believes and on that basis alleges that he never received any

18  further counsel from AUSTEN nor from JTWA regarding the television show "White Collar" and

19  his ownership of the television show "White Collar."

20  51. PLAINTIFF is informed and believes and on that basis alleges that AUSTEN and JTWA

21  never explained, nor sought input from ROMERO, in negotiating ROMERO's agreement with

22  FVN Productions, and in the end only provided him with a story editor agreement for his

23  signature.

24  52. PLAINTIFF is informed and believes and on that basis alleges that AUSTEN and JTWA

25  never inquired as to ROMERO's participation in the endeavor that was the television show "White

26  Collar," nor did they inquire about ROMERO's role as EASTIN's partner.

27  53. AUSTEN and JTWA benefitted from their work on ROMERO's agreement by taking five

28  5% of ROMERO's earnings from the television show "White Collar."

FIRST AMENDED COMPLAINT                                    12

54. In mid June 2009 KENNEALLY and CAA had been representing EASTIN as EASTIN's agent and agency for a number of years and through numerous projects.

55. ROMERO is informed and believes and on that basis alleges that KENNEALLY was working with EASTIN on negotiating EASTIN's agreements for the television show "White Collar".

56. ROMERO, in furtherance of his venture with EASTIN, and ROMERO's absolute trust of EASTIN, asked EASTIN if he should find and engage his own talent agent. PLAINTIFF is informed and believes and on that basis alleges that EASTIN responded stating that ROMERO could just use EASTIN's agent KENNEALLY and that it would be more cost effective this way.

57. At this same time, EASTIN had already communicated to ROMERO and to his (EASTIN'S) long time agent KENNEALLY that ROMERO would require representation for the television show "White Collar".

58. KENNEALLY and CAA never informed ROMERO of the conflict of interest that KENNEALLY had in representing both EASTIN and ROMERO. PLAINTIFF is informed and believes and on that basis alleges that KENNEALLY provided some services for ROMERO but never fully represented ROMERO's best interests in regard to the television show "White Collar" and that he (KENNEALLY) was well aware that EASTIN and ROMERO worked hand in hand in the development of the television show "White Collar" and that ROMERO was entitled to co-ownership of the venture.

59. PLAINTIFF is informed and believes and on that basis alleges that EASTIN had earned KENNEALLY and CAA substantial sums of money through their representation of EASTIN.

60. Throughout the next many months ROMERO and EASTIN continued their "White Collar" venture and worked with the studio and the network and employees of the studio and network to film episodes of the "White Collar" television series for airing in late 2009.

61. Despite some initial attempts to quietly reduce the significance of ROMERO's contribution to the creation of the "White Collar" television series, EASTIN had another moment of honesty on or about October 18, 2009. During an interview with Kathryn Shattuck of the New York Times, which took place shortly before October 18, 2009, EASTIN admitted to Shattuck that the idea for

<div align="center">FIRST AMENDED COMPLAINT</div>

13

1   the "White Collar" television series came from ROMERO. (A true and correct copy of the October

2   18, 2009 New York Times Article is attached to this complaint as Exhibit D) Specifically, in

3   response to Shattuck's question, "'White Collar'" seems so timely, Who or what, was your

4   inspiration?", EASTIN replied,

5              "The idea really came from a friend of mine, Travis Romero,

6              who I broke the story with."

7   62. Around late October, 2009 EASTIN was called into a meeting with USA to discuss the

8   October 18, 2009 interview. After that meeting EASTIN told ROMERO that the article created a

9   lot of trouble for him. Around this time ROMERO again asked EASTIN about his ownership of

10  "White Collar". EASTIN told ROMERO that at this point it would be a difficult subject to bring

11  up given everything that was happening and that it could potentially affect his ability to bring

12  ROMERO back as a story editor for another season. In light of EASTIN's indirect threats

13  ROMERO worried not only about his friendship with EASTIN but also about his job as a story

14  editor for "White Collar" and the partnership that he had with EASTIN in the "White Collar"

15  venture. Despite the fact that potentially millions of dollars were at stake, ROMERO did not fear

16  losing out on compensation pertaining to "White Collar" and returning to his relatively poor

17  lifestyle, so much as he feared losing his best friend.

18  63.   ROMERO is informed and believes, and, on that basis alleges, on or about October 18, 2009,

19  and after EASTIN's comments to the New York Times, EASTIN realized that he would have to

20  share the benefits, profits, and compensation of the lucrative deals he entered into with Fox and

21  USA, pertaining to the television show White Collar.

22  64.   Over the next two months, from late October to late December 2009, EASTIN alienated

23  ROMERO and the relationship between the two deteriorated swiftly, because EASTIN did not

24  want to share compensation with ROMERO pertaining to the "White Collar" television series.

25  EASTIN made false accusations on ROMERO's abilities and contributions to the television show

26  "White Collar".

27  65.   Even though he was ostracized by EASTIN, ROMERO continued to further the development

28  and production of "White Collar". ROMERO did so not only because he believed in his "White

Del:
"writer"

FIRST AMENDED COMPLAINT                                                    14

550

1  Collar" venture, and he wanted his venture to succeed, but also because he hoped to save his
2  friendship with EASTIN.

3  66.  In or about November 2009, the "White Collar" Pilot aired, which blossomed into a series
4  that continues to air new episodes as of the filing of this complaint.

5  67.  In response to EASTIN's sudden change in demeanor and tone towards ROMERO,
6  ROMERO wrote EASTIN an e-mail in late November 2009. ROMERO wrote that email to the
7  guy he considered his best friend (at least until White Collar took off). In fact, ROMERO
8  desperately hoped he could continue to consider EASTIN his best friend. ROMERO addressed the
9  early success of "White Collar" and the good times that he and EASTIN had as friends before that
10  success and before big money became a real possibility. ROMERO wrote,

11           "Got to say I enjoy the positive reviews and good ratings.[of White Collar]
12           And we should cause (*sic*) God knows we've endured our share of the
13           other. Miss hanging with you. Hope you are doing well. And just
14           remember, before any of this at some point we were both pretty happy
15           having adventures in the Mazda Protégé."

16  68.  On or about December 21, 2009 EASTIN wrote ROMERO an email stating that he was in a
17  meeting with Fox and USA regarding ROMERO and that there were issues with ROMERO. At
18  the same time the relationship between ROMERO and EASTIN continued to degrade, what used
19  to be a constant back and forth of e-mails between ROMERO and EASTIN reduced to a trickle
20  and then a one sided communication coming only from ROMERO. EASTIN shut ROMERO out.

21  69.  ROMERO continued his attempts to contact EASTIN to resolve the issues around the
22  ownership of the television show "White Collar" and ROMERO's due compensation for his
23  efforts in the shows creation. EASTIN never contacted ROMERO back with any intent to resolve
24  their issues and left ROMERO without an informal avenue to resolve their differences.

25  70.  At the end of 2009 ROMERO's contract with "White Collar" was not renewed and
26  ROMERO went back to California. Despite EASTIN's repeated and severe bad behavior towards
27  ROMERO, ROMERO continued to contact EASTIN on numerous occasions to resolve their
28  issues, including ROMERO's ownership of the television show "White Collar" and ROMERO's

1   compensation for creating the television show. Unfortunately, EASTIN never attempted to contact

2   ROMERO to resolve the issues and EASTIN left ROMERO with no ability to resolve their issues

3   informally.

4   71.   For much of 2010 ROMERO worked on other projects, one of which he produced himself.

5   However, throughout this period of time ROMERO was bothered by what happened with his

6   friendship with EASTIN and the television show "White Collar". ROMERO's mental anguish

7   about his relationship with EASTIN and the television show "White Color" came to a head when

8   he saw the film "The Social Network". As he watched that movie ROMERO realized that

9   EASTIN took advantage of him much like Mark Zuckerberg took advantage of Eduardo Saverin.

10  Somewhat inspired, ROMERO told himself that he would not be taken advantage anymore; that

11  he needed to stand up for his rights.

12  72.   After significant soul searching and contemplation ROMERO finally decided to contact an

13  attorney, although he did not want to, he was ultimately forced to; EASTIN left him no choice.

14  73.   ROMERO is informed and believes, and, on that basis alleges that the White Collar

15  television show has been distributed throughout the United States, as well as at least 28 foreign

16  countries[3].

Was ¶51

17  74.   ROMERO is informed and believes that the television show "White Collar" has generated

18  revenue, money, proceeds and other compensation through its domestic and foreign distribution

19  both on broadcast television, via DVD and other means.

20  75.   As the filing date of this complaint "White Collar" is an ongoing business venture in its third

21  season and scheduled for broadcasting on June 6, 2011. EASTIN continues to acquire and

22  accumulate, money, compensation, remuneration as a result of the "White Collar" television show,

23  and in light of the fact that it is one of the highest rated cable television series, (including the

24  highest rated original programming series) EASTIN will continue to do so for the foreseeable

25  future.

26

27        [3]The foreign countries include, but may not be limited to, Canada, Mexico, Australia,
     Austria, Belgium, Brazil, Chili, Columbia, Denmark, Finland, France, Greece, Israel, India,
28   Iceland, Italy, Japan, Latvia, The Netherlands, Norway, Philippines, Portugal, Slovenia,
     Singapore, South Africa, Sweden, Thailand, United Kingdom, and Latin American countries.

FIRST AMENDED COMPLAINT                                                    16

1   76. ROMERO is informed and believes, and, on that basis, alleges that as of March 17, 2011 the

2 "White Collar" television show was the top drama on cable to that date in the eighteen to forty-

3 nine year old demographic, as well as the top Tuesday night drama among all key demographics.[4]

4   77. ROMERO imposed confidence in the integrity of DEFENDANTS, and each of them, and

5 DEFENDANTS, and each of them, voluntarily accepted ROMERO's confidence and agreed not to

6 take advantage of ROMERO or to take any act relating to the interest of ROMERO without

7 ROMERO's knowledge or consent.

8   78. When it came to deal making, EASTIN never provided ROMERO with any details of the

9 deals that EASTIN, and DEFENDANTS, and each of them, entered into regarding the television

10 show "White Collar" and did not include ROMERO in the negotiation of such deals.

11   79. ROMERO has not been provided with any information pertaining to the money, revenue

12 profits, expenses, and, costs pertaining to or associated with the "White Collar" venture.

13   80. ROMERO, through his work with EASTIN on the creation of the show "White Collar", has

14 performed, has been excused from performing, or has been prevented from performing, all of the

15 work he and EASTIN agreed upon. As the show "White Collar" has been picked up and is

16 currently in its third season EASTIN's obligation to compensate ROMERO has arisen and has

17 been ongoing. To this date, ROMERO has not received his portion of the proceeds, remuneration,

18 and/or compensation for his creation and ownership of "White Collar" and the creative and

19 intellectual property associated therewith. This in turn has resulted with ROMERO being harmed

20 financially and emotionally.

21   81. ROMERO is informed and believes, and, on that basis, alleges that EASTIN received

22 compensation from Fox Studios pertaining to the creation, development, production, and

23 exploitation of the "White Collar" television series.

24   82. ROMERO is informed and believes, and, on that basis, alleges that EASTIN received

25 compensation from the USA Network pertaining to the creation, development, production, and

26

27    [4] Romero is informed and believes, and, on that basis, alleges that on Tuesday's at ten
P.M. the "White Collar" television show delivered more twenty-five to fifty-four year old total

28 viewers and households for the USA network than any other network on cable, and out-
performed ABC and CBS among eighteen to thirty-four year olds.

FIRST AMENDED COMPLAINT       17

1    exploitation of the "White Collar" television series.

2    83.   Even though EASTIN received some monetary compensation, from the USA Network and

3    or from Fox Studios, to continue developing the show; ROMERO, has not received any

4    compensation. In fact, EASTIN had a fiduciary duty to share equally with ROMERO in any

5    proceeds derived from their mutual efforts on the venture "White Collar"; and, even though

6    EASTIN knew that ROMERO's financial position was dire, to the point that ROMERO was

7    borrowing money from friends and family just to house, clothe, and feed himself, he never shared

8    with ROMERO any of the proceeds he (EASTIN) received for "White Collar". ROMERO, even

9    though times were extremely difficult continued to work with EASTIN on their venture.

10    84.   Throughout the ROMERO EASTIN general partnership, EASTIN has not satisfied his

11    obligations pursuant to the general partnership, and his fiduciary duty to ROMERO, and has

12    denied ROMERO the benefits of the general partnership.

13    85.   ROMERO was not provided an opportunity to pursue his rights as a co-creator of the "White

14    Collar" television show because ROMERO was not provided with any Notice of Tentative

15    Writing Credits pertaining to the television show.

16    86.   In an e-mail dated December 5, 2008, from MATT LOZE to EASTIN, LOZE stated, "per

17    our lawyer folks, a bunch of issues associated with your giving up partial story credit, not least of

18    which is giving USA power to remove you as showrunner. We'll talk tomorrow, but not sure we

19    can [allow you to give ROMERO partial story credit] at this late date."

20    87.   In a series of e-mails, dated from March 19 through March 25, 2009, between DAVID

21    MADDEN and EASTIN, MADDEN stated that he understood ROMERO's significant

22    contribution to the creation of the "White Collar" television show, and that ROMERO is

23    extraordinarily strong at breaking stories. MADDEN even recognized ROMERO's role in

24    creating the story for the "White Collar" television show. But MADDEN suggested to EASTIN

25    that EASTIN take credit for ROMERO's story ideas, and that ROMERO should not even be a part

26    of the "White Collar" television show, despite ROMERO's contribution to the creation of the

27    show.

28

## JURISDICTIONAL AND DOE ALLEGATIONS

88. ROMERO is, and at all times mentioned in this complaint was, a resident of Los Angeles County California.

89. ROMERO is, and at all times relevant to this complaint was, doing business within the County of Los Angeles in California.

90. EASTIN is, and at all times relevant to this complaint was, a resident of Los Angeles County California, with his primary residence at 5026 Medina Road, Woodland Hills, CA 91364.EASTIN is and at all times relevant to this complaint was, doing business within the County of Los Angeles in California.

91. Karl Austen is, and at all times relevant to this complaint was, doing business within the County of Los Angeles in California with his principal place of business at 1925 Century Park East 22nd Floor, Century City, California 90067.

92. Jackoway, Tyerman Wertheimer Austen Mandelbaum Morris & Klein A Professional Corporation is, and at all times relevant in this complaint was, doing business within the County of Los Angeles in California with its principal place of business at 1925 Century Park East 22nd Floor, Los Angeles, California 90067.

93. MATT LOZE is, and at all times relevant to this complaint was, doing business within the County of Los Angeles in California with his principal place of business at 10201 West Pico Boulevard, Los Angeles, California 90064.

94. DAVID MADDEN is, and at all times relevant to this complaint was, doing business within the County of Los Angeles in California with his principal place of business at 10201 West Pico Boulevard, Los Angeles, California 90064.

95. TOM YOUNG is, and at all times relevant to this complaint was, doing business within the County of Los Angeles in California with his principal place of business at 2000 avenue of the stars, Los Angeles, California 90067.

96. ROB KENNEALLY is, and at all times relevant to this complaint was, doing business within the County of Los Angeles in California with his principal place of business at 2000 avenue of the stars, Los Angeles, California 90067.

1   97.  Creative Artists Agency is, and at all times relevant in this complaint was, doing business
2   within the County of Los Angeles in California with its principal place of business at 2000
3   avenue of the stars, Los Angeles, California 90067.
4   98.  Fox Television Studios Productions, Inc. is, and at all times relevant in this complaint was,
5   doing business within the County of Los Angeles in California with its principal place of
6   business at 10201 W. Pico Boulevard, Los Angeles, California 90035.
7   99.  Fox Television Studios, Inc. is, and at all times relevant in this complaint was, doing
8   business within the County of Los Angeles in California with its principal place of business at
9   10201 W. Pico Boulevard, Los Angeles, California 90035.
10  100. Fox Television Studios, Inc. is, and at all times relevant in this complaint was, doing
11  business within the County of Los Angeles in California with its principal place of business at
12  10201 W. Pico Boulevard, Los Angeles, California 90035.
13  101. TVM Productions, Inc. is, and at all times relevant in this complaint was, doing business
14  within the County of Los Angeles in California with its principal place of business at 10201 W.
15  Pico Boulevard, Los Angeles, California 90035.
16  102. Upon information and belief, at all times mentioned in this Complaint, each of Defendants
17  DOES 1 through 100, inclusive, was the agent and employee of the other defendants, and in doing
18  the things alleged herein was acting within the course and scope of that agency and employment.
19  Each of DOES 1 through 100, inclusive has ratified, approved, and authorized the acts of each of
20  the remaining defendants with full knowledge of said acts.
21  103. ROMERO does not know the true names of Defendants DOES 1 through 100, inclusive, and
22  therefore sues them by those fictitious names.
23  104. The capacities of DOES 51-100 are also unknown to ROMERO; each is in some manner or
24  capacity, and to some degree, legally responsible and liable for the damages of which ROMERO
25  complains.  ROMERO will amend this Complaint to allege the true names and capacities of these
26  DOE Defendants once they are ascertained.
27  105. The monetary damages sought by ROMERO exceed the minimal jurisdictional limits of this
28  Court and will be established according to proof at trial.

<center>FIRST AMENDED COMPLAINT</center>

20

1

2 ## FIRST CAUSE OF ACTION FOR ACCOUNTING

3 ### (Against Defendant Jeff Eastin)

4 106. ROMERO refers to paragraphs 1 through 105 above, and hereby incorporates such

5 paragraphs herein by this reference as though said paragraphs were set forth in full herein.

6 107. ROMERO and EASTIN agreed on working together to develop television shows aimed at

7 Fox Studios and the USA Network with the purpose of selling the shows to Fox Studios and the

8 USA Network.

9 108. As a result of their venture to make money through the creation production and development

10 of the "White Collar" television series, ROMERO and EASTIN formed a general partnership.

11 109. As a result of the fruits of the aforementioned general partnership, the television show

12 "White Collar" was created and produced. In turn, as a result of the distribution, licensing,

13 syndication, merchandising and other forms of compensation the television show "White Collar"

14 has generated and produced, money, revenue, remuneration, benefits and proceeds.

15 110. As a result of the aforementioned partnership, Defendants, and each of them, have benefitted

16 from the production  of "White Collar" and have received money, revenue, remuneration, benefits

17 and proceeds, a portion of which is due to ROMERO.

18 111. Per the general partnership formed by ROMERO and EASTIN to develop and exploit, for

19 profit, the television show "White Collar" EASTIN owed ROMERO a fiduciary duty.

20 112. The amount of money due from Defendants, and each of them to Plaintiff is unknown to

21 Plaintiff and cannot be ascertained without an accounting of the money, revenue, remuneration,

22 benefits and proceeds generated, and or other compensation received by Defendants, and each of

23 them, from the exploitation, sale, development, licensing, use, dispensation,  of the television

24 show "White Collar".

25 113. ROMERO is informed and believes and on that basis alleges that the amounts due Plaintiff

26 exceed the jurisdictional limits of this Court. In light of the television distribution of "White

27 Collar" both foreign and domestic, as well as the DVD distribution of the television show "White

28 Collar" and the licensing deals that appear to be associated with the television show "White

1   Collar" including deals with the auto manufacturer Ford, Plaintiff is informed and believes the

2   amounts due to plaintiff are in the millions.

3   ¶14. Plaintiff has demanded an accounting of the aforementioned monies from Defendant and

4   payment of the amount found due, but Defendant has failed and refused, and continues to fail and

5   refuse, to render such an accounting and to pay such sum.

6

7   SECOND CAUSE OF ACTION FOR FRAUD: INTENTIONAL MISREPRESENTATION:

8   (Against All Defendants)

9   ¶15. ROMERO refers to paragraphs 1 through 105 above, and hereby incorporates such

10   paragraphs herein by this reference as though said paragraphs were set forth in full herein.

11   ¶16. DEFENDANTS, and each of them, made, or conspired to make, representations of material

12   fact to ROMERO that were in fact false.

13   ¶17. Among other things, EASTIN represented to ROMERO that if ROMERO worked with

14   EASTIN on the "White Collar" television show, ROMERO and EASTIN were partners, equal in

15   the partnership. EASTIN and other DEFENDANTS, including KENNEALLY, YOUNG, CAA,

16   AUSTEN, JACKOWAY, represented to ROMERO that ROMERO would be recognized and

17   compensated as a co-creator of the "White Collar" television show. DEFENDANTS, and each of

18   them, further conspired among themselves to represent to ROMERO that ROMERO would be

19   recognized and compensated as a co-creator of the "White Collar" television show.

20   ¶18. AUSTEN and JACKOWAY represented to ROMERO that AUSTEN and JACKOWAY

21   were representing ROMERO and ROMERO's interests in dealings with various individuals and

22   entities, including EASTIN, KENNEALLY, YOUNG, CAA, MATT LOZE, DAVID MADDEN,

23   FOX TELEVISION STUDIOS, INC., FOX TELEVISION STUDIOS PRODUCTIONS, INC.,

24   TWENTIETH CENTURY FOX INTERNATIONAL TELEVISION, INC., TVM

25   PRODUCTIONS, INC., and USA Network.

26   ¶19. KENNEALLY, YOUNG, and CAA represented to ROMERO that KENNEALLY, YOUNG,

27   and CAA were representing ROMERO and ROMERO's interests in dealings with various

28   individuals and entities, including EASTIN, AUSTEN, JACKOWAY, MATT LOZE, DAVID

FIRST AMENDED COMPLAINT

1   MADDEN, FOX TELEVISION STUDIOS, INC., FOX TELEVISION STUDIOS

2   PRODUCTIONS, INC., TWENTIETH CENTURY FOX INTERNATIONAL TELEVISION,

3   INC., TVM PRODUCTIONS, INC., and USA Network.

4   120. MATT LOZE, DAVID MADDEN, FOX TELEVISION STUDIOS, INC., FOX

5   TELEVISION STUDIOS PRODUCTIONS, INC., TWENTIETH CENTURY FOX

6   INTERNATIONAL TELEVISION, INC., TVM PRODUCTIONS, INC. represented, or conspired

7   with individuals such as EASTIN (as well as each other) to represent, to ROMERO that

8   ROMERO would be recognized and compensated as a co-creator of the "White Collar" television

9   show.

10   121. KENNEALLY, YOUNG and CAA represented or conspired with individuals such as

11   EASTIN (as well as each other) to represent, to ROMERO that ROMERO would be recognized

12   and compensated as a co-creator of the "White Collar" television show.

13   122. The truth is that EASTIN and the other DEFENDANTS, and each of them, did not intend to

14   honor any partnership or equality between EASTIN and ROMERO. EASTIN and other

15   DEFENDANTS, including KENNEALLY, YOUNG, CAA, AUSTIN, JACKOWAY, did not

16   intend to recognize or compensate ROMERO as a co-creator of the "White Collar" television

17   show.

18   123. The truth is further that AUSTIN and JACKOWAY did not represent to ROMERO and

19   ROMERO's interests in dealings with various individuals and entities, including EASTIN,

20   KENNEALLY, YOUNG, CAA, MATT LOZE, DAVID MADDEN, FOX TELEVISION

21   STUDIOS, INC., FOX TELEVISION STUDIOS PRODUCTIONS, INC., TWENTIETH

22   CENTURY FOX INTERNATIONAL TELEVISION, INC., TVM PRODUCTIONS, INC., and

23   USA Network.

24   124. The truth is further, that KENNEALLY, YOUNG, and CAA did not represent ROMERO and

25   ROMERO's interests in dealings with various individuals and entities, including EASTIN,

26   AUSTIN, JACKOWAY, MATT LOZE, DAVID MADDEN, FOX TELEVISION STUDIOS,

27   INC., FOX TELEVISION STUDIOS PRODUCTIONS, INC., TWENTIETH CENTURY FOX

28   INTERNATIONAL TELEVISION, INC., TVM PRODUCTIONS, INC., and USA Network.

23

125. The truth is further that MATT LOZE, DAVID MADDEN, FOX TELEVISION STUDIOS, INC., FOX TELEVISION STUDIOS PRODUCTIONS, INC., TWENTIETH CENTURY FOX INTERNATIONAL TELEVISION, INC., TVM PRODUCTIONS, INC., did not intend to recognize and compensate ROMERO as a co-creator of the "White Collar" television show.

126. The truth is further that KENNEALLY, YOUNG, and CAA did not intend to recognize and compensate ROMERO as a co-creator of the "White Collar" television show.

127. When DEFENDANTS, and each of them, made the representations, DEFENDANTS, and each of them, knew the representations were false.

128. DEFENDANTS, and each of them, made the representations with the intent to defraud and induce plaintiff to act and expend efforts in the creation of the "White Collar" television show. DEFENDANTS, and each of them, further made the representations to pacify ROMERO and induce him not to take action to pursue his rights as a co-creator of the "White Collar" television show.

129. At the times that DEFENDANTS, and each of them, made the representations, ROMERO did not know the representations were false, and believed they were true.

130. ROMERO acted in justifiable reliance on the representations because ROMERO is, in fact, a co-creator of the "White Collar" television show. Additionally, ROMERO had no reason not to believe the representations when they were made because, among other things, AUSTEN is an attorney and JACKOWAY is a law firm in California, and KENNEALLY and YOUNG are agents at CAA, a very large and well-established talent agency.

131. As a direct and legal result of the misrepresentations by DEFENDANTS, and each of them, PLAINTIFF has been damaged in an amount exceeding the jurisdictional limits of this court, in an amount to be proven at trial.


**THIRD CAUSE OF ACTION FOR FRAUD: NEGLIGENT MISREPRESENTATION**

**(Against All Defendants)**

132. ROMERO refers to paragraphs 1 through 105, above, and hereby incorporates such

FIRST AMENDED COMPLAINT                                   24

1   paragraphs herein by this reference as though said paragraphs were set forth in full herein.

2   133. DEFENDANTS, and each of them, made or conspired to make, representations of material

3   fact to ROMERO that were in fact false.

4   134. Among other things, EASTIN represented to ROMERO that it ROMERO worked with

5   EASTIN on the "White Collar" television show, ROMERO and EASTIN were partners, equal in

6   the partnership. EASTIN and other DEFENDANTS, including KENNEALLY, YOUNG, CAA,

7   AUSTEN, JACKOWAY, represented to ROMERO that ROMERO would be recognized and

8   compensated as a co-creator of the "White Collar" television show. DEFENDANTS, and each of

9   them, further conspired among themselves to represent to ROMERO that ROMERO would be

10   recognized and compensated as a co-creator of the "White Collar" television show.

11   135. AUSTEN and JACKOWAY represented to ROMERO that AUSTEN and JACKOWAY

12   were representing ROMERO and ROMERO's interests in dealings with various individuals and

13   entities, including EASTIN, KENNEALLY, YOUNG, CAA, MATT LOZE, DAVID MADDEN,

14   FOX TELEVISION STUDIOS, INC., FOX TELEVISION STUDIOS PRODUCTIONS, INC.,

15   TWENTIETH CENTURY FOX INTERNATIONAL TELEVISION, INC., TVM

16   PRODUCTIONS, INC., and USA Network.

17   136. KENNEALLY, YOUNG, and CAA represented to ROMERO that KENNEALLY, YOUNG,

18   and CAA were representing ROMERO and ROMERO's interests in dealings with various

19   individuals and entities, including EASTIN, AUSTEN, JACKOWAY, MATT LOZE, DAVID

20   MADDEN, FOX TELEVISION STUDIOS, INC., FOX TELEVISION STUDIOS

21   PRODUCTIONS, INC., TWENTIETH CENTURY FOX INTERNATIONAL TELEVISION,

22   INC., TVM PRODUCTIONS, INC., and USA Network.

23   137. MATT LOZE, DAVID MADDEN, FOX TELEVISION STUDIOS, INC., FOX

24   TELEVISION STUDIOS PRODUCTIONS, INC., TWENTIETH CENTURY FOX

25   INTERNATIONAL TELEVISION, INC., TVM PRODUCTIONS, INC. represented or conspired

26   with individuals such as EASTIN (as well as each other) to represent to ROMERO that

27   ROMERO would be recognized and compensated as a co-creator of the "White Collar" television

28   show.

FIRST AMENDED COMPLAINT     25

138. KENNEALLY, YOUNG, and CAA represented, or conspired with individuals such as EASTIN (as well as each other) to represent to ROMERO that ROMERO would be recognized and compensated as a co-creator of the "White Collar" television show.

139. The truth is that EASTIN and the other DEFENDANTS, and each of them, did not intend to honor any partnership or equality between EASTIN and ROMERO. EASTIN and other DEFENDANTS, including KENNEALLY, YOUNG, CAA, AUSTEN, JACKOWAY, did not intend to recognize or compensate ROMERO as a co-creator of the "White Collar" television show.

140. The truth is further that AUSTEN and JACKOWAY did not represent ROMERO and ROMERO's interests in dealings with various individuals and entities, including EASTIN, KENNEALLY, YOUNG, CAA, MATT LOZE, DAVID MADDEN, FOX TELEVISION STUDIONS, INC., FOX TELEVISION STUDIOS PRODUCTIONS, INC., TWENTIETH CENTURY FOX INTERNATIONAL TELEVISION, INC., TVM PRODUCTIONS, INC., and USA Network.

141. The truth is further that KENNEALLY, YOUNG, and CAA did not represent ROMERO and ROMERO's interests in dealings with various individuals and entities, including EASTIN, AUSTEN, JACKOWAY, MATT LOZE, DAVID MADDEN, FOX TELEVISION STUDIOS, INC., FOX TELEVISION STUDIOS PRODUCTIONS, INC., TWENTIETH CENTURY FOX INTERNATIONAL TELEVISION, INC., TVM PRODUCTIONS, INC., and USA Network.

142. The truth is further that MATT LOZE, DAVID MADDEN, FOX TELEVISION STUDIOS, INC., FOX TELEVISION STUDIOS PRODUCTIONS, INC., TWENTIETH CENTURY FOX INTERNATIONAL TELEVISION, INC., TVM PRODUCTIONS, INC. did not intend to recognize and compensate ROMERO as a co-creator of the "White Collar" television show.

143. The truth is further that KENNEALLY, YOUNG, and CAA did not intend to recognize and compensate ROMERO as a co-creator of the "White Collar" television show.

144. When DEFENDANTS, and each of them, made the representations, DEFENDANTS, and each of them, knew the representations were false.

FIRST AMENDED COMPLAINT                    26

145. DEFENDANTS, and each of them, made the representations negligently. They should have known that the representations they were making were false. DEFENDANTS, and each of them, further should have known that the representations they made would serve to pacify ROMERO and induce him not to take action to pursue his rights as a co-creator of the "White Collar" television show.

146. At the times that DEFENDANTS, and each of them, made the representations, ROMERO did not know the representations were false and believed they were true.

147. ROMERO acted in justifiable reliance on the representations because ROMERO is, in fact, a co-creator of the "White Collar" television show. Additionally, ROMERO had no reason not to believe the representations when they were made because, among other things, AUSTEN is an attorney, and JACKOWAY is a law firm in California, and KENNEALLY and YOUNG are agents at CAA, a very large and well established talent agency.

148. As a direct and legal result of the misrepresentations by DEFENDANTS, and each of them, PLAINTIFF has been damaged in an amount exceeding the jurisdictional limits of this court, in an amount to be proven at trial.

## FOURTH CAUSE OF ACTION FOR FRAUD: PROMISE WITHOUT INTENT TO PERFORM

### (Against All Defendants)

149. ROMERO refers to paragraphs 1 through 105, above, and hereby incorporates such paragraphs herein by this reference as though said paragraphs were set forth in full herein.

150. DEFENDANTS, and each of them, made, or conspired to make, promises to ROMERO that were in fact false.

151. Among other things, EASTIN promised ROMERO that if ROMERO worked with EASTIN on the "White Collar" television show, ROMERO and EASTIN were partners, equal in the partnership. EASTIN and other DEFENDANTS, including KENNEALLY, YOUNG, CAA, AUSTEN, JACKOWAY, promised ROMERO that ROMERO would be recognized and compensated as a co-creator of the "White Collar" television show. DEFENDANTS, and each of

1    them, further conspired among themselves to promise ROMERO that ROMERO would be

2    recognized and compensated as a co-creator of the "White Collar" television show.

3    152. AUSTEN and JACKOWAY promised ROMERO that AUSTEN and JACKOWAY were

4    representing ROMERO and ROMERO's interests in dealings with various individuals and

5    entities, including EASTIN, KENNEALLY, YOUNG, CAA, MATT LOZE, DAVID MADDEN,

6    FOX TELEVISION STUDIOS, INC., FOX TELEVISION STUDIOS PRODUCTIONS, INC.,

7    TWENTIETH CENTURY FOX INTERNATIONAL TELEVISION, INC., TVM

8    PRODUCTIONS, INC., and USA Network.

9    153. KENNEALLY, YOUNG, and CAA promised ROMERO that KENNEALLY, YOUNG, and

10   CAA were representing ROMERO and ROMERO's interests in dealings with various individuals

11   and entities, including EASTIN, AUSTEN, JACKOWAY, MATT LOZE, DAVID MADDEN,

12   FOX TELEVISION STUDIOS, INC., FOX TELEVISION STUDIOS PRODUCTIONS, INC.,

13   TWENTIETH CENTURY FOX INTERNATIONAL TELEVISION, INC., TVM

14   PRODUCTIONS, INC., and USA Network.

15   154. MATT LOZE, DAVID MADDEN, FOX TELEVISION STUDIOS, INC., FOX

16   TELEVISION STUDIOS PRODUCTIONS, INC., TWENTIETH CENTURY FOX

17   INTERNATIONAL TELEVISION, INC., TVM PRODUCTIONS, INC. promised or conspired

18   with individuals such as EASTIN (as well as each other) to promise, ROMERO that ROMERO

19   would be recognized and compensated as a co-creator of the "White Collar" television show.

20   155. KENNEALLY, YOUNG, and CAA promised, or conspired with individuals such as

21   EASTIN (as well as each other) to promise, ROMERO that ROMERO would be recognized and

22   compensated as a co-creator of the "White Collar" television show.

23   156. The truth is that EASTIN and the other DEFENDANTS, and each of them, did not intend to

24   honor any promise they made regarding any partnership or equality between EASTIN and

25   ROMERO. EASTIN and other DEFENDANTS, including KENNEALLY, YOUNG, CAA,

26   AUSTEN, JACKOWAY, did not intend to honor their promise(s), to recognize or compensate

27   ROMERO as a co-creator of the "White Collar" television show.

28   157. The truth is further that AUSTEN and JACKOWAY did not intend to represent ROMERO

<div align="center">FIRST AMENDED COMPLAINT</div>

<div align="right">28</div>

1   and ROMERO's interests in dealings with various individuals and entities, including EASTIN,

2   KENNEALLY, YOUNG, CAA, MATT LOZE, DAVID MADDEN, FOX TELEVISION

3   STUDIOS, INC., FOX TELEVISION STUDIOS PRODUCTIONS, INC., TWENTIETH

4   CENTURY FOX INTERNATIONAL TELEVISION, INC., TVM PRODUCTIONS, INC., and

5   USA Network.

6   158.  The truth is further that KENNEALLY, YOUNG, and CAA did not intend to represent

7   ROMERO and ROMERO's interests in dealings with various individuals and entities, including

8   EASTIN, AUSTEN, JACKOWAY, MATT LOZE, DAVID MADDEN, FOX TELEVISION

9   STUDIOS, INC., FOX TELEVISION STUDIOS PRODUCTIONS, INC., TWENTIETH

10  CENTURY FOX INTERNATIONAL TELEVISION, INC., TVM PRODUCTIONS, INC., and

11  USA Network.

12  159.  The truth is further that MATT LOZE, DAVID MADDEN, FOX TELEVISION

13  STUDIOS, INC., FOX TELEVISION STUDIOS PRODUCTIONS, INC., TWENTIETH

14  CENTURY FOX INTERNATIONAL TELEVISION, INC., TVM PRODUCTIONS, INC. did not

15  intend to honor their promise(s) to recognize and compensate ROMERO as a co-creator of the

16  "White Collar" television show.

17  160.  The truth is further that KENNEALLY, YOUNG, and CAA did not intend to honor their

18  promise(s) to recognize and compensate ROMERO as a co-creator of the "White Collar"

19  television show.

20  161.  When DEFENDANTS, and each of them, made the promises, DEFENDANTS, and each of

21  them, knew the promises were false.

22  162.  DEFENDANTS, and each of them, made the promises intentionally.  They knew that the

23  promises they were making were false.  DEFENDANTS, and each of them, further knew that the

24  promises they made would serve to pacify ROMERO and induce him not to take action to pursue

25  his rights as a co-creator of the "White Collar" television show.

26  163.  At the times that DEFENDANTS, and each of them, made the promises, ROMERO did not

27  know the promises were false and believed they were true.

28  164.  ROMERO acted in justifiable reliance on the promises because ROMERO is, in fact, a co-

FIRST AMENDED COMPLAINT                              29

1  creator of the "White Collar" television show. Additionally, ROMERO had no reason not to

2  believe the promises when they were made because, among other things, AUSTEN is an attorney

3  and JACKOWAY is a law firm in California, and KENNEALLY and YOUNG are agents at CAA

4  a very large and well established talent agency.

5  165.  As a direct and legal result of the false promises made by DEFENDANTS, and each of them,

6  PLAINTIFF has been damaged in an amount exceeding the jurisdictional limits of this court, in an

7  amount to be proven at trial.

8

9  **FIFTH CAUSE OF ACTION FOR CONSPIRACY TO DEFRAUD**

10  **(Against All Defendants)**

11  166.  ROMERO refers to paragraphs 1 through 105, 115 through 131, and 149 through 165,

12  above, and hereby incorporates such paragraphs herein by this reference as though said paragraphs

13  were set forth in full herein.

14  167.  DEFENDANTS, and each of them, engaged in a conspiracy among themselves to make

15  misrepresentations and false promises to ROMERO, and thus to defraud ROMERO pertaining to

16  ROMERO's work pertaining to, and co-creation of, the "White Collar" television show.

17  168.  As a direct and legal result of the conspiracy of DEFENDANTS, and each of them,

18  PLAINTIFF has been damaged in an amount exceeding the jurisdictional limits of this court, in an

19  amount to be proven at trial.

20

21  **SIXTH CAUSE OF ACTION FOR UNFAIR BUSINESS PRACTICES IN VIOLATION OF**

22  **BUSINESS AND PROFESSIONS CODE § 17000, and 17200 ET SEQ.**

23  **(Against All Defendants)**

24  169.  ROMERO refers to paragraphs 1 through 105, above, and hereby incorporates such

25  paragraphs herein by this reference as though said paragraphs were set forth in full herein.

26  170.  DEFENDANTS, and each of them, are "persons" as defined under Business & Professions

27  Code section 17201.

28  171.  DEFENDANTS, and each of them, provide services to the public as defined in Business &

FIRST AMENDED COMPLAINT                                    30

1   Professions Code section 17000, et seq.

2   172.  DEFENDANTS, and each of them, violated numerous provisions of California law,

3   including, but not limited to, the California Labor Code Section 1700.32 and California

4   Corporations Code Section 16404.

5   173.  Upon information and belief, and among other things, DEFENDANTS, and each of them,

6   acted wrongfully in disrupting, diverting, and derailing PLAINTIFF's business relationships and

7   economic advantages pertaining to his work as a co-creator of the White Collar television show.

8   Such conduct is illegal under Business & Professions Code sections 17000, et seq. and 17200, et

9   seq.

10   174.  Upon information and belief, and among other things, DEFENDANTS, and each of them,

11   have committed malpractice, and/or breached fiduciary duties owed to ROMERO.  Such conduct is

12   illegal under Business & Professions Code sections 17000, et seq. and 17200, et seq.

13   175.  Upon information and belief, and among other things, DEFENDANTS, and each of them,

14   have defrauded or conspired to defraud ROMERO.  Such conduct is illegal under Business &

15   Professions Code sections 17000, et seq. and 17200, et seq.

16   176.  Upon information and belief, by disrupting, diverting, and derailing PLAINTIFF's business

17   relationships and economic advantages pertaining to his work as a co-creator of the White Collar,

18   and by engaging in malpractice and breach of fiduciary duties, and by defrauding and conspiring

19   to defraud ROMERO, DEFENDANTS, and each of them, have engaged in business and profited

20   from their bad acts within the State of California.

21   177.  Pursuant to Business & Professions Code sections 17071 and 17075, the allegations set forth

22   in the Complaint, and the facts underlying those allegations, show DEFENDANTS', and each of

23   their, intent to violate the Unfair Practices Act.

24   178.  Pursuant to Business & Professions Code section 17082, ROMERO requests treble damages

25   and attorney fees, as well as costs of suit.

26   179.  Pursuant to Business & Professions Code sections 17078 and 17079, ROMERO seeks

27   injunctive relief in the form of an order requiring DEFENDANTS, and each of them, to recognize

28   and compensate ROMERO as a co-creator of the White Collar television show.

FIRST AMENDED COMPLAINT                          31

## STATEMENT CAUSE OF ACTION FOR VIOLATION OF THE TALENT AGENCY ACT

### (CALIFORNIA LABOR CODE §1700.32 ET SEQ.)

### (Against Defendants Creative Artists Agency LLC, Tom Young, and Rob Kennelly)

180. ROMERO refers to paragraphs 1 through 105, above, and hereby incorporates such

paragraphs herein by this reference as though said paragraphs were set forth in full herein.

181. Section 1700.32 of the California Labor Code states: "All advertisements of a talent

agency by means of cards, circulars, or signs, and in newspapers and other publications

and all letterheads, receipts, and blanks shall be printed and contain the licensed name and

address of the talent agency, and the words 'talent agency.'"

182. In advertisements, promotional pieces, and correspondence issued by KENNALLY,

YOUNG, and CAA, some of which were issued to PLAINTIFF, from at least the first

quarter of 2009 to the present, KENNALLY, YOUNG, and CAA have failed to comply

with Section 1700.32 of the California Labor Code because the advertisements,

promotional pieces, and correspondence did not, and do not, contain the licensed name of

the talent agency and the words 'talent agency.'

183. Additionally, KENNALLY, YOUNG, and CAA failed to comply with the statutory

requirements of section 1700.32 by using letterhead that does not contain the words "talent

agency," that does not contain the licensed name of the talent agency, and that does not

contain the address of the talent agency.

184. PLAINTIFF is informed and believes, and on that basis alleges, that KENNALLY,

YOUNG, and CAA, and each of them, interact with, network with, socialize with, work

with, communicate with, and advertise to, thousands of individuals and entities (including

PLAINTIFF), and that KENNALLY, YOUNG, and CAA have distributed, issued,

mailed, or shared multiple tens of thousands of advertisements, promotional pieces, and

correspondence (including cards, circulars, signs, letters, correspondence, and copy, in

publications) that violate Section 1700.32 of the California Labor Code to such individual

and entities (including PLAINTIFF).

185. KENNEALLY, YOUNG, and CAA violated Labor Code Section 1700.32, and in doing so, deceived PLAINTIFF, concealed their true identities from PLAINTIFF, concealed their true intent from PLAINTIFF, and injured PLAINTIFF as set forth in this Complaint.

186. Pursuant to the allegations of this Complaint, including those specifically set forth in this cause of action, PLAINTIFF seeks actual damages, as well as attorney fees, treble damages, and an injunction pursuant to Section 1704.2.

**EIGHTH CAUSE OF ACTION FOR PROFESSIONAL MALPRACTICE**

**(Against Defendants Karl R. Austen and Jackoway Tyerman Wertheimer Austen Mandelbaum Morris & Klein, a Professional Corporation.)**

187. ROMERO refers to paragraphs 1 through 105, above, and hereby incorporates such paragraphs herein by this reference as though said paragraphs were set forth in full herein.

188. PLAINTIFF is informed and believes and thereon alleges that, at all times mentioned herein, Karl Austen was an attorney licensed to practice law in California and was an employee of the law firm Jackoway Tyerman Wertheimer Austen Mandelbaum Morris & Klein, a Professional Corporation.

189. AUSTEN and JTWA approached PLAINTIFF, at EASTIN's request, to provide legal services for PLAINTIFF, including negotiation and representation of PLAINTIFF's best interests in regard to the television show "White Collar."

190. On or about June 2009, AUSTEN and JTWA, and each of them, convinced ROMERO to allow AUSTEN and JTWA to provide such legal services for ROMERO.

190. Pursuant to the direction of, and in concert with, EASTIN, AUSTEN and JTWA, and each of them, negotiated a position for ROMERO as a story editor for the television show "White Collar."

191. At all times after accepting employment, AUSTEN and JTWA, and each of them, failed to exercise reasonable care and skill in advising PLAINTIFF of his valuable rights to

1    the television show "White Collar", and to the valuable partnership between EASTIN and

2    PLAINTIFF, and failed to negotiate in PLAINTIFF's best interests.

3    192. At all times after accepting employment, AUSTEN and JTWA, and each of them,

4    failed to exercise reasonable skill and diligence in representing PLAINTIFF, in that they

5    neglected to interview PLAINTIFF in regard to PLAINTIFF's ownership of the endeavor

6    that is the television show "White Collar", and they neglected to disclose to PLAINTIFF

7    their conflict of interest between their long-term client EASTIN and PLAINTIFF.

8    193. PLAINTIFF is informed and believes and thereon alleges that had AUSTEN and

9    JTWA used reasonable skill to interview ROMERO they would have discovered that

10    ROMERO was much more than just a story editor for the television show "White Collar"

11    and that they had a conflict of interest in representing ROMERO and that they could not

12    appropriately and fully represent both ROMERO and EASTIN in such a matter.

13    194. If PLAINTIFF had been informed and represented competently, PLAINTIFF would

14    have owned 50% of the endeavor that is the television show "White Collar". A television

15    show that is, as of the date of this First Amended Complaint, in its third season and,

16    PLAINTIFF is informed and believes and on that basis alleges, has earned EASTIN

17    millions of dollars.

18    195. As a direct and legal result of the carelessness and negligence of AUSTEN and JTWA, and

19    each of them, as herein alleged, PLAINTIFF has been deprived of the full value of his work and

20    involvement in the endeavor that is the television show "White Collar".

21    196. AUSTEN and JTWA and each of them continue to represent PLAINTIFF in regard to the

22    television show "White Collar".

23    197. PLAINTIFF is a layperson, unfamiliar with the intricacies and complexities of the

24    entertainment industry and the complexities around business formation.

25    198. PLAINTIFF has suffered general and special damages in an amount according to proof at

26    time of trial.

27

28

<div align="center">FIRST AMENDED COMPLAINT      34</div>

**NINTH CAUSE OF ACTION FOR PROFESSIONAL MALPRACTICE**

**(Against Defendants Rob Kenneally, Tom Young, and Creative Artists Agency LLC)**

199. ROMERO refers to paragraphs 1 through 105, above, and hereby incorporates such paragraphs herein by this reference as though said paragraphs were set forth in full herein.

200. PLAINTIFF is informed and believes and thereon alleges that, at all times mentioned herein, Rob Kenneally was, and is, a talent agent working for Creative Artists Agency, a talent agency licensed in the state of California.

201. At the direction of EASTIN, KENNEALLY, YOUNG, and CAA approached ROMERO to be PLAINTIFF's talent agent and to negotiate and represent PLAINTIFF in regard to the television show "White Collar."

202. On or about June 2009, KENNEALLY, YOUNG, and CAA, and each of them, convinced ROMERO to allow them to engage in such efforts on behalf of ROMERO.

203. At the direction of, and in concert with, EASTIN, KENNEALLY, YOUNG, and CAA, and each of them, represented ROMERO as ROMERO's talent agent and agency for the endeavor that was the television show "White Collar."

204. At all times after accepting employment, KENNEALLY, YOUNG, and CAA, and each of them, failed to exercise reasonable care and skill in advising PLAINTIFF of his valuable rights to the endeavor that is the television show "White Collar" and failed to negotiate, and represent PLAINTIFF's best interests.

205. At all times after accepting employment, KENNEALLY, YOUNG, and CAA, and each of them, failed to exercise reasonable skill and diligence in representing PLAINTIFF, in that they neglected to ascertain PLAINTIFF's ownership of the endeavor that is the television show "White Collar" and they neglected to disclose to PLAINTIFF a conflict of interest between their long-term client EASTIN and PLAINTIFF in regard to the endeavor that is the television show "White Collar."

206. PLAINTIFF is informed and believes and thereon alleges that had KENNEALLY, YOUNG, and CAA and each of them, used reasonable skill to interview ROMERO they would have discovered that ROMERO was much more than just a story editor for the

1   endeavor that is the television show "White Collar" and that they had a conflict of interest

2   in representing ROMERO and that they could not appropriately and fully represent both

3   ROMERO and EASTIN in such a matter.

4   207.  If PLAINTIFF had been informed and represented competently, PLAINTIFF would

5   have owned 50% of the endeavor that is the television show "White Collar." A television

6   show that is, as of the date of this First Amended Complaint in its third season, and

7   PLAINTIFF is informed and believes and on that basis alleges, has earned EASTIN, his

8   partner, millions of dollars.

9   208.  As a direct and legal result of the carelessness and negligence of KENNEALLY, YOUNG

10   and CAA, and each of them, as herein alleged, PLAINTIFF has been deprived of the full value of

11   his work and involvement in the endeavor that is the television show "White Collar."

12   209.  PLAINTIFF is a layperson, unfamiliar with the intricacies and complexities of the

13   entertainment industry and the complexities around business formation.

14   210.  PLAINTIFF has suffered general and special damages in an amount according to proof at

15   time of trial.

16

17            TENTH CAUSE OF ACTION FOR BREACH OF FIDUCIARY DUTY

18     (Against Defendants Karl R. Austen and Jackoway Tyerman Wertheimer Austen

19         Mandelbaum Morris & Klein, a Professional Corporation)

20   211.  ROMERO refers to paragraphs 1 through 105, above, and hereby incorporates such

21   paragraphs herein by this reference as though said paragraphs were set forth in full herein.

22   212.  As PLAINTIFF's attorney and representative for the "White Collar" television show,

23   AUSTEN, and JTWA, and each of them, owed ROMERO fiduciary duties, including but not

24   limited to, the duty of loyalty, the duty of good faith and fair dealing, and the duty of care.

25   213.  AUSTEN, and JTWA, and each of them, violated the above-mentioned fiduciary duties to

26   ROMERO in that AUSTEN, and JTWA, and each of them, among other things, failed to satisfy

27   his and their fiduciary duties to ROMERO by not acting in ROMERO's best interests when

28   dealing with the negotiation, sale, distribution and exploitation of the television show "White

1  Collar."

2  214. As a direct and legal result of the misconduct of AUSTEN, and JTWA, and each of them,

3  including the breach of fiduciary duties owed from AUSTEN, and JTWA, and each of them to

4  ROMERO, ROMERO sustained damages in an amount in excess of the jurisdictional threshold of

5  this Court, in an amount to be proven at trial.

6

7  **ELEVENTH CAUSE OF ACTION FOR BREACH OF FIDUCIARY DUTY**

8  **(Against Defendants Rob Kenneally, Tom Young, and Creative Artists Agency, LLC)**

9  215. ROMERO refers to paragraphs 1 through 105, above, and hereby incorporates such

10  paragraphs herein by this reference as though said paragraphs were set forth in full herein.

11  216. As PLAINTIFF's talent agent and representative for the endeavor that is the "White Collar"

12  television show KENNEALLY, and CAA, and each of them, owed ROMERO fiduciary duties,

13  including but not limited to the duty of loyalty, the duty of good faith and fair dealing, and the

14  duty of care.

15  217. KENNEALLY and CAA, and each of them, violated the above-mentioned fiduciary duties

16  to ROMERO in that KENNEALLY and CAA, and each of them, among other things, failed to

17  satisfy their fiduciary duties to ROMERO by not acting in ROMERO's best interests when dealing

18  with the negotiation, sale, distribution and exploitation of the endeavor that is the television show

19  "White Collar."

20  218. As a direct and legal result of the misconduct of KENNEALLY and CAA, and each of them,

21  including the breach of fiduciary duties owed from KENNEALLY and CAA, and each of them, to

22  ROMERO, ROMERO sustained damages in an amount in excess of the jurisdictional threshold of

23  this Court, in an amount to be proven at trial.

24

25  **TWELFTH CAUSE OF ACTION FOR BREACH OF FIDUCIARY DUTY**

26  **(Against Defendant Jeff Eastin)**

27  219. ROMERO refers to paragraphs 1 through 105, above, and hereby incorporates such

28  paragraphs herein by this reference as though said paragraphs were set forth in full herein.

FIRST AMENDED COMPLAINT                                     37

1  220. As a general partner in the "White Collar" television show EASTIN owed ROMERO

2  fiduciary duties, including but not limited to, the duty of loyalty, the duty of good faith and fair

3  dealing, and the duty of care.

4  221. EASTIN violated the above-mentioned fiduciary duties to ROMERO in that EASTIN,

5  among other things, failed to act in ROMERO's best interests with regard to the sale, distribution

6  and exploitation of the television show "White Collar", as well as the distribution of money,

7  proceeds, remuneration, and benefits pertaining the television show.   ← wording changed

8  222. EASTIN also violated the above-mentioned fiduciary duties to ROMERO by failing to

9  account to ROMERO pertaining to the television show "White Collar."

10  223. Eastin also violated the above-mentioned fiduciary duties to ROMERO by failing to hold as

11  trustee for ROMERO the property, profit, and benefits derived as a result of the efforts expended

12  by EASTIN and ROMERO pertaining to the television show "White Collar".

13  224. Eastin also violated the above-mentioned fiduciary duties to ROMERO by failing to include

14  ROMERO is business and economic opportunities related or pertaining to the television show

15  "White Collar".

16  225. Eastin also violated the above-mentioned fiduciary duties to ROMERO by dealing with

17  ROMERO as though EASTIN had an interest adverse to ROMERO and the partnership that

18  existed between ROMERO and EASTIN pertaining to the television show "White Collar".

19  226. Eastin also violated the above-mentioned fiduciary duties to ROMERO by competing with

20  the partnership that existed between ROMERO and EASTIN pertaining to the television show

21  "White Collar".

22  227. Eastin also violated the above-mentioned fiduciary duties to ROMERO by engaging in

23  intentional misconduct, reckless misconduct, and knowing violations of the law with regard to the

24  partnership that existed between ROMERO and EASTIN pertaining to the television show "White

25  Collar".

26  228. Eastin also violated the above-mentioned fiduciary duties to ROMERO by not treating

27  ROMERO with good faith and fair dealing.

28  229. As a direct and legal result of the misconduct of EASTIN, including EASTIN's various

FIRST AMENDED COMPLAINT                    38

1  breaches of fiduciary duties owed from EASTIN to ROMERO, ROMERO sustained damages in

2  an amount in excess of the jurisdictional threshold of this Court, in an amount to be proven at trial.

3

4  **THIRTEENTH CAUSE OF ACTION FOR INTENTIONAL INTERFERENCE WITH**

5  **PROSPECTIVE BUSINESS/ECONOMIC ADVANTAGE**

6  **(Against All Defendants)**

7  230.  ROMERO refers to paragraphs 1 through 105, above, and hereby incorporates such

8  paragraphs herein by this reference as though said paragraphs were set forth in full herein.

9  231.  DEFENDANTS, and each of them, intentionally disrupted, diverted, and derailed

10  PLAINTIFF's business relationships and economic advantages pertaining to his work as a co-

11  creator of the White Collar television show, and DEFENDANTS, and each of them, did so with

12  knowledge of PLAINTIFF's business relationships and economic advantages pertaining to his

13  work as a co-creator of the White Collar television show.

14  232.  Until PLAINTIFF was forced out of his position working on the White Collar television

15  show in or about December 2009 and deprived of his rights as a creator of the White Collar

16  television show beginning in or about 2009 (and continuing through the present), PLAINTIFF had

17  prospective business and economic relationships, and prospective economic advantages related to

18  the White Collar television show.

19  233.  PLAINTIFF's writing successes, including those pertaining to the White Collar television

20  show, and the success of the White Collar television show in particular, resulted in a probability of

21  future economic benefit from business and economic relationships, and economic advantages, in

22  the entertainment industry (i.e. PLAINTIFF stood to earn and benefit from substantial income

23  from his co-creation and exploitation of the White Collar television show, including that

24  pertaining to the airing of the television show on various networks throughout the world, including

25  USA Network in the United States).

26  234.  As a direct and proximate result of DEFENDANTS, and each of their, interference with,

27  disruption of, diversion of, and derailing of PLAINTIFF's business relationships and economic

28  advantages pertaining to his work as a co-creator of the White Collar television show, PLAINTIFF

FIRST AMENDED COMPLAINT                    39

1   has been, and continues to be, injured. Among other things, PLAINTIFF has not received any

2   compensation whatsoever for his role as a co-creator of the White Collar television show.

3

4   **FOURTEENTH CAUSE OF ACTION FOR NEGLIGENT INTERFERENCE WITH**

5   **PROSPECTIVE BUSINESS/ECONOMIC ADVANTAGE**

6   **(Against All Defendants)**

7   235.  ROMERO refers to paragraphs 1 through 105, above, and hereby incorporates such

8   paragraphs herein by this reference as though said paragraphs were set forth in full herein.

9   236.  DEFENDANTS, and each of them, acted unreasonably and wrongfully and negligently

10  disrupted, diverted, and derailed PLAINTIFF's business relationships and economic advantages

11  pertaining to his work as a co-creator of the White Collar television show, and DEFENDANTS

12  237.  As set forth in this Complaint, special relationships existed between PLAINTIFF and

13  DEFENDANTS, and each of them, such that DEFENDANTS, and each of them, owed (and all

14  DEFENDANTS except AUSTEN, JACKOWAY, KENNEALLY, YOUNG, and CAA continue to

15  owe) PLAINTIFF a duty of care.

16  238.  Until PLAINTIFF was forced out of his position working on the White Collar television

17  show in or about December 2009 and deprived of his rights as a creator of the White Collar

18  television show beginning in or about 2009 (and continuing through the present), PLAINTIFF had

19  prospective business and economic relationships, and prospective economic advantages, related to

20  the White Collar television show.

21  239.  PLAINTIFF's writing successes, including those pertaining to the White Collar television

22  show, and the success of the White Collar television show in particular, resulted in a probability of

23  future economic benefit from business and economic relationships, and economic advantages, in

24  the entertainment industry (i.e. PLAINTIFF stood to earn and benefit from substantial income

25  from his co-creation and exploitation of the White Collar television show, including that

26  pertaining to the airing of the television show on various networks throughout the world, including

27  USA Network in the United States).

28  240.  DEFENDANTS, and each of them, wrongfully interfered with PLAINTIFF's prospective

FIRST AMENDED COMPLAINT                                        40

1  business and economic relationships, and prospective economic advantages, related to the White

2  Collar television show.

3  241. As a direct and proximate result of DEFENDANTS, and each of their, interference with

4  disruption of, diversion of, and derailing of, PLAINTIFF's business relationships and economic

5  advantages pertaining to his work as a co-creator of the White Collar television show, PLAINTIFF

6  has been, and continues to be, injured. Among other things, PLAINTIFF has not received any

7  compensation whatsoever for his role as a co-creator of the White Collar television show.

8

9             **FIFTEENTH CAUSE OF ACTION FOR DECLARATORY RELIEF**

10                            **(Defendant Jeff Eastin)**

11 242. ROMERO refers to paragraphs 1 through 105, above, and hereby incorporates such

12 paragraphs herein by this reference as though said paragraphs were set forth in full herein.

13 243. A controversy and dispute has arisen between ROMERO and EASTIN concerning the

14 validity of the ROMERO EASTIN general partnership.

15 244. A judicial declaration concerning the validity, and existence of the ROMERO EASTIN

16 general partnership is necessary and proper at this time.

17

18            **SIXTEENTH CAUSE OF ACTION FOR DECLARATORY RELIEF**

19                            **(Defendant Jeff Eastin)**

20 245. ROMERO refers to paragraphs 1 through 105, above, and hereby incorporates such

21 paragraphs herein by this reference as though said paragraphs were set forth in full herein.

22 246. A controversy and dispute has arisen between ROMERO and EASTIN concerning

23 EASTIN's fiduciary duty owed to ROMERO as a general partner.

24 247. A judicial declaration concerning the existence of EASTIN's fiduciary duty to ROMERO is

25 necessary and proper at this time.

26 ///

27

28

## PRAYER FOR RELIEF

WHEREFORE, ROMERO prays for relief and judgment against Defendants, and each of them, as follows:

## ON THE FIRST CAUSE OF ACTION

1. For an accounting;

2. For the amount due to Plaintiff as a result of the Accounting;

3. For interest on any and all amounts found to be due;

4. For reasonable attorney fees and costs of suit herein incurred;

5. For such other and further relief as the court may deem proper.

## ON THE SECOND CAUSE OF ACTION

1. For general and compensatory damages according to proof at trial, including all actual, consequential, and incidental losses, including, but not limited to, loss of income, together with prejudgment interest;

2. For punitive damages;

3. For pre-judgment interest;

4. For reasonable attorney's fees and costs of suit herein; and

5. For such other relief as this court may deem just and proper.

## ON THE THIRD CAUSE OF ACTION

1. For general and compensatory damages according to proof at trial, including all actual, consequential, and incidental losses, including, but not limited to, loss of income, together with prejudgment interest;

2. For pre-judgment interest;

3. For reasonable attorney's fees and costs of suit herein; and

4. For such other relief as this court may deem just and proper.

FIRST AMENDED COMPLAINT                              42

ON THE FOURTH CAUSE OF ACTION

1.    For general and compensatory damages according to proof at trial, including all actual, consequential, and incidental losses, including, but not limited to, loss of income together with prejudgment interest;

2.    For punitive damages;

3.    For pre-judgment interest;

4.    For reasonable attorney's fees and costs of suit herein; and

5.    For such other relief as this court may deem just and proper.

ON THE FIFTH CAUSE OF ACTION

1.    For general and compensatory damages according to proof at trial, including all actual, consequential, and incidental losses, including, but not limited to, loss of income, together with prejudgment interest;

2.    For punitive damages;

3.    For pre-judgment interest;

4.    For reasonable attorney's fees and costs of suit herein; and

5.    For such other relief as this court may deem just and proper.

ON THE SIXTH CAUSE OF ACTION

1.    For restitution;

2.    For treble damages;

3.    For pre-judgment interest;

4.    For reasonable attorney's fees and costs of suit herein;

5.    For a declaration that the business practices alleged herein are a violation of the public policy of the State of California, including but not limited to, California Business & Professions Code sections 17000, et seq;

6.    For a preliminary and permanent injunction to prevent the use of each practice alleged herein and found to be unfair, unlawful, and/or a fraudulent business practice;

FIRST AMENDED COMPLAINT

43

1    7.    For a further order to restore PLAINTIFF and any person in interest, any money or
2    property which the DEFENDANT may have acquired by means of any practice alleged
3    and found herein to be unfair, unlawful, and/or a fraudulent business practice.
4    8.    or a further order to restore PLAINTIFF and any person of interest, the value of any
5    compensation and benefit of which they were deprived by virtue of DEFENDANT's
6    conduct in engaging in any practice alleged and found herein to be unfair, unlawful,
7    and/or a fraudulent business practice.
8
9    **ON THE SEVENTH CAUSE OF ACTION**
10   1.    For pre-judgment interest;
11   2.    For treble damages;
12   3.    For reasonable attorney's fees and costs of suit herein; and
13   4.    For injunctive relief and such other relief as this court may deem just and proper.
14
15   **ON THE EIGHTH CAUSE OF ACTION**
16   1.    For general and compensatory damages according to proof at trial, including all
17   actual, consequential, and incidental losses, including, but not limited to, loss of income,
18   together with prejudgment interest.
19   2.    For pre-judgment interest;
20   3.    For reasonable attorney's fees and costs of suit herein; and
21   4.    For such other relief as this court may deem just and proper.
22
23   **ON THE NINTH CAUSE OF ACTION**
24   1.    For general and compensatory damages according to proof at trial, including all
25   actual, consequential, and incidental losses, including, but not limited to, loss of income,
26   together with prejudgment interest.
27   2.    For pre-judgment interest;
28   3.    For reasonable attorney's fees and costs of suit herein; and

FIRST AMENDED COMPLAINT                                                    44

4.   For such other relief as this court may deem just and proper.

**ON THE TENTH CAUSE OF ACTION**

1.   For general and compensatory damages according to proof at trial, including all actual, consequential, and incidental losses, including, but not limited to, loss of income, together with prejudgment interest.

2.   For pre-judgment interest.

3.   For reasonable attorney's fees and costs of suit herein; and

4.   For such other relief as this court may deem just and proper.

**ON THE ELEVENTH CAUSE OF ACTION**

1.   For general and compensatory damages according to proof at trial, including all actual, consequential, and incidental losses, including, but not limited to, loss of income, together with prejudgment interest.

2.   For pre-judgment interest.

3.   For reasonable attorney's fees and costs of suit herein; and

4.   For such other relief as this court may deem just and proper.

**ON THE TWELFTH CAUSE OF ACTION**

1.   For general and compensatory damages according to proof at trial, including all actual, consequential, and incidental losses, including, but not limited to, loss of income, together with prejudgment interest.

2.   For pre-judgment interest.

3.   For reasonable attorney's fees and costs of suit herein; and

4.   For such other relief as this court may deem just and proper.

**ON THE THIRTEENTH CAUSE OF ACTION**

1.   For compensatory damages in an amount to be proven at trial, including all actual,

FIRST AMENDED COMPLAINT

45

1   consequential, and incidental losses, including, but not limited to, loss of income, together with
2   prejudgment interest;
3       2)    For costs of suit herein;
4       3)    For punitive damages; and
5       4)    For such other and further relief as this court may deem just and proper.
6
7   ON THE FOURTEENTH CAUSE OF ACTION
8       1)    For compensatory damages in an amount to be proven at trial;
9       2)    For costs of suit herein; and
10      3)    For such other and further relief as this court may deem just and proper.
11
12  ON THE FIFTEENTH CAUSE OF ACTION
13      1)    For compensatory damages in an amount to be proven at trial;
14      2)    For costs of suit herein;
15      3)    For such other and further relief as this court may deem just and proper.
16
17  ON THE SIXTEENTH CAUSE OF ACTION
18      1)    For compensatory damages in an amount to be proven at trial;
19      2)    For costs of suit herein;
20      3)    For such other and further relief as this court may deem just and proper.
21
22  DATED: September 20, 2011          THE LAW OFFICES OF RHETT T. FRANCISCO
23                              and    THE LAW OFFICES OF PAWEL R. SASIK
24
25                                     By: _____
26                                          Rhett T. Francisco,
                                            Pawel R. Sasik
27                                          Attorneys for Plaintiff
28

FIRST AMENDED COMPLAINT                                                     46

# EXHIBIT A

# Stokes & Caffrey

### Character Recap / Pilot Synopsis
### 10/3/07

by
Jeff Eastin
Travis Romero



Peter
Stokes

Neal
Caffrey

"You can have caviar and champagne
every day if you're not picking up the
check."

     - Neal Caffrey.


"You can lie to them. Never lie to me."

     - Kate


"I'm not jealous. I don't get jealous.
Shut up and drive."

     - Peter Stokes

# Our Characters



### Neal Caffery

Conona, imposter and forger extraordinaire. Neal likes nice things, and he usually gets them through charm and intelligence. He is serving the remaining 5 years of a federal fraud conviction as an FBI Special Consultant under the supervision of the man who caught him. Peter Stokes... a man Neal respects, detests and annoys in equal measure.

Neal likes the ladies, but throughout the series he will search for his true love. Kate, who's criminal talents may equal his own.



### Peter Stokes, FBI

Head of the FBI Fraud & Forgery Unit, San Diego. He's smart. He believes in hard work and trusts his gut. He's funny after a few beers and infamous for his temper. Neal was his white whale.

He is a happy family man with a wife and son he adores, although he feels an unsettling attraction to his junior agent Diane Berrigan and finds himself jealous of her fascination with Neal.



### Diane Berrigan, FBI

She is a junior agent, which means she does the grunt work Stokes doesn't have time for.

Following in Stokes' footsteps she joined the FBI as a forensic accountant then transferred to the field when she got bored crunching numbers. She is opinionated and justifiably conceited. She has a wicked sense of humor. She idolizes Stokes and finds her attraction to Neal disquieting.



### Kate Perdu

Neal was her partner, lover and soul mate. She believed in him completely until he lied to her and destroying her trust. She changed her identity and disappeared from his life.

Kate is beautiful and tragic. She can't let go of Neal but can't let herself get hurt again. She keeps tabs on Neal through rare secret communications with Stokes.

# The Pilot

### The Tease:

We open on the most low-key prison escape in history as NEAL CAFFREY simply walks out the front door. He's wearing a guard uniform that he ordered off the Internet using the Warden's gold MasterCard number. He hotwires an old truck in the parking lot and drives out the gate. But a battered pickup belching smoke is not how Neal Caffrey travels. He finds three dollars in the ashtray. Time for an upgrade.

We cut to Neal inside a thrift store trying on cheap windbreakers. He picks a particularly loud yellow one and pays the clerk the three bucks.

We reveal Neal wearing his new yellow jacket and the brown prison guard pants and shoes as he waits at the long term parking garage at the airport. A man pulls up in a Mercedes SL65 convertible and tosses Neal the keys. "Take care of my car. I'll be back in a month."

Cut to Neal cruising on the freeway in his new Mercedes, top down, wind in his hair, Vivaldi pumping out of the speakers. Three minutes in and now we know how Neal Caffrey rolls.

We move to the other side of the law and introduce PETER STOKES, head of the FBI Fraud and Forgery Unit and the man responsible for sending Neal to prison in the first place. Stokes and his junior agent DIANE BERRIGAN are with the Warden as guards tear Neal's cell apart. Stokes orders up the usual manhunt but doesn't think it will do much good. Neal is too smart. Probably the smartest guy Stokes has ever met. But Neal has his Achilles heel and Stokes has a hunch he knows were he's going. Neal Caffrey is going home.

We cut to a small rundown apartment complex. The Mercedes is parked at the curb as Stokes' own car pulls in next to it.

Inside the apartment Neal is sitting on the empty floor staring at the bare walls.

"Kate's gone," Stokes says as he walks in. "She changed her name, erased herself. Disappeared."

3

# EXHIBIT B

# White Collar

By

Jeff Eastin


Story by

Jeff Eastin
&
Travis Romero


May 8, 2008

"WHITE COLLAR"

IN BLACK:

We hear the SNICK SNICK of scissors.

FADE IN:

INT. WE DON'T KNOW WHERE - CLOSE ON

A MAN'S HEAVILY BEARDED FACE. Just his face. Eyes deep and intelligent, but with a slight desparation and resolve.

SNICK SNICK SNICK.

He keeps the scissors moving. Rough-trimming the beard. Rushing but not panicking. Revealing more of his face.

CLOSE ON:

Toilet Bowl -- as clumps of hair fall into the water.

CLOSE ON:

The Man. The beard is roughly trimmed short. We're beginning to see the face underneath. It's an exceptional face.

He holds up a shard of mirror with taped edges and a disposable razor and goes to work on the remaining stubble.

EXTREMELY CLOSE ON:

The razor as the man cleans it in the water on the back of the toilet tank.

WIDER:

Reveal we're in a bathroom stall. The man is seated backward on the toilet, his back to us. He's wearing the orange jumpsuit of a federal prisoner.

The lid of the tank is off. He finishes with the razor. Splashes water from the tank on his face.

CLOSE ON:

The mirror. The image in it steadies on his face. This is NEAL CAFFREY. Another time, another place, he might give Cary Grant a run for his money. He is a man at whom you will look twice.

WIDER:

Neal reaches deep into the tank and pulls out two ziplock bags.

79.

                    PETER
          Good, because next Saturday I've got
          some follow-up work on a case in
          Boulder, thought I'd drag you along.

Neal just looks at him, not sure he heard correctly.

                    NEAL
          Boulder?

                    PETER
          Any problem with that?

                    NEAL
          No. I just... why are you doing this?

Peter doesn't answer immediately. He looks over at his wife.
She catches his eye and smiles and we see it... Peter gets
the arrow straight through the heart all over again.

                    PETER
          Because you're right. When she's the
          one you can never let go.

They sit in comfortable silence for a moment.

                    PETER (CONT'D)
          By the way... I would have caught
          you.

OFF both of them grinning at that--

                                        FADE OUT.

              THE END

# EXHIBIT C

# White Collar

By

Jeff Eastin

Story by

Jeff Eastin
&
Travis Romero

October 30, 2008

"WHITE COLLAR"

IN BLACK:

We hear the SNICK SNICK of scissors.

FADE IN:


INT. WE DON'T KNOW WHERE - CLOSE ON

A MAN'S HEAVILY BEARDED FACE. Just his face. Eyes deep and
intelligent, but with a slight desperation and resolve.

SNICK SNICK SNICK.

He keeps the scissors moving. Rough-trimming the beard.
Rushing but not panicking. Revealing more of his face.

CLOSE ON:

Toilet Bowl -- as clumps of hair fall into the water.

CLOSE ON:

The Man. The beard is roughly trimmed short. We're beginning
to see the face underneath. It's an exceptional face.

He holds up a shard of mirror with taped edges and a
disposable razor and goes to work on the remaining stubble.

EXTREMELY CLOSE ON:

The razor as the man cleans it in the water on the back of
the toilet tank.

WIDER:

Reveal we're in a bathroom stall. The man is seated backward
on the toilet, his back to us. He's wearing the orange
jumpsuit of a federal prisoner.

The lid of the tank is off. He finishes with the razor.
Splashes water from the tank on his face.

CLOSE ON:

The mirror. The image in it steadies on his face. This is
NEAL CAFFREY. Another time, another place, he might give
Cary Grant a run for his money.

WIDER:

Neal reaches deep into the tank and pulls out two ziplock
bags. One contains a pair of brown dress shoes, another holds
a package from the Quartermaster Uniform Supply company.

78.

She's happy, laughing and glowing like a teenager.

Without a word, Peter reaches into his pocket and pulls out
a leather ID wallet and hands it to Neal. Inside is Neal's
picture and a card that reads: NEAL CAFFREY, FBI CONSULTANT.

                    PETER
          Figured if we didn't give you this,
          you'd end up making one of your own.

                    NEAL
              (touched)
          I'm official?

                    PETER
          Yeah. It's not going to be easy. How
          do you feel about working weekends?

                    NEAL
          I'm all yours.

                    PETER
          Good, because next Saturday I've got
          some follow-up work on a case in
          Boulder, thought I'd drag you along.

Neal just looks at him, not sure he heard correctly.

                    NEAL
          Boulder?

                    PETER
          Any problem with that?

                    NEAL
          No. I just .. why are you doing this?

Peter doesn't answer immediately. He looks over at his wife.
She catches his eye and smiles and we see it... Peter gets
the arrow straight through the heart all over again.

                    PETER
          Because you're right. When she's the
          one you can never let go.

They sit in comfortable silence for a moment.

                    PETER (CONT'D)
          By the way... I would have caught
          you.

OFF both of them grinning at that--

                                        FADE OUT.

                    THE END

# EXHIBIT D

# A Crime Show
# Charles Ponzi
# Could Love



596

**From:** "eastin.jeff" <eastin.jeff@yahoo.com>
**Subject:** **New York times today**
**Date:** October 18, 2009 11:36:13 AM PDT
**Cc:** recipient list not shown: ;
1 Attachment, 481 KB

# A Crime Show Charles Ponzi Could Love

[illegible]

The New York Times



October 18, 2009

# A Crime Show Charles Ponzi Could Love

### By KATHRYN SHATTUCK

BERNARD L. MADOFF was so far off the public's radar when Jeff Eastin pitched the crime series "White Collar" to USA two years ago that he described the main character as "an evil Donald Trump."

Luckily for Mr. Eastin the corporate misdeeds of financiers like Mr. Madoff and the miscalculations of others have provided a topical backdrop for "White Collar," a show about Neal Caffrey (Matt Bomer), a bond forger just escaped from prison, and Peter Burke (Tim DeKay), the agent who put him behind bars. The show's pilot episode, shot before the Madoff scandal unfolded, has its premiere on USA on Friday night at 10. Mr. Eastin's credits include creator and executive producer of the NBC series "Hawaii," now defunct, and screenwriter for the 1999 Jamie Foxx comedy "Held Up."

The new show's cat-and-mouse game becomes a partnership when Neal, snared again by Peter, offers his criminal expertise to the Feds rather than return to prison. In no time Neal has finagled his way out of the government's fleabag housing and into a penthouse with a closet full of gently-used Sy Devore suits.

"I work hard," Peter blusters in a scene in which he takes in Neal's surroundings, accompanied by Sinatra's recording of "The Good Life." "I do my job well, and I don't have a $10 million view of Manhattan that I share with a 22-year-old art student while we sip espresso."

To which Neal replies, without a hint of irony, "Why not?"

Following are excerpts from Mr. Eastin's recent interview with Kathryn Shattuck, in which he spoke about those who roll in other people's dough.

Q. "White Collar" seems so timely. Who, or what, was your inspiration?

A. The idea really came from a friend of mine, Travis Romero, who I broke the story with. This was just before the writers' strike, and we were sitting around in the hot tub like we usually do, trying to figure out what's next. The whole idea of the buddy comedy was

something I was pretty familiar with and wanted to do for television. And "The Shield" is probably my favorite show of all time. If you want to do that dark and dirty stuff, you can't beat it.

But I really wanted to go the other way. With white-collar crime, it's the one place where the crime itself can be beautiful. If you forge the Mona Lisa, that's kind of spectacular. Actually we were shooting the pilot when Madoff got arrested, and I literally had 30 people call me that day and say, "Hey, I've got a great story for you."

Q. What gives Neal his allure?

A. I've always been fascinated by guys you could drop anywhere in the world with nothing, not a penny in their wallet, just the clothes on their back, and by the end of one day they'd be driving a Mercedes, staying at the Plaza and dating the most beautiful woman in the world. They get to where they're going by sheer force of personality. Neal is someone you could easily hate, but I think Matt Bomer brings so much boyish charm to him that you end up liking the guy despite that.

Q. Do Peter and Neal start envying each other's lives as they go on?

A. Envy is an interesting word. I don't know if it's envy as much as it is that Peter can't understand Neal. And when Neal sees the relationship between Peter and his wife, Elizabeth [Tiffani Thiessen], I think it really kills him that the one thing he desperately wants, which is Kate [his ex-girlfriend, played by Alexandra Daddario] and a normal life, he can't achieve.

Q. What's the story behind Kate?

A. In the mythology of the show they're together, working for this Madoff-type character, who pulls a Ponzi scheme and takes them for everything. They're two people in love, life was perfect, and then the rug's pulled out from under them. That's when Neal became a criminal.

Q. And Elizabeth?

A. Tiffani asked where Elizabeth came from, and I said, "Honestly, I based this character on Abigail Adams." I'd seen the John Adams mini-series, and what I found fascinating about Abigail Adams is that you had a woman who was very strong in her own right but at the same time was a passionate defender of her husband, who by all accounts was an incredible workaholic. Elizabeth is the same. She knew what she was getting into when she married Peter.

Q. You said the character of Peter Burke is your alter ego. How did someone like that end up in Hollywood?

A. I grew up in Longmont, Colo., a little town right next to Boulder. One day I decided I wanted to make movies, so I packed up an old Volkswagen bus, drove out to California, and on my first day went to U.S.C., because that's where Spielberg and Lucas were. I parked off campus, and when I came back, my bus was gone, along with everything else I had in the world. To my dad's eternal credit, I called crying from a pay phone, sirens in the background, and I said, "I want to come home." And he said, "Well, get a job, buy a ticket and come home." He told me later it was the hardest thing he'd ever done, but had he not done that, I'd probably be selling insurance in Longmont right now.

This article has been revised to reflect the following correction:

Correction: November 8, 2009
A picture caption on Oct. 18 with excerpts of an interview with Jeff Eastin, creator of the television show "White Collar," misidentified the actress shown with Matt Bomer and Tim DeKay. She is Marsha Thomason — not Alexandra Daddario, who also appears in the series.

Copyright 2009 The New York Times Company

Privacy Policy | Terms of Service | Search | Corrections | RSS | First Look | Help | Contact Us | Work for Us | Site Map

1

## *PROOF OF SERVICE*

2     I am an active member of the State Bar of California. I am over the age of eighteen years and not a party to the within action; my business address is: 5350 Topanga Canyon Boulevard, Woodland Hills, California 91364.

3

4     On September 20, 2011, I served the foregoing documents described as **FIRST AMENDED COMPLAINT** on the interested parties to be noticed in said action, by delivering a true copy, via the method indicated below, to the following recipient(s):

5

6     **The Law Offices of Max J. Sprecher**

7     Max J. Sprecher
    5850 Canoga Avenue, 4th Floor

8     Woodland Hills, CA 91367

9     ☐ BY MAIL I am "readily familiar" with the firm's practice for collection and processing of correspondence for mailing; under the practice it would be deposited with the United States Postal Service on the same day with postage thereon fully prepaid at Simi Valley, California in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if the postal cancellation date or postage meter date is more than one day after date of deposit for mailing an affidavit.

10

11

12

13     ☐ BY FACSIMILE I transmitted the foregoing DOCUMENT via facsimile to the recipient(s) listed above at

14

15     ☐ BY EXPRESS SERVICE CARRIER I am "readily familiar" with the firm's practice for collection and processing of correspondence for overnight mail/FedEx; under the practice it is deposited in a box or other facility regularly maintained by the express service carrier, or delivered to an authorized courier or driver authorized by the express service carrier to receive DOCUMENTS, in an envelope or package designated by the express service carrier with delivery fees paid or provided for to the recipient(s) listed above.

16

17

18     ☒ BY PERSONAL SERVICE I caused the foregoing document to be hand delivered to the offices of the recipient(s) / the recipient listed above at

19

20     at     3:17   a.m. /p.m.
    5850 CANOGA AVE.

21     4TH FLOOR
    WOODLAND HILLS, CA 91367

22     ☒ STATE I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and that this declaration was executed on September 20, 2011 at Woodland Hills, California.

23

24

25     Joshua Maxman

26

27

28

99541         SERVICE LIST

# PROOF OF SERVICE

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action. My business address is 5850 Canoga Ave., 4th Floor, Woodland Hills, CA 91367. On November 16, 2011, I served the within document(s) described as:

**DEFENDANT JEFF EASTIN'S NOTICE OF DEMURRERS TO FIRST AMENDED COMPLAINT; DEMURRERS TO FIRST AMENDED COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES**

on the interested parties in this action as stated on the attached mailing list.

[X] (BY MAIL) By placing a true copy of the foregoing document(s) in a sealed envelope addressed as set forth on the attached mailing list. I am readily familiar with this firm's practice for collection and processing of correspondence for mailing. Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing contained in affidavit.

[ ] (BY EXPRESS MAIL) By placing a true copy of the foregoing document(s) in a sealed envelope addressed as set forth on the attached mailing list. I placed each such envelope for collection and overnight mailing following ordinary business practices. I am readily familiar with this firm's practice for collection and processing of Express Mail to be sent overnight by the U.S. Postal Service. Under that practice, it would be deposited on that same day in the ordinary course of business, with Express Mail postage thereon fully prepaid, in a post office, mailbox, sub-post office, substation, mail chute, or other like facility regularly maintained by the U.S. Postal Service for receipt of Express Mail.

[ ] (BY FAX) By transmitting a true copy of the foregoing document(s) via facsimile transmission from this firm's facsimile machine, to each interested party at the facsimile machine telephone number(s) set forth on the attached mailing list. Said transmission(s) were completed on the aforesaid date at the time stated on the transmission record issued by this firm's sending facsimile machine. Each such transmission was reported as complete and without error and a transmission report was properly issued by this firm's sending facsimile machine for each interested party served. A true copy of each transmission report is attached to the office copy of this proof of service and will be provided upon request.

[X] (BY E-MAIL) By transmitting a true copy of the foregoing document(s) to the e-mail addresses set forth on the attached mailing list.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on November 16, 2011, at Woodland Hills, California.

Max J. Sprecher                          _(Signature)_

---

1

Case No. BC463026

DEFENDANT JEFF EASTIN'S DEMURRERS TO FIRST AMENDED COMPLAINT

1

## SERVICE LIST

2    Rhett T. Francisco, Esq.            Pawel R. Sasik, Esq.

The Law Offices of Rhett T. Francisco    The Law Offices of Pawel R. Sasik

3    5350 Topanga Canyon Boulevard      5350 Topanga Canyon Boulevard

Woodland Hills, CA  91364           Woodland Hills, CA  91364

4    Fax: N/A                           Fax: N/A

Email: rhett@francisco-law-firm.com    Email: psasik@sasikmoon.com

5          rhett_francisco_law@yahoo.com   (Counsel for Plaintiff)

(Counsel for Plaintiff)

6

7                   **VIA EMAIL ONLY:**

8    <u>Courtesy Copies:</u>               <u>Courtesy Copies:</u>

Adam Levin, Esq. (axl@msk.com)     Greg David Derin, Esq.

9    Tracy Cox, Esq. (tec@msk.com)      1925 Century Park East, Suite 1700

Mitchell, Silberberg & Knupp LLP    Los Angeles, California 90067

10   11377 West Olympic Blvd.           Email: gdderin@derin.com

Los Angeles, CA  90064-1683        (Counsel for CAA Parties)

11   (Counsel for Fox Parties)

12   <u>Courtesy Copies:</u>

Rita M. Haeusler, Esq.

13   Hughes Hubbard & Reed LLP

350 South Grand Avenue, Suite 3600

14   Los Angeles, California 90071

Email: haeusler@hugheshubbard.com

15   (Counsel for JTWAMM Parties)

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANT JEFF EASTIN'S DEMURRERS TO FIRST AMENDED COMPLAINT