# EXHIBIT M

# 2008



# WRITERS GUILD OF AMERICA

# THEATRICAL AND TELEVISION BASIC AGREEMENT

Effective February 13, 2008 through May 1, 2011

Alliance of Motion Picture & Television Producers, Inc.
15301 Ventura Blvd., Building E
Sherman Oaks, CA 91403

Writers Guild of America, East, Inc.
555 West 57th Street
New York, NY 10019

Writers Guild of America, West, Inc.
7000 West Third Street
Los Angeles, CA 90048

(unsigned draft)

# 2008 WRITERS GUILD OF AMERICA - ALLIANCE OF MOTION PICTURE & TELEVISION PRODUCERS THEATRICAL AND TELEVISION BASIC AGREEMENT

## Table of Contents

PREAMBLE REGARDING SO-CALLED "POSSESSIVE CREDITS" ......................... 1
ARTICLE 1 - DEFINITIONS ................................................. 7
A.     GENERAL ......................................................... 7
B.     THEATRICAL ...................................................... 8
C.     TELEVISION ...................................................... 11
ARTICLE 2 - TERM AND EFFECTIVE DATE OF AGREEMENT ........................ 18
A.     GENERAL ......................................................... 18
B.     THEATRICAL ...................................................... 19
C.     TELEVISION ...................................................... 19
ARTICLE 3 - WORK LISTS, LOAN-OUTS AND RECOGNITION ...................... 19
A.     GENERAL ......................................................... 19
       1.     Work Lists and Notices of Employment ..................... 19
       2.     Loan-Out Agreements ...................................... 20
B.     RECOGNITION (THEATRICAL) ........................................ 21
C.     RECOGNITION (TELEVISION) ........................................ 21
ARTICLE 4 - PARTIES BOUND BY THIS BASIC AGREEMENT ...................... 22
A.     GENERAL ......................................................... 22
B.     THEATRICAL ...................................................... 22
C.     TELEVISION ...................................................... 23
ARTICLE 5 - GEOGRAPHICAL APPLICATION OF THIS BASIC AGREEMENT (GENERAL) ... 23
ARTICLE 6 - GUILD SHOP (GENERAL) ....................................... 24
ARTICLE 7 - NO STRIKE, NO LOCKOUT CLAUSE (GENERAL) ..................... 27
ARTICLE 8 - CREDITS FOR SCREEN AUTHORSHIP (GENERAL) .................... 29
ARTICLE 9 - MINIMUM TERMS (GENERAL) .................................... 29
ARTICLE 10 - GRIEVANCE AND ARBITRATION ................................. 29
A.     MATTERS SUBJECT TO GRIEVANCE AND ARBITRATION (GENERAL) .......... 29
B.     LIMITATION OF MATTERS SUBJECT TO GRIEVANCE AND ARBITRATION ...... 30
C.     MATTERS SUBJECT TO ARBITRATION BUT NOT GRIEVANCE ............... 31
D.     REFUSAL TO ARBITRATE ............................................ 31
E.     REFERENCES ...................................................... 31
ARTICLE 11 - GRIEVANCE AND ARBITRATION RULES AND PROCEDURES ............ 31
A.     GENERAL RULES ................................................... 31
       1.     Parties .................................................. 31
       2.     Time Limits .............................................. 32
       3.     Place of Hearing ......................................... 33
       4.     Award .................................................... 33
       5.     Costs .................................................... 33
       6.     Notices .................................................. 33
       7.     Conduct of Proceedings ................................... 34
       8.     Claims for Compensation, Cross-Claims and Defenses ....... 34
       9.     Overpayments ............................................. 35
       10.    Withdrawal of Services ................................... 35
B.     GRIEVANCE ....................................................... 36
       1.     Step One - Informal Conference ........................... 36
       2.     Step Two - Grievance ..................................... 36
C.     ARBITRATION ..................................................... 37
       1.     Initiation of Proceedings ................................ 37
       2.     Selection of Arbitrator .................................. 37
       3.     Substitution of Arbitrators .............................. 39
       4.     Notice of Hearing ........................................ 39
       5.     Exchange of Information .................................. 39

|     |     |     | 6. | Hearing | 39 |
| D. | | | | ARBITRATION OF DISPUTES WHICH INVOLVE QUESTIONS OF JURISDICTION OR ARBITRABILITY | 40 |
| E. | | | | ARBITRATION OF DISPUTES CONCERNING CREDIT PROVISIONS | 40 |
| F. | | | | EXPEDITED ARBITRATION OF CERTAIN DISPUTES CONCERNING REACQUISITION OF UNPRODUCED LITERARY MATERIAL (THEATRICAL) | 42 |
| G. | | | | ARBITRATION OF CERTAIN DISPUTES CONCERNING RESIDUALS PROVISIONS | 46 |
| H. | | | | ARBITRATION OF DISPUTES CONCERNING TRI-GUILD RESIDUALS AUDITS | 50 |
| I. | | | | EQUAL STATUS OF PARTIES | 50 |

ARTICLE 12 - COURT PROCEEDINGS .................................................. 50

| A. | DISPUTES CONCERNING CREDITS | 50 |
| B. | DISPUTES CONCERNING COMPENSATION | 50 |

ARTICLE 13 - COMPENSATION ...................................................... 51

| A. | THEATRICAL | | | 51 |
| | 1. | a. | Minimum Compensation | 52 |
| | | c. | Additional Payment - No Assigned Material | 53 |
| | 2. | | Narration | 54 |
| | 3. | | Initial Payment | 54 |
| | 4. | | Maximum Period of Employment | 55 |
| | 5. | | Computation of Writer's Period of Employment | 55 |
| | 6. | | Waiting Time | 56 |
| | 7. | | Extension of Employment Period | 56 |
| | 8. | | Failure to Deliver Material Within Allotted Time Period | 56 |
| | 9. | | Teams | 57 |
| | 10. | | Week-to-Week, Term, Flat Deal | 57 |
| | 11. | | Applicable Deal Minimum Compensation | 58 |
| | 12. | | Inapplicability of Provisions | 58 |
| | 13. | | Purchases | 59 |
| | 14. | | Payment of Compensation Under Deal Contract | 59 |
| | 15. | | Minimum Weekly Compensation | 59 |
| | 16. | | Theatrical Motion Picture Released on Free Television | 60 |
| | 17. | | Remakes | 60 |
| | 18. | | Script Annotations | 61 |
| B. | TELEVISION | | | 61 |
| | 1. | | Minimum Basic Compensation | 61 |
| | 2. | | "High Budget" Films | 62 |
| | 3. | | "Low Budget" Films | 63 |
| | 4. | | "Negative Cost" | 63 |
| | 5. | | Story Claim By Production Executive | 64 |
| | 6. | | Step Outline | 64 |
| | 7. | | Schedule of Minimum Compensation | 64 |
| | | a. | Story | 64 |
| | | b. | Teleplay | 65 |
| | | c. | Story and Teleplay | 66 |
| | | cc. | Story with Options | 67 |
| | | d. | Network Prime Time | 67 |
| | | | (1) Story | 68 |
| | | | (2) Teleplay | 68 |
| | | | (3) Story and Teleplay | 69 |
| | | dd. | Segment Rate | 69 |
| | | e. | Serials | 71 |
| | | f. | Installment Payments | 71 |
| | | g. | Plot Outline - Narrative Synopsis of Story | 72 |
| | | h. | Compensation for Rewrites and Polishes | 74 |
| | | | (1) Rewrites | 74 |
| | | | (2) Polishes | 75 |
| | | m. | (1) Format | 76 |
| | | | (2) Bible | 76 |
| | | | (3) Rewrite or Polish of Format or Bible | 77 |

**2008 WRITERS GUILD OF AMERICA - AMPTP
THEATRICAL AND TELEVISION BASIC AGREEMENT**

|    | n. | ...rration ................................................................. | 78 |
|    | o. | Remakes ................................................................ | 81 |
|    | p. | Non-Commercial Openings and Closings ........................... | 82 |
|    | q. | Total Writing Cost .................................................... | 82 |
|    | r. | Pilot Scripts, Back-up Scripts and Spin-offs ...................... | 83 |
|    | s. | Week-to-Week and Term Employment ............................. | 83 |
| 8. | | Reading Time and Obligations of Freelance Writer Re Revisions ............... | 85 |
| 9. | | Time of Payment ............................................................. | 86 |
| 10. | | Cut-Off ..................................................................... | 87 |
| 11. | | Script Annotations ........................................................ | 87 |
| 12. | | Notice of Conditions Precedent ........................................ | 87 |
| C. | | CLAIMED OVERPAYMENTS  (See Article 11.A.9.) ........................... | 87 |
| D. | | PAYMENT PROCEDURES (GENERAL) .......................................... | 87 |

ARTICLE 14 - WRITERS ALSO EMPLOYED IN ADDITIONAL CAPACITIES  (TELEVISION) ... 88

| A. | | DEFINITION ................................................................. | 88 |
| B. | | CONTRACTS OF EMPLOYMENT .............................................. | 88 |
| C. | | FORMS OF EMPLOYMENT .................................................... | 88 |
| D. | | AMOUNT, NATURE AND EXTENT OF SERVICES ........................... | 89 |
| E. | 1. | What Minimum Compensation Covers .................................. | 89 |
| F. | 1. | Becoming a "Writer Also Employed in Additional Capacities" After Initial Employment ...................................................... | 90 |
| G. | | PROGRAM FEES ............................................................. | 92 |
| H. | | SUSPENSION, TERMINATION AND/OR OFFSET ............................ | 93 |
| I. | | HIATUS PERIODS ........................................................... | 93 |
| J. | | .............................................................................. | 94 |
| K. | | MINIMUM COMPENSATION ................................................. | 94 |
| L. | | .............................................................................. | 94 |
| M. | | BETTER TERMS ............................................................. | 95 |

ARTICLE 15 - TELEVISION EXHIBITION ............................................... | 95

| A. | | THEATRICAL ............................................................... | 95 |
| | 1. | Pre-1960 Motion Pictures ............................................... | 95 |
| | 2. | .......................................................................... | 95 |
| | 3. | Payment ................................................................. | 95 |
| | | LITERARY MATERIAL ASSUMPTION AGREEMENT ................... | 102 |
| | 4. | Small Accountings ...................................................... | 105 |
| | 5. | .......................................................................... | 105 |
| | 6. | .......................................................................... | 105 |
| | 7. | .......................................................................... | 105 |
| B. | | TELEVISION RERUNS & FOREIGN TELECASTS OF TELEVISION MOTION PICTURES ............................................................... | 105 |
| | 1. | United States and Canada .............................................. | 105 |
| | 2. | Foreign Telecasting Formula ........................................... | 108 |
| | 3. | Application of Excess ................................................... | 111 |
| | 4. | .......................................................................... | 112 |
| | 5. | .......................................................................... | 112 |
| | 6. | .......................................................................... | 112 |
| | 7. | .......................................................................... | 112 |
| | 8. | Literary Material Assumption Agreement (Television) .............. | 113 |
| | 9. | [Deleted.] ............................................................... | 114 |
| | 10. | Use of excerpts ........................................................ | 114 |
| | 11. | [Deleted.] ............................................................... | 117 |
| | 12. | Small Accountings ...................................................... | 117 |
| | 13. | Additional Compensation for Theatrical Exhibition ................. | 118 |
| | 14. | Additional Compensation for Certain Use of Material to Which Separated Rights Do Not Apply .......................................... | 121 |
| | 15. | Simulcasts .............................................................. | 128 |
| | 16. | Basic Cable ............................................................. | 128 |
| | 17. | .......................................................................... | 129 |

ARTICLE 16 - SEPARATION OF RIGHTS ............................................... | 129

| A. | | THEATRICAL ............................................................... | 129 |

|  | 2. | Initial Qualification ........................... | 129 |
|  | 3. | Final Qualification ........................... | 130 |
|  | 4. | Separable Material ........................... | 138 |
|  | 5. | Sequel and Interactive Payments ........................... | 139 |
|  | 6. | Arbitration ........................... | 141 |
|  | 7. | Miscellaneous ........................... | 143 |
|  | 8. | Writer's Right to Reacquire Literary Material ........................... | 145 |
|  | 9. | Hot Line Dispute Resolution ........................... | 152 |
|  | 10. | Publication Fee ........................... | 152 |
| B. | TELEVISION ........................... | | 153 |
|  | 1. | General Qualifications ........................... | 153 |
|  | 2. | Television Rights. ........................... | 154 |
|  | 3. | Other Rights ........................... | 158 |
|  | 4. | Sketches and Routines ........................... | 162 |
|  | 5. | Upset Price ........................... | 162 |
|  | 6. | Adapter's Royalty ........................... | 164 |
|  | 7. | Extricable Material ........................... | 164 |
|  | 8. | Continuing Rights and Obligations ........................... | 164 |
|  | 9. | Hot Line Dispute Resolution ........................... | 164 |

ARTICLE 17 - PENSION PLAN AND HEALTH FUND ........................... 164
A.    GENERAL PROVISIONS ........................... 164
B.    PENSION PLAN ........................... 165
C.    HEALTH FUND ........................... 168
D.    SUPPLEMENTAL HEALTH INSURANCE PLAN ........................... 170
E.    AUDITS ........................... 170
F.    COMMITTEE ON PENSION AND HEALTH ........................... 171
ARTICLE 18 - NOTICE TO WRITERS EMPLOYED ON SAME MATERIAL
A.    GENERAL ........................... 172
B.    THEATRICAL ........................... 172
C.    TELEVISION ........................... 173
ARTICLE 19 - USE AND DELIVERY OF STANDARD FORM CONTRACTS ........... 173
A.    GENERAL ........................... 173
B.    THEATRICAL ........................... 173
C.    TELEVISION ........................... 174
ARTICLE 20 - SPECULATIVE WRITING ........................... 175
A.    THEATRICAL ........................... 175
B.    TELEVISION ........................... 176
ARTICLE 21 - LOCATION EXPENSES (GENERAL) ........................... 178
ARTICLE 22 - TERM CONTRACTS-OPTIONS (GENERAL) ........................... 180
ARTICLE 23 - LAY-OFF (GENERAL) ........................... 180
ARTICLE 24 - GUARANTEED EMPLOYMENT (GENERAL) ........................... 181
ARTICLE 25 - NOTICE OF TERMINATION OF EMPLOYMENT (GENERAL) ........... 181
ARTICLE 26 - FORCE MAJEURE ........................... 182
ARTICLE 27 - MOTION PICTURES TO WHICH AGREEMENT NOT APPLICABLE
(THEATRICAL) ........................... 182
ARTICLE 28 - WARRANTY AND INDEMNIFICATION (GENERAL) ........................... 182
ARTICLE 29 - SEPARATE AGREEMENT (GENERAL) ........................... 183
ARTICLE 30 - WRITER EMPLOYMENT AGREEMENT WITH COMPANY (THEATRICAL) ... 183
ARTICLE 31 - OPPORTUNITY TO EXECUTE SIMILAR AGREEMENT (THEATRICAL) ..... 184
ARTICLE 32 - REFERENCE TO AGREEMENT (GENERAL) ........................... 184
ARTICLE 33 - JURISDICTIONAL DISPUTES (GENERAL) ........................... 184
ARTICLE 34 - [Deleted.] ........................... 184
ARTICLE 35 - RECOGNITION OF AGREEMENT (GENERAL) ........................... 184
ARTICLE 36 - TERMS AND CONDITIONS APPLICABLE TO CERTAIN CATEGORIES OF
      PROGRAMS ........................... 185
ARTICLE 37 - NAMES ON LITERARY MATERIAL (GENERAL) ........................... 185
ARTICLE 38 - NON-DISCRIMINATION ........................... 189
A.    POLICY AND NEW PROGRAMS ........................... 189
B.    REPRESENTATIVES ........................... 189

C. HUMAN RESOURCES COORDINATING COMMITTEE . . . . . . . . . . . . . . . . . . . . . 189
D. DATA SUBMISSION PROGRAM . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 190
E. SCRIPT SUBMISSION PROGRAM . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 191
F. WRITERS TRAINING PROGRAM . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 191
G. ARBITRATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 193
ARTICLE 39 - PILOT SCREENING (TELEVISION) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 194
ARTICLE 40 - SECURITY INSTRUMENTS (TELEVISION) . . . . . . . . . . . . . . . . . . . . . . . 194
ARTICLE 41 - NOTICES (GENERAL) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 195
ARTICLE 42 - POSTING BONDS (GENERAL) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 195
ARTICLE 43 - COMPUTATION OF TIME (GENERAL) . . . . . . . . . . . . . . . . . . . . . . . . . . 196
ARTICLE 44 - SEVERABILITY OF PROVISIONS (GENERAL) . . . . . . . . . . . . . . . . . . . . 196
ARTICLE 45 - LABOR-MANAGEMENT COOPERATIVE COMMITTEE . . . . . . . . . . . . . . 196
ARTICLE 46 - FOREIGN PERFORMANCE FEES (THEATRICAL) . . . . . . . . . . . . . . . . . 196
ARTICLE 47 - RESIDUALS PROTECTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 197
ARTICLE 48 - PROFESSIONAL STATUS OF WRITERS: WRITER PARTICIPATION IN THE
   PRODUCTION PROCESS (GENERAL) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 197
Preamble . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 197
A. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 198
B. THEATRICAL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 198
C. TELEVISION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 199
D. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 201
E. "Hot Line Dispute Resolution" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 201
F. Committee on the Professional Status of Writers . . . . . . . . . . . . . . . . . . . . . . . . 201
G. Authorized Expenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 201
H. Campaign For Greater Appreciation of the Role of the Writer . . . . . . . . . . . . . . . 201
I. [Deleted.] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 202
J. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 202
K. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 202
L. Product Integration . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 202
ARTICLE 49 - SHOPPING OF MATERIAL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 202
A. TELEVISION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 202
B. THEATRICAL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 202
C. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 202
ARTICLE 50 - COPYRIGHT (TELEVISION) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 203
ARTICLE 51 - SUPPLEMENTAL MARKETS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 203
   "LITERARY MATERIAL ASSUMPTION AGREEMENT" . . . . . . . . . . . . . . . . . . . . . . 212
ARTICLE 52 - INDUSTRIAL FILMS (GENERAL) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 213
ARTICLE 53 - FINANCIAL INFORMATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 213
A. GENERAL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 213
B. RESIDUALS AUDITS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 214
ARTICLE 54 - PROHIBITION OF SO-CALLED "MORALS CLAUSE" . . . . . . . . . . . . . . . 215
ARTICLE 55 - RESTRAINT ON LICENSEE RIGHT OF APPROVAL . . . . . . . . . . . . . . . 215
ARTICLE 56 - SIGNIFICANCE OF TITLES AND SUB-TITLES (GENERAL) . . . . . . . . . . 215
ARTICLE 57 - PAY TELEVISION AND VIDEODISC/VIDEOCASSETTE PRODUCTION . . . . . . 215
ARTICLE 58 - RELEASE OF FREE TELEVISION PROGRAMMING AND THEATRICAL MOTION
   PICTURES TO BASIC CABLE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 215
ARTICLE 59 - COPYRIGHT ROYALTY TRIBUNAL MONIES (GENERAL) . . . . . . . . . . . . . . 216
ARTICLE 60 - DISSEMINATION OF CRITIQUES OF LITERARY MATERIAL (GENERAL) . . . 216
ARTICLE 61 - JOINT COMMITTEES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 216
A. GENERAL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 216
B. COMMITTEE ON THE PROFESSIONAL STATUS OF WRITERS . . . . . . . . . . . . . . 216
ARTICLE 62 - CONTRACT ADJUSTMENT COMMITTEE . . . . . . . . . . . . . . . . . . . . . . . 217
ARTICLE 63 - CREDITS REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 217
ARTICLE 64 - REUSE OF MBA-COVERED MATERIAL IN INTERACTIVE PROGRAMS . . . . . 217
A. Definitions and Coverage . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 217
B. Reuse of Covered Motion Pictures, In Whole or In Part . . . . . . . . . . . . . . . . . . . . 219
C. Interactive Programs Based Upon Literary Material . . . . . . . . . . . . . . . . . . . . . . . 221
D. Combination Payments for Reuses Described in Article 64.B. and C. . . . . . . . . . . . . 221
E. Reporting and Assumption Agreements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 223
   Licensor/Licensee's Assumption Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . 226

|     | F. | | 232 |
|     | G. | Recognition of Experimental Nature of Article; Cooperation | 232 |
|     | H. | Interactive Media Committee | 232 |
| ARTICLE 65 - RESPONSIBILITY FOR RESIDUAL PAYMENTS (GENERAL) | | | 232 |
|     | A. | THEATRICAL MOTION PICTURES | 232 |
|     |     | 1.   Distributor's Assumption Agreement | 232 |
|     |     | 2.   Buyer's Assumption Agreement | 239 |
|     |     | 3.   Distributor's Liability | 245 |
|     | B. | TELEVISION MOTION PICTURES | 246 |
|     |     | 1.   Television Distributor's Assumption Agreement | 246 |
|     |     | 2.   Television Buyer's Assumption Agreement | 253 |
|     | C. | DEFINITION OF COMPANY FOR PURPOSES OF ARTICLE 65.A. AND B. | 260 |
|     | D. | COMPANY'S DISSOLUTION (GENERAL) | 261 |
|     | E. | NETWORKS AND TELEVISION STATIONS (GENERAL) | 261 |
| ARTICLE 66 - TRAINING PROGRAM FOR EPISODIC TELEVISION WRITERS | | | 261 |
| THEATRICAL SCHEDULE A - THEATRICAL CREDITS | | | 263 |
|     | NOTICE OF TENTATIVE WRITING CREDITS - THEATRICAL | | 268 |
| TELEVISION SCHEDULE A - TELEVISION CREDITS | | | 281 |
|     | NOTICE OF TENTATIVE WRITING CREDITS - TELEVISION | | 290 |
| SIDELETTER TO THEATRICAL SCHEDULE A AND TO TELEVISION SCHEDULE A | | | 293 |
| TELEVISION SCHEDULE B | | | 294 |
| STANDARD FORM FREELANCE TELEVISION | | | |
|     | WRITER'S EMPLOYMENT CONTRACT | | 294 |
| SIDELETTER A WITH EXHIBIT A | | | 296 |
| EXHIBIT A TO SIDELETTER A - SCREEN AND TELEVISION CREDITS AGREEMENT | | | 297 |
| SIDELETTER B - ARTICLE 42 | | | 298 |
| APPENDIX A | | | 299 |
| GENERAL | | | 299 |
| Article 1. | Definitions | | 299 |
| Article 3. | Recognition | | 302 |
| Article 5. | Application of this Basic Agreement | | 302 |
| Article 8. | Credit | | 303 |
| Article 13. | Compensation | | 303 |
|     | 1.   Minimum Basic Compensation | | 303 |
|     | 2.   Comedy-variety Programs | | 303 |
|     |        a.   Minimum Compensation Per Program | | 303 |
|     |        b.   Minimum Variety Show Commitment | | 304 |
|     |        g.   Pre-Production Periods | | 307 |
|     |        h.   Multiple Programs Per Week | | 308 |
|     | 3.   Self-Contained Portions of Programs | | 308 |
|     | 4.   Quiz and Audience Participation Programs | | 308 |
|     | 5.   Serials - Other than Prime Time | | 311 |
|     | 6.   Other Non-Dramatic Programs | | 318 |
|     | 7.   Compensation Provisions Applicable to Television Programs Covered by | | |
|     |        Appendix A (Other than Documentary) | | 326 |
|     | 8.   Documentary Programs | | 329 |
| Article 14. | Writers Also Employed in Additional Capacities | | 335 |
| Article 15. | Television Exhibition | | 336 |
|     | 1.   Generally | | 336 |
|     | 2.   Comedy-Variety Programs - Prime Time, Once a Week or Less | | 337 |
|     | 3.   Non-Prime Time Serials | | 337 |
|     | 3.1.  Other Non-Dramatic Programs, Documentary, News and Public Affairs | | |
|     |        Programs | | 339 |
|     | 4.   Documentary Programs | | 339 |
|     | 5.   Application of Article 15.B.14. | | 339 |
|     | 6.   Radio Use of Simulcast Programs | | 339 |
| Article 16. | Separation of Rights | | 339 |
|     | 1.   Comedy-Variety Programs | | 339 |
|     | 2.   Serials (Non-Prime Time) | | 340 |

**2008 WRITERS GUILD OF AMERICA - AMPTP
THEATRICAL AND TELEVISION BASIC AGREEMENT**

|  | 3. | Quiz / Audience Participation Programs | 341 |
|  | 4. | "Incidental Uses" of Material | 341 |
| Article 17. |  | Pension Plan and Health Fund | 342 |
| Article 19. |  | Use and Delivery of Standard Form Contracts | 342 |
| Article 20. |  | Speculative Writing | 342 |
| Article 21. |  | Location Expenses | 342 |
| Article 22. |  | Term Contracts - Options | 342 |
| Article 28. |  | Warranty and Indemnification | 342 |
| Article 39. |  | Pilot Screening | 343 |
| Article 41. |  | Notices | 343 |
| Article 48. |  | Professional Status of Writers; Writer Participation in the Production Process | 343 |
| Article 61. |  | Services Not Covered by This Agreement (Documentary) | 343 |

ATTACHMENT TO APPENDIX A - PROCEDURES WITH RESPECT TO ASSIGNMENTS
AND INDIVIDUAL CONTRACTS REFERRED TO IN ARTICLES 19 AND 20 . . . . . . . . . . . . . . 345
TELEVISION SCHEDULE C - APPENDIX A
        PROGRAM CREDITS (OTHER THAN DOCUMENTARY) . . . . . . . . . . . . . . . . . . . . . . . . 346
TELEVISION SCHEDULE D - APPENDIX A
        DOCUMENTARY, NEWS AND PUBLIC AFFAIRS PROGRAM CREDITS . . . . . . . . . . . 350
SCHEDULE D-1 - DOCUMENTARY WRITING CREDITS ADDENDUM . . . . . . . . . . . . . . . . . . 355
SIDELETTER TO APPENDIX A - RE LITERARY MATERIAL . . . . . . . . . . . . . . . . . . . . . . . . . . 356
SIDELETTER TO APPENDIX A - ARTICLE 13.B.2.b.(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 357
SIDELETTER TO APPENDIX A - ARTICLE 13.B.5. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 358
APPENDIX B - PRODUCTION FOR THE PAY TELEVISION AND THE
        VIDEODISC/VIDEOCASSETTE MARKETS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 359

| A. |  | Introduction and Scope | 359 |
| B. |  | Definitions | 359 |
| C. |  | Compensation for Covered Programs (other than Dramatic Programs of a Type Generally Produced for Prime Time Network Television Which are Produced Principally for Pay Television) | 360 |
| D. |  | Compensation for Dramatic Programs of a Type Generally Produced for Prime Time Network Television which are Produced Principally for Pay Television | 363 |
| E. |  |  | 364 |
| F. |  | Distribution Formula | 364 |
| G. |  | Release in Other Media | 365 |
| H. |  | Separation of Rights | 365 |
| I. |  | Other Provisions | 365 |
| J. |  | Use of Excerpts | 366 |

APPENDIX C - PROGRAMS MADE FOR BASIC CABLE TELEVISION . . . . . . . . . . . . . . . . . 367
APPENDIX D - WRITER-DIRECTOR COLLABORATION - THEATRICAL . . . . . . . . . . . . . . . 371
APPENDIX E . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 373
WRITER-DIRECTOR COLLABORATION - TELEVISION . . . . . . . . . . . . . . . . . . . . . . . . . . . . 373
SIDELETTER TO ARTICLE 3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 376
SIDELETTER TO ARTICLE 11.F., "EXPEDITED ARBITRATION OF CERTAIN DISPUTES
        CONCERNING REACQUISITION OF UNPRODUCED LITERARY MATERIAL
        (THEATRICAL)" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 377
SIDELETTER TO ARTICLE 11.H. - ARBITRATION OF DISPUTES
        CONCERNING TRI-GUILD RESIDUALS AUDITS . . . . . . . . . . . . . . . . . . . . . . . . . . 378
EXHIBIT A TO ARTICLE 11.H . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 384
SIDELETTER TO ARTICLE 13.B.7.
        "SUPERSIZED" EPISODES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 386
SIDELETTER TO ARTICLE 13.B.7.f.
        Time of Payment (Television) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 387
SIDELETTER TO ARTICLE 13.B.7.o. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 389
SIDELETTER TO ARTICLE 14.E.2. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 392
SIDELETTER NO. 1 TO ARTICLE 15.B.1.b.(2)(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 393
SIDELETTER NO. 2 TO ARTICLE 15.B.1.b.(2)(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 396
SIDELETTER RE ELECTRONIC DATA TRANSFER . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 398
SIDELETTER TO ARTICLE 16 RE REACQUISITION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 399
SIDELETTER TO ARTICLE 16.A.8.d) RE REACQUISITION . . . . . . . . . . . . . . . . . . . . . . . . . 400
SIDELETTER RE THEATRICAL RIGHTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 402

SIDELETTER NO. 1 RE ARTICLE 48.B. .............................................. 403
SIDELETTER NO. 2 RE ARTICLE 48.B.   ............................................. 404
SIDELETTER TO ARTICLE 48.F. .................................................... 405
SECOND SIDELETTER TO ARTICLE 48.F. ........................................... 407
SIDELETTER TO ARTICLE 51  ...................................................... 409
SIDELETTER REGARDING ALTERNATIVE DIGITAL BROADCAST CHANNELS .......... 412
SIDELETTER ON LITERARY MATERIAL WRITTEN FOR
PROGRAMS MADE FOR NEW MEDIA ................................................. 413
SIDELETTER ON EXHIBITION OF MOTION PICTURES TRANSMITTED
VIA NEW MEDIA  ................................................................... 427
ARTICLE 64 SIDELETTER REGARDING CREDITS  ................................... 436
SIDELETTER REGARDING INTEREST ON DELINQUENT RESIDUALS PAYMENTS ...... 438
QUALIFIED DISTRIBUTOR/BUYER LETTER OF AGREEMENT (THEATRICAL) .......... 439
STANDARD LETTER OF GUARANTY (THEATRICAL) ................................. 442
QUALIFIED RESIDUAL PAYOR LETTER OF AGREEMENT (TELEVISION)  ............ 444
STANDARD LETTER OF GUARANTY (TELEVISION) .................................. 447
SIDELETTER ON NEW TECHNOLOGIES COOPERATIVE EDUCATION PROGRAM ...... 449
SIDELETTER ON INFORMATIONAL PROGRAMS  ..................................... 450
SIDELETTER RE METHODS OF ENCOURAGING ORIGINAL WRITER'S
CONTINUED PERFORMANCE OF WRITING SERVICES - TELEVISION  ............... 451
AMENDMENT AGREEMENT REGARDING RELEASE
OF ROYALTY PLAN PROGRAMS TO BASIC CABLE ................................. 452

# PREAMBLE REGARDING SO-CALLED "POSSESSIVE CREDITS"

### Purpose of Preamble

In the negotiations leading to the 1995 Minimum Basic Agreement, the Companies and the Guild confirmed their jointly held view that the making of film and television is a collaborative art and business venture in which the contributions of many persons are essential, and without which motion pictures cannot be made.  The Companies and the Guild sought to reach an agreement to meet the Guild's long-standing objection to the use of possessive credits.  It was concluded that a comprehensive resolution of the issues involved would not be reached prior to the end of the negotiation, but that a comprehensive resolution would be sought in the future.  The bargaining parties further agreed to the inclusion of this PREAMBLE as a means of highlighting the Writers Guild's strong, continuing, long-standing opposition and objections to the use of so-called "Possessive Credit(s)."

### Defining Possessive Credit(s)

The term "possessive credits" refers to such credits as are generally regarded as such in the film and television industry and which attribute, impute and/or which could be reasonably construed to credit a person with the authorship of a film.  It is understood that the term "possessive credits" does not include any forms of writing or source material credits.  Examples of such credits are:

" A Film By _____ "

" Pat Brown's [title of film] "

" A Robin Smith Film "

The PREAMBLE is in two parts:

1.    Statement of the Writers Guild of America.

2.    Acknowledging statement by each Company signatory to this MBA.

## STATEMENT OF THE WRITERS GUILD OF AMERICA

### Writers Guild Objections to Possessive Credits

Since its founding, the Writers Guild has opposed the use of the so-called "possessive credit" on screen and in advertising and promotion when used to refer to a person who is not the sole author of the screenplay.

The Guild's historic, current and ongoing opposition is based upon beliefs and principles which include the following:

Credits should, as far as possible, accurately reflect each individual's contribution.

The granting of a possessive credit to a person who has not both written and directed a given motion picture inaccurately imputes sole or preeminent authorship.

The proliferation of the number of unnecessary credits on screen and in advertising devalues credits in general.

The widespread use of the credit denigrates the creative contributions of others.

## ACKNOWLEDGING STATEMENT BY EACH COMPANY

Each Company acknowledges that the Guild holds the foregoing strong objections and beliefs regarding the use of the "possessive credit."

The Companies believe that the best way to address the foregoing objections is through tripartite discussions among the Companies, the WGA and the DGA and, therefore, commit to their full participation in that process.

2                                                    PREAMBLE TO THE AGREEMENT

# 2008 WRITERS GUILD OF AMERICA-ALLIANCE OF MOTION PICTURE & TELEVISION PRODUCERS
## THEATRICAL AND TELEVISION BASIC AGREEMENT

This Agreement, to be referred to as the **"2008 Writers Guild of America-Alliance of Motion Picture & Television Producers Theatrical and Television Basic Agreement,"** was executed as of the 13th day of February, 2008, by and between Writers Guild of America, West, Inc. and Writers Guild of America, East, Inc. (hereinafter referred to as the "Guild"), and the following producing companies represented for purposes of collective bargaining by the Alliance of Motion Picture & Television Producers, Inc. ("AMPTP"):

12:05 AM Productions, LLC
66 Degrees North Post
1000 Steps Entertainment, Inc.
Academy of Motion Picture Arts and Sciences
Act III Productions, LP
Alan Wagner Productions, Inc., dba
    Boardwalk Entertainment
Albemarle Productions, Inc.
Alex Entertainment, Inc.
Alive and Kicking, Inc.
All Media Inc.
Allenford Productions, Inc.
Ambrica Productions, Inc.
Ancillary Film and Television, LLC
Appleton Productions, Inc.
AR Etc. Productions, Inc.
Arlington Productions, Inc.
ARPAD Productions, Inc.
Ashland Productions, Inc.
Auckland Productions, Inc.
Aura Writes, LLC
Avalon I, LLC
Avery Pix, Inc.
The Avnet/Kerner Co.
Band of Angels, LLC
The Barn Productions, Inc.
BBC Worldwide Productions, LLC
Behave Productions, Inc.
Bell Dramatic Serial Company
Bell-Phillip Television Productions, Inc.
Belleville Productions, Inc.
The Best of Enemies Productions LLC
Beulah Productions LLC
Blackbird Films Ltd
Bochco Media, LLC.
Borndreamer Incorporated
BOT Productions, Inc.
Braun Entertainment Group, Inc.
Bright Star Pictures LLC
Brilliant Films, LLC
Bruce Nash Entertainment, Inc.
The Bubble Factory LLC
Bungalow 78 Productions, Inc.
Camelot Pictures, LLC
Cannell Entertainment, Inc.
Canterbury Productions, Inc.
Cara Communications Corp
Castle Rock Pictures, Inc.
Castlewood Productions, Inc.
CBS Films Inc.
CBS Studios Inc.
Centropolis Entertainment, Inc.
Chainsaw Productions, LLC
Childless, LLC
Chiz Schultz, Inc.
Christmas Cottage Movie, LLC
Chuck Fries Productions, Inc.
Cinergi Pictures Entertainment Inc.
Clandrew, Inc. dba Andrew Solt Productions

Cloverleaf Productions Inc.
Columbia Pictures Industries, Inc.
Columbia TriStar Television, Inc.
CoMedia, Inc.
Compass Rose Productions, L.L.C.
Constantin Media GmbH Audiovisuelle Produktion
Constantin Production Services, Inc.
Corapeake Productions, Inc.
Corday Productions, Inc.
Corsica Productions, Inc.
Cosgrove-Meurer Productions, Co.
Country Music Association, Inc.
CPT Holdings, Inc.
Creative Technologies Inc.
Crescent Moon Partners, LLC
Crystal Lake Entertainment, Inc.
Cypress Entertainment Development, LLC
Dakota North Entertainment, Inc.
Daniel H. Blatt Productions, Inc. II
Daniel L. Paulson Productions, Inc.
Danjaq LLC
Dave Dog Productions, Inc.
Dean River Productions, Inc.
Dean Street Productions, Inc.
Deeper Dimensions, Inc.
Diablo Details, LLC
Disciples Seminary Foundation
Double Life Productions, Inc.
DW Dramatic Television L.L.C. fka DreamWorks
    Dramatic Television LLC
DW Films L.L.C. fka DreamWorks Films LLC
DW SKG TV L.L.C. fka DreamWorks SKG TV LLC
DW Television L.L.C. fka DreamWorks Television LLC
East of Doheny, Ltd.
El-Don Productions Ltd, Inc.
ELP Communications
E.O.B. Productions, Inc.
Escape Artists Productions, LLC
ETR, Inc.
Evergreen Pictures, LLC
Eye Productions Inc.
F & L Films LLC
Ferreira Films LLC
FilmPool, Inc.
The Filmmakers, Inc.
Filmquest Pictures Corporation
Final Stretch Productions, Inc.
First Light Productions, Inc.
The FKPS Company
Floresta Productions, Inc.
Flye Bye Nyte Productions, Inc.
Forge Picture, Inc.
Fortress Films, Inc.
Fountain Productions, Inc.
Fox Late Night Productions, Inc.
Fox Nitetime Prod., Inc.
Fox Square Productions, Inc.
Frank & Bob Films II
Freedom Films Development, LLC

PREAMBLE TO THE AGREEMENT    3

FSO Productions, Inc.
FTP Productions, LLC
Fuma Films, Ltd
FWA Productions, Inc.
Galaxy Way Productions, Inc.
Gang Documentary LLC
Garden Films, Inc
Gary Hoffman Productions, Inc.
The Gary Smith Company Inc.
Genuine Buck Film, Inc.
George S. Taweel, Inc.
George Tirl
Get A Life Productions, Inc.
Gilded Pictures LLC
Glenhill Productions, Inc.
Goldberg and O'Relly Enterprises, Inc.
GPEC Inc.'
Grand Productions, Inc.
The Greenblatt Janollari Studio, Inc.
Gross-Weston Productions, Inc.
The Gurin Company
Halberd Productions, Inc.
Hangman's Curse, LLC
Hardstone Entertainment, Inc.
Hardware Distribution, Inc.
Harvest Pictures II Limited
Helfgott-Turner Productions, Inc.
The Hidden, LLC
Highway 61, LLC
Hillard Productions, Inc.
Holding Pictures Development Co., LLC
Hollyvista Productions, Inc.
The Hollywood Office of the Humane
    Society of the United States
Hoosier Daddy, Inc.
Horizon Scripted Television Inc.
Hornrim Productions, Inc.
Howard Dratch dba Howard Dratch Productions
HT Hurt Film, LLC
Hudson Productions, Inc.
I Like Pie, Inc.
Icon Productions, LLC
Imagine Television
IMAX Scribe Inc.
In The Flames Productions, LLC
Independent Projects Inc.
Interim Productions, Inc.
Intermedia Film Development Limited
Inwood Entertainment Inc.
James B. Harris Productions, Inc.
Jeff Margolis Productions, Inc.
Jennilind Productions Inc.
Jerisy Investment Co.
Jerry Reger Productions, Inc.
JFR Enterprises, Ltd.
Joel Freeman Productions, Inc.
John G Farbes - Athens Development Corp.
Johnny Lindy Company
The Jon Avnet Co. II
Katell Productions, LLC
Katja Motion Picture Corp
KB Production Group, Inc.
Kelley Productions, Inc. dba David E. Kelley Productions
The Kemp Company, Inc.
KFJ Films LLC
King Media Services, Inc.
Kyle Productions Inc.
La Mesa Productions, Inc.
Lafitte Productions, Inc.
Lakeshore Entertainment Group LLC
Landscape Entertainment, Inc.
Larry A. Thompson Organization, Inc.
Lary Simpson Productions
The Last Territory, LLC
Laura C. Byrnes d/b/a Paradyne

LD&A Films LLC
Lester Persky Productions, Inc.
Let's Make A Deal
Level Pictures, Inc.
Limestone Entertainment, Inc.
Lincoln Center for the Performing Arts, Inc.
Llamame Loco Producciones, Inc.
LMK Productions, Inc.
LMNO Productions, Inc.
Longbow Productions LLC
Lost Productions, Inc.
A Louis J Horvitz Production Inc.
Lumiere Productions, Inc.
MacGillivray Freeman Films, Inc.
Mad Mack Productions, Inc.
Madison Avenue Productions, Inc.
Madison Productions, Inc.
Mandalay Development LLC
Mandalay International, LLC
Mandalay Teleplays, LLC
Mandalay Ventures, LLC
Manor Drive Productions, Inc.
Maple Street Films Inc.
Maroda, Inc.
McFarlane Productions, Inc.
The Meeting Place Movie, LLC
Mennonite Anabaptist Information Center,
    Inc. dba Menno-Hof
Metro-Goldwyn-Mayer Pictures, Inc.
MGM Television Entertainment Inc.
Michael Mailer Films, Inc.
Mill Pond Productions, LLC
Miltod Productions, LLC
Miss Universe L.P., LLLP
Modern Girl Productions, LLC
Montrose Productions, Inc.
MOP Productions, Inc.
Morabito Films Inc.
Morrow-Heus Prods., Inc.
MP Acquisitions, LLC
MT2 Services, Inc.
Mysteries of History Productions, Inc.
Namor Productions, LLC
National Studios, Inc.
New Amsterdam Entertainment, Inc.
New Line Productions, Inc.
New Regency Productions, Inc.
Night Life Inc.
Niki Marvin Productions, Inc.
Nobleman Productions, LLC
N.W. Productions
October Holdings, Inc.
On Kids Inc.
Once Upon A Time Films, Ltd.
Open 4 Business Productions LLC
Orca Productions Inc.
Original Pictures Inc.
Over the Pond Productions, Inc.
Overachiever Productions, Inc.
Pacific 2.1 Entertainment Group, Inc.
Pantheon Entertainment Corporation
Paramount Pictures Corporation
Park Court Productions, Inc.
Patchett Kaufman Entertainment
Paul Maslansky Productions Inc.
Pee-wee Herman Productions, Inc.
Penthouse Presentations, Inc.
Perdido Productions, Inc.
Pet II Productions, Inc.
Peter Baloff Creative Services, Inc.
Phoenix Pictures Development Corp.
Platinum Band LLC
Pond Writer LLC
Priority Productions, Inc.
Punch Productions, Inc.

4

Quadra Productions, Inc.
Rain Media, Inc.
Ralph Edwards Productions
Ralph Edwards/Stu Billett Productions
Randwell Productions, Inc.
Ranger Productions Limited
Raptor Productions
Readcrest Productions, Inc.
Redacted LLC
Redweed Productions, LLC
Regency Television Productions, Inc.
Remote Broadcasting, Inc.
RHI Entertainment Productions, LLC
Rise and Shine Productions, Inc.
RLR Associates, Ltd.
Robert Benedetti Productions, Inc.
Rosecrans Productions, Inc.
RSP Television
Rubin Productions, LLC
Sackett Landing Productions, LLC
Salamander Film Productions, Inc.
Sammy Speaks, L.P.
Samson, Inc.
Samuel Goldwyn Productions
San Vicente Productions, Inc.
Sand Creek, Ltd.
Santucci Films, Ltd.
Sarabande Productions Inc.
The Saul Zaentz Company
SCFV Development, Inc.
Schafer/Thurling Productions Ltd.
Sea Side Film Company
Seneca Productions, Inc.
Seven Arrows Multimedia, Inc.
Seventh Heaven Productions, Inc.
Shangri-La Pictures, LLC
Shiksa Films, Inc.
S.H.I.P. Hamburg Filmproduktion 1 GmbH
ShoelArt LLC
Shoot the Horse Productions, Inc.
Showtime Pictures Development Company
Sivad Arts Development, Inc.
The SKPS Company
Slate of Eight, LLC
Smart People, Inc.
Smash Media, Inc.
Smith & Weed Productions, Inc.
The Somerset Foundation, Inc.
Sony Pictures Television Inc.
Sphinx Corporation dba Dimitri Villard Productions
Spyglass Development, LLC
The Steve Tisch Company, Inc.
Still Life Pictures, Inc.
Storyville Films, LLC
Strike Entertainment, Inc.
Strike-a-Match Productions
StudioCanal Entertainment Development, Inc.
Sussex Ltd., Inc.
Swamp Gravy Productions, LLC
Syntax Entertainment LLC
Table Rock Productions, Inc.
Tadpole Productions, Inc.
Talking Wall Pictures
Tardy-Green Productions Ltd.
Taweel-Loos & Company d/b/a TLC Entertainment
Technik, Inc.
Telco Productions, Inc.
Theodore Thomas Productions
Thinking Films LLC
Thomas J. McGough
Thr3e, LLC
Three B Productions Inc.
Thunderbird Development Inc.
Tiger Development, LLC
Tiny Dancer Films, LLC

Tisch, Black and Blu... ...al Productions, LLC
Topanga Productions, Inc.
Touchstone Television Productions LLC dba ABC Studios
Trackdown Productions, Inc.
Trailer Park Pictures, Inc.
TriStar Pictures, Inc.
TriStar Television, Inc.
Turner Pages, Inc.
TurtleBack Productions, Inc.
TVM Productions, Inc.
Twentieth Century Fox Film Corporation
TwinStar Entertainment, LLC, a California
    Limited Liability Company
Uncharted, LLC
United Artists Pictures Inc.
Universal City Studios LLLP
Universal Family Entertainment LLC
Universal Network Programming LLC
Universal Network Television LLC
USA Cable Entertainment Development LLC
Utopia Productions, Inc.
Valley Crest Productions, Ltd
Vanguard Pictures, Inc.
Vasanta Productions, Inc.
Verdict Films LLC
Vernon God Little, Inc.
The Video Line Inc.
Village Roadshow Productions Inc.
Vincent Pictures
Visionaire Media, Inc.
Volpone Productions, Inc.
Walking Woman Productions, Inc.
Walt Disney Pictures
Warner Bros. Pictures
Warner Bros. Television
Warner Specialty Films Inc.
WarnerVision Entertainment Inc.
Westgate Productions, Inc.
Westholme Productions, Inc.
A WGA Signatory Company Inc.
Wilarvi Communications, Inc.
William Gazecki
William W. Wilson III dba Lopez Films
Wind Dancer Film Development, LLC
Windward Productions, LLC
Woodridge Productions, Inc.
Wooster Productions, Inc.
Working Dog Group, Inc.
World Film Services, Inc.
WWE Films Development, Inc.
YaYa Productions, LLC
Zing Productions, Inc.
Zito Productions, Inc.

PREAMBLE TO THE AGREEMENT          5

[The listed Companies furnished their names to the Guild, which cannot insure that any of these names is in its full and correct form or is spelled correctly. Inquiries regarding the full and correct legal name of a signatory Company may be directed to the Guild's Signatories Department.]

(Each entity listed above is hereinafter referred to as the "Company" and collectively as the "Companies.") In consideration of the mutual agreements contained in this Agreement, the Guild and the Companies agree as follows:

The provisions of this Basic Agreement shall be designated as follows:

(I)     General provisions (herein designated "General") applicable to both theatrical employment, options (to the extent provided in this Agreement) and purchases and to television employment, options (to the extent provided in this Agreement) and purchases, and

(ii)    Provisions (herein designated "Television") applicable to television employment, options (to the extent provided in this Agreement) and purchases only, and

(iii)   Provisions (herein designated "Theatrical") applicable to theatrical employment, options (to the extent provided in this Agreement) and purchases only.

The provisions of this Basic Agreement which are applicable to employment, options and purchases for free television motion pictures are also applicable to employment, options and purchases for:

(a)     live television programs to the extent that such programs would be covered if they were television motion pictures; and

(b)     programs covered by Appendix B to the extent provided in Appendix B; and

(c)     motion pictures produced primarily for the basic cable market to the extent provided in Appendix C.

Notwithstanding any of the foregoing, the provisions of this Basic Agreement are not applicable to employment, options and purchases for:

(a)     [Deleted.]

(b)     programs excluded from the coverage of Appendix B which are produced principally for the pay television and/or videodisc/videocassette markets except to the extent provided in the Sideletter on Informational Programs.

The Company agrees that if it produces program(s) for television of the types heretofore traditionally produced for free television pursuant to any WGA Basic Agreement, such program(s) will be considered to be produced either for free television, basic cable or pay television. In the event a new distribution system evolves (distinct from the foregoing three methods), the parties to this Agreement reserve their respective rights with regard to such new system.

PREAMBLE TO THE AGREEMENT

## ARTICLE 1 - DEFINITIONS

The following terms or words used in this Basic Agreement shall have the following meanings:

**A.    GENERAL**

1.    The term *"television motion picture"* (sometimes referred to in this Basic Agreement as "television film") means the entertainment portion of motion pictures, whether made on or by film, tape or otherwise and whether produced by means of motion picture cameras, electronic cameras or devices or any combination of the foregoing or any other means, methods or devices, now used or which may hereafter be adopted for the recordation of motion pictures produced primarily for exhibition by free television. The prefatory language to this Basic Agreement and the provisions cited therein determine the extent to which the provisions of the Basic Agreement which are applicable to television motion pictures are also applicable to pay television and basic cable.

2.    The term *"theatrical motion picture"* means motion pictures and photoplays, whether made on or by film, tape or otherwise and whether produced by means of motion picture cameras, electronic cameras, or devices or any combination of the foregoing or any other means, methods or devices now used or which may be hereafter adopted for the recordation of motion pictures produced primarily for exhibition in a theater or similar location in which a fee or admission charge is paid by the viewing audience, other than those motion pictures produced primarily for exhibition in another market covered by this Basic Agreement.

3.    The term *"basic cable,"* as distinguished from pay television or free television, refers to that type of exhibition which is commonly understood in the industry today to be basic cable exhibition.

4.    The terms *"pay television"* and *"videodisc/videocassette"* are defined in Article 51 and in Appendix B of this Basic Agreement.

5.    The term *"literary material"* shall be deemed to include stories, adaptations, treatments, original treatments, scenarios, continuities, teleplays, screenplays, dialogue, scripts, sketches, plots, outlines, narrative synopses, routines, and narrations, and, for use in the production of television film, formats.

6.    The term *"radio rights"* means the right to broadcast by radio for aural reception only and unaccompanied by any recordation, transmission or broadcast intended for visual reception.

7.    The term *"week-to-week employment"* means the employment of a writer on a week-to-week basis which, except for such restrictions as may herein elsewhere be contained, may be terminated by the Company or writer at any time.

8.    The term *"public domain"* refers to literary material which is not subject to copyright protection in the United States.

9.    The term *"member of the Guild in good standing"* means a member of the Guild who has tendered the initiation fee and periodic dues uniformly required as a condition of acquiring or retaining membership.

10.   The term *"writer"* shall not be deemed to include any corporate or impersonal purveyor of literary material or rights therein.

11.   Other than as provided in Article 14 hereof, this Basic Agreement shall not, nor is it intended to cover, the employment of Producers, Directors, Story Supervisors, Composers, Lyricists, or other persons employed in a *bona fide* non-writing capacity

except to the \_\_\_nt that such employment consists of writing se\_\_\_es covered under this Article 1, section B.1.a.(2) or section C.1.a., nor the employment of Story Analysts, at any time prior to the expiration of this Basic Agreement, in the synopsizing of literary material, as referred to in the footnotes to Paragraph 1 of the wage scales and working conditions of the current agreement between "Producer and I.A.T.S.E. & M.P.T.A.A.C. and Local #854 thereof."

12.    It is understood that this Basic Agreement shall not, nor is it intended to, cover contracts for the purchase of literary material (a) which literary material at the time of purchase is published or exploited in any manner or by any medium whatever, or (b) with a person who is not a professional writer as defined in Article 1.B.1.b. or 1.C.1.b. hereof, whichever of said subparagraphs of Article 1 is applicable.

12.1.    The term **"network,"** as used in the Agreement, means ABC, CBS, FBC and NBC, or any other entity which qualifies as a "network" under Section 73.662(f) of the rules of the Federal Communications Commission, unless the FCC determines that such entity is not a "network" for purposes of such Section."

13.    Other terms not expressly defined in this Basic Agreement are used in their present commonly understood meaning in the theatrical motion picture and television motion picture industry in the State of California.

14.    [Deleted.]

15.    [Deleted.]

16.    [Deleted.]

17.    [Deleted.]

**B.    THEATRICAL**

1.    Writer and Professional Writer

a.    A "*writer*" is a person who is:

(1)    employed by the Company to write literary material as defined herein, where the Company has the right by contract to direct the performance of personal services in writing or preparing such material or in making revisions, modifications or changes therein; or

(2)    employed by Company, who performs services (at Company's direction or with its consent) in writing or preparing such literary material or making revisions, modifications, or changes in such literary material regardless of whether such services are described or required in his/her contract of employment; provided, however, that any writing services described below performed by Producers, Directors, Story Supervisors (other than as provided in Article 14 hereof), Composers, Lyricists, or other employees, shall not be subject to this Basic Agreement and such services shall not constitute such person a writer hereunder:

(a)    Cutting for time
(b)    Bridging material necessitated by cutting for time
(c)    Changes in technical or stage directions
(d)    Assignment of lines to other existing characters occasioned by cast changes
(e)    Changes necessary to obtain continuity acceptance or legal clearance

(f) Casual minor adjustments in dialogue or narration made prior to or during the period of principal photography

(g) Such changes in the course of production as are made necessary by unforeseen contingencies (*e.g.*, the elements, accidents to performers, etc.)

(h) Instructions, directions, or suggestions, whether oral or written, made to writer regarding story or screenplay

In addition to the foregoing, in the case of a person who at the time he/she performs services has not received at least two (2) screen credits for story or screenplay or both, as determined pursuant to Theatrical Schedule A of this Basic Agreement, or Schedule A of prior Theatrical Basic Agreements, within a period of ten (10) years (or has not received at least one (1) of such credits within a period of five (5) years) immediately prior to the rendition of such services, and who is employed solely in the capacity of the *bona fide* producer of a motion picture and whose employment does not include the requirement that he/she perform writing services, then, such person may, in addition to the above, perform the following writing services: make changes in dialogue, narration or action, but not including significant changes in plot, story line or interrelationship of characters, and such services by such person shall not be subject to this Basic Agreement. If such person does make significant changes in plot, story line or interrelationship of characters, then such services by such person shall be subject to this Basic Agreement, except Article 6 hereof.

In addition to the foregoing, in the case of a person who at the time he/she performs services has received at least two (2) such screen credits within such ten-year period (and with at least one (1) of such credits within such five-year period) immediately prior to the rendition of such services, and who is employed solely in the capacity of the *bona fide* producer of a motion picture, and whose employment does not include the requirement that he/she perform writing services, then, if such person shall perform writing services in addition to those described in (a) through (h) above, such services by such person shall be subject to this Basic Agreement.

In addition to the foregoing, in the case of a person who at the time he/she performs services is employed solely in the capacity of the director of a motion picture, and whose employment does not include the requirement that he/she perform writing services, then, such person may, in addition to the above, perform the following writing services: make changes in dialogue, narration or action, but not including significant changes in plot, story line or interrelationship of characters, and such services by such person shall not be subject to this Basic Agreement.

If such person does make significant changes in plot, story line or interrelationship of characters, then such services by such person shall be subject to this Basic Agreement, except Article 6 hereof.

In any event, if any producer or director shall receive screen credit pursuant to the provisions of Theatrical Schedule A and the Guild's credit rules relating to the writing contribution necessary for such credit, then the provisions of Paragraph I. of Article 6 of this Basic Agreement shall apply with respect to such person.

With respect to a person employed solely as a producer-director, on the motion pictures which he/she directs, the director paragraph above shall apply and on the motion pictures which he/she does not direct, the producer paragraphs above shall apply.

ARTICLE 1 - DEFINITIONS
B - THEATRICAL

9

As used above, "**producer**" shall also include the *bona fide* executive producer of said motion picture if such executive producer is of the same industry stature and has responsibilities and functions similar to those held or exercised by the following executive producers during 1977: Samuel Arkoff, Ron Miller and Marvin Mirisch.

With respect to signatory Companies, no services of any kind of any executive of the same industry stature and with responsibilities and functions similar to those held by or exercised by the following executives during 1977: Cardon Walker, Alan Ladd, Jr., John Calley, and Daniel Melnick shall be covered by any provisions of this Basic Agreement, except that if any such executive shall receive screen credit pursuant to the provisions of Theatrical Schedule A and the Guild's credit rules relating to the writing contribution necessary for such credit, then the provisions of Paragraph I. of Article 6 of this Basic Agreement shall apply to such person.

b.   The term "***professional writer***" means a person who on or after February 13, 2008, sells, licenses or options to the Company the ownership of or rights to use literary material written by such writer, for use in the production of a motion picture, which literary material had not prior to such sale, license or option been published or exploited in any manner or by any medium whatever, and who at such time:

(1)   has received employment for a total of thirteen (13) weeks, which need not be consecutive, as a motion picture and/or television writer, or radio writer for dramatic programs; or

(2)   has received credit on the screen as a writer for a television or theatrical motion picture; or

(3)   has received credit for three (3) original stories or one (1) teleplay for a program one-half hour or more in length in the field of live television; or

(4)   has received credit for three (3) radio scripts for dramatic radio programs one-half hour or more in length; or

(5)   has received credit for one (1) professionally produced play on the legitimate stage, or one (1) published novel.

The Company may rely on the statement of the writer with respect to whether or not the material had theretofore been published or otherwise exploited.

2.   The term "***treatment***" means an adaptation of a story, book, play or other literary, dramatic or dramatico-musical material for motion picture purposes in a form suitable for use as the basis of a screenplay.

The term "***original treatment***" means an original story written for motion picture purposes in a form suitable for use as the basis of a screenplay.

3.   The term "***screenplay***" means the final script with individual scenes, full dialogue and camera setups.

4.   The term "***first draft screenplay***" means a first complete draft of any script in continuity form, including full dialogue.

ARTICLE 1 - DEFINITIONS
B - THEATRICAL

5.    The term "*story*" means literary or dramatic material including the characterization of the principal characters and containing sequences and action suitable for use in, or representing a substantial contribution to, a final script.

6.    The term "*shorts*" or "*short subjects*," for the purposes of this Basic Agreement, is defined as motion pictures which when released are 3,600 lineal feet or less in length, other than motion pictures known as cartoons, newsreels, trailers, travelogues, commercials or news and sports commentaries and motion pictures intended primarily for exhibition by free television, if such motion pictures are originally made and originally distributed as such.

7.    The term "*rewrite*" means the writing of significant changes in plot, story line, or interrelationship of characters in a screenplay.  "*Polish*," as used herein, means the writing of changes in dialogue, narration or action, but not including a rewrite.

8.    Merchandising Rights - The term "*merchandising rights*" means the right to manufacture and to sell or otherwise dispose of any object or thing first described in literary material written by the writer pursuant to an employment agreement subject to this Basic Agreement, entered into on or after February 13, 2008, or acquired from a professional writer; provided such object or thing is fully described in such literary material and by such description appears to be unique and original.  Merchandising rights include the right of publication in publications of the generic type described as "photo novels" or "photo albums."

The writer shall have no merchandising rights.  However, if the Company exploits the merchandising rights (as defined above) in any such literary material, Company shall pay to such writer an amount equal to five percent (5%) of absolute gross, that is, monies remitted by the manufacturer on account of the exploitation of the subject merchandising rights.  The provisions of this subparagraph 8. are also applicable to a writer who is not entitled to Separation of Rights.

9.    The term "*interactive rights*" means the right:

a.    to reuse a theatrical motion picture, in whole or in substantial part, in an interactive program, as provided in Article 64.B.1.;

b.    to utilize excerpts from a theatrical motion picture in an interactive program, as provided in Article 64.B.2.; and

c.    to produce an interactive program based upon literary material for a theatrical motion picture written by a writer pursuant to an employment agreement (to which employment the provisions of this Basic Agreement or any prior MBA containing a separation of rights provision applies) or acquired by the Company from a professional writer (to which acquisition the provisions of this Basic Agreement or any prior MBA containing a separation of rights provision applies), which interactive program meets the requirements of Article 64.C.1.

The writer shall have no interactive rights.  However, if the interactive rights are licensed as provided in Article 64.B.1., B.2., C.1., D.1.a. or D.2.a., Company shall make payment to the writer in accordance with such provisions.

## C.    TELEVISION

1.    Writer and Professional Writer

a.    A "*writer*" is a person who is:

(1)    engaged by the Company to write literary material as defined herein (including making changes or revisions in literary material), when the

......pany has the right by contract to direct the pe......nance of personal services in writing or preparing such material or in making revisions, modifications or changes therein; or

(2) engaged by Company who performs services (at Company's direction or with its consent) in writing or preparing such literary material or making revisions, modifications, or changes in such material regardless of whether such services are described or required in his/her contract of employment.

A writer is a creative and professional person who performs a unique and indispensable function in relation to the production of motion pictures. It is an element of good faith, and part of the consideration of this Agreement, that no Company will use any of the following provisions of this paragraph with the purpose or intent of circumventing the employment of writers. Accordingly, it is agreed that the following services performed by an employee who is not employed as a writer shall not be subject to this Agreement and such services shall not constitute such a person a writer hereunder:

(a) Cutting for time
(b) Bridging material necessitated by cutting for time
(c) Changes in technical or stage directions
(d) Assignment of lines to other existing characters occasioned by cast changes
(e) Changes necessary to obtain continuity acceptance or legal clearance
(f) Casual minor adjustments in dialogue or narration made prior to or during the period of principal photography
(g) Such changes in the course of production as are made necessary by unforeseen contingencies (*e.g.*, the elements, accidents to performers, etc.)
(h) Instructions, directions or suggestions, whether oral or written, made to a writer regarding story or teleplay

In addition to the foregoing, if a person is employed solely in the capacity of the *bona fide* executive producer or *bona fide* producer of a specific television program and his/her employment agreement does not include the requirement that he/she perform writing services, and if said person has not been employed as a writer at least twice since June 1, 1966, and if said person nevertheless renders writing services (other than those specified in (a) through (h) above), then his/her employment as a writer shall be subject to this Basic Agreement, except that Article 6 and Article 14 of this Basic Agreement shall not be applicable if he/she performs no more than the following writing services on not more than three (3) programs in any one (1) production season (not more than one (1) of which may be a program in a mini-series, which for this purpose is a series of not more than eight (8) episodes in the production season): changes in dialogue, narration or action, but not including significant changes in plot, story line or interrelationship of characters. If such person makes significant changes in plot, story line or interrelationship of characters, such person shall be subject to Articles 6 and 14 of this Basic Agreement.

In determining whether a person has been employed as a writer since June 1, 1966, for the purposes of this subparagraph, (I) each separate occasion, if any, for which he/she has declared earnings to the Guild for services as a writer performed on a particular theatrical motion picture or television project since June 1, 1966, and (ii) each occasion, if any, on which he/she has been listed as a participating writer in relation to a screen authorship credit determination pursuant to a collective bargaining agreement with the Guild with respect to services performed as a writer since June 1, 1966 shall be conclusively counted as an employment as a writer. The exception provided for in this subparagraph shall not be valid in a particular case unless the Company obtains from the

12

ARTICLE 1 - DEFINITIONS
C - TELEVISION

...vidual a warranty in writing that he/she has not been employed as a writer at least twice since June 1, 1966. If the Guild should question whether the exception applies, whether relating to employment by the Company or by another signatory, the Company shall cooperate in making available to the Guild any evidence in its possession or control which may be relevant to the inquiry. Said exception shall not apply to a writer if such writer has been previously employed as a writer also employed in additional capacities as provided in said Article 14.

With respect to signatory Companies, no services of any kind of any executive of the same industry stature and with responsibilities and functions similar to those held by or exercised by the following executives during the 1977-78 broadcast season: Larry White at Columbia Pictures Industries, Inc., Allan Shayne at Warner Bros. Inc., Sy Salkowitz at Twentieth Century-Fox Film Corp., and Ron Miller at Walt Disney Productions, shall be covered by any provisions of the Basic Agreement, except that if any such executive shall receive screen credit pursuant to the provisions of Television Schedule A and the Guild's credit rules relating to the writing contribution necessary for such credit, then the provisions of Article 6, Paragraph I. shall apply to such person.

In addition to the foregoing, in the case of a person who at the time he/she performs services is employed solely in the capacity of the director of a specific television program, and whose employment does not include the requirement that he/she perform writing services, then, such person may, in addition to (a) through (h) above, perform the following writing services: make changes in dialogue, narration or action, but not including significant changes in plot, story line or interrelationship of characters, and such services by such person shall not be subject to this Basic Agreement. If such person does make significant changes in plot, story line or interrelationship of characters, then such services by such person shall be subject to this Basic Agreement, except Article 6 hereof.

In any event, if any director shall, with respect to the particular program, receive screen credit pursuant to the provisions of Television Schedule A and the Guild's credit rules relating to the writing contribution necessary for such credit, then the provisions of Article 6, Paragraph I. shall apply to such person. A writer who renders services as a director on a particular episode shall be deemed to be a director as to such episode.

b.  A "*professional writer*" means any person who has (1) received employment for a total of thirteen (13) weeks as a television, motion picture or radio writer, or (2) has received credit on the screen as a writer for a television or theatrical motion picture, or (3) has received credit for three (3) original stories or one (1) teleplay for a program one-half hour or more in length in the field of live television, or (4) has received credit for three (3) radio scripts for radio programs one-half hour or more in length, or (5) has received credit for one (1) professionally produced play on the legitimate stage or one (1) published novel.

2.  The term "*teleplay*" means the final script with individual scenes, full dialogue or monologue (including narration in connection therewith), and camera setups if required; provided, however, that if the Company desires any script to consist in part of suggested or indicated dialogue (so that an actor portraying a role may extemporize therefrom), such suggested or indicated dialogue shall be deemed to satisfy the requirement of "full dialogue or monologue."

3.  The term "*rewrite*" means the writing of significant changes in plot, story line or interrelationship of characters in a teleplay.

4.  The term "*polish*" means the writing of changes in dialogue, narration or action, but not including a rewrite.

5.    A **"back-up story"** is a story and/or teleplay for a proposed episodic series for which a writer is employed prior to the exploitation of the television series sequel rights for such proposed series, other than a pilot script.

6.    A **"pilot script"** is a story and/or teleplay intended to be used for the production of a pilot for a proposed serial or episodic series and setting forth the framework intended to be repeated in subsequent episodes, including the setting, theme and premise of the proposed serial or series and its central running characters.  A story and/or teleplay may be a "pilot script" whether or not there is a separate format for the proposed serial or series and regardless of whether it is written for broadcast as a unit of a unit series or as a one-time program.  The foregoing definition of pilot script also may apply to a story and/or teleplay intended to be used for the production of a pilot for a proposed unit series which does not have central running characters, but which story and/or teleplay does set forth the context and continuing framework intended to be repeated in subsequent units, including the central premises, themes, setting (locale, time, etc.), flavor, mood, style and attitude of the proposed unit series.

Nothing herein shall be construed to require that a pilot be produced for any such serial or series nor that a pilot script must be written for any such serial or series.

7.    The term **"first draft teleplay"** means a first complete draft of any script in continuity form, including the full dialogue.

8.    The term **"story"** means a story indicating the characterization of the principal characters and containing sequences and action suitable for use in or representing a substantial contribution to a final script; provided, however, that the writer shall not be obligated to insert dialogue therein (except to the extent necessary to show characterization) or to prepare the story in the form of a step outline.

9.    a.    A **"national radio network broadcast"** means a broadcast carried simultaneously by a station or stations in excess of the stations comprising a regional radio network.

      b.    A **"regional radio network"** means a network maintained by a network company for regional coverage as distinguished from national or transcontinental coverage.

10.   The term **"dramatic rights"** means the right of presentation in dramatic form on the speaking stage with living actors appearing and performing in the immediate presence of an audience, without any recordation, transmission, or broadcast thereof intended for aural or visual reception at places away from the place of performance, except that the dramatic rights shall include the right to broadcast directly by television such live presentation without any kinescope or other recording thereof, subject to restriction concerning the time when such broadcasts may be made as hereinafter provided.

11.   The term **"publication rights"** means the right to publication of the work in book form or in magazine or periodical form, including serial publication.

12.   **"Series sequel rights"** means the right to use the leading character or characters of a work participating in a substantially different story in an "episodic series" or "serial" type television program or radio program.

      **"MOW sequel rights"** means the right to use the leading character or characters of a work participating in a substantially different story in a program, ninety (90) minutes or longer, which is ordered subsequent to the broadcast of the "first MOW," as defined in Article 16.B.2.b., and is other than an exploitation of the "series sequel rights."

13.   The term **"single unit"** means a television program intended for broadcast as a single show, broadcast or program, and not as a part of a unit series or episodic series.

14

ARTICLE 1 - DEFINITIONS
C - TELEVISION

14. The term "*unit series*" means a series of programs, each of which contains a separate complete story, without a character or characters common to each of the programs in the series, but held together by the same title, trade name or mark or identifying device or personality common to all the programs in the series.

15. "*Episodic series*" means a series of programs, each of which contains a separate complete story with a character or characters common to each of the programs in the series, provided, however, that such series shall still remain an episodic series even though a two- three- four- or five- multi-part story is utilized in the series.
With regard to "literary material" for an "episodic series," extricable material shall consist of the plot of such material, and such original characters and characterizations which are distinctive and identifiable and which are the sole original creation of the writer, but shall not include the names of the characters.

16. The term "*serial*" means a series of programs in which generally the same characters carry on a continuing narrative.

17. The term "*established serial or episodic series*" means a serial or episodic series based upon material that has been published or exploited in any manner or by any medium whatsoever, or based upon a story in the public domain or owned by the Company.

18. **Merchandising Rights**

    a. The term "*merchandising rights*" with regard to any established serial or episodic series, or any unit series or one-time television program to which separated rights do not apply, means the right to manufacture and to sell or otherwise dispose of any object or thing first described in literary material written by the writer, provided such object or thing is fully described therein and by such description appears to be unique and original.

    b. With regard to writers entitled to separation of rights, merchandising rights shall mean the exclusive right to grant to manufacturers or others the right to refer, in conjunction with the marketing or exploitation of objects or things, to the series in which the writer's separation of rights exists or to characters of such series, but such objects or things shall not include:

        (1) The television motion picture itself or any part of the television motion picture;

        (2) Music composed for or identified with such series or with any episode of such series, including any form of exploitation of music, such as records or publishing;

        (3) Objects or things furnished by a manufacturer or other person or company for use in or in connection with such series or any episode of such series, where the Company receives no revenue from the marketing of such objects or things (for example, a motorcycle manufacturer furnishes motorcycles to the Company for photography in a series dealing with motorcyclists in exchange for the right granted to the manufacturer to refer to the series or to characters of the series in conjunction with the marketing and exploitation of its motorcycles);

        (4) Objects or things manufactured or sold by any sponsor of such series, where the right to refer to such series or characters of such series in conjunction with the marketing of such objects or things is obtained by the sponsor as part of the initial agreement for the sponsorship of the series, and the Company receives no revenue from the marketing of such objects or things (as distinguished from the revenue received by the Company for

series itself); but the sponsor referred to in this paragraph (4) refers to the overall sponsor or sponsors of the series, as distinguished from the companies advertising in "spot" commercials;

(5)   Objects or things which, in the reasonable judgment of the Company, would be harmful to the Company, network, sponsor or series to identify with such series or with characters of such series.

To effectuate the purposes of the foregoing provisions, the writer shall notify the Company in writing of the proposed license and the object or thing which is to be the subject of the license at least ten (10) business days before granting the license, so as to give the Company the opportunity to give appropriate notice to the writer.  If the Company notifies the writer that any proposed license is in violation of any of the foregoing provisions of this subparagraph 18., the Company shall concurrently send a copy of such notice to the Guild.  Within one (1) business day after receipt of such notice the Guild may submit the dispute to arbitration, for which purpose the "quick arbitration" provisions of Paragraph 26 of Theatrical Schedule A shall be used (but for this purpose a special panel of arbitrators shall be selected by the parties as promptly as possible following the execution of this Agreement).  With respect to subparagraph (5), the arbitrator's authority shall be limited to deciding whether the Company's judgment was reasonable.  The reserved merchandising rights do not include the right to use or license the use of:

(i)   The name or likeness of any person;

(ii)   Any proper name, trademark, service mark, trade name, or literary or artistic character (except public domain characters) existing and first exploited independently of such series.

The Company does not warrant or represent that it has or will have the right to use the title of the series or of any episode of the series in merchandising deals.  In the event that a writer of a particular episode is entitled to a merchandising rights payment, the amount due such individual shall be deducted from the merchandising rights payment which would otherwise be due the writer entitled to separation of rights in the series.  The definition of "merchandising rights," as it applies to writers entitled to separation of rights, shall be without prejudice to the respective positions of the parties hereto as to the meaning of the term in previous collective bargaining agreements.

19.   The term "*interactive rights*" means the right:

a.   to reuse a television motion picture, in whole or in substantial part, in an interactive program, as provided in Article 64.B.1.;

b.   to utilize excerpts from a television motion picture in an interactive program, as provided in Article 64.B.2.; and

c.   to produce an interactive program based upon literary material for a television motion picture written by a writer pursuant to an employment agreement (to which employment the provisions of this Basic Agreement or any prior MBA containing a separation of rights provision applies) or acquired by the Company from a professional writer (to which acquisition the provisions of this Basic Agreement or any prior MBA containing a separation of rights provision applies), which interactive program meets the requirements of Article 64.C.2., subject to the following:

(1)   When separation of rights does not apply to such literary material, but the writer(s) describes an object or thing or introduces a character as provided in Article 64.C.2.a. or b., such writer shall have no interactive rights.  However, if the Company exploits the interactive rights as provided in

Article 64.C.2., D.1.b. or D.2.b., Company shall make payment to such writer in accordance with such provisions.

(2) The interactive rights described in this subparagraph c. are reserved to the writer(s) entitled to separation of rights pursuant to Article 16.B.3.a. (subject to Article 16.B.3.d. or e. and 16.B.5.).

With respect to subparagraphs a. and b. above, the writer shall have no interactive rights. However, if the Company exploits either of such rights as provided in Article 64.B., D.1.b. or D.2.b. (subject to subparagraph c.(2) above), Company shall make payment to the writer in accordance with such provision.

20. A "*routine*" means a self-contained dramatic unit constituting fifty percent (50%) or less of the entertainment portion of a comedy-variety program; provided that such routine is either (a) an adaptation of material previously used in television or any other medium, or (b) original and written to fit the special talents and personality of the particular actor or actors in the program involved.

21. The term "*simulcast*" means the broadcast of a single performance of a program by radio and television, whether or not the radio and television broadcasts are made at the same time, provided that the original broadcasts by radio and television take place within twenty-one (21) days of each other.

22. Writers of variety and audience participation programs shall be deemed included under all provisions of this Basic Agreement to the same extent as writers of dramatic programs, despite the fact that only "story" and "teleplay" are hereinafter referred to in the Agreement.

23. The term "*weekly unit of television films*" means the number of television films of a particular series of variety (including comedy-variety), quiz or audience participation programs prepared by the same writer or writers for initial broadcast within one (1) week.

24. The term "*format*" means a written presentation consisting of the following:

a. As to a serial or episodic series, such format sets forth the framework within which the central running characters will operate and which framework is intended to be repeated in each episode; the setting, theme, premise or general story line of the proposed serial or episodic series; and the central running characters which are distinct and identifiable, including detailed characterizations and the interplay of such characters. It also may include one or more suggested story lines for individual episodes.

b. As to a multi-part series telling a complete story such as "*Rich Man, Poor Man*" (Book I) or "*Roots*" or a prime time serial, such as "*Executive Suite,*" such format as described in a. above shall be called a "*bible*" if, in addition and at the request or upon the instructions of the Company, it contains all of the following characteristics and requirements:

(1) It is in much greater detail than a traditional format, and includes the context, framework, and central premises, themes and progression of the multi-part series or serial.

(2) It sets forth a detailed overall story development for the multi-part series or for the first broadcast season of the serial (or such lesser period as may be contracted for with the writer) and includes detailed story lines for (a) all of the projected episodes of the multi-part series or (b) most of the projected episodes for the first broadcast season of the serial (or such lesser period as may be contracted for with the writer).

(3)     characters must be not only distinct and identifie, but must be set forth with detailed descriptions and characterizations.

c.     Except as to minimum compensation and reversion pursuant to Article 16.B.2.a., a "*bible*" is a format for all other purposes of this Agreement, including but not limited to other applicable provisions of Article 16.B.

d.     As to a unit (anthology) series, a format means a written presentation consisting of the following:  a detailed description of the concept of the proposed series; the context and continuing framework intended to be repeated in each episode; and the central premises, themes, setting (locale, time, etc.), flavor, mood, style and attitude of the proposed series; and it may include suggested story lines for several of the projected episodes.

25.     The term "*narration*" means material used (typically off camera) to explain or relate sequences or action (excluding promos or trailers).

26.     *Narrative Synopsis*:  An outline of a story owned by a writer, which is prepared for the purpose of determining the suitability of the story for teleplay purposes, which outline shall indicate characters and plot line but need not be sufficiently developed to meet the definition of a story.

# ARTICLE 2 - TERM AND EFFECTIVE DATE OF AGREEMENT

## A.     GENERAL

1.     The term of this Basic Agreement shall commence on February 13, 2008 and shall continue to and include May 1, 2011.

2.     With respect to all employment agreements with writers in effect on February 13, 2008, the terms of this Basic Agreement relating to minimum compensation and to rights in material shall apply only to services performed and literary material written under such employment contracts where the date of actual employment (*i.e.*, the commitment date) was on or after February 13, 2008, except as specifically otherwise provided herein in Article 2, Section B. or Section C.

3.     With respect to literary material licensed or acquired from professional writers (as described herein), the terms of this Basic Agreement relating to minimum compensation and rights in material shall apply only to unpublished and unexploited literary material licensed or acquired from such professional writers on or after February 13, 2008. Options of unpublished and unexploited literary material obtained from professional writers on or after February 13, 2008 shall be subject only to the provisions of this Basic Agreement relating to options (i.e., third paragraph of Article 13.A., Article 13.B.1.a., Article 16.A.3.d. and Article 16.B.3.i.), and then only to the extent applicable.  Disputes relating to the options provisions listed in the preceding sentence shall be subject to grievance and arbitration as provided in Articles 10, 11 and 12 of this Agreement.

4.     Company or Guild may, by written notice to the other served not earlier than ninety (90) days nor later than sixty (60) days prior to the expiration date of this Basic Agreement, signify its desire to negotiate a new collective bargaining agreement which shall become effective upon a date determined by mutual agreement between the Company and the Guild.  Such notice shall set forth in detail the proposals or recommendations of the party serving such notice.  If such notice is served, the parties agree to commence negotiations covering the proposals or recommendations in the notice, and the proposals and recommendations of the party receiving such notice, within thirty (30) days after the receipt of such notice and to continue such negotiations diligently and in good faith.  It is understood and agreed that the existing Basic Agreement shall continue in full force and effect until the termination date above provided.

5.     [Dele___ (See the fourth and fifth paragraphs of Article ___ 2.1. for provisions relating to the diversion of salary increases to Health Fund contributions and *vice versa*.)

6.     [Appeared as Article 2.A.5. in predecessor Basic Agreements.] Nothing herein contained shall be deemed to modify or affect the terms or conditions of any existing contract which are more favorable to the writer than the terms and conditions of this Basic Agreement.

## B.     THEATRICAL

1.     With respect to all theatrical employment agreements with writers under term or deal contracts which were in effect on February 13, 2008, the new minimum compensations, conditions and Theatrical Schedule A as herein contained shall not in any manner be applicable for the period prior to, nor effective until:

a.     in the case of a term contract, the effective date of the exercise of the next option which occurs after February 13, 2008, for the renewal of the employment period, or six (6) months after the effective date of the commencement of the current employment period, whichever occurs first, but in no event prior to February 13, 2008.

b.     in the case of a deal contract, the effective date of the next step of such deal contract, which commences after February 13, 2008.

2.     Any contractual obligation by Company, in effect on December 12, 1966, to give credit for source material or story in connection with a photoplay, shall not in any manner be affected by the provisions of Theatrical Schedule A contained herein.

## C.     TELEVISION

1.     With respect to television employment agreements with writers on a term or week-to-week contract basis in effect on February 13, 2008, the terms of this Basic Agreement relating to rights in material shall apply only to literary material written pursuant to assignments made on or after February 13, 2008.

2.     Notwithstanding any other provisions of this Article, the terms of this Basic Agreement relating to rights in material shall not apply to literary material written pursuant to any agreement in effect on February 13, 2008, if the granting or reserving of such rights, as herein provided, would conflict with any contractual obligation of the Company to any third party entered into prior to the effective date of this Basic Agreement; provided that the Company does not have a right to require the removal or elimination of the conflict created by such contractual obligation to the third party.

# ARTICLE 3 - WORK LISTS, LOAN-OUTS AND RECOGNITION

## A.     GENERAL

1.     Work Lists and Notices of Employment

Company each week shall send the Guild a list of the names of writers in the employ of a Company, and/or the names of professional writers from whom previously unexploited literary material has been purchased, at any time during the preceding week.  Copies of such list shall be mailed concurrently to the Writers Guild of America, West, Inc., 7000 West Third Street, Los Angeles, CA 90048 and to the Writers Guild of America, East, Inc., 555 West 57th Street, New York, New York 10019.  Company will send two (2) additional copies of work lists to the Guild, so that the Guild may distribute copies to Pension and Health Fund Administrators.

The notice of employment will contain the name and address of writer, the form of the material, the place of delivery and, if the information is then available, whether or not any material has been assigned to the writer. In addition, for theatrical motion pictures, the notice of employment shall include the title of the picture and the initial compensation for writing services. For television motion pictures, the notice of employment shall include the type, title and length of the program and the "initial compensation" as that term is defined in Article 17.B.1.e.

The Company each week shall also send the writer and the Guild a notice of employment for each freelance writer, other than those employed for episodic series, for whom a deal was made during the preceding week. The notice will also indicate the name of the Company representative to contact in connection with such notice. The notice may contain a statement substantially as follows, and in any event shall be deemed to contain the following statement:

> "This information is furnished pursuant to the requirements of Article 3.A. of the 2008 Writers Guild of America Basic Agreement. It is based upon the facts presently available to us and, in any event, may be subject to change. THIS IS NOT A CONTRACT. All contractual provisions, including rights, and compensation terms, whether or not specified above, will be contained in the agreement entered into between the parties."

The notices of employment may be combined with the weekly work lists referred to above.

Failure on the part of the Company to furnish any notice of employment or any list shall not constitute a default by the Company or a breach of this Basic Agreement unless the Company fails to deliver such list or such notice within seven (7) days after receiving the Guild's written request to do so. The Guild will not send such request unless it has in fact failed to receive such list or such notice within a reasonable period of time. In case of a failure to send such list and/or any such notice or notices after receiving a request to do so, liquidated damages totaling two hundred fifty dollars ($250.00) shall be paid for all such failures for any week. This shall be the sole and exclusive remedy for such breach.

2.    Loan-Out Agreements

In the event the Company borrows the services of a writer from a loan-out company, then the Company shall not acquire such writer's services on terms less advantageous to the loan-out company than if the Company had employed an individual to write the material pursuant to the terms of this Basic Agreement.

Borrowing a writer's services through a loan-out company will not in any manner deprive the writer of any benefits of this Agreement to which the writer would have been entitled had he/she been employed directly by the Company, provided that the Company (as distinguished from the loan-out company) shall be responsible for such benefits only to the extent that they are within the control of the Company. Such benefits to which the writer is entitled from the Company shall include but not be limited to credits, compensation for television licensing of theatrical motion pictures, residuals with respect to television motion pictures, and separation of rights, if applicable.

With respect to compensation, and other payments which may be due under this Basic Agreement, the Company shall pay the loan-out company or the writer at least minimum, but is not responsible for payment by the loan-out company to the writer. With respect to grievance and arbitration, claims by the loan-out company against the Company for unpaid compensation for writing services under the loan-out agreement shall be subject to grievance and arbitration to the same extent as though the transaction had been an employment contract. With respect to pension and health, the agreement between the Company and the loan-out company shall provide that the

Company shall make pension and health contributions directly to the Plans on behalf of the loan-out company.  In no event shall the Company be obligated to make larger contributions than it would have been obligated to make had it employed the borrowed writer directly.  ***"Loan-out company,"*** for the purposes of the foregoing and for the purposes of Article 12 of this Basic Agreement, means a company controlled by the writer.

**B.    RECOGNITION (THEATRICAL)**

1.    The Company hereby recognizes the Guild as the exclusive representative for the purpose of collective bargaining for all writers in the motion picture industry.

2.    The provisions of this Basic Agreement, to the extent the same are applicable, shall apply to professional writers.  However, the provisions of Article 6, "Guild Shop," and Article 17, "Pension Plan and Health Fund" are not applicable to professional writers, except to the extent that the second sentence of Article 17.B.1. and the second paragraph of Article 17.C.1. are applicable.  The Company each week shall send the Guild a list of the names of the writers, professional and non-professional, from whom the Company acquired literary material which had not been previously published or exploited in any manner or by any medium, provided that failure on the part of the Company to furnish any such list shall not constitute a default by the Company or a breach of this Basic Agreement unless the Company fails to deliver such list within forty-eight (48) hours after receiving the Guild's written request to do so.

**C.    RECOGNITION (TELEVISION)**

1.    The Company hereby recognizes the Guild as the exclusive representative for the purpose of collective bargaining of all writers engaged by the Company as employees for the purpose of preparing literary material for the entertainment portion of motion pictures produced primarily for exhibition over television.

2.    If a professional writer sells or licenses to the Company the ownership of or rights to use literary material written by such writer, for use in the production of a television motion picture, then upon condition that such literary material had not prior to such sale or license been published or exploited in any manner or by any medium whatsoever, Company agrees that the provisions of this Basic Agreement, to the extent the same are applicable, shall be effective to determine the rights of such professional writer and the obligations of the Company with respect to such literary material.  However, the provisions of Article 6, "Guild Shop," and Article 17, "Pension Plan and Health Fund," are not applicable, except to the extent that the second sentence of Article 17.B.1. and the second paragraph of Article 17.C.1. are applicable.  The Company may rely on the statement of the writer with respect to whether or not the material had theretofore been published or otherwise exploited.  The Company each week shall send the Guild a list of the names of the writers from whom the Company acquired literary material which had not been previously published or exploited in any manner or by any medium, provided that failure on the part of the Company to furnish any such list shall not constitute a default by the Company or a breach of this Basic Agreement unless the Company fails to deliver such list within forty-eight (48) hours after receiving the Guild's written request to do so.

# ARTICLE 4 - PARTIES BOUND BY THIS BASIC AGREEMENT

## A.  GENERAL

1.  With regard to a partnership signatory, all general partners are personally bound.

2.  With regard to any entity which becomes bound by this Basic Agreement by reason of this section, said entity will, upon request of the Guild, execute necessary documentation, but will be deemed signatory even without doing so.

3.  With respect to a theatrical or television motion picture covered hereunder which is financed fifty percent (50%) or more by the Company (or a fifty percent (50%) or more owned subsidiary of the Company), Company will obtain a warranty from the actual employer or purchaser that writer was paid all compensation for writing services theretofore due.  Upon request of the Guild, Company will provide the Guild with a certified copy of such warranty provision.

4.  In the event the Company borrows a writer (whose employment had he/she been employed directly by the Company would have been covered by this Basic Agreement), whether from a domestic or foreign company, the Company shall, within ten (10) days after the execution of the agreement covering the loan-out transaction, give the Guild a written notice of the transaction, including the name of the lending company.  An inadvertent failure by the Company to give such notice shall not be deemed to be a breach of this Basic Agreement.

## B.  THEATRICAL

1.  This Basic Agreement shall be binding upon the Company and its subsidiaries in which it has a fifty percent (50%) or more financial interest and all parties who by reason of mergers, consolidations, reorganizations, sale, assignment or the like shall succeed to or become entitled to a substantial part of the business of a signatory.

2.  With respect to a motion picture produced by an independent producer under a contract with the Company for the financing and distribution of such motion picture, if Company gives the Guild notice within ten (10) days following agreement between Company and independent producer with respect to such contract that such motion picture is not covered by this Basic Agreement, then Company shall not be obligated with respect to such picture except as otherwise provided in Article 15.  If the Company does not give the Guild such notice, then Company shall be obligated under this Basic Agreement (and no other collective bargaining agreement with the Guild shall be applicable) with respect to such motion picture.  The provisions of this subparagraph 2. apply only to:

   a.  a writer whose employment, had he/she been employed directly by Company in connection with such motion picture, would have been covered by this Basic Agreement; and

   b.  a professional writer where the sale or license of the literary material involved, had it been made directly to Company in connection with the motion picture involved, would have been covered by this Basic Agreement.

3.  Company agrees to notify the Guild within seven (7) days after it executes an agreement with any person, firm or corporation (not covered by the provisions of the preceding subparagraphs 1. and 2. of this Article), for the use of its studio for the production of a theatrical motion picture.  Company further agrees to notify the Guild within fourteen (14) days after it executes an agreement in the County of Los Angeles, California, with any person, firm or corporation (not covered by the provisions of the preceding subparagraphs 1. and 2. of this Article) for the production, distribution or release of a theatrical motion picture where Company's studio is not used for the production of such picture; such notice to the Guild shall contain the name and address

of such person, firm or corporation as well as the name of the person who signed the agreement on behalf of such person, firm or corporation. An inadvertent failure on the part of the Company to comply with the provisions of this paragraph shall in no event constitute a default by the Company or a breach of this Basic Agreement.

## C. TELEVISION

1. Company agrees to cause any subsidiary company, owned or controlled by it, which shall hereafter engage in the production of television motion pictures, to become a signatory to this Basic Agreement prior to its employment of any writer employed to prepare any material for use in such motion pictures.

2. With respect to a television motion picture produced by a non-signatory independent producer under a contract with Company for the financing, production and distribution of such television motion picture, if Company gives the Guild written notice not later than ten (10) days following agreement between Company and independent producer with respect to such contract that this motion picture is not to be covered by this Basic Agreement, then Company shall not be obligated hereunder with respect to it.

    a. If Company does not give the Guild such notice, then Company shall be obligated hereunder with respect to such television motion picture.

    b. This provision is subject to Article 5, "Geographical Application."

## ARTICLE 5 - GEOGRAPHICAL APPLICATION OF THIS BASIC AGREEMENT (GENERAL)

Notwithstanding anything to the contrary contained herein, this Basic Agreement shall apply to writers only in the specific instances set forth below regardless of where the contract of employment or acquisition, as the case may be, is signed:

A. As to a writer or professional writer who lives in the United States, if a deal is made in the United States to employ such writer to render his/her services or if an acquisition deal is made in the United States with such professional writer, and if at the time such deal is made such writer or professional writer is present in the United States, regardless of where the services are rendered; provided further, however, that if such writer or professional writer is a permanent resident of the United States but is temporarily abroad, and if the deal is made by his/her agent, attorney or other representative (including the Guild acting on the writer's behalf) who is in the United States at the time the deal is made, such deal shall be within the scope and coverage of this Paragraph A., even if such deal is made by such representative in communication by telephone, mail or cable with a representative of the Company, whether such representative of the Company is in the United States or abroad.

B. As to a writer or professional writer who lives in the United States and is transported abroad by Company, if a deal is made to employ such writer to render his/her services or if an acquisition deal is made with such professional writer while the writer or professional writer is abroad as a result of being so transported.

C. As to an employee whose writing services are required or requested by the Company to be performed and are performed in the United States under the supervision and direction of the Company.

D. "A writer or professional writer who lives in the United States," as such phrase is used in Paragraphs A. and B. above, does not include either of the following:

    1. A person who lives outside the United States (other than for a temporary visit) even though he/she may at any given time be temporarily in the United States; or

ARTICLE 5 - GEOGRAPHICAL APPLICATION OF THIS BASIC AGREEMENT (GENERAL)

23

2.   A person who is outside of the United States (other than for a temporary visit) whether or not he/she has retained his/her domicile in the United States.

E.   A "deal is made" within the meaning of both Paragraphs A. and B. above when agreement is reached by the Company and the writer as to the money terms.

# ARTICLE 6 - GUILD SHOP (GENERAL)

A.   Except as provided below, in both theatrical and television motion pictures each writer employed by Company on the effective date of this Basic Agreement who is then a member of the Guild in good standing shall remain a member in good standing, and each writer so employed who is not a member shall, on or before the thirtieth day following the effective date of this Basic Agreement, become and remain a member of the Guild in good standing. Each writer employed hereunder by Company after the effective date of this Basic Agreement shall, not later than the thirtieth day following the beginning of his/her first employment, as hereinafter defined, in the motion picture and television industry, become and remain a member of the Guild in good standing.

The term *"first employment,"* as referred to above, shall mean the first such employment to which the provisions of this Basic Agreement apply as a writer for a motion picture by an employer in the motion picture and television industry, on or after the effective date of this Basic Agreement.

B.   The provisions of Paragraph A. of this Article 6 shall not apply:

1.   If a writer is not a member of the Guild at the time of his/her employment and although required by the provisions of his/her employment agreement to do so, fails or refuses to become a member of the Guild in good standing within the thirty (30) days above-mentioned, provided that within fifteen (15) days after written notice thereof from the Guild to the Company, the Company shall either terminate such employment or shall pay or cause to be paid the initiation fees and dues of the writer in the manner, within the time, and subject to the provisions of subparagraph E.2. hereof relating to the payment of dues. If the Company elects to and does pay such initiation fees and dues, such writer shall be deemed to be a member of the Guild in good standing, but only for the period necessary to permit him/her to complete the performance of his/her services in connection with the then current assignment. The Company may use this exception only once for any particular person.

2.   To a writer whom the Company is required to employ as a condition of the sale, license or option of material, provided that within fifteen (15) days after written notice from the Guild to the Company that such writer is not a member of the Guild in good standing, the Company shall either terminate such employment, or shall pay or cause to be paid the initiation fees and dues that the writer would otherwise be required to pay hereunder during such employment, in the manner, within the time, and subject to the provisions of subparagraph E.2. hereof relating to the payment of dues. However, the writers employed by the Company within the exception provided for in this subparagraph 2. shall not exceed ten percent (10%) of the total number of writers in the employ of the Company. For the purpose of such computation, if the Company has in its employ at any time less than ten (10) writers, then one (1) of such writers so employed may fall within this exception. Promptly following the employment of any writer claimed by the Company to be within this exception, the Company will notify the Guild in writing of the name of the writer employed, the date of the employment agreement and the fact that the Company claims that such writer is an exception hereunder. For the purpose of such computation, a writer who is employed under an exclusive contract by a Company shall be regarded as being employed by the Company at all times during the term of such contract, including periods during which the writer may be on layoff and periods during which such contract may be suspended by reason of illness or default of the writer or otherwise. The writer shall be regarded as continuing in the employ of the

24

Company by which he/she is employed regardless of the fact that his/her services may be loaned to another Company.

C.    The term "dues," as used herein, shall not include fines or initiation fees.

D.    Promptly after request by any person designated by the Company, the Guild will admit such person to membership in the Guild upon terms and conditions not more burdensome to such person than those then applicable to other applicants.  Membership shall be effective as of the date of such request.  Guild agrees that during the term it will not impose any unreasonable initiation fee as a condition to admission to membership, and agrees that during the term hereof it will not impose upon its members any obligation to pay dues that does not uniformly apply to all members of the Guild.

It is agreed that the Guild shall not close its membership books or otherwise prevent any person who wishes to become or remain a writer from becoming a member of the Guild, but on the contrary (subject to the provisions hereof relating to waivers as to members suspended or expelled) will make available the privileges of membership to any and all writers employed by the Company.  The Guild will reinstate or readmit to membership any writer who applies for reinstatement or readmission, after being declared to be not in good standing or after suspension, expulsion, or resignation for any reason whatsoever, provided the writer will apply for such reinstatement or readmission and with such application tender to the Guild unpaid dues permitted by law, and upon such tender the Company may employ or continue to employ such writer.  Instead of readmitting or reinstating such writer, the Guild may, at its option, grant to the Company a waiver as to such writer, in which event, for the purpose of determining the Company's compliance with the provisions of this Article 6, such writers shall not be considered as being employed by the Company.

E.    If, during any time that a writer is employed by the Company under a contract of employment, such writer is or becomes a member of the Guild in good standing and if such writer shall subsequently and before his/her employment under such contract terminates, cease to be a member of the Guild in good standing then:

1.    If such writer has ceased or shall cease to be a member for any reason other than his/her failure to pay dues, such writer shall, for the purposes of this Basic Agreement, be deemed to remain a member of the Guild in good standing throughout the writer's employment under said contract of employment as the same may be extended or renewed pursuant to any provisions or options therein contained.

2.    If he/she has ceased or shall cease to be a member in good standing by reason of his/her failure to pay dues, and if the Guild gives the Company written notice of that fact within three (3) business days after such writer is first named on the weekly list provided for in Article 3.A.1. of this Basic Agreement (in the case in which he/she has ceased to be a member in good standing prior to such employment), such writer shall, for the purposes of this Basic Agreement, be deemed to remain a member in good standing for a period of fifteen (15) days after written notice from the Guild to such writer and to the Company that he/she has ceased to be a member in good standing for failure to pay dues.  If, prior to the expiration of said fifteen (15) day period, payment of said dues in fact due and owing and specified in said notice shall be made by the writer or the Company, then, for the purposes of this Basic Agreement, such writer shall not lose his/her status as a member in good standing.  To the extent that it may be lawful for the Company to do so, the Company may require, as a condition of employment, that any writer become and/or remain a member of the Guild in good standing, and may also require such written consent or consents as may be necessary so that, if the Company elects, it may pay to the Guild any dues of any writer and the Company shall have the right, insofar as its obligations to the Guild and to any writer under the terms and provisions of this Basic Agreement are concerned, if it elects, to deduct the amount of such dues from any compensation then or thereafter due or to become due to the writer.  If, prior to the expiration of said fifteen (15) day period, payment of said dues in

ARTICLE 6 - GUILD SHOP (GENERAL)

25

fact due...d owing as specified in said notice shall not b...de, the Company shall terminate the employment of such writer.

Every personal service contract of employment shall provide that if the writer fails or refuses to become or remain a member of the Guild in good standing, as above provided, the Company shall have the right at any time thereafter to terminate such employment agreement with such writer.

If the Company is required or directed by any decision of a court of competent jurisdiction or any proper governmental authority to refund to any writer, in whatsoever form the same may be recovered, any dues deducted and paid to the Guild by the Company under the provisions of subparagraph 2. of this Paragraph E., the Guild agrees to repay to the Company the amount of such dues so refunded. The Guild will cooperate with the Company in obtaining the necessary authorizations from writers for the payment and deduction of dues in the manner provided in subparagraph 2. above.

Notwithstanding anything to the contrary in Paragraph B. of this Article 6 or in this Paragraph E., if the payment of initiation fees or dues (in the case of Paragraph B.), or if the payment of dues (in the case of this Paragraph E.), or the deduction thereof from the compensation of the writer, is or shall become contrary to law, or any statute, or is declared by any court of competent jurisdiction in the State of California or by any Federal Court or the National Labor Relations Board or its General Counsel, or by any other board or individual having jurisdiction over the matter, to be in violation of any applicable law or statute and if, by reason thereof, the Company fails to deduct and pay to the Guild such initiation fees or dues, as the case may be, as aforesaid, and shall notify the Guild thereof in writing within the fifteen (15) days after any notice from the Guild above-mentioned, then although such initiation fees or dues, as the case may be, are not paid within the fifteen (15) day period, for the purposes of this Basic Agreement, such writer shall nevertheless be deemed to remain a member of the Guild in good standing throughout the term of the writer's assignment.

F.   The Guild will facilitate employment of its members by the Company and will at all reasonable times promptly furnish to the Company in writing information concerning the status of any of its members, and the Company shall be entitled to rely upon such information so furnished by the Guild.

G.   The Guild represents and warrants that discipline, resignation, admission, reinstatement, readmission and all other matters relating to membership status will at all times during the term hereof be within the exclusive jurisdiction of the Guild. The Guild agrees that it will exercise such jurisdiction subject to and in accordance with the provisions and intent of this Article 6 and of any other applicable provisions of this Basic Agreement.

H.   It is understood that the provisions of this Article 6 shall never under any circumstances be so construed during the term of this Basic Agreement as to constitute or permit what is known as a "closed shop" or construed in any manner that will at any time deprive the Company of its right to employ or continue the employment of a writer who is not a member of the Guild in good standing, or who does not become a member of the Guild in good standing within the period prescribed in Paragraph A. of this Article 6 if the Company has reasonable grounds for believing that such a membership was not available to such writer on the same terms and conditions generally applicable to other like members of the Guild, or if the Company has reasonable grounds for believing that membership in the Guild was denied, deferred, suspended or terminated for reasons other than the failure of such person to tender the applicable periodic dues uniformly required as a condition for acquiring or retaining membership in the Guild.

I.   If a person who has not been listed by the Company as a writer in accordance with the provisions of Article 3 hereof shall receive, or shall have been entitled to receive, a writing credit in the form of "Story by," "Written by," "Screenplay by," or "Teleplay by," and if the period during which the person performed his services in the writing of the literary material has exceeded a period of thirty (30) days from the commencement of such services, then within

ARTICLE 6 - GUILD SHOP (GENERAL)

fifteen (15) days after receipt of written notice from the Guild to the Company, the writer or the Company shall pay or cause to be paid the initiation fee, if any, and the dues which otherwise would have been payable to the Guild and such person shall be deemed to have been a member of the Guild in good standing during the time that he/she was so performing his/her services as a writer.  For such purpose, the person receiving or entitled to such credit or the Company may apportion, on a reasonable basis, salary payable to such person during the period he/she was employed as a writer.

J.    When the Company has failed to include a writer employed by the Company on the list of names of writers to be sent to the Guild under Article 3 of this Basic Agreement and when such writer's performance of writer's services has continued for more than thirty (30) days after the beginning of his/her first employment, then within fifteen (15) days after receipt of written notice thereof from the Guild to the Company, the writer or the Company shall pay or cause to be paid (in the manner, within the time, and subject to the provisions of subparagraph E.2. hereof, relating to the payment of dues) the initiation fee, if any, and the dues payable to the Guild for the period during which such writer was employed by the Company after such thirty (30) day period.  Upon such payment, such writer shall be deemed to have been a member of the Guild in good standing during the time that he/she was so performing his/her services as a writer.  The provisions of this paragraph shall not apply in the event the Guild gives the Company such notice prior to the expiration of such period of thirty (30) days.

K.    In relation to investigations by the Guild of compliance with the provisions of this Agreement, the Guild, through its authorized representatives, shall have access to the Company's premises at reasonable times during normal business hours for the purpose of interviewing the Company's employees whose employment is covered by this Agreement, provided that such interviews shall not interfere with the normal conduct of the Company's business.

## ARTICLE 7 - NO STRIKE, NO LOCKOUT CLAUSE (GENERAL)

A.    The Guild agrees that during the term hereof it will not call or engage in any strike, slowdown or stoppage of work affecting theatrical or television motion picture production against the Company.

B.    If, after the expiration or other termination of the effective term of this Basic Agreement, the Guild shall call a strike against any Company, then each respective then current employment contract of writer members of the Guild (hereinafter for convenience referred to as "members") with such Company shall be deemed automatically suspended, both as to service and compensation, while such strike is in effect, and each such member of the Guild shall incur no liability for breach of his/her respective employment contract by respecting such strike call, provided such member shall promptly, upon the termination of such strike, and on the demand of the Company, perform as hereinafter in this paragraph provided, and the member shall be deemed to have agreed as follows:

1.    That if the writer has been assigned to the writing of any material at the time any such strike is commenced, he/she will, after the termination of such strike and upon the request of the Company, report to the Company and perform his/her services in the completion of such assignment at the same salary and upon the same terms and conditions as were agreed upon prior to the commencement of said strike.

2.    That he/she will immediately, after the termination of such strike and upon the request of the Company, execute a new contract on the same terms and conditions, and at the same salary or other compensation as provided in the employment contract which was in effect at the time the strike commenced, except that such new contract shall be for a period or periods, including options, equivalent to the unexpired term of the contract which was in effect when such strike was commenced.

3.   That he/she will, in lieu of subparagraph 2., after the termination of such strike, at the option of the Company, and upon its demand, execute an agreement in writing with the Company extending the term or period of such personal service contract in effect when such strike was commenced for a period of time equal to the period of any suspension by such strike.

C.   If the member shall fail to perform the foregoing, or if he/she shall fail actually to finish his/her services in the assignment mentioned in subparagraph B.1., (except by reason of his/her death, physical disability, or default by the Company), then the waiver of liability by the Company heretofore given shall be null and void.

D.   The member further agrees that the statute of limitations as a defense to any action by the Company against the member for his/her failure to perform during such strike is extended by a period equivalent to the duration of such strike. If the member asserts any claim or defense by reason of the expiration of time during which he/she can be required to perform services by virtue of any statute (such as the seven-year statute), which claim or defense is based in whole or in part on the lapse of time during such strike, the waiver by the Company is ineffective thereupon, and the statute of limitations as to the Company's rights is waived by the member automatically.

E.   The automatic suspension provisions of this Article 7 shall not affect the Company's right to sue any individual writer for breach of contract arising during the period of such strike, unless such writer shall have complied with his/her obligations under the provisions of this Article 7. Nothing herein contained shall be construed to deprive the

Company of its right to terminate the employment contract at any time after such member shall strike or otherwise fail or refuse to perform services.

F.   The provisions of this Article 7 shall be deemed included in all employment contracts between writers and Company which are now in effect and all such employment contracts which shall be entered into during the effective term of this Basic Agreement.

G.   The Guild agrees that it will take such affirmative actions as may be necessary and lawful in order to require its members to perform their respective obligations under the provisions of this Article 7.

H.   Notwithstanding the expiration or other termination of the effective term of this Basic Agreement, by termination or otherwise, the provisions of this Article 7 shall be and remain in full force and effect for a period of seven (7) years following the termination of any such strike, unless this covenant be sooner terminated by the written consent of Company and Guild.

I.    The Guild is a corporation. Nothing in this Paragraph I. shall enlarge the liability of its officers, directors, agents, and members, and this Paragraph I. being an additional limitation thereon. The Guild will not be held liable for unauthorized acts of its officers, agents, directors, or members; neither the Guild, nor its officers, directors, agents, or members not participating in the actions hereinafter mentioned shall be liable for any strike, slowdown, or work stoppage, unless the same be authorized by the Guild in accordance with its by-laws, but the foregoing exemption of this sentence shall not apply unless the Guild, upon request from the Company affected thereby, shall proclaim promptly and publicly that such strike, slowdown or work stoppage is unauthorized and follows such pronouncement within a reasonable time thereafter, if requested so to do by the Company affected, with disciplinary proceedings in accordance with its by-laws against the participants in such unauthorized action.

J.    The Company agrees that it will not call or engage in any lockout of members.

K.   In accordance with and to the extent required by Articles 11 and 12 of this Basic Agreement as to any matter arbitrable thereunder, the Guild has the right to strike Company so long as the Company's wrongful failure to participate in grievance and arbitration procedures continues. Such action on the part of the Guild is not a waiver of the right to compel Company to participate in grievance and arbitration procedures. If the Company contests the arbitrability

28                                  ARTICLE 7 - NO STRIKE, NO LOCKOUT CLAUSE (GENERAL)

of such issu___.bitrability shall first be determined prior to the ___rator's proceeding with a
hearing on the merits.

# ARTICLE 8 - CREDITS FOR SCREEN AUTHORSHIP (GENERAL)

The Company agrees that credits for screen authorship shall be given only pursuant to the terms of and in the manner prescribed in the applicable Schedule A attached hereto and by this reference incorporated herein, with respect to credits for screen authorship finally determined during the term hereof, and with respect to credits for screen authorship finally determined after the expiration of the term hereof involving material written during the term hereof or during the term of a prior collective bargaining agreement between the Company and the Guild; provided, however, that any such credits determined during the term of a successor collective bargaining agreement between the Company and the Guild shall be determined pursuant to the terms of such successor collective bargaining agreement.

# ARTICLE 9 - MINIMUM TERMS (GENERAL)

The terms of this Basic Agreement are minimum terms; nothing herein contained shall prevent any writer from negotiating and contracting with any Company for better terms for the benefit of such writer than are here provided, excepting only credits for screen authorship, which may be given only pursuant to the terms and in the manner prescribed in Article 8. The Guild only shall have the right to waive any of the provisions of this Basic Agreement on behalf of or with respect to any individual writer.

# ARTICLE 10 - GRIEVANCE AND ARBITRATION

### A.    MATTERS SUBJECT TO GRIEVANCE AND ARBITRATION (GENERAL)

Except as otherwise specifically provided in this Article or elsewhere in this Basic Agreement, the following matters shall be submitted to grievance and thereafter to arbitration as hereinafter provided, and no other matters shall be submitted to grievance or arbitration:

1.    Any dispute between the Guild and the Company concerning the interpretation of any of the terms of this Basic Agreement and the application and effect of such terms as determined by an interpretation thereof.

2.    Any alleged breach of any of the terms or provisions of this Basic Agreement by the Guild or the Company.

3.    Any claim by the Guild and a writer, on the one hand, against the Company, on the other hand, for unpaid compensation under the writer's individual employment agreement or loan-out agreement with the Company, or for payment under a purchase agreement with the Company in the case of a professional writer, excluding, however, any claim not related to the writer's services as a writer or not related to the sale of literary material. (Claims for compensation or payment under an employment, loan-out or purchase agreement shall be referred to hereafter as "**compensation claims**" or "**claims for compensation**.") Notwithstanding the foregoing, the grievance committee and arbitrator shall not have jurisdiction to render an award for compensation or payment exceeding the sum of four hundred thousand dollars ($400,000.00) for a theatrical or television employment or purchase. (This amount is herein referred to as the "*jurisdictional maximum*.") If a compensation claim exceeds the jurisdictional maximum, the claim may nevertheless be submitted to grievance and/or arbitration, but by such submission the Guild and writer waive any award exceeding the jurisdictional maximum and shall have no further claim or right with respect to any amount in excess of the jurisdictional maximum. A claim for compensation cannot be split nor may more

than one (1) grievance or arbitration proceeding be brought for the purpose of avoiding the jurisdictional maximum.

4. In any grievance or arbitration proceeding with respect to a claim for compensation brought under subparagraph 3. of this Article 10.A., the Company may, but need not, assert any and all defenses, including defenses based on an alleged right of suspension or termination, and any counterclaim or setoff (hereinafter referred to as "**cross-claim**"). A cross-claim is either mandatory or permissive. A mandatory cross-claim is one arising out of or related to the pending claim for unpaid compensation. A permissive cross-claim is any other cross-claim by the Company against the writer. Provided that the Company has obtained knowledge of the facts upon which the cross-claim is based, the Company shall assert any and all mandatory cross-claims in any arbitration proceeding involving a compensation claim. If the amount claimed by the Company in a cross-claim exceeds the jurisdictional maximum of four hundred thousand dollars ($400,000.00), the Company shall have the option of submitting such cross-claim to grievance and (whether or not submitted to grievance) to arbitration or to institute an action at law or in equity with respect to such cross-claim. The Company may, but need not, assert any permissive cross-claim.

5. Any claim of overpayment by a Company under Article 11.A.9. of this Basic Agreement.[1]

## B. LIMITATION OF MATTERS SUBJECT TO GRIEVANCE AND ARBITRATION

1. Except as otherwise provided in this Basic Agreement, disputes under individual employment agreements, loan-out agreements or under purchase agreements with professional writers, involving:

   a. Company's rights of suspension and termination,

   b. Company's right to seek or obtain injunctive relief or specific performance,

   c. any of the warranties or grants of rights made by the writer, or

   d. any of the rights of the Company to any literary material,

   shall not be subject to grievance or arbitration (except as provided to the contrary in Article 16), and the Company reserves all of its legal and equitable rights and remedies with respect thereto. Any decision in grievance or award in arbitration purporting to determine or affect any of the aforementioned matters shall, to that extent, be of no force or effect whatsoever; provided, however, that if the Company asserts in any grievance or arbitration any defense or cross-claim involving or based upon the alleged exercise of a right of suspension or termination, the same shall be determined in such grievance and arbitration proceeding.

2. The grievance committee and the arbitrator shall have jurisdiction to determine only such disputes as are submitted for grievance or arbitration under this Basic Agreement, subject to the limitations upon the powers of said grievance committee and arbitrator under this Basic Agreement. Neither the grievance committee nor the arbitrator shall have the power or jurisdiction to reform, amend or extend the express terms and provisions of this Basic Agreement or of any employment agreement, loan-out agreement or purchase agreement.

---

[1] Articles 10.A.5. and 11.A.9. replace Article 13.C. of the 1973 Basic Agreement.

**C.   MATTERS SUBJECT TO ARBITRATION BUT NOT GRIEVANCE**

Notwithstanding anything elsewhere contained in this Article 10, the following matters shall be submitted to arbitration but not to grievance:

1.   Any dispute as to whether the arbitrator has jurisdiction or whether any matter is arbitrable, provided, however, that the arbitrator may not order an arbitration of any matter not arbitrable as provided above.

2.   Any dispute concerning the credit provisions of this Basic Agreement.  Such disputes are subject to the procedures set forth in Article 11.E. of this Basic Agreement.

3.   Any dispute concerning separation of rights under the provisions of subparagraph 6. of Article 16.A. of this Basic Agreement.

4.   Any dispute concerning allocation of receipts under Article 15.A.3.a. of this Basic Agreement.

5.   Any dispute concerning Article 16.A.8. which is subject to the expedited arbitration procedure in Article 11.F.

**D.   REFUSAL TO ARBITRATE**

A failure or refusal by any party to go to grievance on a matter subject to grievance or to arbitrate an arbitrable matter, including disputes as to jurisdiction and arbitrability pursuant to this Article 10, is a substantial breach of this Basic Agreement.  A failure or refusal by any party to go to grievance on a matter subject to grievance or to arbitrate an arbitrable matter shall not limit, impair or divest the jurisdiction and powers of the grievance committee or arbitrator provided notice of grievance or arbitration has been served as provided herein. Grievance and arbitration may proceed despite the failure of a party to appear and the grievance committee or arbitrator may enter an award against such a party.

**E.   REFERENCES**

All references in Articles 10, 11 and 12 to individual employment agreements, loan-out agreements or purchase agreements only refer to such agreements as are subject to this Basic Agreement.

# ARTICLE 11 - GRIEVANCE AND ARBITRATION RULES AND PROCEDURES

**A.   GENERAL RULES**

Unless otherwise provided in this Article 11 or elsewhere in this Basic Agreement, the rules and procedures for grievance and arbitration shall be as follows:

1.   Parties

a.   In any grievance or arbitration concerning any claim by a writer for compensation under Article 10.A.3., the Guild and the writer involved shall be jointly a party and may be represented by joint counsel.  In any grievance or arbitration concerning such a claim by any loan-out company, the loan-out company also shall be jointly a party and may be represented by joint counsel.  The claim shall be initiated by the Guild on behalf of the writer and the loan-out company, if any.

b.   Except as provided in subparagraph a. above, only the Company and the Guild shall be parties.

c.   [Renumbered as Article 11.B.3. and deleted here.]

d.   The party commencing a claim in grievance or arbitration is sometimes referred to herein as complainant.  The party against whom such grievance or arbitration is commenced is sometimes referred to herein as respondent.  Use of such terms in the singular shall be deemed to include the plural.

e.   The grievance and arbitration provisions shall apply to disputes with respect to purchase agreements with professional writers to the same extent but no greater than they are applicable to disputes involving employed writers.

f.   As used in Articles 10, 11 and 12 of this Basic Agreement, the term "writer" shall be deemed to include the plural, the writer's loan-out company if any (as defined in Article 3 of this Basic Agreement) and, in the case of a purchase agreement, a professional writer (as defined in Article 1 of this Basic Agreement).

2.   Time Limits

a.   Proceedings for grievance (or arbitration, to the extent a party is required to initiate arbitration without invoking a grievance proceeding) of a claim relating to actual or alleged television employment or purchase shall be commenced no later than two (2) years after the party bringing the grievance or arbitration proceeding (whether it is the Company, Guild or the writer) has obtained knowledge of the facts upon which the claim is based.  Proceedings for grievance (or arbitration, to the extent a party is required to initiate arbitration without invoking a grievance proceeding) of a claim relating to actual or alleged theatrical employment or purchase shall be commenced no later than eighteen (18) months after the party bringing the grievance or arbitration proceeding (whether it is the Company, Guild or the writer) has obtained knowledge of the facts upon which the claim is based.

b.   In any event, grievance and arbitration proceedings shall commence not later than four (4) years after the occurrence of the facts upon which the claim is based.  An arbitration may be commenced prior to initiation or conclusion of a grievance proceeding, if it reasonably appears that the grievance proceeding will not be concluded in sufficient time to permit the arbitration proceeding to be commenced in time.

c.   With respect to separation of rights in television literary material, Company may accelerate the applicable limitation of time by serving notice on the Guild, after the literary material is completed, that the writer concerned does not have separation of rights in such material and by furnishing with such notice copies of all literary material and contracts upon which the Company's position in such notice is based.  The Guild must respond within ninety (90) days from the date such notice is received or the claim to separation of rights is waived on behalf of the writer and the Guild.

d.   If grievance or arbitration proceedings are not commenced within the applicable time period specified in this Article 11, such claim shall be deemed to be waived.  All time limits provided in Article 11 may be extended by mutual agreement of the parties to the dispute.

e.   It is the intent of the Guild and the Company that all arbitration awards should be rendered within sixty (60) days following the close of the arbitration hearing or submission of post-hearing briefs, whichever is later.  However, the arbitrator's failure to render an award within such period shall not deprive him/her of jurisdiction over the dispute or render the award invalid because it is made thereafter.

3.     Place   ...iearing

Except as otherwise provided in this paragraph, all arbitrations shall be in Los Angeles, absent agreement of the parties. At the election of Writers Guild of America, East, the arbitration shall be in New York if a majority of the witnesses required for the arbitration hearing reside regularly in and around the New York area; provided, however, if any Company which is a party to the arbitration has its headquarters for the production of motion pictures in California, such arbitration shall be held in Los Angeles. Any dispute as to where the arbitration should be held shall be determined by an arbitrator in Los Angeles, selected in accordance with the procedures set forth in Article 11.C.2., and said arbitrator shall be disqualified from hearing the merits of the dispute. Said arbitrator shall take testimony by telephone from distant witnesses when requested to do so by either party. If the arbitrator determines that the arbitration shall be heard in New York, the arbitrator assigned to hear the merits of the dispute shall be selected from the New York list of arbitrators set forth in Article 11.C.2.

The selection of the situs of the hearing room within the appropriate city shall be by mutual agreement of the Company and the Guild. If there is no such agreement, those parties will alternate in selecting the hearing room, with the party making the selection supplying the room at no charge to the other.

4.     Award

The grievance committee and the arbitrator may make any appropriate award permitted herein. Such award shall be in writing and shall be limited as provided in this Basic Agreement. Subject to the provisions of this Basic Agreement, the award shall be final and binding upon the parties to the proceeding, whether participating in the proceeding or not, and in any grievance or arbitration proceeding in which the writer involved is not a party. Any interpretation of this Basic Agreement made in such award shall be final and binding on such writer.

5.     Costs

Each party shall pay the costs of its representatives on the grievance committee. The fee and expenses of the arbitrator shall be shared equally, unless otherwise provided by the arbitrator. The arbitrator may require a court reporter and a transcript, and if so required, the cost thereof shall be shared equally. All other costs and expenses of grievance and arbitration shall be borne by the party incurring the same.

6.     Notices

a.     All written notices referred to in this Article 11 commencing a grievance or arbitration or alleging a cross-claim shall be sent by registered or certified mail or by personal delivery and shall set forth the particulars thereof. If the moving party is unable to effect service in this manner, service then may be effected by first class mail, postage prepaid, to the address for service last designated in writing by the Company, together with publication in *Daily Variety, The Hollywood Reporter, The Los Angeles Times* and *The New York Times*. All other written notices may be served by first class mail, postage prepaid, unless otherwise specifically provided herein.

b.     All notices sent by the Guild to the Company shall be sent to the address designated by the Company in writing to the Guild at the time Company becomes signatory to the Basic Agreement. Should Company change its address for the purpose of receiving notices relating to grievance or arbitration, the Company shall notify the Executive Director of Writers Guild of America, West, Inc. and the Executive Director of Writers Guild of America, East, Inc. of such new address, which shall then be substituted for the prior address.

c.    Unless otherwise designated by Company in a written notice to the Guild, all notices sent by the Guild to the Company shall be addressed to the attention of an officer of the Company, or to its Labor Relations Department. If the Company maintains an office in Los Angeles, California or its vicinity, all such notices shall be sent to said office.

d.    A petition to confirm, modify or vacate, as the case may be, an arbitration award in any court of competent jurisdiction shall be served upon the respondent by registered or certified mail or by personal delivery. If the petitioner is unable to effect service in this manner, service then may be effected by first class mail, postage prepaid, to the address for service last designated in writing by the Company, together with publication in *Daily Variety, The Hollywood Reporter, The Los Angeles Times* and *The New York Times.*

7.   Conduct of Proceedings

Except as set forth elsewhere herein, the grievance committee and the arbitrator shall adopt such rules of procedure and shall conduct proceedings in such manner as they shall determine to be proper; provided, however, that each party to any grievance or arbitration shall be afforded a reasonable opportunity to present evidence and argument before the grievance committee and the arbitrator.

All hearings, deliberations and proceedings of the arbitrator and the grievance committee shall be closed to the public and shall be absolutely privileged. Only interested parties, their representatives and witnesses may attend. All communications to and from the arbitrator or the grievance committee shall likewise be absolutely privileged. Unless the Company objects, the arbitrator will send a copy of the award to the AMPTP. The Guild shall have access to those awards.

8.   Claims for Compensation, Cross-Claims and Defenses

Subparagraphs a. through e. of this subparagraph 8. relate to compensation claims, cross-claims and defenses covered by Articles 10.A.3. and 10.A.4. of this Basic Agreement.

a.    The grievance committee and arbitrator shall have no jurisdiction to determine or affect any claim relating to services in connection with any theatrical or television motion picture other than the theatrical or television motion picture as to which the compensation claim is asserted unless a defense or cross-claim is asserted with respect to another theatrical or television motion picture.

b.    A decision made or award rendered in grievance or arbitration of a claim for compensation shall be limited to deciding or awarding what compensation, if any, is due the writer from the Company and what amount, if any, is due the Company from the writer on account of any cross-claim asserted by the Company in such grievance or arbitration.

c.    If a claim for compensation under Article 10.A.3. of this Basic Agreement is submitted to grievance or arbitration, any claim of a breach of this Basic Agreement arising out of or connected with said claim must, to the extent permitted by the Basic Agreement, be submitted for grievance and arbitration together with the claim for compensation, provided that the Guild or the writer has obtained knowledge of the facts upon which said claim of breach is based. Failure to so submit such claim shall constitute a waiver of any and all rights to assert such claim thereafter.

d.    The institution of any action in court by the Company shall not stay an arbitration proceeding brought by the Guild and writer for compensation, nor shall any such grievance or arbitration proceeding stay any action instituted by the Company

**ARTICLE 11 - GRIEVANCE AND ARBITRATION RULES AND PROCEDURES**
A - GENERAL RULES

in any matter Company is not required to submit a grievance or arbitration as
a defense or cross-claim, whether or not such action is instituted prior to the
submission of the compensation claim to grievance or arbitration.

e.      Cross-claims must be submitted to grievance or arbitration by serving written
notice on the complainant, by certified or registered mail, setting forth the
particulars thereof.

9.   Overpayments

If the Company claims that it has made an overpayment to a writer of any
compensation provided for in this Basic Agreement or in any prior collective bargaining
agreement between the Company and the Guild (*i.e.*, minimum compensation,
residuals and other compensation provided for in this Basic Agreement or any other
such collective bargaining agreement (hereinafter called "MBA compensation")) or of
any compensation provided for in an employment or loan-out contract with a writer or
an option agreement subject to the MBA or a purchase agreement with a professional
writer not in excess of the applicable jurisdictional maximum of four hundred thousand
dollars ($400,000.00) as set forth in Article 10.A.3. above (hereinafter called "arbitrable
overscale compensation"), and if the Company desires to offset such payment against
other compensation payable to such writer, the Company shall advise the Guild thereof
in writing setting forth the particulars of such claim of overpayment.  If the Guild
requests that the question of whether the Company has overpaid MBA compensation or
arbitrable overscale compensation to the writer be submitted to grievance and
arbitration, such request shall be made within seven (7) days after such notice from the
Company to the Guild.  If the Guild does not make a timely request, the Company may
proceed with the offset, subject to all of the legal rights and remedies of the writer.  If
the Guild does make a timely request, then pending the outcome of such grievance and
arbitration, the Company agrees that it will not apply the offset, but will pay the amount
it desires to apply as an offset to the Guild.  The Guild shall then promptly deposit the
amount so paid in a separate interest-bearing trust account until it is determined in such
grievance and arbitration proceeding whether there was in fact an overpayment of MBA
compensation or arbitrable overscale compensation, as the case may be.  The
grievance and arbitration shall involve only the question of whether there was in fact an
overpayment of such compensation, and the amount thereof, and if it is determined that
there was in fact an overpayment of such compensation, the right of offset is
recognized.  Upon conclusion of the arbitration, the payments into such account,
together with applicable interest, shall be paid to the Company or to the writer in
accordance with the arbitration decision.  The parties shall cooperate in obtaining a
speedy determination of the grievance and arbitration.  As to any claimed right of offset
with respect to any alleged overpayments of monies other than MBA compensation or
arbitrable overscale compensation, the Guild and the Company reserve their respective
rights and contentions.

10.   Withdrawal of Services

Notwithstanding any provision of any personal service contract (including a
memorandum agreement) or of the MBA to the contrary, it shall not be a violation
thereof for the Guild or any employee (at the direction of the Guild) to withhold services
from the Company if the Company fails or refuses to abide by the final award of an
arbitrator for any reason whatsoever.

11.   Any grievance and/or arbitration concerning a dispute arising under a prior MBA or a
writer's individual employment agreement, loan-out agreement, option agreement or
purchase agreement subject to a prior MBA shall be subject to the following grievance
and arbitration rules and procedures as set forth in the MBA in effect at the time the
grievance or arbitration is initiated:

a.      The lists of arbitrators;

ARTICLE 11 - GRIEVANCE AND ARBITRATION RULES AND PROCEDURES
A - GENERAL RULES          35

b.   The method of selecting an arbitrator;

c.   A party's unilateral right to waive second step grievance;

d.   Use of a sole disinterested arbitrator rather than a tripartite arbitration panel;

e.   Respondent's written statement of position prior to an arbitration hearing;

f.   Methods of effecting service of grievance notices, arbitration claims, cross-claims and notices, and petitions to confirm, modify or vacate an arbitration award;

g.   Arbitration of disputes concerning tri-Guild residuals audits as set forth in the Sideletter to Article 11;

h.   Expedited arbitration of residuals disputes under Article 11.G.; and

I.   Expedited arbitration of reacquisition disputes under Article 11.F.

The parties agree that the provisions of this Article 11.A.11. shall not be construed to render a dispute subject to grievance and/or arbitration hereunder if that dispute was not subject to grievance and/or arbitration under such prior MBA. The parties further agree that to the extent a claim of overpayment as described in Article 11.A.9. of this Agreement or a "cross-claim" may lie, the provisions of this Article 11.A.11. also shall apply.

## B.   GRIEVANCE

1.   Step One - Informal Conference

Prior to submitting to grievance any matter properly a subject thereof, an authorized representative of the Guild and an authorized representative of the Company will meet in a good faith attempt to settle the dispute. If the representatives of the parties shall fail to settle the dispute within fourteen (14) days after the matter is first brought to the attention of the respondent, then the dispute may be referred to Step Two Grievance.

2.   Step Two - Grievance

a.   Commencement of Grievance

Complainant shall set out the nature of its claim in writing, and serve a copy ("grievance notice") thereof upon respondent by certified or registered mail. Respondent may, but need not, reply in writing, setting forth its position. The parties shall attempt to agree upon a mutually satisfactory date to convene a grievance committee and hold a grievance hearing, but if no mutually agreeable date is chosen, respondent may, within five (5) days after receipt of the grievance notice, designate by written notice to complainant a date upon which the grievance committee shall convene to hold the grievance hearing. Such date shall be no earlier than fifteen (15) nor later than thirty (30) days after receipt of the grievance notice. If respondent fails or refuses to designate such a date, complainant may designate the date for such meeting, such date to be not earlier than fifteen (15) nor later than thirty (30) days after service of the grievance notice.

b.   Grievance Committee

The grievance committee shall consist of three (3) representatives chosen by respondent and three (3) representatives chosen by complainant. Either party shall have the right to designate a substitute for any of its representatives. The

committee will, by majority vote, select its chairman. By mutual agreement, the grievance committee may consist of two (2) representatives chosen by respondent and two (2) representatives chosen by complainant.

    c.    Grievance Hearing

The grievance committee thus designated shall meet upon the date selected pursuant to the procedure described above, and shall consider and attempt to resolve the dispute brought before it. The hearing shall be conducted in an orderly fashion, but rules of evidence and technicalities of procedure shall not be controlling. It is the intent of this Basic Agreement that the committee members shall use their good faith, best judgment and common sense, as persons experienced in the motion picture and television industry, in attempting to resolve the dispute brought before it. No matter shall be considered by the grievance committee unless a quorum is present. A quorum shall consist of six (6) members. If any four (4) members of the committee shall agree on a decision, such decision shall be final and binding upon the parties to the proceedings and any interpretation of this Basic Agreement made in such decision shall also be binding upon the writer or writers involved. If no decision is agreed upon, then in any subsequent arbitration or other proceeding, no reference shall be made to the grievance proceeding or to any statements or discussions therein, or to the failure of the grievance committee to settle the dispute.

    d.    Unresolved Grievance

If either party fails to designate its representatives within ten (10) days after notice of grievance is served, or if the committee shall fail to meet and commence hearings on the date selected in accordance with the procedures described above, or if four (4) members of the committee shall fail to concur in a decision, or if a grievance hearing is waived by one (1) of the parties hereto, or in any event if the dispute has not been settled by the committee or otherwise within forty-five (45) days after the mailing of the grievance notice, then either party may submit such matter to arbitration.

3.    Waiver of Grievance [appeared as Article 11.A.1.c. in predecessor Agreements].

Either party may, by written notice to the other party, waive grievance. In such event, the dispute shall be submitted directly to arbitration.

## C.    ARBITRATION

1.    Initiation of Proceedings

A dispute which is subject to grievance proceedings shall not be subject to arbitration, except as provided in subparagraph B.2.d. or subparagraph B.3. of this Article 11. An arbitration shall be initiated by complainant by written notice, setting forth the particulars of the claim, to be sent to respondent in accord with the procedures described in Article 11.A.6.a. of this Basic Agreement. Respondent will provide complainant with a written statement of its position not later than ten (10) days prior to the date of the hearing.

2.    Selection of Arbitrator

The arbitrator shall be a disinterested person. The parties shall in good faith attempt to mutually agree upon an arbitrator within ten (10) business days after respondent's receipt of the arbitration notice. The complainant may extend this ten (10) day period upon written notice to respondent(s) at the time the arbitration claim is served. Such extension is deemed effective at that time absent an objection by respondent(s). In addition, the extension will no longer be deemed effective if respondent(s) gives subsequent written notice to complainant in which case the parties shall in good faith

attempt to mutually agree upon an arbitrator within ten (10) business days after complainant's receipt of notice from respondent(s).  With respect to arbitration claims served on or after February 13, 2008, if the complainant has failed to take any action to select the arbitrator (either by mutual agreement or the applicable Strike Process), or has failed to withdraw the claim with or without prejudice, for a period of eighteen (18) months after service of the claim on respondent(s), such claim shall be deemed to be waived.

Should the parties fail to agree on an arbitrator, the arbitrator shall be selected by the "Strike Process" as follows:

a.  The arbitrators listed in Article 11.C.2.e.(3) shall constitute the lists of arbitrators.

b.  On a Company-by-Company basis, the Guild and the Company shall alternate on a case-by-case basis in first striking a name from the applicable list of arbitrators (Los Angeles or New York).  Thereafter, the other party shall "strike" a name from the list.  The parties shall continue to alternate in striking names from the list, until one (1) arbitrator's name remains.

c.  The arbitrator whose name remains (after the Strike Process is completed) shall be the arbitrator.

d.  The "Strike Process" shall commence within two (2) business days following completion of the ten (10) business day period referred to in subparagraph 2. above and must conclude no later than three (3) business days following completion of the ten (10) day period referred to in subparagraph 2. above.

e.  In the event that one of the parties fails to participate in the Strike Process, or fails to strike in order and/or timely, the other party may thereupon select the arbitrator to hear the matter.

   (1)  [Deleted.]

   (2)  If more than one Company is a party, then the Company which is the real party in interest shall participate in the striking process with the Guild.  In the event that such Companies cannot agree on which of them is the real party in interest, then such Companies shall determine by lot which Company shall participate in the striking process with the Guild.

   (3)  The authorized lists of arbitrators approved by the parties hereto are as follows:

ARTICLE 11 - GRIEVANCE AND ARBITRATION RULES AND PROCEDURES
C - ARBITRATION

LOS ANGELES

| | |
|---|---|
| Sara Adler | Joel Grossman |
| Charles Askin | Fredric R. Horowitz |
| Howard Block | Joshua Javits |
| Mark Burstein | Edgar A. Jones, Jr. |
| Tom Christopher | Anita Christine Knowlton |
| Douglas Collins | Michael Rappaport |
| Paul E. Crost | Lionel Richman |
| Dixon Dern | Sol Rosenthal |
| Edna Francis | Robert Steinberg |
| Joe Gentile | Barry Winograd |
| William Gould IV | John Zebrowski |

### NEW YORK

| | |
|---|---|
| Maurice Benewitz | George Nicolau |
| Noel Berman | Joan Parker |
| Howard Edelman | Janet Spencer |
| Susan MacKenzie | |

Additional names may be added from time to time during the term of the contract by mutual agreement of the parties, provided that each panel shall consist of an odd number of arbitrators at all times.

3.  Substitution of Arbitrators

    If the arbitrator selected cannot serve, a substitute shall be selected in accordance with subparagraph 2. above.

4.  Notice of Hearing

    The arbitrator or, at his/her request, one of the parties shall give written notice to the parties of the time and place of the arbitration hearing. In fixing such date, the arbitrator shall consult the parties and shall consider the time reasonably necessary for the parties to prepare their cases.

5.  Exchange of Information

    The parties will cooperate in the exchange of information prior to the hearing regarding the expected utilization of documents and witnesses, including the exchange of lists of witnesses and copies of documents to be utilized. Such utilization shall not be precluded because such exchange did not take place.

6.  Hearing

ARTICLE 11 - GRIEVANCE AND ARBITRATION RULES AND PROCEDURES
C - ARBITRATION 39

a.   The arb___ ___or may, upon a sho___ of good cause, conti___ ___he hearing.

b.   The arbitration shall take place as noticed or continued regardless of whether one (1) or more of the parties fails to participate.

## D.   ARBITRATION OF DISPUTES WHICH INVOLVE QUESTIONS OF JURISDICTION OR ARBITRABILITY

An objection to jurisdiction or arbitrability shall first be determined by the arbitrator prior to proceeding with a hearing on the merits.  If the arbitrator determines that there is jurisdiction and that the dispute is arbitrable, the arbitrator shall proceed to a decision on the merits; provided; however, that the party contesting arbitration or jurisdiction shall not, by proceeding to a determination of the merits of such arbitration, be deemed to have waived its position that the dispute is not arbitrable or that the arbitrator does not have jurisdiction.  If the arbitrator rules he has no jurisdiction over the dispute or that the dispute is not arbitrable, then each party is relieved of its obligation to further delay taking any action at law or in equity which it may desire to take.

## E.   ARBITRATION OF DISPUTES CONCERNING CREDIT PROVISIONS

A dispute concerning the credit provisions of this Basic Agreement shall be submitted to an expedited arbitration proceeding governed by the following rules:

1.   The Guild shall act on behalf of itself and the writer.

2.   Within twenty-four (24) hours after the Guild or the Company serves written notice upon the other concerning a dispute involving a credit provision, an authorized representative of the Guild and an authorized representative of the Company will make a good faith attempt to settle or resolve the dispute.

3.   In the event the parties shall fail to meet or shall otherwise fail to settle or resolve the dispute within twenty-four (24) hours after the twenty-four (24) hours provided in subparagraph 2. above, the dispute shall be submitted to arbitration to be commenced not later than five (5) business days after the service of the written notice provided for in subparagraph 2. above.

4.   The dispute shall be submitted to a sole neutral arbitrator mutually selected from the authorized list of arbitrators approved by the parties hereto as follows:

### LOS ANGELES

| | |
|---|---|
| Sara Adler | Joel Grossman |
| Charles Askin | Fredric R. Horowitz |
| Howard Block | Joshua Javits |
| Mark Burstein | Edgar A. Jones, Jr. |
| Tom Christopher | Anita Christine Knowlton |
| Douglas Collins | Michael Rappaport |
| Paul E. Crost | Lionel Richman |
| Dixon Dern | Sol Rosenthal |
| Edna Francis | Robert Steinberg |

| | |
|---|---|
| Joe Gentile | Barry Winograd |
| William Gould IV | John Zebrowski |

### NEW YORK

| | |
|---|---|
| Maurice Benewitz | George Nicolau |
| Noel Berman | Joan Parker |
| Howard Edelman | Janet Spencer |
| Susan MacKenzie | |

Additional names may be added from time to time during the term of the contract by mutual agreement of the parties, provided that each panel shall consist of an odd number of arbitrators at all times.

In the event the parties are unable, within forty-eight (48) hours (not including weekends or holidays) after respondent's receipt of the written notice provided for in subparagraph 2. above, to agree upon an arbitrator from the above list or otherwise, the arbitrator shall be selected by use of the following "strike process:"

a.  The arbitrators listed in this Article 11.E.4. shall constitute the lists of arbitrators.

b.  On a Company-by-Company basis, the Guild and the Company shall alternate on a case-by-case basis in first striking a name from the applicable list of arbitrators (Los Angeles or New York).  Thereafter, the other party shall "strike" a name from the list.  The parties shall continue to alternate in striking names from the list until one arbitrator's name remains.

c.  The arbitrator whose name remains (after the strike process is completed) shall be the arbitrator, so long as the arbitrator is a disinterested person.

d.  The "strike process" shall commence within twenty-four (24) hours (not including weekends or holidays) after the period for mutual agreement has expired and shall be completed within forty-eight (48) hours (not including weekends or holidays) after the period for mutual agreement has expired.

e.  If one of the parties fails to participate in the strike process, or fails to strike in order and/or timely, the other party may thereupon select a neutral arbitrator to hear the matter.

f.  If more than one Company is a party, then the Company which is the real party in interest shall participate in the strike process with the Guild.  In the event that such Companies cannot agree on which of them is the real party in interest, then such Companies shall determine by lot which Company shall participate in the strike process with the Guild.

5.  Notwithstanding anything in this Basic Agreement to the contrary, the arbitrator shall have jurisdiction and power to award damages, to order the Company to withdraw, cancel, change, or re-do advertising materials already issued or prepared, to require the Company to re-do any film titles, and to order any other reasonable relief the arbitrator deems appropriate in the circumstances, whether relating to credit on the screen, advertising or otherwise.  Any award rendered by the arbitrator shall be binding on the parties and upon the writer.

6. Any or all time limits set forth herein may be waived by the mutual consent of the parties.

7. To the extent not inconsistent herewith, all other provisions of the Basic Agreement relating to arbitrations shall be applicable.

## F. EXPEDITED ARBITRATION OF CERTAIN DISPUTES CONCERNING REACQUISITION OF UNPRODUCED LITERARY MATERIAL (THEATRICAL)

### 1. a. Disputes Subject to Expedited Arbitration Procedure

The following procedure applies only to arbitrable disputes between the Guild and the Company concerning the interpretation or application, or alleged breach, of any provision of Article 16.A.8. of this Basic Agreement or any predecessor WGA Basic Agreement as to which the initial written notice of the writer's desire or intent to reacquire is received by the Company on or after May 2, 1998.

### b. Parties

Only the Guild and the Company shall be parties to an Article 11.F. arbitration proceeding. The Guild shall act on behalf of itself and the writer.

### 2. Right to Invoke

Either the Guild or the Company shall have the right to invoke this expedited arbitration procedure when there is a likelihood of irreparable harm in connection with the proposed reacquisition if regular arbitration procedures were used. For purposes of Article 11.F., it is agreed that "irreparable harm" means an event or occurrence that cannot be undone or an opportunity or situation that, once lost or foregone, is unlikely to be revived or recaptured. The burden of proof shall be on the moving party to show that use of the expedited procedure is appropriate under the provisions of this subparagraph 2.

### 3. Commencement of Proceedings

Complainant shall initiate expedited arbitration proceedings by written notice, setting forth the particulars of the claim, to be sent to the respondent in accordance with the procedures described in Article 11.A.6.a. of the Basic Agreement. Such notice shall be served within ten (10) business days after the moving party has obtained knowledge of the facts upon which the claim is based. If expedited arbitration proceedings are not commenced within this time period, use of the expedited procedure shall be deemed waived. When the WGA or the Company has initiated the Article 48.E. Hot Line procedure, the period of no more than seven (7) days used to attempt resolution of the dispute in this manner shall not be included in the computation of the ten (10) business day period under this subparagraph 3.

### 4. a. Response or Objection to Expedited Claim

The respondent shall respond to the claim or object to use of the expedited procedure within ten (10) business days after its receipt of the expedited arbitration claim. If there is no objection to the procedure, the respondent will provide to complainant a written statement of its position within the time specified in the preceding sentence and, upon selection, to the arbitrator.

### b. Objection to Expedited Procedure and Interim Ruling

If the respondent has objected to use of the expedited procedure, the objection must describe the factual or other basis for its contention that use of the

ARTICLE 11 - GRIEVANCE AND ARBITRATION RULES AND PROCEDURES
F - EXPEDITED ARBITRATION OF CERTAIN DISPUTES CONCERNING REACQUISITION OF
UNPRODUCED LITERARY MATERIAL (THEATRICAL)

42

696

...pedited procedure is not appropriate under the ... visions of Article 11.F.2. The arbitrator (upon selection) may either convene an informal hearing by conference call, or a formal hearing, for the purpose of determining whether use of the expedited procedure is appropriate.

The hearing will take place within three (3) business days following selection of the arbitrator. Each party may file hearing briefs, page limit to be set by the arbitrator, and may make closing arguments. There will be no post-hearing briefs. The arbitrator must inform the parties of his/her decision as to whether the expedited procedure was appropriately invoked within twenty-four (24) hours after conclusion of the hearing, to be followed by an interim ruling in writing.

5.   **Selection of an Arbitrator; Place of Hearing**

a.   The arbitrator shall be a neutral third party. The parties shall in good faith attempt to mutually agree upon an arbitrator within three (3) business days after the response, objection or failure to respond, but in no event later than expiration of the ten (10) business day period in Article 11.F.4.a. above. Should the parties fail to so agree, the arbitrator shall be selected by the "Strike Process" as follows:

(1)   The arbitrators listed in subparagraph (7) below shall constitute the lists of arbitrators.

(2)   On a respondent-by-respondent basis, the moving party and the respondent shall alternate on a case-by-case basis in first striking a name from the list of arbitrators. Thereafter, the other party shall "strike" a name from the list. The parties shall continue to alternate in striking names from the list, until one (1) arbitrator's name remains.

(3)   The arbitrator whose name remains (after the Strike Process is completed) shall be the arbitrator.

(4)   The Strike Process shall commence on the first business day following completion of the three (3) business day period referred to in subparagraph 5.a. above and must conclude by close of business that day.

(5)   In the event that one of the parties fails to participate in the Strike Process, or fails to strike in order and/or timely, the other party may thereupon select the arbitrator to hear the matter.

(6)   If there is more than one respondent, then the respondent which is the real party in interest shall participate in the strike process with the Guild. In the event that such respondents cannot agree on which of them is the real party in interest, then such respondents shall determine by lot which of them shall participate in the striking process with the Guild.

(7)   The authorized lists of arbitrators are as follows:

ARTICLE 11 - GRIEVANCE AND ARBITRATION RULES AND PROCEDURES
F - EXPEDITED ARBITRATION OF CERTAIN DISPUTES CONCERNING REACQUISITION OF
UNPRODUCED LITERARY MATERIAL (THEATRICAL)

43

697

LOS ANGELES

| | |
|---|---|
| Sara Adler | Joel Grossman |
| Charles Askin | Fredric R. Horowitz |
| Howard Block | Joshua Javits |
| Mark Burstein | Edgar A. Jones, Jr. |
| Tom Christopher | Anita Christine Knowlton |
| Douglas Collins | Michael Rappaport |
| Paul E. Crost | Lionel Richman |
| Dixon Dern | Sol Rosenthal |
| Edna Francis | Robert Steinberg |
| Joe Gentile | Barry Winograd |
| William Gould IV | John Zebrowski |

NEW YORK

| | |
|---|---|
| Maurice Benewitz | George Nicolau |
| Noel Berman | Joan Parker |
| Howard Edelman | Janet Spencer |
| Susan MacKenzie | |

Additional names may be added from time to time by mutual agreement of the parties, provided that each panel shall consist of an odd number of arbitrators at all times.

**b.    Substitution of Arbitrators**

If the arbitrator selected cannot serve, a substitute shall be selected in accordance with subparagraph 5.a. above.

**c.    Choice of Two Arbitrators**

If there is to be a hearing on the respondent's objection to use of the expedited procedure, the parties have the option of selecting one arbitrator to rule on such objection and another arbitrator to determine the remaining issues in the case, both of whom shall be selected pursuant to this subparagraph 5.

**d.    Place of Hearing**

The place of the arbitration hearing shall be determined in accord with Article 11.A.3. of the Agreement.

---

ARTICLE 11 - GRIEVANCE AND ARBITRATION RULES AND PROCEDURES
F - EXPEDITED ARBITRATION OF CERTAIN DISPUTES CONCERNING REACQUISITION OF
UNPRODUCED LITERARY MATERIAL (THEATRICAL)

44

698

6. **Timel..., Citation of Expedited Arbitration Awards**

a. The hearing on the merits of the claim shall commence within twenty (20) business days following the respondent's receipt of the arbitration claim or, if the respondent has objected to use of this expedited procedure, within twenty (20) business days following the arbitrator's determination that use of this expedited procedure is appropriate.

   The arbitrator or, at his/her request, one of the parties, shall give written notice to the other party of the time and place at which the arbitration hearing will commence. In fixing such date, the arbitrator shall consult the parties and shall consider the time reasonably necessary for the parties to prepare their cases. The arbitration shall take place as notified (or as continued) regardless of whether one (1) of the parties fails to participate.

b. The hearing on the merits of the claim shall conclude within ten (10) business days after its commencement, provided that the duration of the hearing is consistent with fundamental fairness in the arbitrator's sole judgment.

c. The parties may file post-hearing briefs within fifteen (15) business days following the close of the hearing. Either party's election to file a post-hearing brief will not preclude that party's right to make a closing argument so long as the hearing concludes within the time permitted in subparagraph 6.b. above.

d. Within ten (10) business days following either receipt of the parties' briefs, or the conclusion of the hearing if no briefs are filed, the arbitrator shall issue a written decision and award on the issues presented. The arbitrator's failure to meet the deadline shall not oust the arbitrator of jurisdiction. The arbitrator's determination of issues and award shall be final and binding upon the Company, the Guild and the writer or writers involved, whether participating in the proceeding or not.

   Any award so rendered may be cited or offered into evidence by any party in another arbitration proceeding under this Basic Agreement, whether expedited or not.

7. **Waiver of Time Limits**

Any or all of the time limits set forth in Article 11.F.6. may be waived by the mutual consent of the parties.

8. **Right to Seek an Extension of Time Limit**

Upon the arbitrator's finding of good cause demonstrated by either party, the arbitrator may expand the time for conducting the hearing for a maximum of three (3) additional business days, and/or the time for filing post-hearing briefs for a maximum of three (3) additional business days. In making such a determination, the arbitrator shall take into account the position of a party opposing the extension that prejudice would result from the extension. The arbitrator shall advise the parties of his/her ruling on any request for an extension within forty-eight (48) hours after the request is made.

9. **Choice of Arbitration Forum; Application of Other Arbitration Provisions**

Claims processed under this Article 11.F., which result in expedited arbitration awards on the merits of the issues presented, shall not be subject to adjudication in a judicial forum. The preceding sentence does not reduce or impair the rights of any party under Article 12.C., D., and E. of this Agreement.

---

ARTICLE 11 - GRIEVANCE AND ARBITRATION RULES AND PROCEDURES
F - EXPEDITED ARBITRATION OF CERTAIN DISPUTES CONCERNING REACQUISITION OF
UNPRODUCED LITERARY MATERIAL (THEATRICAL)

45

699

In addition, once an expedited arbitration procedure is initiated, provisions of Article 11.F. shall preclude arbitration under Article 16.A.6. to the extent that the issue(s) under Article 16.A.6. has (have) been decided in the expedited proceeding.

To the extent not inconsistent herewith, all other provisions of Articles 10, 11 and 12 of the Basic Agreement relating to arbitration shall be applicable.

### 10. Remedies in the Arbitration Forum

In an expedited arbitration proceeding under Article 11.F., the arbitrator is limited to providing remedies that are in the nature of equitable relief such as a declaration of the respective rights of the parties and specific performance.

If all issues in dispute concerning the reacquisition are not fully resolved in the expedited proceeding, the WGA or the Company may initiate a subsequent arbitration proceeding under the regular procedures in the Basic Agreement.

### 11. Legal Subcommittee

The parties to this Basic Agreement shall establish a legal subcommittee to explore whether the expedited arbitration procedure in Article 11.F. should apply to other Article 16 disputes. The subcommittee shall report its recommendations, if any, to the Contract Adjustment Committee (CAC).

## G. ARBITRATION OF CERTAIN DISPUTES CONCERNING RESIDUALS PROVISIONS

Notwithstanding any other provision of the MBA, a dispute concerning the residuals provisions of this Basic Agreement or a predecessor WGA Basic Agreement shall be submitted to an expedited arbitration proceeding if the respondent is not financially responsible, or it is likely that the respondent's assets will be depleted or transferred, such that in either case it is reasonable to believe that the respondent would be unable to satisfy its residuals liability if the dispute were processed through the grievance and/or arbitration procedures set forth in Articles 11.A. through 11.C., above. This expedited proceeding will be governed by the following rules:

### 1. Invocation of Expedited Proceeding

A Notice of Expedited Arbitration (so labeled by the claimant) shall be reduced to writing and delivered to the respondent. The Notice of Expedited Arbitration shall include the name, address and telephone number of the claimant's representatives and the name of the person who represents the respondent, if known. The Notice of Expedited Arbitration shall also set forth the particulars of the claim, including an allegation that the respondent is not financially responsible, or it is likely that the respondent's assets will be depleted or transferred, such that in either case it is reasonable to believe that the respondent would be unable to satisfy its residuals liability if the dispute were processed through the grievance and/or arbitration procedures set forth in Articles 11.A. through 11.C.

This expedited procedure is not available when the residuals obligation(s) at issue is (are) payable, guaranteed or assumed by a "Qualified Distributor," "Qualified Buyer" and/or a "Qualified Residuals Payor," except by mutual agreement.

### 2. Attempt to Settle Dispute

Within seven (7) business days after the claimant serves written notice upon the respondent concerning an expedited arbitration proceeding, an authorized representative of the claimant and an authorized representative of the respondent will make a good faith attempt to settle or resolve the dispute.

46

ARTICLE 11 - GRIEVANCE AND ARBITRATION RULES AND PROCEDURES
G - ARBITRATION OF CERTAIN DISPUTES CONCERNING RESIDUALS PROVISIONS

700

3.    Submission of Dispute to Arbitrator

In the event the parties shall fail to meet or discuss the claim, or shall otherwise fail to settle or resolve the dispute within fifteen (15) business days after the respondent's receipt of the claim, the dispute shall be submitted to arbitration to be commenced not later than sixty (60) days after the respondent's receipt of the claim.

4.    Place of Hearing

All expedited arbitration hearings under this Paragraph G. shall be in Los Angeles, absent agreement of the parties to another situs.

5.    Arbitrator Selection

The dispute shall be submitted to a sole neutral arbitrator mutually selected from the authorized list of arbitrators as follows:

| | |
|---|---|
| Sara Adler | Joel Grossman |
| Charles Askin | Fredric R. Horowitz |
| Howard Block | Joshua Javits |
| Mark Burstein | Edgar A. Jones, Jr. |
| Tom Christopher | Anita Christine Knowlton |
| Douglas Collins | Michael Rappaport |
| Paul E. Crost | Lionel Richman |
| Dixon Dern | Sol Rosenthal |
| Edna Francis | Robert Steinberg |
| Joe Gentile | Barry Winograd |
| William Gould IV | John Zebrowski |

Additional names may be added from time to time during the term of the contract by mutual agreement of the parties, provided that each panel shall consist of an odd number of arbitrators at all times.

In the event the parties are unable, within ten (10) business days (not including weekends or holidays) after the respondent's receipt of the claim, to agree upon an arbitrator from the above list or otherwise, the arbitrator shall be selected by use of the following "strike process:"

a.    The arbitrators listed in this Article 11.G. shall constitute the list of arbitrators.

b.    On a Company-by-Company basis, the Guild and the Company shall alternate on a case-by-case basis in first striking a name from the list of arbitrators. Thereafter, the other party shall "strike" a name from the list. The parties shall continue to alternate in striking names from the list until one arbitrator's name remains.

c.    The arbitrator whose name remains (after the strike process is completed) shall be the arbitrator, so long as the arbitrator is a disinterested person.

ARTICLE 11 - GRIEVANCE AND ARBITRATION RULES AND PROCEDURES
G - ARBITRATION OF CERTAIN DISPUTES CONCERNING RESIDUALS PROVISIONS    47

701

d.   The strike process shall commence within twenty-four (24) hours (not including weekends or holidays) after the period for mutual agreement has expired and shall be completed within forty-eight (48) hours (not including weekends or holidays) after the period for mutual agreement has expired.

e.   If one of the parties fails to participate in the strike process, or fails to strike in order and/or timely, the other party may thereupon select a neutral arbitrator to hear the matter.

f.   If more than one Company is a party, then the Company which is the real party in interest shall participate in the strike process with the Guild. In the event that such Companies cannot agree on which of them is the real party in interest, then such Companies shall determine by lot which Company shall participate in the strike process with the Guild.

6.   **Award**

The arbitrator's written award shall be issued within sixty (60) calendar days from the end of the expedited arbitration hearing if closing argument is substituted for post-hearing briefs, or ninety (90) days following submission of post-hearing briefs. The arbitrator's failure to meet the deadline shall not oust the arbitrator of jurisdiction. The arbitrator's determination of issues and award shall be final and binding on all parties, whether participating in the hearing or not. The parties shall be so bound in any subsequent arbitration proceeding between them concerning a residuals dispute involving the same theatrical and/or television motion picture(s). Except as provided above, awards resulting from the use of these expedited procedures shall not be offered in evidence or cited in arbitrations under this Basic Agreement.

7.   **Continuance of Hearing and Testimony by Telephone**

The hearing shall not be continued, absent agreement of the parties, except upon proof of good cause by the party requesting such continuance. The unavailability of any witness shall not constitute good cause unless the witness' testimony is relevant to the issues in the arbitration and could not be received by means consistent with fundamental fairness which do not require the witness' presence at the hearing. Each party shall have the right to present the testimony of any witness by telephone, so long as the arbitrator is satisfied that the examination is consistent with fundamental fairness.

8.   **Settlement**

Nothing contained in this Article 11.G. shall preclude the parties from discussing the settlement of the dispute, except that such discussion shall not delay the expedited arbitration procedure.

9.   **Time Limit for Use of Expedited Proceedings and Determination of Claims Not Subject to Expedited Arbitration**

The failure of the claimant to serve the Notice of Expedited Arbitration within sixty (60) days following the date on which the facts upon which the claim is based were discovered by the moving party shall constitute a waiver of the right to use this expedited arbitration procedure. If two (2) or more residuals claims are submitted to expedited arbitration and the expedited arbitration procedure has been waived or is inapplicable to one (1) or more claims, absent objection by the respondent, the non-expedited claim(s) may be heard in the expedited proceeding. If the respondent objects to the determination of the non-expedited claim(s) in the expedited proceeding, the same arbitrator selected to hear the expedited claim(s) may, absent objection by a party during the arbitration hearing, determine the claim(s) not subject to expedited

48

ARTICLE 11 - GRIEVANCE AND ARBITRATION RULES AND PROCEDURES
G - ARBITRATION OF CERTAIN DISPUTES CONCERNING RESIDUALS PROVISIONS

702

arbitra____; provided that such non-expedited arbitration___m(s) shall be determined in a separate proceeding conducted in accordance with Article 11.C., above.

10. **Right to Object to Expedited Procedures and Interim Ruling**

The respondent may object to proceeding under this Article 11.G. by serving written notice of such objection with claimant and the arbitrator within seven (7) business days of receipt of the Notice of Expedited Arbitration. The respondent's notice of objection must describe facts indicating it is financially responsible, or that it is not likely that its assets will be depleted or transferred, such that in either case it is reasonable to believe that the respondent would be able to satisfy its residuals liability if the dispute(s) at issue were processed through the grievance and/or arbitration procedures set forth in Articles 11.A. through 11.C., above. In the event of an objection, the claimant shall have the burden of proving that it is consistent with this Article 11.G. to hear the dispute(s) under these expedited procedures.

The arbitrator may convene an informal hearing by telephone conference call, or a formal hearing, to determine whether it is consistent with this Article 11. to hear the dispute(s) under these expedited procedures. If the arbitrator convenes a hearing, that hearing will take place within three (3) business days of receipt of the respondent's notice of objection. The parties may file hearing briefs, the page limit to be set by the arbitrator, and they may make closing argument. There will be no post-hearing briefs. The arbitrator must inform the parties of the interim ruling on the use of the expedited procedures under this Article 11.G. within twenty-four (24) hours after conclusion of the hearing or, in the event no hearing is convened, within twenty-four (24) hours of the submission to the arbitrator of all briefs and/or relevant documents, to be followed by an interim ruling in writing.

11. **Bifurcation**

If the expedited arbitration involves multiple residuals disputes or controversies, such as which of two (2) or more respondents is liable to make payment and the amount of residuals unpaid, the arbitrator may, upon the request of a party, bifurcate or separate such disputes or controversies and render separate awards, each of which shall be deemed final.

12. **Invocation of Expedited Proceeding After Service of Claim Under Articles 11.A. through 11.C.**

If, after such time as a residuals arbitration has been commenced under the procedures set forth in Articles 11.A. through 11.C. above, a party learns that a respondent is not financially responsible, or it is likely that the respondent's assets will be depleted or transferred, such that in either case it is reasonable to believe that the respondent would be unable to satisfy its residuals liability if the dispute were processed through such grievance and/or arbitration procedures, any party to that arbitration proceeding may invoke an expedited arbitration under this Article 11.G. by serving appropriate notice to that effect.

13. **Waiver of Time Limits**

Any and all time limits in Article 11.G. may be waived by the mutual consent of the parties.

14. **Other Provisions Applicable**

To the extent not inconsistent with Article 11.G., all other provisions of the Basic Agreement relating to arbitrations shall be applicable.

ARTICLE 11 - GRIEVANCE AND ARBITRATION RULES AND PROCEDURES
G - ARBITRATION OF CERTAIN DISPUTES CONCERNING RESIDUALS PROVISIONS     49

703

H.    ARBITRATION OF DISPUTES CONCERNING TRI-GUILD RESIDUALS AUDITS

> See Sideletter to Article 11, Arbitration of Disputes Concerning Tri-Guild Residuals Audits, for the procedures applicable to such cases.

I.    EQUAL STATUS OF PARTIES

> It is understood that the Companies and the Guild are parties of equal status under this Agreement and in the administration of the arbitration processes throughout this Agreement. The equal status of the parties in the administration of the arbitration process shall be recognized in matters involving the determination of the availability of arbitrators, the selection of hearing dates, the retention of stenographic reporters, and insofar as applicable in all communications with the arbitrators.
>
> Arbitration claims, cross-claims and notices shall carry the caption "WRITERS GUILD OF AMERICA - PRODUCERS ARBITRATION TRIBUNAL."

# ARTICLE 12 - COURT PROCEEDINGS

A.    DISPUTES CONCERNING CREDITS

> Nothing in this Basic Agreement shall limit the rights of the Guild or any writer to assert any and all appropriate legal and equitable rights and remedies to which the Guild or such writer is entitled in courts of competent jurisdiction with regard to an alleged breach of Article 8 and Schedule A of this Basic Agreement with respect to writing credit; subject, however, to the following conditions and limitations:

> 1.    The Guild and the writer shall be bound by any court proceedings instituted by the Guild.

> 2.    If the Guild or the writer commences any proceedings in court with respect to any such alleged breach prior to the submission of the dispute to arbitration hereunder, then neither the Guild nor the writer may submit such dispute to arbitration and no arbitrator shall have jurisdiction to consider the alleged breach of such credit provision.

> 3.    If the Guild or the Company commences an arbitration proceeding hereunder with respect to any such alleged breach prior to the submission of the dispute to a court, then neither the Guild nor the writer shall thereafter commence any proceeding in court with respect to such alleged breach.

> 4.    Any permissible court proceeding referred to in this Paragraph A. must be commenced by the Guild or the writer, if at all, within the applicable time limits specified in subparagraph 2. of Article 11.A.

B.    DISPUTES CONCERNING COMPENSATION

> With respect to a compensation claim which is arbitrable pursuant to the provisions of this Basic Agreement, the writer, at his/her option, need not proceed by grievance and arbitration, but instead may institute an action at law or in equity with respect to such claim prior to submission of such claim to grievance or arbitration; provided, however, that for compensation claims of four hundred thousand dollars ($400,000.00) or less for theatrical or television employment or purchase, the writer must submit such claim to grievance and arbitration pursuant to Articles 10 and 11 of this Basic Agreement and failure to so proceed by grievance and arbitration shall constitute a waiver by the writer as to such compensation claim.

C.    Nothing in this Basic Agreement shall impair, affect or limit the right of the Company, the Guild or any writer to assert and exercise any and all appropriate legal or equitable rights or

remedies to which such Company, Guild or writer is entitled in a court of competent jurisdiction as to any dispute which is not subject to grievance or arbitration pursuant to this Basic Agreement. The rights of the parties to assert and exercise legal or equitable rights or remedies as to disputes which are subject to grievance or arbitration are as more particularly defined in this Basic Agreement.

D.   The Guild shall have the right to take to grievance and arbitration a claim of the Guild of a breach by the Company of any of the terms or provisions of this Basic Agreement, including a failure to pay minimum compensation, regardless of whether or not such claimed breach may also involve a breach by the Company of its contract with the writer and such proceeding shall not affect the right of the writer to pursue his/her own remedies at law or in equity, except as limited by the provisions of this Basic Agreement.

E.   Nothing in this Basic Agreement shall preclude any court of competent jurisdiction from confirming, setting aside or modifying any grievance or arbitration award hereunder in any proceeding brought for such purpose in accordance with applicable law.

## ARTICLE 13 - COMPENSATION

### A.   THEATRICAL

Company agrees that the minimum basic compensation to be paid a writer who is employed for a feature length photoplay on a so-called flat deal basis shall be as herein set forth.

For the purpose of this Article 13.A.1.a., "High Budget" photoplay shall be a photoplay the cost of which equals or exceeds five million dollars ($5,000,000.00); a photoplay the cost of which is less than five million dollars ($5,000,000.00) shall be referred to as a "Low Budget" photoplay.

The Company may option to purchase or license from a professional writer literary material, which would be covered by this Basic Agreement, for a period of eighteen (18) months upon payment of ten percent (10%) of the applicable minimum compensation for such literary material. Company may renew or extend such option for subsequent eighteen (18) month periods upon payment of an additional ten percent (10%) of the applicable minimum compensation for such literary material for each such eighteen (18) month period. Notwithstanding anything in this Basic Agreement to the contrary, the option payment(s) shall be credited against the purchase price or other compensation payable to the writer.

a. Minimum Compensation

## FLAT DEAL SCREEN MINIMUMS

### HIGH BUDGET

| | | | Effective | |
|---|---|---|---|---|
| | | 2/13/08-5/1/09 | 5/2/09-5/1/10[2] | 5/2/10-5/1/11[3] |
| (1) | Screenplay, including treatment | $95,158 | $98,489 | $101,936 |
| (2) | Screenplay, excluding treatment | 65,802 | 68,105 | 70,489 |
| (3) | Final Draft Screenplay or Rewrite | 29,250 | 30,274 | 31,334 |
| (4) | Polish | 14,625 | 15,137 | 15,667 |
| (5) | First Draft of Screenplay (alone or with option for Final Draft Screenplay): | | | |
| | First Draft Screenplay | 43,875 | 45,411 | 47,000 |
| | Final Draft Screenplay | 29,250 | 30,274 | 31,334 |
| (6) | Treatment | 29,250 | 30,274 | 31,334 |
| (7) | Original Treatment | 43,875 | 45,411 | 47,000 |
| (8) | Story | 29,250 | 30,274 | 31,334 |
| (9) | Additional Compensation Screenplay - No Assigned Material | 14,625 | 15,137 | 15,667 |

---

[2] The Trustees of the Writers Guild - Industry Health Fund may determine that an increase in the contribution rate for this period is needed to maintain the level of benefits in existence on February 13, 2008 or they may determine that a reduction in the contribution rate for this period is appropriate. If either of these changes occur, the increases in minimums in the column marked "5/2/09 - 5/1/10" will be increased or reduced by an equivalent percentage.

[3] The Trustees of the Writers Guild - Industry Health Fund may determine that an increase in the contribution rate for this period is needed to maintain the level of benefits in existence on February 13, 2008 or they may determine that a reduction in the contribution rate for this period is appropriate. If either of these changes occur, the increases in minimums in the column marked "5/2/10 - 5/1/11" will be increased or reduced by an equivalent percentage.

52

ARTICLE 13 - COMPENSATION
A - THEATRICAL

### FLAT DEAL SCREEN MINIMUMS

#### LOW BUDGET

|  |  | Effective | | |
|---|---|---|---|---|
|  |  | 2/13/08-<br>5/1/09 | 5/2/09-<br>5/1/10 [4] | 5/2/10-<br>5/1/11 [5] |
| (1) | Screenplay, including treatment | $51,169 | $52,960 | $54,814 |
| (2) | Screenplay, excluding treatment | 31,974 | 33,093 | 34,251 |
| (3) | Final Draft Screenplay or Rewrite | 19,187 | 19,859 | 20,554 |
| (4) | Polish | 9,599 | 9,935 | 10,283 |
| (5) | First Draft of Screenplay (alone or with option for Final Draft Screenplay): | | | |
|  | First Draft Screenplay | 23,028 | 23,834 | 24,668 |
|  | Final Draft Screenplay | 15,347 | 15,884 | 16,440 |
| (6) | Treatment | 19,187 | 19,859 | 20,554 |
| (7) | Original Treatment | 26,495 | 27,422 | 28,382 |
| (8) | Story | 19,187 | 19,859 | 20,554 |
| (9) | Additional Compensation Screenplay - No Assigned Material | 7,316 | 7,572 | 7,837 |

NOTE:  The minimum for a screen writer shall be not less than the "appropriate" television minimum, consistent with the particular literary element and the length of the motion picture.

    b.   Discount - New Writers

        Company may employ a writer who has not been previously employed as a writer under any Guild MBA in television or theatrical motion pictures or radio dramatic programs on a flat deal basis at not less than seventy-five percent (75%) of the applicable minimum compensation set forth in this subparagraph 1.  If such writer receives any writing credit on the theatrical motion picture for which he/she was so employed, his/her compensation will be adjusted to one hundred percent (100%) of the applicable minimum compensation.  Such payment will be made within ten (10) business days after determination of final writing credit.

    c.   Additional Payment - No Assigned Material

        When Company employs a writer to write a screenplay on a flat deal basis at the minimum basic compensation provided in this Article 13.A., unless Company in good faith furnishes such writer a novel, play, treatment, original treatment, or story upon which the screenplay is to be based or from which it is to be adapted,

---

[4]    See footnote 2 on page 52

[5]    See footnote 3 on page 52

such w____ shall be paid an additional amount as describ____ i subparagraph 1. above.  The assigned material shall be specifically identified in the notice of employment and contract; if not then known, the writer and the Guild shall be furnished with such identification when it is available.

Any dispute as to whether or not Company has so furnished such writer a novel, play, treatment, original treatment, or story shall be subject to automatic arbitration by the Guild arbitration committee (referred to in Theatrical Schedule A); provided, however, that in the event Company or the writer does not accept the decision of such Guild arbitration committee, such party shall notify the Guild and the other party, in writing, of its position and such dispute shall thereupon be subject to the grievance and arbitration provisions of Articles 10, 11 and 12 of this Basic Agreement.

2.  Narration by a Writer Other Than any Writer of Screenplay or Story and Screenplay

Minimums for narration are based on status of film assembly and nature of previously written material as follows:

| Nature of Material Written Prior to Employment of Narration Writer | Film Assembled in Story Sequence | Film Footage Not Assembled in Story Sequence |
|---|---|---|
| None | Applicable Screenplay excluding Treatment Minimum | Applicable Screenplay including Treatment Minimum |
| Story Only | Applicable Screenplay excluding Treatment Minimum | Applicable Screenplay excluding Treatment Minimum |
| Story and Screenplay | Per Rate Schedule A | Per Rate Schedule A |

|  | Effective | | |
|---|---|---|---|
| Rate Schedule A | 2/13/08- 5/1/09 | 5/2/09- 5/1/10 [6] | 5/2/10- 5/1/11 [7] |
| Two minutes or less | $  894 | $  925 | $  957 |
| Over two minutes through five minutes | 3,162 | 3,273 | 3,388 |
| Over five minutes | applicable polish minimum | | |

Aggregate sound track running time in minutes of narration written by writer hired pursuant hereto.
Narration writer may be hired on a week-to-week basis.
There is no separation of rights for narration.

3.  Initial Payment

The Company shall use its best efforts to issue to the writer (or his/her designated representative), for the writer's signature, a written document memorializing the agreement reached between the Company and the writer within ten (10) business days

---

[6]  See footnote 2 on page 52
[7]  See footnote 3 on page 52

54

ARTICLE 13 - COMPENSATION
A - THEATRICAL

after agreement is reached on the major deal points of writing assignment (*e.g.*, agreement on initial compensation, including bonus, if any, and number of drafts) for a theatrical motion picture (twelve (12) business days in the case of either a term writing agreement or an agreement for both writing and non-writing services), but in no event later than the earlier of: (a) fifteen (15) business days after agreement is reached on the major deal points of the writing assignment, or (b) the time period required by Article 19. Disputes as to whether Company has submitted such document in a timely manner may be submitted to the "Hot Line" dispute resolution procedure in Article 48.

Company shall attach a cover sheet to the document memorializing the agreement reached between the Company and the writer which sets forth in summary form all conditions precedent which must be satisfied before writing services can commence. The terms of such cover sheet shall not alter or vary the terms of the agreement reached between the Company and the writer, and, in any event, the terms of the writer's agreement shall prevail.

With respect to any employment under this Article 13.A. on a flat deal basis, the Company will pay to the writer, not later than the next regular payday in the week following the day the Company instructs the writer to commence his/her services, a single advance amount (to be applied against the first compensation which otherwise would be due to the writer) at least equal to the greater of (a) ten percent (10%) of the writer's agreed compensation which otherwise would be due to the writer upon delivery of the first required material, or (b) one week's compensation at the weekly rate for term employment for 14 out of 14 weeks.

4.   Maximum Period of Employment

With respect to writers employed at the minimum basic compensation provided for in this Article 13.A. to write a story, treatment, original treatment, first draft screenplay, final draft screenplay, screenplay, or rewrite, the Company shall not require the writer to render services beyond that period of weeks (and fractions thereof) obtained by dividing such applicable minimum basic compensation set forth above in (1) through (9), as the case may be, by the minimum weekly compensation provided for in Article 13.A., subparagraph 15. hereof, for writers employed on a weekly basis.

In the event that the same writer is employed to write any combination of those items set forth above in (1) through (9), such time periods shall be cumulative.

If the writer is required by written notice from the Company to render his/her services beyond such time period, he/she shall be entitled to the specified compensation on delivery and to the minimum weekly compensation to which such writer would be entitled if employed on a weekly basis, as hereinafter in subparagraph 15. of Article 13.A. provided, for services rendered after the expiration of such period.

5.   Computation of Writer's Period of Employment

In computing the duration of a writer's employment under this Article 13.A., there shall be excluded the following:

a.   Any time during which the writer's employment agreement was suspended by reason of any breach or default on the part of the writer;

b.   Any time during which the writer's employment agreement was suspended by reason of any of the causes specified in the "*force majeure*" clause of such writer's employment agreement;

c.   Except as hereinafter provided, waiting time which occurs during or after the writer's employment.

ARTICLE 13 - COMPENSATION
A - THEATRICAL          55

Any excess waiting time shall be included in computing the duration of the writer's employment. However, excess waiting time after the expiration of the duration of the writer's employment shall not be included in computing the duration of the writer's employment unless the writer holds himself/herself available for the Company's further instructions pursuant to the Company's written notice to the writer so to hold himself/herself available after the expiration of the writer's employment.

Any time during which the writer shall make revisions called for by the Company shall be included in computing the duration of the writer's employment.

6. Waiting Time

The waiting time to be excluded in computing the duration of the writer's employment shall not exceed three (3) days following delivery of material, and such waiting time shall not be compensable. In the event that the same writer is employed to write any combination of story, treatment or original treatment, first draft screenplay, final draft screenplay or screenplay, such waiting time shall be cumulative. "Excess waiting time," as used in this Article 13.A., means waiting time in excess of the waiting time to be excluded as provided in this subparagraph 6. If the writer is called into conference on any day or instructed to perform any services on any day, such day may not be included in waiting time. Sundays and holidays generally recognized in the motion picture industry shall be excluded in computing waiting time.

7. Extension of Employment Period

If the employment agreement under this Article 13.A. for a treatment on a flat deal basis contains any option for additional literary material, and the Company wishes the writer to change, revise or complete his/her assignment after the expiration of the maximum allotted employment period under this Article, the Company may postpone the time for exercise of such option by notifying the writer that it elects to continue the employment of the writer on a week-to-week basis commencing upon the expiration of the employment period then expiring at the minimum weekly compensation prescribed in subparagraph 15. hereof, but without any minimum guaranteed period of employment. The Company must notify the writer to this effect promptly upon the expiration of such maximum allotted employment period. Such employment shall continue until further notice from the Company, and the waiting time shall commence upon such termination of the employment. If the Company thereafter exercises any option, and the maximum allotted employment period under this Article 13.A. for which the Company would be entitled to the writer's services under such option shall exceed the period during which the writer performed his/her services (excluding time for which the writer was compensated on a week-to-week basis and excluding waiting time), then the Company shall be entitled to credit against the amount due under such option an amount equal to the minimum weekly compensation specified in subparagraph 15. herein for the period of such excess. Such credit shall not exceed the amount actually paid to the writer for services performed on a week-to-week basis.

8. Failure to Deliver Material Within Allotted Time Period

If the writer has not completed and delivered to the Company the material within the maximum allotted employment period provided for in this Article 13.A., or any shorter period specified in the individual writer's employment agreement, then the Company may exercise the succeeding option and require the writer to complete such material within the succeeding option period. If the writer has not completed and delivered to the Company the material within such maximum allotted employment period, or such shorter period specified in the individual writer's employment agreement, and if the failure of the writer so to complete and deliver such material was not caused by any instructions or directions on the part of the Company, then and at any time thereafter and prior to the delivery of such material, the Company may terminate the writer's

employment agreement, and the Company shall not be obligated to make any further or
additional payment thereunder.  For the purposes of determining whether to terminate
such contract, the Company may require the writer to deliver for inspection any material
then written and compliance with such requirement shall not constitute delivery for the
purpose above mentioned without the written consent of the Company.  The Company
shall retain title to and ownership of any material theretofore delivered for which
payment was made by the Company, subject to the provisions of Article 16.A.

9.      Teams

Every writer shall receive no less than the applicable minimum, except that if a *bona
fide* team of no more than two (2) writers offers, prior to employment on the script in
question, to collaborate, the team as a unit shall receive in the aggregate not less than
the applicable minimum compensation. .

In addition, if a *bona fide* team of no more than three (3) writers offers, prior to
employment on the script in question, to collaborate, the team as a unit shall receive in
the aggregate not less than two hundred percent (200%) of the applicable minimum
compensation, of which each individual writer shall be paid not less than one-third (1/3)
of said aggregate compensation.

10.     Week-to-Week, Term, Flat Deal

The Company may employ a writer on a week-to-week or term basis to write a story,
treatment, original treatment, first draft screenplay, final screenplay, screenplay, or
rewrite.  At any time thereafter, Company may employ such writer or any other writer on
a flat deal basis to write any such material in accordance with the provisions of this
Article 13.A.  If Company employs a writer on a flat deal basis to write any such
material, at any time thereafter Company may employ such writer or any other writer to
write any such material on a week-to-week basis or term basis.  If the Company
imposes the condition that such material must be completed and delivered by a
specified date, and the writer accepts the employment upon such conditions and
completes and delivers the material to the Company in compliance with such condition,
then such employment shall be deemed to be employment on a flat deal basis and the
writer shall be entitled to the applicable flat deal minimums provided in this Article 13.A.
for the work involved.  If the Company employs two (2) writers as a team on a
week-to-week basis to write a story, treatment, original treatment, first draft screenplay,
final screenplay, screenplay or rewrite and imposes the condition that such material
must be completed and delivered by a specified date, and if the period by which the
writers are to complete and deliver the material under their employment agreement is
less than one-half of the applicable maximum period of employment for the work
involved as provided in this Article 13.A., the Company shall only be obligated to pay to
each such writer one-half of the amount payable to one (1) writer employed on a flat
deal basis for the work involved, but if the period by which the writers are to complete
and deliver the material under their employment agreement is more than one-half of the
applicable maximum period of employment for the work involved provided in this Article,
the Company shall not be obligated by this Article 13.A. to pay any additional amount to
such writers.  For example, if a team of writers is employed on a week-to-week basis
during the period February 13, 2008 through May 1, 2009 to write a "screenplay,
including treatment" for a High Budget photoplay (for which the flat deal minimum is
$95,158) and a date later than ten (10) weeks after the commencement of such
employment is specified in the employment agreement for completion and delivery of
such final screenplay, then if such final screenplay is completed and delivered within
such time, the Company need only pay each writer the $47,590 received as weekly
salary.  In the event of a dispute as to whether the Company has imposed such a
specified date of completion and delivery, such dispute shall be subject to grievance
and arbitration pursuant to the provisions of Articles 10, 11 and 12 hereof.

11.   Applicable De_____inimum Compensation

When Company hereafter employs one (1) or more writers on a flat deal basis for the minimum basic compensation as above provided, then regardless of the exercise of any option, if a motion picture is actually produced by Company from the screenplay so written under such deal basis, the compensation (hereinafter called "applicable minimum deal compensation") paid to the writer or writers who participated in the writing under such flat deal shall be not less than the applicable "Flat Deal Screen Minimums" set forth in Article 13.A., subparagraph 1.a. above.  In the event an amount at least equal to such applicable minimum deal compensation has not been paid to such writer or writers by the time screen credits for such motion picture have been finally determined, then Company shall pay to the writer or writers receiving screen credit for such motion picture, within thirty (30) days after such screen credit has been finally determined, the difference between all of the compensation theretofore paid to the writer or writers employed by Company on such flat deal basis in connection with such photoplay, on the one hand, and the applicable minimum deal compensation provided, on the other hand.  A writer or writers employed at the minimum week-to-week compensation to write a treatment and also a screenplay for a motion picture which is produced by Company shall be compensated at not less than the applicable minimum basic compensation provided for in this Article 13.A., and shall be considered as employed on a flat deal basis at such minimum compensation for purposes of subparagraph 1.c. of this Article.  No writer employed on a term basis shall be entitled to additional compensation by reason of the provisions of this Article 13.A.

When a planned Low Budget theatrical motion picture is produced as a High Budget theatrical motion picture for reasons other than *force majeure* (including but not limited to disability, illness or inclement weather) or labor cost escalations undetermined at commencement of production, the Company shall pay any necessary increase in the applicable minimum deal compensation within thirty (30) days after Company knows that the cost of the motion picture has increased or will increase past the High Budget break figure, and in any event within thirty (30) days after delivery of the answer print of said motion picture.

12.   Inapplicability of Provisions

The provisions of this Article 13.A. shall not apply to writers employed at compensation in excess of the applicable minimum specified in this Article except as hereinafter provided.  However, even though the total compensation shall exceed such minimums, the amount payable for the writing of the story, treatment, original treatment, first draft screenplay, final screenplay, screenplay or rewrite shall be not less than the minimum for such individual work as above designated.  The provisions of subparagraphs 4., 5. and 6. of this Article 13.A. shall be applicable to writers employed at compensation not exceeding twice the applicable minimum compensation, except that the three (3) day waiting period in subparagraph 6. shall be two (2) weeks for the above-scale writer covered by this sentence.  The provisions of subparagraph 8., subparagraph 14. and the last two paragraphs of subparagraph 15. of this Article 13.A. are applicable to all employment agreements regardless of compensation.

The provisions of this Article 13.A. shall not apply to any short or short subject, except that the Company agrees that any such agreement made by the Company with any writer employed on a similar basis with respect to a short or short subject shall guarantee such writer an aggregate compensation for services rendered in the writing and preparation of such material which shall be not less than a sum equal to the minimum weekly compensation to which such writer would be entitled if employed on a weekly compensation basis, as provided in subparagraph 15. hereof, multiplied by the number of weeks (plus any fraction of a week) during which the writer actually and continuously performed such services, it being understood that the Company may terminate the employment of such writer at the time the writer becomes entitled to

58

ARTICLE 13 - COMPENSATION
A - THEATRICAL

additi___ compensation by reason of the provisions of ___ paragraph or at any time thereafter.

13.     Purchases

    a.     The applicable minimums for purchases or licenses subject to this Agreement from a professional writer shall be the flat deal minimum for the appropriate budget as determined by the Company in good faith; provided, however, that if a motion picture is produced based upon the story, treatment or screenplay, as the case may be, and if such motion picture is a High Budget photoplay, and if the purchase price or license fee paid for the acquisition or license was less than the applicable minimum for the respective type of work (story, treatment or screenplay, as the case may be) for such class of motion picture, i.e., High Budget, pursuant to Article 13.A.1., an additional payment shall be made to the professional writer in an amount such that such writer shall have received in the aggregate an amount equal to such higher applicable minimum.

    b.     [Deleted.]

14.     Payment of Compensation Under Deal Contract

Company will use its best efforts to pay writers employed to write on a deal basis not less than the applicable minimum within forty-eight (48) hours after the delivery of a completed story, treatment or original treatment, first draft screenplay or final draft screenplay, as the case may be, but in no event shall any such payment be made later than seven (7) days after delivery of such material.  Payment shall not be contingent upon the acceptance or approval by the Company of the material so delivered. Company shall include in writer's deal memorandum or personal service contract:

    a.     the place where and the name(s) or function of the person(s) to whom delivery of such material is to be made, and

    b.     the name(s) of the person(s) authorized to request rewrites of said material.

The person(s) identified pursuant to a. and b. above shall be at a level no higher than the President of Production (i.e., the individual who heads theatrical creative development).

Company shall give writer written notice of any change in the name(s) of the person(s) to whom delivery is to be made and/or the name(s) of the person(s) authorized to request rewrites.

Company will pay interest of one and one-half percent (1.5%) per month when any initial compensation payment is due and not paid as provided.  If the Company has failed to make such payment because the executed contract was not delivered by the writer to the Company, then no such interest is due.  If the contract is not so delivered by the writer because of a dispute as to the terms of the contract and the Company shall be held to be wrong, the above-described interest payment shall be applicable.

15.     Minimum Weekly Compensation

Every writer employed on a week-to-week or term basis shall receive a salary at the rate of not less than the amount per week specified below for the respective period designated:

At the Rate of Per Week

| Term Contracts | 2/13/08-<br>5/1/09 | 5/2/09-<br>5/1/10[8] | 5/2/10-<br>5/1/11[9] |
|---|---|---|---|
| 40 out of 52 weeks | $ 3,754 | $ 3,885 | $ 4,021 |
| 20 out of 26 weeks | 4,080 | 4,223 | 4,371 |
| 14 out of 14 weeks | 4,417 | 4,572 | 4,732 |
| Week-to-Week | 4,759 | 4,926 | 5,098 |

Every week-to-week or term contract shall specify the exact compensation for each full week of services rendered or to be rendered thereunder.

If any writer under a week-to-week or term contract shall render services after the expiration of the guaranteed period of employment, then, for purposes only of prorating days worked in a partial workweek (*i.e.*, less than six (6) days), at the end of such employment, the writer shall receive one-fifth (1/5) of the weekly rate for each day worked during such partial workweek, after the expiration of the guaranteed period.

Company may employ a writer who has not been previously employed as a writer under any Guild MBA in television or theatrical motion pictures or radio dramatic or comedic programs on a week-to-week or term basis for a period not to exceed fourteen (14) consecutive weeks at seventy-five percent (75%) of the minimum weekly compensation as provided in this subparagraph 15.

16.   Theatrical Motion Picture Released on Free Television

If a theatrical motion picture is released on free television before it has had a *bona fide* theatrical release (determined as provided in Article 15.A.3.j. of this Basic Agreement), the compensation of the writer or writers who have received screen authorship credit for such motion picture shall be adjusted so that it shall be no less than the appropriate television minimum compensation or the appropriate theatrical minimum compensation, whichever is higher.

17.   Remakes

The Company's right to remake a theatrical film shall be subject to the following:

a.   If a credited writer's material is used for a remake and no writer is employed to rewrite, adapt or revise such material for the remake, the Company will pay such writer(s) the applicable minimum compensation for the intended medium of the remake (but this provision shall not be construed as affecting the rule that a *bona fide* team shall be considered a unit). In addition, the writer will be entitled to receive payment in accordance with Article 15.A. with respect to a theatrical remake licensed to free television, Article 15.B. with respect to reruns or foreign telecast of a television remake, and Article 51 with respect to a theatrical or free television remake released in Supplemental Markets.

b.   If a writer is employed to rewrite, adapt or revise such literary material for the remake, then the credited writer(s) of the original material shall also be participant(s) in the credit determination and if accorded credit shall accordingly be entitled to the portion of applicable minimum compensation for the intended

---

[8]   See footnote 2 on page 52

[9]   See footnote 3 on page 52

**ARTICLE 13 - COMPENSATION**
A - THEATRICAL

dium of the remake equal to the proportion of credit awarded pursuant to subparagraph c.(1) below (but this provision shall not be construed as affecting the rule that a *bona fide* team shall be considered a unit). In addition, the writer will be entitled to share in any additional compensation in accordance with Article 15.A. with respect to a theatrical remake licensed to free television, Article 15.B. with respect to reruns or foreign telecast of a television remake, and Article 51 with respect to a theatrical or free television remake released in Supplemental Markets. The writer's portion of such additional compensation shall be equal to the portion of credit awarded pursuant to subparagraph c.(1) below.

c.   With respect to a television remake of a theatrical film, the phrase "applicable minimum compensation" in subparagraphs a. and b. of this subparagraph 17. means the applicable rate provided for in Article 13.B.7.a., b. or e. of this Agreement.

In a credit arbitration concerning such remake, the arbiters shall determine the following issues:

(1)   the contribution made by the writer(s) of the original material expressed as a percentage of the whole, and

(2)   the form of credit to be accorded such writer(s), which credit may include a credit in the nature of a source material credit, such as "Based on a Screenplay by ..."

The foregoing provisions shall apply to material written during the term of this Agreement upon which a remake is based.

18.   Script Annotations

If the Company is to require one or more script annotations, it shall so inform the writer at the time of the negotiation of the writing assignment, or option or acquisition of literary material, unless from the nature of the project the Company's need for the annotation(s) is not reasonably known at the outset. In the latter case, the Company shall inform the writer that an annotation is needed when the Company knows, or reasonably should have known, of it.

If the Company uses written guidelines or standards describing the type of information to be included in an annotation for a fact-based project or a project inspired by fact, such guidelines or standards shall be furnished to the writer when the Company first informs the writer that an annotation is needed.

B.   **TELEVISION**

1.   **Minimum Basic Compensation**

a.   Options

When the Company options to purchase or license from a professional writer literary material, which would be covered under this Basic Agreement, Company shall pay five percent (5%) of the applicable minimum compensation for such literary material for the first period of up to one hundred eighty (180) days, and an additional ten percent (10%) of the applicable minimum compensation for each subsequent period of up to one hundred eighty (180) days.

Notwithstanding anything in this Basic Agreement to the contrary, the option payment(s) shall be credited against the purchase price or other compensation payable to the writer.

The foregoing paragraphs shall not apply to arrangements under which the consideration for the agreement is the Company's good faith effort to effectuate network or other buyer/licensee interest or otherwise obtain a development commitment for the material.

b.    Other Compensation Minimums

Company agrees that the minimum basic compensation to be paid for writing services covered by this Basic Agreement shall be as herein set forth during the periods indicated below.  The periods are herein designated:

|  | From | Through |
|---|---|---|
| "1st Period" | February 13, 2008 | May 1, 2009 |
| "2nd Period" | May 2, 2009 | May 1, 2010 |
| "3rd Period" | May 2, 2010 | May 1, 2011 |

The applicable minimum shall be the minimum for each writer, except when a *bona fide* team of no more than two (2) writers offers, prior to employment on the script in question, to collaborate, in which event such writers shall be considered a unit, which unit shall receive in the aggregate not less than the applicable minimum compensation.

In addition, if a *bona fide* team of no more than three (3) writers offers, prior to employment on the script in question, to collaborate, the team as a unit shall receive in the aggregate not less than two hundred percent (200%) of the applicable minimum compensation, of which each individual writer shall be paid not less than one-third (1/3) of said aggregate compensation.  If all three (3) writers are also employed pursuant to Article 14 of this Basic Agreement, the two hundred percent (200%) of minimum compensation may be reduced to not less than one hundred fifty percent (150%).

With respect to the provisions for increased rates during specified periods, the intent is that, as to freelance employment, the rates applicable when the employment is entered into shall apply, except that when an employment is entered into during one period, but is not to start until a subsequent period, the rate applicable during the subsequent period applies.

2.    "High Budget" Films

For the purpose of this schedule, "High Budget" television motion pictures are those for which the negative costs equal or exceed the following amounts:

| | |
|---|---|
| 15 minutes or less | $150,000 |
| 30 minutes or less (but more than 15 minutes) | 215,000 |
| 60 minutes or less (but more than 30 minutes) | 300,000 |
| 75 minutes or less (but more than 60 minutes) | 400,000 |
| 90 minutes or less (but more than 75 minutes) | 500,000 |
| 120 minutes or less (but more than 90 minutes) | 900,000 |
| For each additional 30 minutes or less, an additional | 300,000 |

ARTICLE 13 - COMPENSATION
B - TELEVISION

However, in the case of non-prime time network films, "Low Budget" films shall be films the negative costs of which equal or exceed the following amounts:

| | |
|---|---|
| 15 minutes or less | $60,000 |
| 30 minutes or less (but more than 15 minutes) | 100,000 |
| 60 minutes or less (but more than 30 minutes) | 200,000 |
| 75 minutes or less (but more than 60 minutes) | 260,000 |
| 90 minutes or less (but more than 75 minutes) | 340,000 |
| 120 minutes or less (but more than 90 minutes) | 450,000 |
| For each additional 30 minutes or less, an additional | 125,000 |

3. "Low Budget" Films

For the purpose of this schedule, "Low Budget" television motion pictures are those for which the negative cost is less than the amounts indicated above.

4. "Negative Cost"

a. "Negative cost," for the purposes of this Article 13.B., shall be deemed to include all actual costs and expenses of production, including overhead and, except to the extent hereinafter provided, excluding deferments. If no overhead has been charged, an amount equal to twenty percent (20%) of all direct charges shall be added to represent an overhead charge.

b. It is agreed that if the Company rents studio facilities and the customary rental includes a charge for overhead, the provisions of the preceding quoted sentence shall be waived, but the Guild shall have the right at all times to have a determination by arbitration as to whether said customary rental charge has in fact included a charge for overhead.

c. If more than fifty percent (50%) of the cost of any item is deferred, the negative cost of the film shall be revised to include a charge of not less than fifty percent (50%) of the total cost of such item including the amount deferred.

d. If the compensation of any actor, writer, director or producer shall include a participation in the receipts of a film and the initial salary paid such employee shall be less than one hundred percent (100%) of his/her established television salary, or fifty percent (50%) of his/her established theatrical motion picture salary (if he/she has not established his/her television salary), the negative cost shall be revised to include an amount equal to such established television salary or fifty percent (50%) of such established theatrical motion picture salary, as the case may be. The "established theatrical motion picture salary" for the purposes hereof shall be computed by dividing the total compensation earned by the employee in theatrical motion pictures during the year immediately preceding the assignment in question by the total weeks and fractions thereof worked for such compensation.

e. Any dispute relating to the determination of the negative cost of a film shall be resolved by a Price Waterhouse audit, the costs of which are to be borne equally by the Company and the Guild.

ARTICLE 13 - COMPENSATION
B - TELEVISION    63

f.  If a Low Budget minimum shall be paid to a writer prior to production of a film whose negative cost shall in fact require the payment of a High Budget minimum, the writer shall be paid the difference not later than thirty (30) days after the completion of production of the film.

5.  Story Claim By Production Executive

If Company shall claim that a writer has been assigned to write a teleplay based upon a story composed or created by a production executive, the story and teleplay shall be subject to an automatic arbitration pursuant to the provisions of Television Schedule A hereof, and if the arbitrators shall accord both the story and teleplay credit to the writer, then the combined story and teleplay minimum above provided for shall apply to the material so written, provided that Company may appeal any such credit determination to arbitration pursuant to Articles 10, 11 and 12 hereof.

6.  Step Outline

The writer may not be compelled to prepare a step outline of the teleplay.  For such purpose, the term "step outline" shall mean a development of the story in the form of a condensed scene-by-scene progression indicating action and the substance of essential story dialogue, but without dialogue.

7.  Schedule of Minimum Compensation

a.  **Story** (For all television films except (1) network prime time programs of the types covered by subparagraph d. below and (2) serials which are covered by subparagraph e.(1) or e.(3) below)

### High Budget

| Program Length in Minutes | 2/13/08-5/1/09 | 5/2/09-5/1/10[10] | 5/2/10-5/1/11[11] |
|---|---|---|---|
| 15 or less | $2,625 | $2,717 | $2,812 |
| 30 or less (but more than 15) | 4,802 | 4,970 | 5,144 |
| 60 or less (but more than 30) | 8,726 | 9,031 | 9,347 |
| 75 or less (but more than 60) | 12,423 | 12,858 | 13,308 |
| 90 or less (but more than 75) | 13,114 | 13,573 | 14,048 |
| 120 or less (but more than 90) | 17,185 | 17,786 | 18,409 |

### Low Budget

| Program Length in Minutes | 2/13/08-5/1/09 | 5/2/09-5/2/10[12] | 5/2/10-5/1/11[13] |
|---|---|---|---|
| 15 or less | $2,234 | $2,312 | $2,393 |
| 30 or less (but more than 15) | 3,715 | 3,845 | 3,980 |

---

[10] See footnote 2 on page 52
[11] See footnote 3 on page 52
[12] See footnote 2 on page 52
[13] See footnote 3 on page 52

ARTICLE 13 - COMPENSATION
B - TELEVISION

| | | | |
|---|---|---|---|
| 60 or less (but more than 30) | 7,024 | 7,270 | 7,524 |
| 75 or less (but more than 60) | 10,001 | 10,351 | 10,713 |
| 90 or less (but more than 75) | 10,708 | 11,083 | 11,471 |
| 120 or less (but more than 90) | 14,144 | 14,639 | 15,151 |

b. **Teleplay** (For all television films except (1) network prime time programs of the types covered by subparagraph d. below and (2) serials which are covered by subparagraph e.(1) or e.(3) below)

### High Budget

| Program Length in Minutes | 2/13/08-5/1/09 | 5/2/09-5/1/10[14] | 5/2/10-5/1/11[15] |
|---|---|---|---|
| 15 or less | $4,802 | $4,970 | $5,144 |
| 30 or less (but more than 15) | 7,798 | 8,071 | 8,353 |
| 60 or less (but more than 30) | 15,113 | 15,642 | 16,189 |
| 75 or less (but more than 60) | 21,993 | 22,763 | 23,560 |
| 90 or less (but more than 75) | 23,245 | 24,059 | 24,901 |
| 120 or less (but more than 90) | 30,832 | 31,911 | 33,028 |

### Low Budget

| Program Length in Minutes | 2/13/08-5/1/09 | 5/2/09-5/1/10[16] | 5/2/10-5/1/11[17] |
|---|---|---|---|
| 15 or less | $3,497 | $3,619 | $3,746 |
| 30 or less (but more than 15) | 6,010 | 6,220 | 6,438 |
| 60 or less (but more than 30) | 11,462 | 11,863 | 12,278 |
| 75 or less (but more than 60) | 16,539 | 17,118 | 17,717 |
| 90 or less (but more than 75) | 17,549 | 18,163 | 18,799 |
| 120 or less (but more than 90) | 23,221 | 24,034 | 24,875 |

---

[14] See footnote 2 on page 52
[15] See footnote 3 on page 52
[16] See footnote 2 on page 52
[17] See footnote 3 on page 52

ARTICLE 13 - COMPENSATION
B - TELEVISION    65

c.   **Story a___ teleplay** when the same writer prepares both ___rgain rates") (For all television films except (1) network prime time programs of the types covered by subparagraph d. below and (2) serials which are covered by subparagraph e.(1) or e.(3) below)

## High Budget

| Program Length in Minutes | 2/13/08- 5/1/09 | 5/2/09- 5/1/10[18] | 5/2/10- 5/1/11[19] |
|---|---|---|---|
| 15 or less | $6,553 | $6,782 | $7,019 |
| 30 or less (but more than 15) | 12,002 | 12,422 | 12,857 |
| 60 or less (but more than 30) | 21,816 | 22,580 | 23,370 |
| 75 or less (but more than 60) | 31,093 | 32,181 | 33,307 |
| 90 or less (but more than 75) | 32,786 | 33,934 | 35,122 |
| 120 or less (but more than 90) | 42,965 | 44,469 | 46,025 |

## Low Budget

| Program Length in Minutes | 2/13/08- 5/1/09 | 5/2/09- 5/1/10[20] | 5/2/10- 5/1/11[21] |
|---|---|---|---|
| 15 or less | $5,565 | $5,760 | $5,962 |
| 30 or less (but more than 15) | 9,275 | 9,600 | 9,936 |
| 60 or less (but more than 30) | 17,567 | 18,182 | 18,818 |
| 75 or less (but more than 60) | 25,447 | 26,338 | 27,260 |
| 90 or less (but more than 75) | 26,771 | 27,708 | 28,678 |
| 120 or less (but more than 90) | 35,364 | 36,602 | 37,883 |

---

[18]   See footnote 2 on page 52
[19]   See footnote 3 on page 52
[20]   See footnote 2 on page 52
[21]   See footnote 3 on page 52

66

ARTICLE 13 - COMPENSATION
B - TELEVISION

programs in excess of one hundred twenty (120) minutes, compensation is based on the one hundred twenty (120) minute or less minimum (shown above) plus, for each additional thirty (30) minutes or less, the following additional payments:

| High Budget | 2/13/08-5/1/09 | 5/2/09-5/1/10[22] | 5/2/10-5/1/11[23] |
|---|---|---|---|
| Story | $4,071 | $4,213 | $4,360 |
| Teleplay | 7,586 | 7,852 | 8,127 |
| Story and Teleplay | 10,177 | 10,533 | 10,902 |
| **Low Budget** | | | |
| Story | $3,432 | $3,552 | $3,676 |
| Teleplay | 5,656 | 5,854 | 6,059 |
| Story and Teleplay | 8,598 | 8,899 | 9,210 |

The minimums set forth in the above schedules constitute the writer's minimum compensation for the purposes of Article 15.B.

The category of minimums provided for in subparagraph c. of this paragraph 7. (the so-called "bargain rate") is applicable only when the employment is for story and teleplay, not when the employment is for story with option for teleplay.

cc.   **Story with Options**

If Company engages a writer to write a story with an option to have the writer write a teleplay, the Company must exercise such option, if at all, within fourteen (14) days after delivery of the final story.

d.   **Network Prime Time**

(For all network prime time episodic series, one-time shows, unit series shows, once-per-week network prime time serials, and anthology programs. This subparagraph d. is not applicable to programs covered by Appendix A and other non-dramatic programs (*e.g.*, *Wild Kingdom* and travelogues). The rates set forth in this subparagraph d. are not to be utilized for the purposes of Article 15.B. of this Agreement.)

---

[22]   See footnote 2 on page 52
[23]   See footnote 3 on page 52

**(1) Story**

|                                                                         | Effective              |                              |                              |
| ----------------------------------------------------------------------- | ---------------------- | ---------------------------- | ---------------------------- |
| Program Length<br>in Minutes                                            | 2/13/08-<br>5/1/09     | 5/2/09-<br>5/1/10[24]        | 5/2/10-<br>5/1/11[25]        |
| 15 or less                                                              | $3,926                 | $4,044                       | $4,165                       |
| 30 or less (but more than 15)                                           | 7,196                  | 7,412                        | 7,634                        |
| 45 or less (but more than 30)                                           | 9,930                  | 10,228                       | 10,535                       |
| 60 or less (but more than 45)                                           | 12,668                 | 13,048                       | 13,439                       |
| 90 or less (but more than 60)                                           | 16,925                 | 17,433                       | 17,956                       |
| For Serials and Episodic Programs<br>120 or less (but more than 90)     | 22,601                 | 23,279                       | 23,977                       |
| For other than Serials and<br>Episodic Programs 120 or less<br>(but more than 90) | 24,665       | 25,405                       | 26,167                       |

**(2) Teleplay**

|                                                                         | Effective              |                              |                              |
| ----------------------------------------------------------------------- | ---------------------- | ---------------------------- | ---------------------------- |
| Program Length<br>in Minutes                                            | 2/13/08-<br>5/1/09     | 5/2/09-<br>5/1/10[26]        | 5/2/10-<br>5/1/11[27]        |
| 15 or less                                                              | $9,534                 | $9,820                       | $10,115                      |
| 30 or less (but more than 15)                                           | 15,482                 | 15,946                       | 16,424                       |
| 45 or less (but more than 30)                                           | 16,375                 | 16,866                       | 17,372                       |
| 60 or less (but more than 45)                                           | 20,886                 | 21,513                       | 22,158                       |
| 90 or less (but more than 60)                                           | 30,094                 | 30,997                       | 31,927                       |
| For Serials and Episodic Programs<br>120 or less (but more than 90)     | 38,613                 | 39,771                       | 40,964                       |
| For other than Serials and<br>Episodic Programs 120 or less<br>(but more than 90) | 42,135       | 43,399                       | 44,701                       |

---

[24]   See footnote 2 on page 52

[25]   See footnote 3 on page 52

[26]   See footnote 2 on page 52

[27]   See footnote 3 on page 52

68

ARTICLE 13 - COMPENSATION
B - TELEVISION

Story and Teleplay when the same writer provides both ("bargain rates")

| Program Length in Minutes | Effective | | |
|---|---|---|---|
| | 2/13/08- 5/1/09 | 5/2/09- 5/1/10[28] | 5/2/10- 5/1/11[29] |
| 15 or less | $11,795 | $12,149 | $12,513 |
| 30 or less (but more than 15) | 21,585 | 22,233 | 22,900 |
| 45 or less (but more than 30) | 24,886 | 25,633 | 26,402 |
| 60 or less (but more than 45) | 31,748 | 32,700 | 33,681 |
| 90 or less (but more than 60) | 44,668 | 46,008 | 47,388 |
| For Serials and Episodic Programs 120 or less (but more than 90) | 58,772 | 60,535 | 62,351 |
| For other than Serials and Episodic Programs 120 or less (but more than 90) | 64,238 | 66,165 | 68,150 |

For programs in excess of one hundred twenty (120) minutes, compensation is based on the one hundred twenty (120) minute or less minimum (shown herein) plus, for each additional thirty (30) minutes or less, the following additional payments:

| | | | |
|---|---|---|---|
| Story | $3,791 | $3,905 | $4,022 |
| Teleplay | 7,071 | 7,283 | 7,501 |
| Story and Teleplay | 9,487 | 9,772 | 10,065 |

dd.   **Segment Rate**

Writers who are employed to write segments for use on programs meeting the requirements of this section may, at the option of the Company, be paid in accordance with this section rather than in accordance with the otherwise applicable provisions of this Agreement. In order to utilize this section, the Company (1) must apply this section to all writers employed on the program or, in the case of a program series, the individual episode; and (2) must inform such writers no later than the time of assignment to the program that this section is being utilized. As to any single dramatic program or any program of a dramatic television series thirty (30) minutes or more in length which consists of self-contained segments of various lengths (whether or not such segments are intercut within each program), the aggregate minimum compensation shall be one hundred seventy-five percent (175%) of the applicable minimum compensation for story and teleplay set forth in subparagraphs c. and d.  Writers employed to write segments for use in such programs shall be compensated at the following rates:

---

28    See footnote 2 on page 52
29    See footnote 3 on page 52

| Total Length of Program in Minutes | Length of Segment in Minutes | Segment Compensation as Percentage of Aggregate Minimum Compensation |
|---|---|---|
| 30 or less | 3 or less | 10% |
| | 5 or less (over 3) | 15% |
| | 10 or less (over 5) | 30% |
| | 15 or less (over 10) | 40% |
| 60 or less (but more than 30) | 8 or less | 16-2/3% |
| | 15 or less (over 8) | 20% |
| | 20 or less (over 15) | 25% |
| | 30 or less (over 20) | 40% |
| 90 or less (but more than 60) | 8 or less | 10% |
| | 15 or less (over 8) | 12-1/2% |
| | 20 or less (over 15) | 16-2/3% |
| | 30 or less (over 20) | 27-1/2% |
| | 60 or less (over 30) | 40% |
| 120 or less (but more than 90) | 8 or less | 8-1/3% |
| | 15 or less (over 8) | 10% |
| | 20 or less (over 15) | 12-1/2% |
| | 30 or less (over 20) | 20% |
| | 60 or less (over 30) | 30% |

Should the total minimum compensation payable to the writers of the segments pursuant to the schedule immediately above be less than the aggregate minimum compensation specified above, the difference shall be distributed among the segment writers in proportion to the segment compensation set forth above. In said distribution, the Company may credit to an individual writer any overscale payment paid to such writer.

With respect to such programs, the following provisions will be incorporated into appropriate sections of the MBA:

(1)   The applicable minimums for rewrites shall be twenty-five percent (25%) of the segment minimum as determined in accordance with the above formula.

(2)   Separation of rights shall apply to each segment, excluding only those elements (continuing characters, etc.) which are part of the continuing series format.

ARTICLE 13 - COMPENSATION
B - TELEVISION

(3)    Any story for which no teleplay is written during the same production season will revert to the writer.

(4)    The minimum compensation as computed above for each writer shall be the basis for calculation of all rerun, foreign telecast and theatrical exhibition payments required under the Basic Agreement.

(5)    Writing credits are to be given for each individual segment, identified by segment title, with a single card devoted to each segment.

### e.   Serials

(1)    Employment and purchase of literary material for serials produced for broadcast three (3), four (4), five (5), six (6) or seven (7) times per week other than prime time is treated in Appendix A. (See Appendix A, Article 13.)

(2)    The minimum compensation for stories and/or teleplays, rewrites and polishes for episodes of a once-a-week network prime time serial shall be the corresponding minimums or stories and/or teleplays, rewrites and polishes for episodes of network prime time episodic series.

(3)    As to serials other than those described in subparagraphs e.(1) and (2) above, there is to be no differentiation between stories and teleplays for compensation purposes and minimum compensation for writing such material for such serials shall be as follows:

| Program Length in Minutes | 2/13/08- 5/1/09 | 5/2/09- 5/1/10[30] | 5/2/10- 5/1/11[31] |
|---|---|---|---|
| 15 or less | $4,518 | $4,676 | $4,840 |
| 30 or less (but more than 15) | 7,524 | 7,787 | 8,060 |
| 60 or less (but more than 30) | 14,293 | 14,793 | 15,311 |
| 90 or less (but more than 60) | 20,426 | 21,141 | 21,881 |

For programs in excess of ninety (90) minutes, compensation is based on the ninety (90) minute or less minimum shown herein, plus, for each additional thirty (30) minutes or less, the difference between the appropriate ninety (90) minute compensation and the sixty (60) minute compensation.

### f.   Installment Payments

Payment of the writer's agreed upon compensation shall be made in installments as follows:

(1)    If employment is for Story and Teleplay, not less than

        (a)    Thirty percent (30%) of agreed compensation on delivery of story.

---

[30]   See footnote 2 on page 52

[31]   See footnote 3 on page 52

Forty percent (40%) of agreed compensation, delivery of first draft teleplay.  In no event shall the total of installments (a) and (b) be less than ninety percent (90%) of the applicable minimum compensation for story and teleplay.

(c)    Balance of agreed compensation on delivery of final draft teleplay.

(2)    If employment is for Teleplay, not less than

(a)    Sixty percent (60%) of agreed compensation or ninety percent (90%) of applicable minimum compensation, whichever is greater, on delivery of first draft teleplay.

(b)    Balance of agreed compensation on delivery of final draft teleplay.

With respect to any employment under Article 13.B.7.a., b., c. or d. above relating to pilots and one-time programs ninety (90) minutes or more in length, the Company will pay to the writer, not later than the next regular payday in the week following the day the Company instructs the writer to commence his/her services, a single advance amount (to be applied against the first compensation which otherwise would be due to the writer) at least equal to ten percent (10%) of the monies which otherwise would be due to the writer upon delivery of the first required material.

If the writer of a television motion picture ninety (90) minutes or longer has negotiated a salary sufficient to allow for three (3) revisions of the teleplay as follows, and the writer's contract provides for such revisions, the first draft teleplay shall be delivered to the producer (or other executive) designated in the writer's deal memorandum or contract and such producer shall be authorized to give notes to the writer and the writer shall utilize such notes in the first revision.

Payment for such writing steps would be as follows:

(1)    commencement (10% of agreed compensation);
(2)    delivery of story (20% of agreed compensation);
(3)    delivery of first draft teleplay to producer (40% of agreed compensation);
(4)[32]    (a)    delivery of first set of revisions to producer, based on producer's notes, if any (10% of agreed compensation); or
    (b)    if producer has not requested a revision, delivery of first set of revisions to network or licensee (10% of agreed compensation);
(5)    delivery of second set of revisions (10% of agreed compensation); and
(6)    delivery of polish (10% of agreed compensation).

g.    **Plot Outline - Narrative Synopsis of Story**

Company may request writer to prepare a narrative synopsis of reasonable length (herein designated as an "outline") of a story owned by writer in order to determine its suitability for television purposes.  The minimum compensation for the preparation of such outline shall be:

---

[32]    See Sideletter to Article 13.B.7.f. at page 387 of this Agreement ("Letter of Understanding Between the Guild and Licensees of Television Motion Pictures (90 Minutes or Longer)".)

**ARTICLE 13 - COMPENSATION**
**B - TELEVISION**

| Program Length in Minutes | 2/13/08-5/1/09 | 5/2/09-5/1/10[33] | 5/2/10-5/1/11[34] |
|---|---|---|---|
| 15 or less | $1,313 | $1,359 | $1,407 |
| 30 or less (but more than 15) | 2,188 | 2,265 | 2,344 |
| 60 or less (but more than 30) | 4,146 | 4,291 | 4,441 |
| 75 or less (but more than 60) | 5,406 | 5,595 | 5,791 |
| 90 or less (but more than 75) | 6,127 | 6,341 | 6,563 |
| 120 or less (but more than 90) | 8,078 | 8,361 | 8,654 |

Company shall, within fourteen (14) days from time of delivery of such outline, notify writer of its election to acquire such outline and employ writer to prepare a teleplay based thereon.  If Company shall so elect, the agreed compensation paid for the outline shall be deemed an advance against the applicable minimum compensation for such story with an option for teleplay, which option shall be deemed exercised, and writer shall receive the difference, if any.  If Company shall elect not to proceed, it shall return the outline to the writer not later than the end of such fourteen (14) day period and writer shall be entitled to retain the above applicable minimum for the outline and shall own all right, title and interest in the literary material contained in such outline, except to the extent that the outline was prepared for an episodic series or serial-type film and program format and/or characters belonging to the Company were incorporated in the material written by the writer.

Company shall sign and deliver to writer, on the date of hiring, a slip stating it has employed the writer to prepare an outline of such material and that the conditions of such employment are upon terms not less favorable than those provided by this subparagraph g.

---

[33]   See footnote 2 on page 52
[34]   See footnote 3 on page 52

ARTICLE 13 - COMPENSATION
B - TELEVISION                    73

**h.    Compensation for Rewrites and Polishes**

Company shall pay not less than the following minimum compensation with respect to rewrites and polishes:

**(1)    Rewrites**

<u>High Budget</u> – Non-serial pictures and serials described in 13.B.7.e.(2)

| Program Length in Minutes | 2/13/08-5/1/09 | 5/2/09-5/1/10[35] | 5/2/10-5/1/11[36] |
|---|---|---|---|
| 15 or less | $2,830 | $2,929 | $3,032 |
| 30 or less (but more than 15) | 4,725 | 4,890 | 5,061 |
| 45 or less (but more than 30) | 6,832 | 7,071 | 7,318 |
| 60 or less (but more than 45) | 8,936 | 9,249 | 9,573 |
| 75 or less (but more than 60) | 12,545 | 12,984 | 13,438 |
| 90 or less (but more than 75) | 13,166 | 13,627 | 14,104 |
| 120 or less (but more than 90) | 17,391 | 18,000 | 18,630 |

<u>Low Budget</u> – Non-serial pictures and serials described in 13.B.7.e.(2)

| Program Length in Minutes | 2/13/08-5/1/09 | 5/2/09-5/1/10[37] | 5/2/10-5/1/11[38] |
|---|---|---|---|
| 15 or less | $2,072 | $2,145 | $2,220 |
| 30 or less (but more than 15) | 3,548 | 3,672 | 3,801 |
| 60 or less (but more than 30) | 6,764 | 7,001 | 7,246 |
| 75 or less (but more than 60) | 9,401 | 9,730 | 10,071 |
| 90 or less (but more than 75) | 9,987 | 10,337 | 10,699 |
| 120 or less (but more than 90) | 13,196 | 13,658 | 14,136 |

---

[35]    See footnote 2 on page 52
[36]    See footnote 3 on page 52
[37]    See footnote 2 on page 52
[38]    See footnote 3 on page 52

ARTICLE 13 - COMPENSATION
B - TELEVISION

...eplays for serials described in 13.B.7.e.(3)

| Program Length in Minutes | 2/13/08- 5/1/09 | 5/2/09- 5/1/10[39] | 5/2/10- 5/1/11[40] |
|---|---|---|---|
| 15 or less | $2,252 | $2,331 | $2,413 |
| 30 or less (but more than 15) | 3,765 | 3,897 | 4,033 |
| 60 or less (but more than 30) | 7,136 | 7,386 | 7,645 |

(2)    Polishes

<u>High Budget</u> - Non-serial pictures and serials described in 13.B.7.e.(2)

| Program Length in Minutes | 2/13/08- 5/1/09 | 5/2/09- 5/1/10[41] | 5/2/10- 5/1/11[42] |
|---|---|---|---|
| 15 or less | $1,416 | $1,466 | $1,517 |
| 30 or less (but more than 15) | 2,358 | 2,441 | 2,526 |
| 45 or less (but more than 30) | 3,410 | 3,529 | 3,653 |
| 60 or less (but more than 45) | 4,475 | 4,632 | 4,794 |
| 75 or less (but more than 60) | 6,264 | 6,483 | 6,710 |
| 90 or less (but more than 75) | 6,576 | 6,806 | 7,044 |
| 120 or less (but more than 90) | 8,695 | 8,999 | 9,314 |

<u>Low Budget</u> - Non-serial pictures and serials described in 13.B.7.e.(2)

| Program Length in Minutes | 2/13/08- 5/1/09 | 5/2/09- 5/1/10[43] | 5/2/10- 5/1/11[44] |
|---|---|---|---|
| 15 or less | $1,031 | $1,067 | $1,104 |
| 30 or less (but more than 15) | 1,769 | 1,831 | 1,895 |
| 60 or less (but more than 30) | 3,378 | 3,496 | 3,618 |
| 75 or less (but more than 60) | 4,698 | 4,862 | 5,032 |
| 90 or less (but more than 75) | 4,998 | 5,173 | 5,354 |
| 120 or less (but more than 90) | 6,602 | 6,833 | 7,072 |

---

[39]    See footnote 2 on page 52
[40]    See footnote 3 on page 52
[41]    See footnote 2 on page 52
[42]    See footnote 3 on page 52
[43]    See footnote 2 on page 52
[44]    See footnote 3 on page 52

**ARTICLE 13 - COMPENSATION**
**B - TELEVISION**          75

Telephor serials described in 13.B.7.e.(3)

| Program Length in Minutes | 2/13/08-5/1/09 | 5/2/09-5/1/10[45] | 5/2/10-5/1/11[46] |
|---|---|---|---|
| 15 or less | $1,132 | $1,172 | $1,213 |
| 30 or less (but more than 15) | 1,892 | 1,958 | 2,027 |
| 60 or less (but more than 30) | 3,576 | 3,701 | 3,831 |

i., j., k. and l. [deleted]

m.   (1)   **Format**

Minimum basic compensation for a format shall be:

| | |
|---|---|
| 2/13/08-5/1/09 | $9,080 |
| 5/2/09-5/1/10[47] | 9,398 |
| 5/2/10-5/1/11[48] | 9,727 |

If a story, or stories, are included in a purchased format and the story is used, the applicable minimum for such story or stories shall apply. If such story or stories are not used, no story minimum would apply.

If a writer is employed to write a format and a story or stories are included, at the direction of Company, the applicable story minimum shall apply.

At the time of purchase or hire, Company shall submit to writer any formats in control of the Company relating to the project for which writer has been engaged. The writer shall be obligated to read, initial and date such format.

(2)   **Bible**

Minimum basic compensation for a network prime time bible shall be:

| | |
|---|---|
| 2/13/08-5/1/09 | $45,905 |
| 5/2/09-5/1/10[49] | 47,512 |
| 5/2/10-5/1/11[50] | 49,175 |

plus ten percent (10%) thereof for each detailed storyline in excess of six (6) ordered by the Company in connection therewith. With respect to a non-network and/or non-prime time bible for a multi-part closed end series, the minimum basic compensation shall be twenty percent (20%) less than set forth above. The writer of the bible shall be entitled to the applicable

---

[45] See footnote 2 on page 52
[46] See footnote 3 on page 52
[47] See footnote 2 on page 52
[48] See footnote 3 on page 52
[49] See footnote 2 on page 52
[50] See footnote 3 on page 52

76

ARTICLE 13 - COMPENSATION
B - TELEVISION

story payment (including the additional compensation set forth in Article 13.B.7.d.(1), if applicable) for each segment or episode of the multi-part program or prime-time serial for which he/she receives story credit. Ten percent (10%) of the applicable minimum for a bible may be credited against such payment for each story. Notwithstanding the foregoing, should the Company separately pay the full story and teleplay minimum to the bible writer or any other writer, the story payment (including the additional compensation set forth in Article 13.B.7.d.(1), if applicable) otherwise due to the bible writer under this subparagraph shall not be required.

(3)     **Rewrite or Polish of Format or Bible**

Minimum basic compensation for a rewrite of a format shall be fifty percent (50%) of the applicable minimum set forth above. Minimum basic compensation for a polish of a format shall be twenty-five percent (25%) of the applicable minimum set forth above.

Minimum basic compensation for a rewrite or polish of a bible shall be:

|  | Rewrite | Polish |
|---|---|---|
| 2/13/08-5/1/09 | $22,953 | $11,477 |
| 5/2/09-5/1/10[51] | 23,756 | 11,879 |
| 5/2/10-5/1/11[52] | 24,587 | 12,295 |

provided, however, that when the writer rewrites or polishes more than six (6) story lines in the bible, the minimum basic compensation shall be increased as follows (for rewrite or polish, as the case may be) for each such story line in excess of six (6):

|  | Rewrite | Polish |
|---|---|---|
| 2/13/08-5/1/09 | $2,294 | $1,148 |
| 5/2/09-5/1/10[53] | 2,374 | 1,188 |
| 5/2/10-5/1/11[54] | 2,457 | 1,230 |

With respect to rewriting or polishing a non-network and/or non-prime time bible, the minimum basic compensation shall be twenty percent (20%) less than set forth above.

---

| [51] | See footnote 2 on page 52 |
|---|---|
| [52] | See footnote 3 on page 52 |
| [53] | See footnote 2 on page 52 |
| [54] | See footnote 3 on page 52 |

n.   Narration

Minimum basic compensation for a narration shall be as follows:

**NARRATION**
(by writer other than writer of teleplay or story and teleplay)

**FILM ASSEMBLED IN STORY SEQUENCE**

| Nature of Material Already Written under MBA when Narration Writer Hired | Credit to Narration Writer[55] | Freelance Minimum | Residuals to Narration Writer |
|---|---|---|---|
| 1. No Material | "Narration Written by" | See Rate Schedule A | Yes, based on % of applicable freelance minimum in Rate Schedule A |
| 2. Story only | "Narration Written by" (If story credit, then on same card) | See Rate Schedule A | Yes, based on % of applicable freelance minimum in Rate Schedule A |
| 3. Story and Teleplay | None, but if over 8 minutes of narration (aggregate), only receive "Narration by" credit (same card)<br><br>**Automatic arbitration** | See Rate Schedule C | If "Narration by" credit, then only shared residuals, as determined in WGA credit arbitration (aggregate of no more than story & teleplay residuals) |

---

[55]   Credit not to affect rates – There is no separation of rights for narration.

**ARTICLE 13 - COMPENSATION**
**B - TELEVISION**

## NARRATION

(by writer other than writer of teleplay or story and teleplay)

### FILM FOOTAGE NOT ASSEMBLED IN STORY SEQUENCE

| Nature of Material Already Written under MBA when Narration Writer Hired | Credit to Narration Writer[56] | Freelance Minimum | Residuals to Narration Writer |
|---|---|---|---|
| 1.  No Material | "Written by" | See Rate Schedule B | Yes, based on % of applicable freelance minimum in Rate Schedule B |
| 2.  Story only | "Narration Written by" (If story credit, then on same card) | See Rate Schedule A | Yes, based on % of applicable freelance minimum in Rate Schedule A |
| 3.  Story and Teleplay | None, but if over 8 minutes of narration (aggregate), only receive "Narration by" credit (same card)<br><br>**Automatic arbitration** | See Rate Schedule C | If "Narration by" credit, then only shared residuals, as determined in WGA credit arbitration |

NOTE:  Excluded from these provisions is material described in Article 13.B.7.p.

Two writers collaborating equal one unit, to receive in the aggregate not less than applicable minimum.

Narration writer may be hired on a week-to-week basis, subject to Article 13.B.7.s.

---

[56]      Credit not to affect rates - There is no separation of rights for narration.

The following rates are for High Budget:[57]

### RATE SCHEDULE A

| Program Length in Minutes* | 2/13/08- 5/1/09 | 5/2/09- 5/1/10[58] | 5/2/10- 5/1/11[59] |
|---|---|---|---|
| 15 or less | $5,676 | $5,875 | $6,081 |
| 30 or less (but more than 15) | 9,436 | 9,766 | 10,108 |
| 60 or less (but more than 30) | 17,895 | 18,521 | 19,169 |
| 75 or less (but more than 60) | 25,085 | 25,963 | 26,872 |
| 90 or less (but more than 75) | 26,361 | 27,284 | 28,239 |
| 120 or less (but more than 90) | 34,818 | 36,037 | 37,298 |
| plus, for each additional ½ hour or fraction thereof | 8,459 | 8,755 | 9,061 |

### RATE SCHEDULE B

| Program Length in Minutes* | 2/13/08- 5/1/09 | 5/2/09- 5/1/10[60] | 5/2/10- 5/1/11[61] |
|---|---|---|---|
| 15 or less | $6,553 | $6,782 | $7,019 |
| 30 or less (but more than 15) | 11,992 | 12,412 | 12,846 |
| 60 or less (but more than 30) | 21,816 | 22,580 | 23,370 |
| 75 or less (but more than 60) | 29,998 | 31,048 | 32,135 |
| 90 or less (but more than 75) | 31,629 | 32,736 | 33,882 |
| 120 or less (but more than 90) | 41,439 | 42,889 | 44,390 |
| plus, for each additional ½ hour or fraction thereof | 9,830 | 10,174 | 10,530 |

* Running time is in terms of soundtrack.

---

[57]   If Low Budget, then applicable rates are equal to corresponding rates for Low Budget teleplay (under "A" above) and Low Budget story and teleplay (under "B" above).

[58]   See footnote 2 on page 52

[59]   See footnote 3 on page 52

[60]   See footnote 2 on page 52

[61]   See footnote 3 on page 52

---

80

ARTICLE 13 - COMPENSATION
B - TELEVISION

.TE SCHEDULE C

| Aggregate sound track running time in minutes of narration written by writer hired pursuant to this chart | 2/13/08-5/1/09 | 5/2/09-5/1/10[62] | 5/2/10-5/1/11[63] |
|---|---|---|---|
| 2 minutes or less of narration | $910 | $942 | $975 |
| Over 2 minutes through 5 minutes of narration | 3,184 | 3,295 | 3,410 |
| Over 5 minutes of narration | Teleplay rewrite minimum for applicable program length | | |

o.   **Remakes**

The Company's right to remake a television motion picture shall be subject to the following:[64] [65]

(1)   If the credited writer's material is used for the remake and no writer is employed to rewrite, adapt or revise such material for the remake, the Company will pay such writer a sum equal to the applicable minimum compensation for the intended medium of the remake appropriate to the writer's initial employment to write such material. Said minimum compensation shall not be diminished by virtue of any sharing of credit by said writer for the remake (but this provision shall not be construed as affecting the rule that a *bona fide* team shall be considered a unit as provided in subparagraph B.1. of this Article). In addition, the writer will be entitled to receive payments in accordance with Article 15.A. with respect to a theatrical remake licensed to free television, Article 15.B. with respect to reruns or foreign telecast of a television remake, and Article 51 with respect to a theatrical or free television remake released in Supplemental Markets.

(2)   If a writer is employed to rewrite, adapt or revise such literary material for the remake, then the credited writer of the original material also shall be a participant in the credit determination and if accorded credit shall be paid the applicable minimum compensation for the intended medium of the remake appropriate to such credit. In the event of a television remake, the writer of the original material, if accorded credit, will be entitled to share, in accordance with such credit, in any additional compensation for television reruns or theatrical exhibition which may become due. Said minimum compensation shall not be diminished by virtue of any sharing of credit by said writer for the remake, (but this provision shall not be construed as affecting the rule that a *bona fide* team shall be considered a unit as provided in subparagraph B.1. of this Article). In addition, such writer of the original material will be entitled to share in any additional compensation in accordance with Article 15.A. with respect to a theatrical remake licensed to free television, Article 15.B. with respect to foreign telecast of a television remake, and Article 51 with respect to a theatrical or free television remake released in Supplemental Markets. The portion

---

[62]   See footnote 2 on page 52

[63]   See footnote 3 on page 52

[64]   But as to any series in production prior to March 6, 1973, this paragraph B.7.o. shall remain as in the 1970 WGA Agreement and as to any series in production prior to March 2, 1977, which was not in production prior to March 6, 1973, this paragraph B.7.o. shall remain as in the 1977 WGA Agreement.

[65]   See Sideletter to Article 13.B.7.o. on page 389

ARTICLE 13 - COMPENSATION
B - TELEVISION          81

ditional compensation referred to in this subparagraph (2) which is payable to the original writer shall be equal to the portion of credit awarded pursuant to subparagraph (a) below.

(3)   With respect to a television remake, the "applicable minimum compensation" in subparagraphs (l) and (2) of this paragraph o. means the applicable rates provided for in Article 13.B.7.a., b. or e. of this Agreement.

In a credit arbitration concerning such remake, the arbitrators shall determine the following issues:

(a)   the contribution made by the writer(s) of the original material expressed as a percentage of the whole; and

(b)   the form of credit to be accorded such writer(s), which credit may include a credit in the nature of a source material credit, such as "Based on a Teleplay by ..."

p.   **Non-Commercial Openings and Closings**

When a writer other than the writer of the teleplay for a television film writes literary material for self-contained units of entertainment which are used as opening, closing and/or bridging material in such film, the total minimum compensation for all such self-contained units in such film will be:

| Aggregate Running Time of Material | 2/13/08– 5/1/09 | 5/2/09– 5/1/10[66] | 5/2/10– 5/1/11[67] |
|---|---|---|---|
| 3 minutes or less | $2,358 | $2,441 | $2,526 |
| More than 3 minutes | 3,311 | 3,427 | 3,547 |

It is further expressly understood that the foregoing rates are not intended to apply to customary or routine introductions, bridges or conclusions.  An example of the material intended to be covered is the material delivered by Alfred Hitchcock on the series "*Alfred Hitchcock Presents*."  In addition, if such units are rerun, as the term "rerun" is used in Article 15.B.1.b., Company shall pay the writer additional payments expressed in percentages of said total minimum compensation at the rates specified in said Article 15.B.1.b.  It is expressly understood that, except as specifically provided herein, this paragraph is not intended to extend the coverage of this Basic Agreement to, nor provide payment for, any matter in any television film not elsewhere covered by this Basic Agreement.

q.   **Total Writing Cost**

Company shall not produce a television film based upon material subject to this Basic Agreement the total purchase and writing cost for which shall be less than the applicable minimum compensation for narration, a story and teleplay, or teleplay, as the case may be.

---

[66]   See footnote 2 on page 52

[67]   See footnote 3 on page 52

ARTICLE 13 - COMPENSATION
B - TELEVISION

r.      Pilot Scripts, Back-up Scripts and Spin-offs

**(1)    Pilot Script**

A writer employed to write a pilot story or a pilot story and teleplay shall receive for said pilot story or pilot story and teleplay an amount equal to one hundred fifty percent (150%) of the applicable minimum initial basic compensation (including the rates set forth in Article 13.B.7.d., where applicable) set forth in this Article 13.B. for a pilot story or pilot story and teleplay, but this provision shall not be construed to increase said writer's rights or minimum compensation for any other purpose under this Basic Agreement, such as, but not limited to, reruns and theatrical uses.

If a writer was paid less than the amount set forth herein by reason of the fact that Company did not intend that the material would be used in a pilot at the time the writer was engaged or material acquired by the Company, but the Company nevertheless actually exploits the television series sequel rights to such material without making a pilot, then such writer shall be paid the amount by which the applicable pilot fee set forth above exceeds the compensation originally paid to the writer for such material.

**(2)    Back-up Script**

A writer employed to write a back-up script shall receive for said story and/or teleplay an amount equal to one hundred fifteen percent (115%) of the applicable minimum initial basic compensation (including the rates set forth in Article 13.B.7.d., if applicable) set forth in this Article 13.B. for a story and/or teleplay, but this provision shall not be construed to increase said writer's minimum compensation for any other purpose under this Basic Agreement, such as, but not limited to, reruns and theatrical uses.

**(3)    Spin-off**

When the Company knows prior to engaging a writer to write a story or story and teleplay for an episode of a series that such episode is intended to be used as a spin-off, the Company shall also advise the writer at the time of the initial interview. If Company does not have such knowledge but thereafter broadcasts one or more programs in a new television series based upon such episode, then, if the initial compensation paid such writer for such episode was less than one hundred fifty percent (150%) of the WGA minimum initial basic compensation therefor, Company shall pay writer the difference between such one hundred fifty percent (150%) and writer's initial compensation, but this provision shall not be construed to increase the writer's minimum basic compensation for any other purposes under this Basic Agreement, such as, but not limited to, reruns and theatrical use. Such payment need not be made when the new television series is based primarily on either a public domain format or public domain character or characters used in the spin-off episode.

s.      **Week-to-Week and Term Employment**

**(1)**    Company agrees that except as hereinafter provided, all employment of writers shall be only on a freelance (non-exclusive) basis, and such employment shall be upon terms and conditions which conform in principle to, and shall not be less favorable than, the terms and provisions hereof.

ARTICLE 13 - COMPENSATION
B - TELEVISION          83

(2)   Company may employ writers on a term contract basis as follows:

| | | Compensation Per Week | | |
|---|---|---|---|---|
| Overall Term | Guaranteed Weeks of Employment | 2/13/08-5/1/09 | 5/2/09-5/1/10[68] | 5/2/10-5/1/11[69] |
| (a)  52 | 40 | $2,991 | $3,096 | $3,204 |
| (b)  26 | 20 | 3,272 | 3,387 | 3,506 |
| (c)  14 | 14 | 3,548 | 3,672 | 3,801 |
| (d)  6 | 6 | 3,817 | 3,951 | 4,089 |

(e)   In no event shall a writer employed on a term basis receive less than the total applicable minimum compensation, as set forth in this Basic Agreement, to which he/she would have been entitled had he/she been employed on a freelance basis.  At the end of each guaranteed period of employment on a term basis, Company shall compute the aggregate minimum compensation to which the writer would have been entitled under this Basic Agreement had he/she been employed on a freelance basis to write the literary material written by the writer during such period, and shall deduct therefrom the total compensation accruing to the writer during such period, and will promptly pay to the writer the excess, if any.  Any dispute as to the amount of compensation payable under this subparagraph (e) may be submitted to arbitration, as herein provided.  All the provisions of this Basic Agreement, to the extent the same are applicable, shall apply to such term employment, including but not limited to the provisions relating to additional compensation for reruns and theatrical release, and the separation of rights provisions.

(f)   The suspension period provided in the so-called "force majeure" clause of employment agreements with writers employed on a week-to-week basis or for a definite term, who receive salary at the rate set forth in subparagraph (d) above or less a week, shall not exceed four (4) weeks; provided, however, that Company shall have the right to continue such suspension from week to week, not exceeding six (6) additional weeks, at one-half salary.  If the salary of any such writer shall be at the rate of more than set forth in subparagraph (d) above per week, such suspension period shall not exceed eight (8) weeks.  Nothing herein contained shall be construed to deprive the Company of its right to terminate any such employment agreement after the commencement of the suspension period.

(g)   For a partial workweek (defined as a workweek consisting of less than six (6) days work) following the guaranteed period of employment, a writer shall be paid one-fifth of his/her weekly compensation for each day employed in such partial workweek.

---

[68]   See footnote 2 on page 52

[69]   See footnote 3 on page 52

**ARTICLE 13 - COMPENSATION**
**B - TELEVISION**

Such writer shall be paid one-fifth of weekly compensation for each day worked at Company's direction in excess of five (5) times the number of weeks worked.

(h) Such writer under a week-to-week employment may write any literary material covered hereunder; provided, however, if such literary material amounts to a rewrite or more, such writer shall be paid not less than the minimum freelance compensation for such literary material, computed as of the end of his/her employment or as of the end of each six (6) month period, whichever occurs sooner. The compensation of a week-to-week writer shall be the compensation per week as set forth in subparagraph (d) above.

(3) Notwithstanding the foregoing, the Company may employ on a term contract basis a writer who has not been previously employed as a writer under any Guild MBA in television, theatrical motion pictures or radio dramatic or comedic programs as follows:

(a) An overall term of fourteen (14) consecutive weeks with fourteen (14) weeks guaranteed employment at a minimum compensation equal to seventy-five percent (75%) of the rate set forth in subparagraph (2)(c) above; or

(b) An initial overall term of seven (7) consecutive weeks with seven (7) weeks guaranteed employment at a minimum compensation equal to sixty percent (60%) of the rate set forth in subparagraph (2)(d) above plus, pursuant to option or agreement, a second overall term of seven (7) consecutive weeks with seven (7) weeks guaranteed employment at a minimum compensation equal to eighty percent (80%) of the rate set forth in subparagraph (2)(d) above.

(4) The Company may employ a writer on a guaranteed episode basis. When such writer's initial guarantee is at least five (5) episodes, the minimums provided in Article 13.B.7.s.(2) (a) - (c) shall apply to such initial guarantee based on the number of weeks such writer actually works.

8. Reading Time and Obligations of Freelance Writer Re Revisions

a. Story

The Company shall have not more than fourteen (14) days (including Sundays and holidays) after the writer's first submission of the story within which to make one (1) request for revision of such story; provided that if, after the writer has made the requested revision of the story first submitted, the Company shall make a second request for revision, such second revision shall be incorporated in the teleplay; it being understood that the Company shall not be entitled to more than two (2) requests for revision of the story and not more than fourteen (14) days shall elapse between the first submission of the story and the commencement of the preparation of the teleplay by the writer.

Company may have a second revision of story before teleplay upon additional payment of one-half story minimum, except when second revision of the story is accomplished by execution in the teleplay. It is understood this does not permit a new story.

Story revision time and obligations shall apply to formats.

b.    Teleplays

The Company shall have not more than fourteen (14) days (including Sundays and holidays) after the writer's first submission of the material in teleplay form within which to make one (1) request for revision of the material; provided that if Company shall make such request within seven (7) days (including Sundays and holidays) after the first submission of the literary material in teleplay form, Company shall be entitled to make a second request for revision within seven (7) days (including Sundays and holidays) after submission of the teleplay as first revised. Neither revision permitted under this subparagraph b. shall involve a substantial change in the story line.

c.    Teleplays Over 30 Minutes

With respect to films more than thirty (30) minutes in length, the fourteen (14) day period mentioned in subparagraph b. shall be increased to twenty-one (21) days and the first seven (7) day period mentioned in subparagraph b. shall be increased to fourteen (14) days.

d.    Writer's Obligation

The writer shall be obligated to make revisions requested by the Company in compliance with the foregoing provisions.

e.    Company's Best Efforts

Company agrees to use its best efforts to read the material submitted and call for any necessary revisions as soon as possible after submission.

f.    Writer Entitled to Script

The Company shall promptly, at the close of production, provide the writer with two (2) copies of the revised final shooting script.

g.    Revisions in Pilot

The time limits referred to in subparagraphs a., b., and c. shall be increased by seven (7) days for pilot stories and teleplays whenever the writer is paid at least double minimum compensation.

9.    Time of Payment

Company will use its best efforts to pay to the writer the applicable installment payment provided in Article 13.B.7.f. within forty-eight (48) hours after delivery of the narrative synopsis, story, first draft or final draft teleplay, as the case may be, but in no event shall any such payment be made later than seven (7) days after the delivery of such narrative synopsis, story or first or final draft teleplay. Payment shall not be contingent upon the acceptance or approval by the Company of the literary material so delivered. Company shall include in writer's deal memorandum or personal service contract:

a.    the place where and the name(s) and function of the person(s) to whom delivery of such material is to be made, and

b.    the name(s) of the person(s) authorized to request rewrites of such material.

Company shall give writer written notice of any change in the name(s) of the person(s) to whom delivery is to be made and/or the name(s) of the person(s) authorized to request rewrites.

ARTICLE 13 - COMPENSATION
B - TELEVISION

The payment for the week shall be made on the Company's regular payday in the following week for writers employed on a week-to-week or term basis.

Company will pay interest of one and one-half percent (1.5%) per month when any payment due to the writer pursuant to this Article 13.B. is due and not paid as provided herein. If the Company has failed to make such payment because the executed contract was not delivered by the writer to the Company, then no such interest is due. If the contract is not so delivered by the writer because of a dispute as to the terms of the contract and the Company shall be held to be wrong, the above-described interest payment shall be applicable.

10. Cut-Off

There shall be no right to cut-off in teleplay employment.

11. Script Annotations

If the Company is to require one or more script annotations, it shall so inform the writer at the time of the negotiation of the writing assignment, or option or acquisition of literary material, unless from the nature of the project the Company's need for the annotation(s) is not reasonably known at the outset. In the latter case, the Company shall inform the writer that an annotation is needed when the Company knows, or reasonably should have known, of it.

If the Company uses written guidelines or standards describing the type of information to be included in an annotation for a fact-based project or a project inspired by fact, such guidelines or standards shall be furnished to the writer when the Company first informs the writer that an annotation is needed.

12. Notice of Conditions Precedent

For long-form television projects, Company shall attach a cover sheet to the document memorializing the agreement reached between the Company and the writer which sets forth in summary form all conditions precedent which must be satisfied before writing services can commence. The terms of such cover sheet shall not alter or vary the terms of the agreement reached between the Company and the writer and, in any event, the terms of the writer's agreement shall prevail.

**C.   CLAIMED OVERPAYMENTS  (See Article 11.A.9.)**

**D.   PAYMENT PROCEDURES (GENERAL)**

Company agrees to meet from time to time at the request of the Guild with representatives of the Guild to review Company's payment procedures for the purpose of assuring timely payment of compensation as provided in this Article 13. The Networks shall cooperate with the Guild in obtaining compliance by the Companies with the provisions of this Basic Agreement governing time of payment. In addition, the AMPTP has issued a bulletin dated August 11, 1989 to Companies signatory to the 1988 MBA reminding them of their obligations to make payment to writers within the time periods set forth in Articles 13.A., 13.B., 15.A., 15.B. and 51 and advising them of the interest charge of one and one-half percent (1.5%) per month assessed on monies not paid timely as provided therein.

# ARTICLE 14 - WRITERS ALSO EMPLOYED IN ADDITIONAL CAPACITIES (TELEVISION)

### A.  DEFINITION

The parties acknowledge that it is customary in the television industry to employ persons to render services as writers under the terms of this Basic Agreement, and the same persons to render services in other capacities which are not subject to this Basic Agreement. For the purposes of this Article 14, a person employed as a writer (as defined in Article 1.C.1.a. of this Basic Agreement) and also as an executive producer, producer, associate producer or story editor (as such terms are customarily used and understood in the television industry) is referred to as a "writer also employed in additional capacities," or "such person" or "such writer." Because of the difficulty of ascertaining the amount, duration, nature and extent of the services rendered by such person as a writer, and for the purpose of avoiding disputes concerning those matters and concerning the extent of such person's contributions as a writer to the programs with respect to which he/she renders his/her services, the parties agree that the duration or term of such person's employment as a writer in relation to a particular series, during a particular production season, shall be no less than the duration or term of his/her employment in the additional capacity in relation to such series, during such production season (except as provided in Paragraphs C. and I. of this Article 14), and that such person shall be employed as a writer in relation to such series, during such production season only in accordance with the provisions of this Article 14.

### B.  CONTRACTS OF EMPLOYMENT

The contract of employment of a writer also employed in additional capacities may cover both the employment as a writer and the employment in additional capacities, or there may be a separate contract covering the employment as a writer and a separate contract covering the employment in additional capacities, provided that in the latter case (i.e., when there are separate contracts) separate compensation shall be provided for the services as a writer from the services in additional capacities, and such separately stated compensation for such person's services as a writer shall not be less than the appropriate minimum compensation for a writer also employed in additional capacities as provided in Paragraph K. of this Article 14. Similarly, when the employment as a writer and in additional capacities is covered by the same contract, and the compensation as a writer is segregated from the compensation for the additional services, such compensation as a writer shall not be less than the appropriate minimum compensation for a writer also employed in additional capacities as provided in said Paragraph K. When the contract of employment of a writer also employed in additional capacities under such contract does not segregate his/her compensation as a writer from his/her compensation for his/her additional services, the Company shall have the right to allocate to his/her services as a writer not less than the appropriate minimum compensation for a writer also employed in additional capacities as provided in said Paragraph K. Except as provided in the immediately preceding sentence, none of the compensation due such person for his/her services in a capacity or capacities other than as a writer shall be offset or credited against any compensation due such person for his/her services as a writer.

### C.  FORMS OF EMPLOYMENT

A writer also employed in additional capacities may be employed as a writer only on a week-to-week or term basis, (which employment may be exclusive), at no less than the appropriate minimum compensation provided in Paragraph K. of this Article 14 and subject to all of the provisions of this Basic Agreement; provided, however, that if the Company employs two (2) such persons, then the Company may employ other individuals (referred to in this Article 14 for convenience as "additional writers") as writers also employed in additional capacities, in relation to the respective series, and such additional writers may be employed as writers on a week-to-week, term or freelance basis, and the duration or term of their employment need not be coterminous with the duration or term of their employment in additional capacities.

ARTICLE 14 - WRITERS ALSO EMPLOYED IN ADDITIONAL CAPACITIES (TELEVISION)
C - FORMS OF EMPLOYMENT

**D.    AMOUNT, NATURE AND EXTENT OF SERVICES**

Because of the difficulty of determining the amount, nature and extent of the services as a writer performed by a writer also employed in additional capacities and his/her contribution as a writer to any specific program of a series, it is agreed that, for the purposes of Paragraph G. of this Article 14, such writer (other than the additional writers referred to in Paragraph C. of this Article 14) shall be deemed to have performed services as a writer on each program of the series for which he/she is employed for which writing is done during the respective production season; provided, however, that if the employment of such writer has been suspended for cause, or terminated for cause (and for this purpose, any termination of employment of a writer employed on a week-to-week basis shall be deemed to be termination for cause), the number of programs of the respective series for which such writer shall be compensated pursuant to said Paragraph G. shall be proportionately reduced.  In the case of suspension, the reduction shall be in the proportion that the length of the suspension bears to the overall period of employment of such writer during the respective production season; in the case of termination, the reduction shall be in the proportion that the length of the period from the date of termination to the completion of principal photography of the series during such production season bears to the period from the commencement of such person's employment as a writer during such production season to the date of completion of principal photography of the series during such production season.  If such calculation results in a fraction, no payment shall be made with respect to a fraction of less than fifty percent (50%), and full payment of one (1) program fee shall be made with respect to a fraction of fifty percent (50%) or more.  An additional writer (as such is referred to in Paragraph C. above) who is employed on a week-to-week, term or freelance basis, need not be deemed to have performed services on each program of the series for which he/she is employed, but shall be entitled to a program fee (or to a share thereof) pursuant to Paragraph G. for each program for which he/she did render writing services during his/her employment.  The Company shall notify the term or week-to-week writer that he/she is an additional writer at the time of his/her employment, or (as to a writer already employed) when he/she is assigned as an additional writer.

**E.    1.    What Minimum Compensation Covers**

All writing services rendered by a writer also employed in additional capacities up to and including rewrites shall be deemed to be compensated by the minimum compensation provided for such writer pursuant to Paragraph K. of this Article 14.

2.    All formats, stories and teleplays written by such writers during their employment as writers also employed in additional capacities shall be separately compensated, without any offset, credit or allocation of any kind against or by any other compensation of any kind due said individual.  Notwithstanding the foregoing, with respect to any writer hereunder who is guaranteed compensation of at least one hundred thousand dollars ($100,000.00) for up to fifty-two (52) weeks of employment for both writing and non-writing services, the Company shall have the right to credit such compensation freely against the compensation which otherwise would be due to said writer for the writing of any literary material during such employment (but not against residuals or the program fees provided for in Paragraph G. below) or for non-writing services.  In the event of such crediting, the applicable minimum compensation for writing services set forth in Paragraph K. below shall be credited at no less than one hundred ten percent (110%) thereof, and the compensation for the writing of stories and teleplays for non-pilot one-time programs ninety (90) minutes or longer shall be credited at no less than one hundred fifty percent (150%) of the applicable minimum therefor (but this provision shall not be construed to increase the writer's compensation for any other purpose under this Basic Agreement, such as, but not limited to reruns and theatrical uses).  In such event, the base amount upon which the Company shall compute Health contributions with respect to such employment shall be two hundred fifty thousand dollars ($250,000.00) and the base amount upon which the Company shall compute

Pension contributions shall be two hundred two thousand dollars (202,000.00).[70] If the period of guaranteed employment is longer than fifty-two (52) weeks, the applicable base amount for computation of contributions referred to above shall be increased proportionately. If the period of guaranteed employment is shorter than fifty-two (52) weeks, the applicable base amount for computation of contributions shall be decreased proportionately. As to contracts in effect on March 1, 1985, the Company may elect to pay pension and health contributions according to the formula set forth above or according to the formula in the 1981 MBA.

3. **Writers Not Considered to be "Writers Also Employed in Additional Capacities"**

In any case in which a writer is employed to write one or more formats, stories or teleplays, or any combination (with or without options) of formats, stories or teleplays, on a freelance basis, concurrently with his/her employment as a producer, executive producer, associate producer or story editor, and whether or not such freelance employment is entered into at the same time as he/she enters into his/her employment in such other capacity or at a different time or times, such person shall not, by reason of such freelance employment, be deemed to be a "writer also employed in additional capacities" for any of the purposes of this Article 14, and this Article 14 shall in no way apply to such employment, notwithstanding anything to the contrary in this Article 14.

F. 1. **Becoming a "Writer Also Employed in Additional Capacities" After Initial Employment**

If an individual is initially employed as an executive producer, producer, associate producer or story editor, but not as a writer, so that at the time of such employment such individual is not a "writer also employed in additional capacities" as defined in Paragraph A. of this Article 14, but if, during such employment, such individual, with the knowledge and consent of the Company, performs services as a writer for the series for which he/she is employed in such additional capacity, such individual shall, from the time he/she starts to perform such services as a writer, be deemed to be employed as a "writer also employed in additional capacities" for the purposes of this Article 14, except that: (a) if such writing services are limited to those described in subparagraphs (a) to (h), inclusive, of Article 1.C.1.a. of this Basic Agreement and to those described in subparagraph E.3. of this Article 14; or (b) if such person is not a "writer," by reason of the provisions of the third paragraph of said Article 1.C.1.a. (immediately following said subparagraph (h)) and such writing does not qualify him/her as a "writer," then in any of said excepted cases, such employment of such individual shall not be subject to this Paragraph F. With respect to contracts in existence on the date of execution of this Agreement, providing for employment as an executive producer, producer, associate producer or story editor, but not for employment as a writer, and which do not contain an express provision that the employee shall not render services as a writer, or is not employed to render services as a writer, such contracts shall be deemed to include such a provision for the purposes of this Paragraph F., if the Company serves written notice on such person to the effect that such person shall not render services as a writer (other than the excepted services referred to above in this subparagraph 1. and in subparagraph E.3. of this Article 14).

2. **Duration of Services**

A person who becomes a writer also employed in additional capacities pursuant to subparagraph 1. of this Paragraph F. shall continue to be employed as a writer in connection with the respective series on a term contract basis for a period coterminous with the remainder of the duration or term of his/her employment in the other capacity or capacities in relation to such series during the respective production season or until the

---

[70]     See Sideletter to Article 14.E.2 - Pension Plan and Health Fund Contributions for Article 14.E.2. writers on page 392.

ARTICLE 14 - WRITERS ALSO EMPLOYED IN ADDITIONAL CAPACITIES (TELEVISION)

compl___n of principal photography of all programs of s___ series produced during such production season, whichever is the earlier, subject to the following provisions of this Paragraph F. and to the provisions of Paragraph I. of this Article 14. In such case, the Company shall have the right to allocate to his/her services as a writer no less than the appropriate minimum compensation for a writer also employed in additional capacities as provided in Paragraph K. of this Article 14.

3.  Notwithstanding anything to the contrary in this.Paragraph F., if such person is an "additional writer," as defined in Paragraph C. of this Article 14, then such person shall be deemed to be employed as a writer and also in additional capacities, pursuant to this Paragraph F., only during the period during which he/she performs services as a writer, and such employment may be on a week-to-week, term or freelance basis.

4.  **Substitute Writer**

Any writer employed on a term basis pursuant to this Paragraph F. may be replaced by the Company with another writer at any time during such term, provided that:

a.  the substitute writer may not be replaced during the term of his/her employment as a writer during the respective production season, except for cause;

b.  the rate of compensation payable to such substitute writer for writing shall be no less than the appropriate minimum rate of compensation provided for in Paragraph K. of this Article 14, or the rate paid to the replaced writer for writing, whichever is higher;

c.  the term of employment of the substitute writer shall be no less than the remainder of the term of employment of the replaced writer during the respective production season.

Subparagraph a. of this subparagraph 4. is to be interpreted as meaning that the Company shall pay the writer's compensation but shall not be obligated to use such writer's services as a writer, and may employ other writers to perform such services. This subparagraph 4. does not apply to any "additional writer" referred to in subparagraph 3. of this Paragraph F.

5.  The Company specifically represents to the Guild that it is not the intention of the Company to use any of the provisions of this Article 14 in such manner as to evade the purpose and intent of this Article 14. Specifically, the Company expressly represents that it is not its intention to, and agrees that it will not, use the provisions of subparagraphs E.3. or F.1. for the purpose of avoiding its obligations under this Article 14 regarding the coterminous employment of a writer also employed in additional capacities. Accordingly, when a person is employed as an executive producer, producer, associate producer or story editor with no intention that such person is to perform services as a writer, including rewrites and polishes (other than the excepted writing services referred to in subparagraphs E.3. and F.1. of this Article 14), and provided that his/her contract of employment for such other capacity or capacities provides that such person shall not render services as a writer, or is not employed to render services as a writer (other than the excepted writing services referred to in subparagraphs E.3. and F.1.):

a.  If such person, without the Company's knowledge and consent, nevertheless does perform services as a writer on the series for which he/she is employed in the other capacity or capacities (other than the excepted writing services referred to in subparagraphs E.3. and F.1.), then promptly after the Company or the Guild becomes aware of that fact, it shall notify the other party, and said parties shall jointly and cooperatively take appropriate steps designed to prevent such person from further performing unauthorized writing services. If the Guild believes that the Company knows of and condones such person's unauthorized writing, or that

it was originally the intent of the Company and its employ to evade the provisions of this Article 14, the Guild may bring the matter to arbitration (but not to grievance) pursuant to Articles 10 and 11 of this Basic Agreement. If the arbitrator rules in favor of the Guild, the arbitrator shall have the power to make a monetary award to the Guild, no part of which shall be paid or otherwise applied to the benefit of the writer, directly or indirectly. In determining the amount of such award, if any is granted, the arbitrator may consider, among other things, the amount of the minimum compensation which would have been paid to such writer had he/she initially been employed for the particular series during the particular production season as a writer and in additional capacities pursuant to this Article 14.

b.  If such person, with the Company's knowledge and consent (and the fact of said knowledge or consent is not disputed by the Company), nevertheless does any rewriting or polishing, then such person shall be deemed to be a term writer pursuant to Article 14.B. retroactively from the commencement of his/her employment by the Company on the particular series during the respective production season.

c.  If his/her contract of employment does not include a provision that such person shall not render services as a writer, or is not employed to render services as a writer (other than the excepted writing services referred to in subparagraphs E.3. and F.1.), and if such person nevertheless does any rewriting or polishing, then such person shall be deemed to be a term writer pursuant to Article 14.B. retroactively from the commencement of his/her employment by the Company on the particular series during the respective production season.

G.  **PROGRAM FEES**

Each person whose employment as a writer is governed by this Article 14, whether such employment is on a week-to-week, term or freelance basis (including the "additional writers" defined in Paragraph C. of this Article 14) shall be paid a program fee for each program of a series produced for network prime time exhibition for which such writer performed services as a writer pursuant to this Article 14 (or is deemed to have performed services as a writer, as provided in Paragraph D. of this Article 14), in the following amount:

|  |  | Effective |  |
| --- | --- | --- | --- |
| Program Fees | 2/13/08-<br>5/1/09 | 5/2/09-<br>5/1/10[71] | 5/2/10-<br>5/1/11[72] |
| 30-minute program | $832 | $857 | $857 |
| 60-minute program | 1,104 | 1,137 | 1,137 |
| 90-minute program or longer | 1,381 | 1,422 | 1,422 |

Provided, however, that in no event for a particular program need the Company pay total program fees in an amount which exceeds three (3) times the applicable rate. If more than three (3) writers (a team is deemed to be one (1) writer) are entitled to receive program fees for the same program, a total sum of three (3) times the applicable rate shall be divided equally among them. Program fees may not be prepaid nor may they be offset or credited against or by any other compensation of any kind due the respective writers and must be paid not later than the first regular payroll date following completion of principal photography of the respective program. Program fees shall not be included in "applicable minimum

---

[71]  See footnote 2 on page 52

[72]  See footnote 3 on page 52

ARTICLE 14 - WRITERS ALSO EMPLOYED IN ADDITIONAL CAPACITIES (TELEVISION)
G - PROGRAM FEES

compensation for the purposes of Article 15.B. of this Basic Agreement, but shall be included in "initial compensation" for the purposes of Article 17 of this Basic Agreement.

## H.  SUSPENSION, TERMINATION AND/OR OFFSET

Nothing in this Article 14 shall be interpreted as precluding the Company from exercising rights of suspension for cause or termination for cause under individual employment contracts, nor from exercising rights of offset, if any, in relation to an indebtedness of the writer to the Company pursuant to law, subject, however, to the provisions of Article 11.A.9. of this Basic Agreement.

## I.  HIATUS PERIODS

For the purposes of this Paragraph I., the following periods will be referred to as "writing hiatus" periods:

1.  With respect to a writer also employed in additional capacities (except one who becomes such a writer pursuant to Paragraph F. of this Article 14 and except a story editor), the period between the date of commencement of his/her employment in a particular production season until the occurrence of the earliest of the following:

    a.  Services as a writer are performed by any writer on the respective series during such production season;

    b.  A commitment is made with a writer (other than as a writer also employed in additional capacities) for such series during such production season;

    c.  A story conference is held with a writer for such series during such production season;

    d.  Principal photography of a program of such series is started during such production season; and the period following the completion of principal photography of the last program of such series produced during such production season until the termination of such person's employment during such production season.

2.  With respect to a writer also employed in additional capacities (including one so employed pursuant to Paragraph F. of this Article 14, but not including a story editor), if in a particular production season principal photography of all of the programs of the respective series theretofore ordered by the network has been completed, the period between such date of completion until the occurrence of the earliest of the following after the start of such period:

    a.  Services as a writer are performed by any writer on the respective series during such production season;

    b.  A commitment is made with a writer (other than as a writer also employed in additional capacities) for such series during such production season;

    c.  A story conference is held with a writer for such series during such production season;

    d.  Principal photography of a program of such series is started during such production season, provided that such period continues for at least fourteen (14) consecutive days.

The Company may suspend the employment of such person as a writer during any writer hiatus period, both as to services as a writer and compensation as a writer; provided, however, that such person's overall compensation shall be allocated or re-allocated by the

Company so that the ____ shall be no reduction in the overall compensation of such person by reason of such suspension, and provided further that the re-allocated payments are subject to contributions to an industry pension plan.

J.  For the purposes of this Article 14, one-time programs including but not limited to a movie-of-the-week, and development deals for specific television programs, shall each, separately, be considered to be a "series," and the employment of an individual as a writer and in additional capacities for such a show or deal shall be governed by this Article 14; the writer also employed in additional capacities on such show or program shall receive the program fee regardless of whether such writer receives or shares in a "Written by" credit. Payment of the program fee for such show or program shall not be payable before the screen authorship credits are finally determined. If there are one or more periods of suspension of writing services between the various steps of a development deal or of a project for a show (for example, between format and screenplay, or between teleplay and production), the employment as a writer of the individual employed as a writer and in other capacities may be suspended as to services and compensation during such periods of suspension.

K.  **MINIMUM COMPENSATION**

The minimum compensation for week-to-week and term employment for writers also employed in additional capacities shall be the following:

|  | Rate per week | | |
|---|---|---|---|
|  | 2/13/08-<br>5/1/09 | 5/2/09-<br>5/1/10[73] | 5/2/10-<br>5/1/11[74] |
| 1. Week-to-week & term employment up to and including 9 weeks | $7,120 | $7,369 | $7,627 |
| 2. Term employment 10 weeks through 19 weeks | 5,934 | 6,142 | 6,357 |
| 3. Term employment 20 weeks or over | 5,336 | 5,523 | 5,716 |

The Company may employ a writer on a guaranteed episode basis. When such writer's initial guarantee is at least five (5) episodes, the minimums provided in Article 14.K.2. or 3. shall apply to such initial guarantee based on the number of weeks such writer actually works.

L.  1.  **Submission of Contracts to Guild**

When the employment of a writer also employed in additional capacities is covered by a single contract, a copy of the entire contract shall be submitted to the Guild as provided in Article 19.C.1. of this Basic Agreement. When such employment is covered by separate contracts, the Company shall, concurrently with the delivery to the Guild of a copy of the writer's employment contract pursuant to said Article 19.C.1., deliver to the Guild a copy of those provisions of the contract governing the additional services which define or specify the term of employment.

2.  **Weekly Work Lists**

The weekly list provided for in Article 3.A.1. of this Basic Agreement shall indicate the type of employment as a writer (week-to-week, term or freelance), the series for which the person is employed as a writer, whether the writer is also employed in additional capacities and, if so, in what additional capacities. Such list shall also include the names of persons, if any, who perform services as writers during the respective week

---

[73]  See footnote 2 on page 52
[74]  See footnote 3 on page 52

(other than services described in subparagraphs (a) to _____ inclusive, of Article 1.C.1. of this Basic Agreement), but who are not "writers" because of the provisions of the third paragraph of said Article 1.C.1.a. (immediately following subparagraphs (a) through (h)).  If such a person is included, the list shall state that he/she is excepted as a "writer" pursuant to Article 1.C.1.a. of this Basic Agreement.  Apart from the mere listing of names, as required by Article 3.A.1., any information once given in the report pursuant to this subparagraph L.2. need not be repeated in subsequent reports unless there is a change in the information previously given.

M.    BETTER TERMS

Nothing contained in this Article 14, including the rights of the Company to allocate compensation and to terminate or suspend employment as a writer as above set forth, shall prevent any such writer from negotiating and contracting with the Company for better terms for the benefit of such writer than are provided in this Article 14.  Only the Guild shall have the right to waive any of the provisions of this Article 14 on behalf of or with respect to such writer.

# ARTICLE 15 - TELEVISION EXHIBITION

A.    THEATRICAL

1.    Pre-1960 Motion Pictures

As to all motion pictures, the principal photography of which commenced prior to June 13, 1960, the Guild agrees that it does not and will not, either during the term of this Basic Agreement or at any time thereafter, make any claim for compensation for or with respect to the exhibition of such motion pictures on television.

2.    The provisions of this subparagraph 2. relate and apply only to theatrical motion pictures as defined in Article 1.A.2.:

a.    produced by the Company or within the provisions of subparagraph 3.h.(1) of this Article 15.A.; and

b.    the principal photography of which commenced on or after February 13, 2008, which motion pictures are, either during the term hereof or at any time thereafter, released to free television; and

c.    based upon a story or screenplay written by writer while in the employ of the Company or in the employ of the actual producing Company as described in subparagraph 3.h.(4) of this Article 15.A. (to which employment the provisions of this Basic Agreement apply as provided in Article 5 hereof) or acquired by the Company (or such actual producing Company) from a professional writer (to which acquisition the provisions of this Basic Agreement apply as provided in Article 5 hereof), which writer or professional writer receives screen credit for the authorship of such story or screenplay, as provided in Theatrical Schedule A.

3.    Payment

As to each such theatrical motion picture referred to in subparagraph 2. above (herein sometimes called "Such Picture"); except as provided in Article 64, the Company will pay to each participating writer (as such term is hereinafter defined) as additional compensation, a *pro rata* share of two percent (2%) (hereinafter referred to as the "percentage payment") of the Company's accountable receipts from the distribution of Such Picture on free television, computed as hereinafter provided and subject to the following conditions:

a. The term "*Producer's gross*," as used herein, means the worldwide total gross receipts derived by the distributor of Such Picture (who may be the Company or a distributor licensed by the Company) from licensing the right to exhibit Such Picture on free television; provided, however, that in the case of any Such Picture which is produced outside of the United States, if Such Picture is subject to this Basic Agreement and if such production is under an arrangement (herein referred to as a "foreign production deal") pursuant to which a foreign producer or distributor provides or guarantees any of the financing for the production of Such Picture or furnishes any other consideration for such production and a foreign distributor acquires one or more foreign territories for the distribution of Such Picture on free television, then no monies from any such distribution in any such foreign territory shall be included in Producer's gross except to the extent such foreign producer or foreign distributor is obligated to account to Company or to the distributor of Such Picture for such monies, and except for gross receipts received by such foreign distributor from such distribution in the United Kingdom.

If the distributor of Such Picture does not distribute Such Picture directly to free television, but employs a subdistributor to so distribute Such Picture, then the "Producer's gross" shall be the worldwide total gross receipts derived by such subdistributor from licensing the right to exhibit Such Picture on free television. In case of an outright sale of the free television distribution rights for the entire world, or any territory or country, the income derived by the seller from such sale, but not the income realized by the purchaser or licensee of such rights, shall be the "Producer's gross." If any such outright sale shall include free television exhibition rights and other rights, then (but only for the purpose of the computation required hereunder) the Company shall allocate to the free television exhibition rights a fair and reasonable portion of the sales price which shall, for the purpose hereof, be the "Producer's gross." In reaching such determination, Company may consider the current market value of free television exhibition rights in comparable motion pictures.

If the Guild shall contend that the amount so allocated was not fair and reasonable, such claim may be determined by submission to arbitration as herein provided. If the arbitrator shall find that such allocation was not reasonable and fair, he/she shall determine the fair and reasonable amount to be so allocated. If the outright sale includes free television distribution rights to more than one motion picture, Company shall likewise allocate to each Such Picture a fair and reasonable portion of the sales price of the free television rights. If the Guild contends that such allocation is not fair and reasonable, the question may be determined by submission to arbitration as above provided. If the arbitrator shall find that such allocation was not fair and reasonable, he/she shall determine the fair and reasonable amount to be so allocated to each Such Picture. Nothing with respect to the price received on the outright sale of only free television distribution rights in a single Such Picture shall be subject to arbitration except that in the event of a dispute, there may be arbitrated the question of whether the price reported by the Company to the Guild as having been received by the Company on such outright sale is less than the amount actually received by the Company on such outright sale. Sums paid to any advertising agency in connection with any exhibition of any Such Picture on free television shall not be included in Producer's gross.

**Guild's right to elect.** The parties further agree with reference to Article 15.A.3.: If, in the upcoming negotiations with SAG and DGA, the Company agrees to modify the basic substantive provisions regarding licensing of theatrical motion pictures for exhibition on free television, Company will so notify the Guild and accord it the opportunity to elect that this subparagraph be modified in the same manner, as of the date on which the Guild so notifies the Company. Adjustments which statistically maintain the relative allocations of proceeds derived from post-1960 theatrical motion pictures licensed to television among SAG, DGA and

ARTICLE 15 - TELEVISION EXHIBITION
A - THEATRICAL

3A as established in 1966 (*i.e.*, the ratio of 6, ___ 2 of accountable receipts, respectively) will not activate this provision, but an increase in the relative allocations to SAG or DGA in such proceeds will activate this provision, with any such increase to be accorded proportionately to WGA.  Upon request, the Guild shall be provided with the statistics upon which the adjustments have been made, and the Guild's right to activate this provision shall be arbitrable.  The Guild shall give notice of its election within sixty (60) days after receipt of the Company's notice or after being provided with the statistics referred to, whichever is later.  The election shall be limited to accepting the entire agreement reached with SAG or DGA on licensing theatrical motion pictures for exhibition on free television, and only such entire agreement, but with appropriate equivalent adjustment for writers for provisions peculiar to actors or directors, as the case may be.

b.      **"Accountable Receipts"**

The term "*accountable receipts*," as used herein, means the balance of the Producer's gross after deducting an arbitrary forty percent (40%) of the Producer's gross for distribution fees and expenses, except that in the case of an outright sale of free television distribution rights, there shall be deducted only an arbitrary ten percent (10%) of the Producer's gross for sales commissions and expenses of sale.

c.      **When Payment Obligation Accrues**

Company's obligation shall accrue hereunder only after accountable receipts are received by Company, but as to foreign receipts such obligation shall accrue only when such receipts can be freely converted to U.S. dollars and are remitted to the United States and until such time, no frozen foreign receipts shall be included in accountable receipts.  Payment of amounts accruing hereunder shall be made quarterly on the basis of quarterly statements, as hereinafter provided.  Upon request, and if permitted by the authorities of a foreign country, the Company will transfer to any writer, in the currency of such foreign country, his/her share, if any, of frozen foreign receipts in such country, provided the writer will bear any costs involved; and such transfer shall be deemed to be payment to the writer of an equivalent number of U.S. dollars at the then current free market rate for blocked funds of that category as determined by the Company.  Concurrently with such transfer, the writer will pay to the Company in U.S. dollars the total amount the Company is required to withhold from such payment under all applicable laws.  If the Company utilizes frozen foreign currencies derived from exhibition of Such Picture on free television by conversion thereof to properties that may be freely exported and turned to account, the amount so utilized by the Company shall be deemed to have been converted to U.S. dollars at the then current free market rate for blocked funds of that category determined as above provided.  Frozen foreign receipts from free television shall be deemed to be released on a first-in, first-out basis, unless the authorities of the foreign country involved designate a specific period that would render such basis inapplicable.  Such released funds shall be allocated between Such Picture and other motion pictures distributed by the distributor on free television in the same ratio that receipts, derived from the distribution of Such Picture on free television within the foreign country, bear to the total receipts derived from the distribution of Such Picture and all other motion pictures on free television within the foreign country, during the applicable period, unless the authorities of the foreign country involved require another method of allocation, in which case such other method shall be used.  Foreign receipts shall be accounted for in U.S. dollars at the rate of exchange at which such receipts are actually converted and remitted, and should any discounts, taxes, duties or charges be imposed in connection with the receipt or remittance of foreign funds, only so much of such funds as remain thereafter shall be included in accountable receipts.  Company shall not be responsible for

loss or diminution of foreign receipts as a result of any matter or thing not reasonably within the control of the Company.  The Guild and the writers shall be bound by any arrangements made in good faith by the Company or for its account, with respect to the deposit or remittance of foreign revenue.  Frozen foreign receipts shall not be considered trust funds and the Company may freely commingle the same with other funds of the Company.  No sums received by way of deposits or security need be included in Producer's gross until earned, but when the Company is paid a non-returnable advance by a distributor, such advance shall be included in the Producer's gross.

A "*non-returnable advance*" is to be included in "*accountable receipts*" when Such Picture is "*available*" and "*identifiable*" and the amount of the advance payment is "*ascertainable.*"

Such Picture is "*available*" when the first of the following occurs:

(1)     The product first may be exhibited or otherwise exploited by a specified method of distribution and in a territory under the terms of the applicable license or distribution agreement, or

(2)     It first may be sold or rented by a retailer under the terms of the applicable license or distribution agreement.

Such Picture is "*Identifiable*" when the Company first knows or reasonably should have known that a given motion picture is covered by a particular license or distribution agreement for its exploitation in the applicable market.

The amount of the advance payment is "*ascertainable*" if:

(1)     the advance is for one (1) motion picture, means of exhibition, and territory, or

(2)     the total amount of the advance is for more than one (1) motion picture, means of exhibition and/or territory, in which case the Company shall fairly and reasonably allocate such advance among the licensed motion pictures, exhibition markets and/or territorial markets.  As each of these pictures becomes identifiable and available, the allocated portion of the non-returnable advance is to be included in "Producer's gross" for that quarter.  The Company shall notify the Guild of its allocation when the report of "Producer's gross," which includes the advance, is to be filed.  The Guild has the right to challenge in an MBA arbitration a failure to allocate or any allocation that it contends is not fair and reasonable.

If Such Picture is available in any territory or by any means of exhibition, and is identifiable and the amount of the advance is ascertainable, but the Company does not provide the WGA with the information required by the MBA and applicable law, then the advance shall be deemed includable in "accountable receipts" no later than six (6) months after the Company receives it.

An advance received by a Company's parent, subsidiary or any other related or affiliated entity or successor-in-interest, or by any other entity to which the advance payment is directed by the Company or license or distribution agreement, shall be considered as an advance payment received by the Company.

d.     If any license or outright sale of exhibition rights to Such Picture on free television includes as a part thereof any recorded commercial or advertising material, the Company shall be permitted to allocate a reasonable amount (in accordance with then current standard charges in the industry) to such

ARTICLE 15 - TELEVISION EXHIBITION
A - THEATRICAL

...mercial or advertising material, and the amou___.io allocated shall not be included in Producer's gross hereunder.

e.    The term "*participating writer,*" as used herein, means a writer who, while in the employ of the Company or in the employ of the actual producing Company of Such Picture as described in subparagraph 3.h.(1) below (to which employment the provisions of this Basic Agreement apply), or a professional writer from whom the Company (or such actual producer) acquired literary material (to which acquisition the provisions of this Basic Agreement apply), participated in the writing of and received credit pursuant to Theatrical Schedule A hereof for the writing of the story or screenplay upon which Such Picture was based.  If Such Picture is a remake of a prior motion picture, and if any of the writers of the prior motion picture receives writing credit for the remake, such writers shall be deemed to be "participating writers" for the purposes of this Article 15.A., but then only if their employment as writers for the prior motion picture, or if the purchase of literary material from them for the prior motion picture, was covered by and subject to a collective bargaining agreement with the Guild. The "*pro rata* share" payable to each participating writer shall be as follows:

(1)    If the participating writer or writers receive "Written by" credit, one hundred percent (100%) thereof shall be payable to the credited writer or writers receiving "Written by" credit.

(2)    If the participating writer or writers receive either story or screen story credit, or screenplay credit, but not both, one hundred percent (100%) thereof shall be payable to the credited participating writer or writers receiving story or screen story, or screenplay credit, as the case may be; provided, however, that if the individual employment contract or purchase agreement with the other writer(s) (*i.e.*, those who are not subject to this Basic Agreement) provides for payment to such writer or writers of the additional compensation provided for in this Article 15.A., such writer or writers shall receive the share which would have been payable had such writer or writers been participating writers, as provided in subparagraph (3) below.

(3)    If the participating writer or writers receive both "Story by" or "Screen Story by" and screenplay credit, seventy-five percent (75%) thereof shall be payable to the credited screenplay writer or writers, and twenty-five percent (25%) thereof to the credited story or screen story writer or writers. In the event there is a minor credit, such as adaptation, the writer or writers receiving such minor credit shall be paid ten percent (10%) thereof which sum shall be deducted from the screenplay writer's share.

Any participating writers receiving the same screen credit referred to above shall share equally in such percentage amount specified.

If there are one or more participating writers who receive screenplay credit and no credit is given for story or screen story, then the *pro rata* share which would have been payable to a participating writer had he/she received such story or screen story credit shall, subject to the provisions of the next following paragraph, be paid to the participating writers who receive such screenplay credit.  The provisions of the immediately preceding sentence shall also apply with respect to the determination under the Producer-Writers Guild Theatrical Basic Agreements of 1960, 1963, 1970 and 1973 of "*pro rata* shares" payable to participating writers as therein defined.

If the writer's services on Such Picture are performed for the Company on a loan-out basis, then for the purposes of this Article 15.A., the Company

s___, be deemed to be the employer, and the lende___, all not have any responsibility hereunder with respect to Such Picture.

f.     **Time and Manner of Payment**

If the picture is licensed for network exhibition, payment with respect to the gross receipts from such license shall be made as follows:

(1)     If, under the terms of the license, there is no possibility that the picture can or may be dropped out of the license, payment must be made within thirty (30) days after receipt of payment from the network with respect to Such Picture.

(2)     If there is a possibility that Such Picture can or may be dropped out of such license, then payment with respect to Such Picture shall be made within thirty (30) days after exhibition of Such Picture on television pursuant to such license, but not earlier than thirty (30) days after receipt of payment from the network with respect to Such Picture.

Payment shall be accompanied with a written report of the license fee payable for Such Picture pursuant to the license and of the amount paid by the network for Such Picture.

With respect to exhibition of the picture on free television other than pursuant to a license for network exhibition, the following provisions of this subparagraph f. shall apply:

Within a reasonable time after the expiration of each calendar or fiscal quarter, but not exceeding sixty (60) days, Company will furnish or cause to be furnished to the Guild a written report showing the Producer's gross during the preceding quarter from the distribution of each Such Picture by Company on free television with respect to which Company is required to make payments hereunder (whether distributed by the Company or through another distributor).

Concurrently with the furnishing of each such report, the Company will make the payments shown to be due by such report. All payments shall be made by check payable to the order of the writers entitled thereto, and shall be delivered to the Guild for forwarding to such writers, and compliance herewith shall constitute payment to the writers.

No such reports need be furnished with respect to any period during which there was no such Producer's gross. The Company shall make available for inspection by the Guild all distributor's statements and exhibitor's statements which are available to the Company insofar as they relate to such Producer's gross, and all the financial terms of contracts pertaining to such Producer's gross, and the Guild shall have the right, at reasonable times, to examine the books and records of the Company as to such Producer's gross pertaining to such distribution of any Such Picture, at whatever place or places such records are customarily kept by the Company. If the Guild requests that it be informed of the license fee paid under a license for the free television exhibition of the picture, or if the Guild requests that it be sent an extract of the financial terms of such a license, and if such information is not extensive in nature, the Company will forward such information or extract without making it necessary for the Guild to send a representative to the offices of the Company. In general, the Company will cooperate in furnishing such information to the Guild by mail or telephone, when doing so is not unreasonable or burdensome. If more than one picture is licensed in a single license agreement, the

100

**ARTICLE 15 - TELEVISION EXHIBITION**
**A - THEATRICAL**

Company shall inform the Guild, at its request, of the identity of the pictures covered by the license, and shall make available for inspection by the Guild in the office where such license agreement is customarily kept a copy of the terms of such license showing the titles of the pictures licensed under such agreement and the license fee for each Such Picture. Company agrees to cooperate in responding to reasonable inquiries from the Guild as to whether any Such Picture is currently being distributed for telecasting on free television. An inadvertent failure to comply with the reporting provisions of this subparagraph f. shall not constitute a default by the Company hereunder, provided such failure is cured promptly after notice thereof from the Guild is received by the Company.

Company shall make all social security, withholding, unemployment insurance, and disability insurance payments required by law with respect to the additional compensation provided for in this Article 15.A.

If the Company shall fail to make any payment provided for in this Article 15.A. to be made to the writer when and as the same becomes due and payable, it shall bear interest at the rate of one and one-half percent (1.5%) per month on the unpaid balance thereof commencing to accrue on the earlier of: (a) seven (7) days after notice in writing to Company from the Guild of such delinquency, or (b) sixty (60) days after such payment becomes due and payable.

The compensation payable under this Article 15.A. shall be excluded from the gross compensation upon which Company contributions are to be made to the Pension Plan.

g.    **Crediting**

If a participating writer's employment agreement with the Company requires that the writer's compensation shall be based, in whole or in part, upon, or measured by, a percentage of the gross receipts derived from the distribution of Such Picture, then such percentage compensation shall be credited against any amounts payable to the writer hereunder, and likewise any payment due to the writer hereunder shall be credited against such percentage compensation. When all or a part of a writer's compensation is a specified sum of money, commonly known and referred to as a "deferment," such deferment may not be credited against amounts payable by the Company to such writer hereunder.

h.    With respect to all Such Pictures, the following provisions shall be applicable:

(1)    Acquisition of Title by Company:

If Company was not the actual producer of Such Picture which was produced by a signatory Company, but acquired title thereto by purchase, assignment, transfer, voluntary or involuntary, or by foreclosure of a chattel mortgage or security agreement or a pledgee's sale, Company shall nevertheless be obligated to make the payments herein provided when Such Picture is exhibited on free television, unless such payment required hereunder has already been paid.

(2)    Financing-Distribution Agreement by Company:

The obligation of the signatory Company hereunder with respect to the payments provided for in this Article 15.A. shall also apply to any Such Pictures produced by an independent producer under a contract between the signatory Company and such independent producer for the production of such motion picture, and for the financing and distribution thereof by the signatory Company. However, such signatory Company shall not be liable

......ie payment of any television fees based on m.....s received by a foreign distributor under a foreign production deal as defined in subparagraph a. of this subparagraph 3., with respect to which such foreign distributor or such independent producer is not obligated to account to such signatory Company.  Nor shall such signatory Company be obligated to obtain any Television Distributor's Assumption Agreement from any foreign distributor referred to in subparagraph a. of this subparagraph 3. except if such foreign distributor is obligated to account to such signatory Company pursuant to subparagraph a. of this subparagraph 3. with respect to monies as therein provided.

(3)   Company Liability:

It is expressly understood and agreed that Company shall in all events remain bound hereunder to make the payments due by reason of the exhibition of each Such Picture on free television, irrespective of the assumption of such liability by any other person, firm or company as hereinabove provided, except as otherwise expressly provided in this Basic Agreement.

(4)   Failure to Deliver Assumption Agreement:

The failure of Company to obtain and deliver an executed assumption agreement as provided in Article 65.A. or subparagraph I. of this Article 15.A.3. shall be deemed a substantial breach of this Basic Agreement.

I.   If the Company shall sell, transfer, assign or otherwise dispose of its rights in any literary material (to which the provisions of Article 15.A.3., 47 and 65 of this Basic Agreement apply, or may apply) prior to the production of a motion picture based thereon, to any person or company (hereinafter referred to as the "Buyer") other than a person or company with headquarters outside the United States, the Company shall obtain from the Buyer a separate agreement in substantially the following form:

"LITERARY MATERIAL ASSUMPTION AGREEMENT

_____
                    (hereinafter referred to as the 'Buyer')
agrees with _____
                              (Company)
that the story, screenplay or story and screenplay covered by this agreement is subject to the 2008 Writers Guild of America-Alliance of Motion Picture & Television Producers Theatrical and Television Basic Agreement (herein the 'Basic Agreement') and particularly to the provisions of Article 15.A.3. thereof pertaining to additional payments to writers on release of a theatrical motion picture based thereon to free television (but excluding subparagraph h. of said Article 15.A.3.), and the said Buyer hereby agrees, expressly for the benefit of the Writers Guild of America, West, Inc., and Writers Guild of America, East, Inc. (herein referred to as the Guild), as representatives of the writers involved, to abide by and perform the provisions of said Basic Agreement and make the additional payments required thereunder, as aforesaid.  For the purpose of applying such provisions of said Basic Agreement, the writer or writers of such material shall be treated in all respects as though the said material were written by such writer or writers while in the employ of the Buyer.

It is expressly understood and agreed that the rights of the Buyer to exhibit or license the exhibition of any motion picture based upon said material shall be subject to and  conditioned upon the payment to the writer or writers involved of

ARTICLE 15 - TELEVISION EXHIBITION
A - THEATRICAL

_ditional compensation, if any, required under s_ _aragraph 3. (except subparagraph h. thereof) of said Article 15.A. of said Basic Agreement, and it is agreed that the Guild shall be entitled to injunctive relief and damages against Buyer in the event such payments are not made.

If the Buyer shall sell, transfer, assign or otherwise dispose of its rights in such material to any person or company with headquarters in the United States, it may obtain from the party acquiring such rights a separate agreement in the same form (including this sentence) as this agreement, and will notify the Guild thereof, together with the name and address of the transferee, and deliver to the Guild a copy of such assumption agreement; it being the intent hereof that the obligations herein set forth shall be continuing obligations on the part of such subsequent owners of such material so headquartered in the United States.

| | BUYER |
|---|---|
| Date: | By _____ |
| | (Please print name and title) |
| Address: | |
| | |

The Company agrees to give notice to the Guild of such sale, transfer or assignment of the nature above mentioned, with the name and address of the Buyer, and to deliver to the Guild an executed copy of such assumption agreement. An inadvertent failure on the part of the Company to comply with any of the provisions of this subparagraph I. shall in no event constitute a default by the Company hereunder or a breach of this Basic Agreement, provided that such failure is cured promptly after notice thereof from the Guild.

Upon delivery of such assumption agreement, Company, or any subsequent owner obtaining the execution of such an assumption agreement, shall not be further liable to the Guild or any writer for the keeping of any such records or the payment of such additional compensation, or for compliance with credit obligations insofar as they relate to the broadcast of Such Picture on free television; and the Guild agrees to look exclusively to the party last executing such an assumption agreement for the keeping of such records, payment and compliance with credit obligations. If a company with headquarters outside the United States is a subsidiary of the Company, or the Company is the distributor of Such Picture for such a company, then, for the purposes of this subparagraph I., such company shall be deemed to be headquartered only in the United States.

j.    Anything to the contrary herein notwithstanding, it is agreed that the provisions of this subparagraph 3. apply only if Such Picture is first exhibited on free television after Such Picture has had a *bona fide* theatrical release. For such purpose, Such Picture may be regarded as having had a *bona fide* theatrical release even though such release has not been fully completed, or shall not have been withdrawn from its theatrical release, and even though Such Picture may have been released theatrically only domestically or theatrically only in foreign countries or territories. If Such Picture is exhibited on free television prior to the time that it has had a *bona fide* theatrical release, then the release of Such Picture to free television shall be governed by the provisions of the Basic Agreement then in effect between the parties hereto, but only with respect to the provisions thereof relating to additional compensation for television reruns on free television.

The provisions of this subparagraph 3. shall not apply to the televising or exhibition of trailers or advertising a motion picture by shots, etc., substantially in the nature of a trailer, or to the use of stock shots, or to the televising or exhibition of excerpts from theatrical motion pictures for news or review purposes unless the excerpts from a single theatrical motion picture exceed ten (10) minutes.  Except as modified by Article 15.B.10.e., for any other use of excerpts from Such Picture in television programs (and, for this purpose, the term "television programs" includes programs made for free television, pay television, videodiscs/videocassettes and basic cable), including television programs which consist substantially of excerpts from theatrical motion pictures, or for any other use of excerpts from Such Picture, the principal photography of which commenced on or after February 13, 2008, in another theatrical motion picture, the Company shall pay the following aggregate one-time-only sum to the writers determined by the  Guild to be entitled to such compensation and prorated as determined by the Guild:

|  |  | 2/13/08-5/1/10 | 5/2/10-5/1/11 |
|---|---|---|---|
| (1) | Thirty (30) seconds or less of excerpts | $173 | $182 |
| (2) | Over thirty (30) seconds but not over two (2) minutes of excerpts | 523 | 549 |
| (3) | Over two (2) minutes of excerpts: |  |  |
|  | -  for the first two (2) minutes | 523 | 549 |
|  | -  for each minute or portion thereof in excess of two (2) minutes | 173 | 182 |

If an excerpt is used in a local program and the program is broadcast in no more than one market, the payment for such use shall be sixty percent (60%) of the amount provided in this Article 15.A.3.j.  If the program is broadcast later in another market, the writer(s) shall be paid the remaining forty percent (40%).

The use of an excerpt from a theatrical motion picture in an interactive program shall be governed by the provisions of Article 64.

No compensation shall be payable pursuant to this subparagraph j. to a writer of a motion picture from which an excerpt is derived if such writer writes material for and receives writing credit on the program or motion picture into which such excerpt is inserted.

jj.   Notwithstanding any other provision of this Agreement, if the writer

(1)   first describes in literary material an object or thing which is fully described in such literary material and by such description appears to be unique and original; and/or,

(2)   introduces a character and the characterization of such character is fully developed and fully described in the material written by the writer and from such development and description the character appears to be unique and the principal creation of the writer,

and an interactive program is based upon such object, thing or character, the writer will be paid as provided in Article 64.

ARTICLE 15 - TELEVISION EXHIBITION
A - THEATRICAL

k.    ...otwithstanding the sooner termination of this Agreement, the parties hereto agree that the terms and conditions of this subparagraph 3. shall apply and remain in full force and effect, and without change, to Such Pictures produced by the Company, the principal photography of which commenced between February 13, 2008 and May 1, 2011, both dates inclusive, regardless of when (either during or at any time after the expiration of the term of this Basic Agreement or of such period) Such Pictures are released to free television, and regardless of the terms or provisions of any Basic Agreement which is a modification, extension, or renewal of, or substitution for this Basic Agreement.

4.    Small Accountings - With regard to all television licensing payments required under this Article 15.A., the Company may accrue such payments until the aggregate is equal to fifty dollars ($50), at which time the payment provision of the appropriate subparagraph shall be effective, except that in any event all accrued amounts of less than fifty dollars ($50) due to the writer shall be paid no later than thirty (30) days following the close of the calendar year in which accrued. Nothing herein shall relieve the Company of its obligation to make the accounting reports required elsewhere herein.

5.    At the request of the Guild, the Company authorizes any networks, as defined in Article 1.A.12.1., as well as any television station to advise the Guild of the fact that a payment was or was not made by the network or station for, and the date of any previous telecast of, a theatrical motion picture specified in the Guild's request.

6.    In the event that a Company liable for the payments required hereunder shall license a motion picture to television stations owned or controlled by it, or to a network owned or controlled by it, the "accountable receipts" shall be comparable to the accountable receipts paid to distributors by comparable stations or comparable networks, as the case may be, for comparable telecasts of comparable motion pictures in comparable markets and the accountable receipts paid to Company by comparable stations or comparable networks, as the case may be, for the comparable telecast of such motion picture in comparable markets.

7.    The Company shall notify the Guild in writing, to the attention of the Residuals Administrator at its Los Angeles, California office, of any and all English language changes made by the Company in the title of any theatrical motion picture subject to this Agreement released to free television, within thirty (30) days of said change of title.

**B.    TELEVISION RERUNS & FOREIGN TELECASTS OF TELEVISION MOTION PICTURES**

1.    United States and Canada

a.    The minimum compensation above provided for in Article 13.B. shall constitute payment in full for the telecasting of such motion picture once in each city in the United States and Canada in which any television broadcasting station is now located and once in each city in the United States and Canada in which any television broadcasting station is hereafter for the first time established.

b.    Rerun Formula, Free Television, in the United States and Canada

(1)    A television motion picture which has been telecast not more than once in any city in the United States and Canada is in its first run. A television motion picture which has been telecast more than once, but not more than twice, in any city in the United States and Canada, is in its second run. A similar test applies in determining when a television motion picture is in its third and succeeding runs.

(2)    In the event a television motion picture based upon literary material to which this Basic Agreement applies is telecast for more than one (1) run in any city in the United States or Canada, the writer or writers who receive

........y and/or teleplay screen credit therefor shall be .......id additional compensation which, in the aggregate, shall not be less than the following amounts (if more than one writer shares a story or teleplay credit, then all of the writers sharing each credit shall be considered a unit and shall participate equally in and receive in the aggregate the rerun payments applicable thereto and, when adaptation credit is accorded, the writer or writers receiving such credit shall be paid ten percent (10%) thereof, which sum shall be deducted from the share of the teleplay writer(s)).

(a)     Reruns over television network in prime time:

        With respect to any television motion picture, the credited writer(s) of which commenced writing services on or after February 13, 2008, the additional compensation payable for the second or any subsequent run which includes telecasting of said motion picture over a television network in prime time shall be not less than one hundred percent (100%) of the writer's applicable minimum compensation.

(b)     [Deleted.]

(c)     Other reruns:[75]

        (I)     For the second run, not less than fifty percent (50%) of the writer's applicable minimum compensation if such second run includes the telecasting of such motion picture over a television network; otherwise, such payment shall be not less than forty percent (40%) of the writer's applicable minimum compensation;

        (ii)    For the third run, not less than forty percent (40%) of the writer's applicable minimum compensation if such third run includes the telecasting of such motion picture over a television network; otherwise, such payment shall be not less than thirty percent (30%) of the writer's applicable minimum compensation;

        (iii)   For the fourth run, not less than twenty-five percent (25%) of the writer's applicable minimum compensation;

        (iv)    For the fifth run, not less than twenty-five percent (25%) of the writer's applicable minimum compensation;

        (v)     For the sixth run, not less than twenty-five percent (25%) of the writer's applicable minimum compensation;

        (vi)    For the seventh run, not less than fifteen percent (15%) of the writer's applicable minimum compensation;

        (vii)   For the eighth run, not less than fifteen percent (15%) of the writer's applicable minimum compensation;

---

[75]     [These provisions were Article 15.B.1.b.(2)(b) in predecessor Basic Agreements.] See Sideletters at pages 393 and 396 for special provisions governing certain reruns of certain one-hour network prime time dramatic series and for the experiment regarding the syndication of half-hour series in markets representing 50% or fewer of U.S. television households.

ARTICLE 15 - TELEVISION EXHIBITION RERUNS & FOREIGN TELECASTS OF TV MOTION PICTURES
B - TELEVISION

(viii)   For the ninth run, not less than fifteen percent (15%) of the writer's applicable minimum compensation;

(ix)   For the tenth run, not less than fifteen percent (15%) of the writer's applicable minimum compensation;

(x)   For the eleventh run, not less than ten percent (10%) of the writer's applicable minimum compensation;

(xi)   For the twelfth run, not less than ten percent (10%) of the writer's applicable minimum compensation;

(xii)   For the thirteenth run and each and every run thereafter, not less than five percent (5%) of the writer's applicable minimum compensation (paid separately for each such run).

(d)   The parties agree to the following for the purpose of encouraging the success of new dramatic free television series produced for a network. No residual compensation shall be due under Article 15.B.1.b.(2) nor Article 58 for the second run (which may be either on free television or basic cable) of two programs chosen by the Company from the pilot and first two episodes broadcast during the first production season, provided the second run occurs within a two month period following the initial exhibition of each program. If such second run is on free television, it shall not constitute a "run" for purposes of Article 15.B.1.b.(1). Company shall be obligated to report any such run to the Guild as required under this Article 15.B., notwithstanding the fact that no payment shall be due therefor.

The Company may not utilize this provision at any time after the series has been cancelled.

(3)   The "**applicable minimum compensation**" is the minimum salary or amount required to be paid under the provisions of this Basic Agreement for the type of story or teleplay involved; provided, however, that for purposes of this Article 15.B., the minimum compensation figures which are set forth in Article 13.B.7.a., b., and c. shall be the "applicable minimum compensation" for programs covered by Article 13.B.7.d.

When the writer has been employed to write a story with option for teleplay, the "applicable minimum compensation" for the story is the minimum set forth in Article 13.B.7.a. (p. 64).. The rate applicable to story and teleplay under Article 13.B.7.c. (pp. 66-67) is the "applicable minimum compensation" only in the case of employment under a contract providing for a commitment for both the story and the teleplay.

(4)   If a writer or writers are entitled to the applicable minimum payments per episode required to be made on account of exploitation of the television series sequel rights and/or MOW sequel rights (as provided in Article 16.B.2.a. or b.) or on account of exploitation of character rights (as provided in subparagraph h. of Article 15.B.14.), or on account of the production of programs entitling a writer to per episode payments pursuant to subparagraph I. of Article 15.B.14., and if an episode for which such a payment is required is telecast for more than one (1) run in any city in the United States or Canada, the writer or writers entitled to such payments shall be paid additional compensation calculated as provided in subparagraph (2) above, and for such purpose the "applicable minimum compensation" is such applicable minimum payment.

(5)    The Company shall pay as provided herein for each respective rerun, not later than four (4) months after the first telecast of the respective rerun in any city in the United States or Canada. However, in the event any rerun is telecast on a television network (or on a regional television network) or, after May 1, 2003, on the WB or UPN, the Company shall make the appropriate rerun payment not later than thirty (30) days after the telecast of such rerun.

(6)    The term "television network," as used in this paragraph, shall mean the network facilities of ABC, CBS, FBC and NBC, or any other entity which qualifies as a "network" under Section 73.662(f) of the rules of the Federal Communications Commission, unless the FCC determines that such entity is not a "network" for purposes of this Section, except in the case (a) when television motion pictures are telecast on any single regional network presently established, and (b) when television motion pictures are telecast on any single regional network which may hereafter be established and which does not include New York, Chicago or Los Angeles.

(7)    [Deleted.]

c.    (1)    For broadcasts in the domestic market after March 1, 1981, in a language other than English, released other than as part of free television licensing, the credited writer(s) shall be paid an aggregate amount equal to two percent (2%) of the Company's "accountable receipts," as defined in Article 51, from the sale or license of such television motion picture for such broadcasts rather than the otherwise required rerun payment.

(2)    The provisions of subparagraph (1) above will apply to all television motion pictures produced on or after July 1, 1971.

d.    The use of a television motion picture, in whole or in substantial part, in an interactive program shall be governed by the provisions of Article 64.

2.    Foreign Telecasting Formula

a.    In the event such television motion picture is telecast in any part of the world outside the United States and Canada, the writers referred to in Article 15.B.1.b.(2) and (4) above shall be paid additional compensation for such foreign telecasting as follows:

(1)    initial payment of not less than fifteen percent (15%) of their applicable minimum compensation payable not later than thirty (30) days after the Company obtains knowledge of the first foreign telecast, and in no event later than six (6) months after the first foreign telecast;

(2)    Ten percent (10%) of the applicable minimum when the Distributor's Foreign Gross exceeds seven thousand dollars ($7,000.00) for one-half (½) hour pictures, thirteen thousand dollars ($13,000.00) for one (1) hour pictures, or eighteen thousand dollars ($18,000.00) for pictures in excess of one (1) hour in length. Such payment to be made no later than thirty (30) days after such gross has been so exceeded;

(3)    a payment of ten percent (10%) of the applicable minimum compensation when the Distributor's Foreign Gross exceeds ten thousand dollars ($10,000.00) for one-half (½) hour pictures, eighteen thousand dollars ($18,000.00) for one (1) hour pictures, or twenty-four thousand dollars ($24,000.00) for pictures in excess of one (1) hour in length. Such payments to be made no later than thirty (30) days after such gross has

ARTICLE 15 - TELEVISION EXHIBITION RERUNS & FOREIGN TELECASTS OF TV MOTION PICTURES
B - TELEVISION

been so exceeded. Such payment to be made no later than thirty (30) days after such gross has been so exceeded; and

(4) After the writer has received a total of thirty-five percent (35%) of applicable minimum compensation with respect to any television film, all credited writer(s) in the aggregate shall be paid one and two-tenths percent (1.2%) of the Distributor's Foreign Gross in excess of:

(I) $365,000 in Distributor's Foreign Gross for one-half (½) hour programs;

(ii) $730,000 in Distributor's Foreign Gross for one (1) hour programs;

(iii) $1,860,000 in Distributor's Foreign Gross for programs more than one (1) hour in length but not more than two (2) hours in length;

(iv) $3,120,000 in Distributor's Foreign Gross for programs more than two (2) hours in length but not more than three (3) hours in length;

(v) $4,170,000 in Distributor's Foreign Gross for programs more than three (3) hours in length but not more than four (4) hours in length;

(vi) $5,210,000 in Distributor's Foreign Gross for programs more than four (4) hours in length but not more than five (5) hours in length;

(vii) $6,250,000 in Distributor's Foreign Gross for programs more than five (5) hours in length but not more than six (6) hours in length; and

(viii) for programs in excess of six (6) hours, the above applicable thresholds will increase proportionately.

For Appendix A programs, the one and two-tenths percent (1.2%) payment shall be triggered when the Distributor's Foreign Gross equals fifty percent (50%) of the amounts set forth in subparagraphs (I), (ii), (iii), (iv), (v), (vi), (vii) or (viii) above, as applicable.

For the purpose of this subparagraph (4), Distributor's Foreign Gross shall include absolute gross income realized by the distributor on account of foreign telecasting and exhibition on foreign basic cable.

In order to preserve the status quo in Article 58, payment of the thirty-five percent (35%) of applicable minimum under the foreign telecasting formula continues to constitute payment for foreign basic cable; provided, however, that foreign basic cable receipts shall apply to "Distributor's Foreign Gross" for purposes of reaching the thresholds in and determining the amount the credited writer(s) shall be paid pursuant to subparagraphs (I), (ii) (iii), (iv), (v), (vi), (vii) or (viii) above.

The writers shall receive such additional monies pursuant to the payment provisions of Article 51.C., except payment and reporting shall be due within sixty (60) days after the close of the second and fourth calendar quarters of each year in which the Company receives Distributor's Foreign Gross with respect to the television film.

aa. Notwithstanding the provisions of subparagraph a. above, the following shall apply to one-hour network prime time dramatic series covered under the sideletter waiving the provisions of Article 15.B.1.b.(2)(c):

(1)  The fifteen percent (15%), ten percent (10%) and ten percent (10%) of applicable minimum compensation payments provided in Article 15.B.2.a.(1), (2) and (3), respectively, shall be collapsed into a single payment of thirty-five percent (35%) of applicable minimum compensation, payable not later than thirty (30) days after the Company obtains knowledge of the first foreign telecast, and in no event later than six (6) months after the first foreign telecast.

(2)  [Deleted.]

b.  [Deleted.]

c.  The term "*foreign telecasting*," as used herein, shall mean any telecast (whether simultaneous or delayed) outside the United States, its territories and possessions, and Canada, other than a telecast on any of the following regularly affiliated stations of a United States television network as a part of the United States network television telecast: XH-TV, Mexico City; ZBM, Pembroke, Bermuda, for CBS; XEW-TV or XEQ-TV or XH-TV or XHGC, Mexico City, and ZBM, Pembroke, Bermuda for NBC; and XE-TV, Tijuana; and ZFB, Hamilton, Bermuda for ABC.

d.  As used herein, the term "*Distributor's Foreign Gross*" shall mean, with respect to any television film, the absolute gross income realized by the distributor of Such Picture from the foreign telecasting thereof and including, in the case of a "foreign territorial sale" by any such distributor, the income realized from such sale by such distributor but not the income realized by the "purchaser" or "licensee." The phrase "absolute gross income" shall not include:

(1)  Sums realized or held by the way of deposits or security, until and unless earned, other than such sums as are non-returnable.

"[S]uch sums as are non-returnable" are to be included in the "Distributor's Foreign Gross" when such television motion picture is "available" and "identifiable" and the amount of the non-returnable sum is "ascertainable."

Such television motion picture is "available" when the first of the following occurs:

(a)  The product first may be exhibited or otherwise exploited by a specified method of distribution and in a territory under the terms of the applicable license or distribution agreement, or

(b)  It first may be sold or rented by a retailer under the terms of the applicable license or distribution agreement.

Such television motion picture is "identifiable" when the Company first knows or reasonably should have known that a given television motion picture is covered by a particular license or distribution agreement for its exploitation in the applicable market.

The amount of the non-returnable sum is "ascertainable" if:

(a)  the non-returnable sum is for one (1) television motion picture, means of exhibition, and territory, or

(b)  the total amount of the non-returnable sum is for more than one (1) motion picture, means of exhibition and/or territory, in which case the Company shall fairly and reasonably allocate such sum among the licensed motion pictures, exhibition markets and/or territorial

---

ARTICLE 15 - TELEVISION EXHIBITION RERUNS & FOREIGN TELECASTS OF TV MOTION PICTURES
B - TELEVISION

markets. As each of these pictures becomes identifiable and available, the allocated portion of the non-returnable sum is to be included in Distributor's Foreign Gross for that quarter. The Company shall notify the Guild of its allocation when the report of Distributor's Foreign Gross, which includes the non-returnable sum, is to be filed. The Guild has the right to challenge in an MBA arbitration a failure to allocate or any allocation that it contends is not fair and reasonable.

If such television motion picture is available in any territory or by any means of exhibition, and is identifiable and the amount of the non-returnable sum is ascertainable, but the Company does not provide the WGA with the information required by the MBA and applicable law, then the non-returnable sum shall be deemed includable in Distributor's Foreign Gross no later than six (6) months after the Company receives it.

A non-returnable sum received by a Company's parent, subsidiary or any other related or affiliated entity or successor-in-interest, or by any other entity to which the payment is directed by the Company or license or distribution agreement, shall be considered as a non-returnable sum received by the Company.

(2)  Sums required to be paid or withheld as taxes, in the nature of turnover taxes, sales taxes or similar taxes based on the actual receipts of the television film or on any monies to be remitted to or by the distributor, but there shall not be excluded from Distributor's Foreign Gross any net income, franchise tax or excess profit tax or similar tax payable by the distributor on its net income or for the privilege of doing business.

(3)  Frozen foreign currency until the distributor shall have either the right to use such foreign currency in or to transmit such foreign currency from the country or territory where it is frozen. In the event such currency may be utilized or transmitted as aforesaid, it shall be deemed to have been converted to United States dollars at the prevailing free market rate of exchange at the time such right to use or transmit accrues.

Distributor's Foreign Gross realized in foreign currency in any reporting period required hereunder shall be deemed to be converted to United States dollars at the prevailing free market rate of exchange at the close of such reporting period.

e.  If any transaction involving any television motion picture subject to a foreign telecast payment under this Basic Agreement shall also include motion pictures, broadcast time, broadcast facilities or material (including commercial or advertising material) which are not subject to such payment, there shall be a reasonable allocation between the television motion pictures which are subject to a foreign telecast payment and such other pictures, time, facilities or material, and only the sums properly allocable to pictures which are subject to a foreign telecast payment shall be included in Distributor's Foreign Gross.

3.  Application of Excess.  Company, at its option, may make any part or all of the additional payments for reruns and foreign telecasts provided herein at the time of employment of writer or at any time prior to the time the same is due (but only if the agreement between the Company and writer with respect thereto is set forth in writer's individual contract); provided that no part of writer's initial compensation which is at or less than twice the applicable minimum compensation (as defined in Article 15.B.1.b.(3)) may be applied against such rerun and foreign telecast payments, or either.

4.   All payments or additional compensation for reruns or foreign telecasts shall be made promptly by check, payable to the order of the writer entitled thereto, and if not initially paid to the writer, shall be delivered to the Guild for forwarding to such writer and compliance herewith shall constitute payment to the writer. The Company shall accompany such checks with a statement of the title of the motion picture and the use for which such payment is made. If Company fails to pay such additional compensation when due and payable, such delinquent payment shall bear interest at the rate of one and one-half percent (1.5%) per month commencing to accrue from the date of such delinquency.

5.   The Company shall keep or have access to:

   a.   complete records showing all cities in the United States and Canada in which all television motion pictures subject to this Basic Agreement have been telecast and the number of telecasts in each such city, the television stations on which telecast, and the dates thereof, and

   b.   complete records showing Distributor's Foreign Gross for such television motion pictures to the extent that such records are pertinent to the computation of payments for foreign telecasting.

Company shall also keep or have access to such records as are necessary for the computation of additional compensation for reruns and foreign telecasts for so long as such rerun or foreign telecast payments may be due or payable. The Guild shall have the right, at all reasonable times, to inspect such records. The undersigned shall give the Guild prompt written notice of the date on which each television motion picture covered hereby is first telecast in any city in the United States and Canada for the second run and for each subsequent run thereafter.

6.   With respect to each television motion picture which is distributed for foreign telecasting, Company shall furnish reports to the Guild and the Alliance of Motion Picture & Television Producers, Inc., showing Distributor's Foreign Gross derived from such television motion picture until:

   a.   such television motion picture has been withdrawn from distribution for foreign telecasting, or

   b.   all of the credited writers of such television motion picture have received the full additional payments for such foreign telecasting to which they are entitled pursuant to subparagraph 2. above.

Such reports shall be rendered to the Guild on a quarterly basis during the first three (3) years in which any such television motion picture is distributed for foreign telecasting, on a semi-annual basis for the next two (2) years and on an annual basis thereafter. Company agrees to cooperate in responding to reasonable requests from the Guild as to whether any television motion picture is currently being distributed for foreign telecasting.

An inadvertent failure on the part of the Company to comply with the reporting provisions of this subparagraph shall in no event constitute a default by the Company or a breach of this Basic Agreement, provided such failure is cured promptly after notice thereof from the Guild.

7.   If a writer's individual employment contract contains a provision giving such writer a percentage or other participation in the receipts, revenues or profits of a television motion picture, such payment may be credited against the minimum additional compensation for reruns and foreign telecasts or either provided herein, but writer, in any event, shall be entitled to be paid not less than such minimum additional compensation for reruns, and foreign telecasts, or either, as the case may be, and any

ARTICLE 15 - TELEVISION EXHIBITION RERUNS & FOREIGN TELECASTS OF TV MOTION PICTURES
B - TELEVISION

payme___ on account thereof shall likewise be credited a₋___st such participation; provided that amounts received by writer as a percentage or other participation in the receipts, revenues or profits of the television motion picture may not be credited against the minimum additional compensation for reruns or foreign telecasts until writer has received as compensation from all sources an amount equal to twice the applicable minimum compensation.

8.   Literary Material Assumption Agreement (Television)

If the Company shall sell, transfer, assign or otherwise dispose of its rights in any literary material (to which the provisions of Articles 15.B., 47 or 65 of this Basic Agreement apply, or may apply) prior to the production of a motion picture based thereon, to any person or company (hereinafter referred to as the "Buyer"), other than a person or company with headquarters outside the United States, the Company shall obtain from the Buyer a separate agreement in substantially the following form:

"LITERARY MATERIAL ASSUMPTION AGREEMENT (TELEVISION)"[76]

"The undersigned _____
                            (insert name of Buyer)
(hereinafter referred to as 'Buyer') agrees with_____

_____
                            (insert name of Company)
that all literary material being acquired and covered by this Assumption Agreement is subject to the 2008 Writers Guild of America Theatrical and Television Basic Agreement ('Basic Agreement'), and particularly to the provisions thereof pertaining to the payment of additional compensation to writers for reruns and foreign telecasting of television motion pictures based thereon (individually referred to as 'Such Picture'). The Buyer hereby agrees, expressly for the benefit of the Writers Guild of America, West, Inc., and Writers Guild of America, East, Inc. ('the Guild'), as representative of the writers involved, to abide by and perform the provisions of the Basic Agreement and make the additional compensation payments required thereby. For the purpose of applying such provisions of the Basic Agreement, the writer or writers of the literary material being acquired shall be treated in all respects as though such material were written by such writer or writers while in the employ of the Buyer.

"It is expressly understood and agreed that the rights of Buyer to telecast or license the telecasting of any Such Picture shall be subject to and conditioned upon the prompt payment to such writer or writers involved of additional compensation for reruns and foreign telecasting as provided in the Basic Agreement. It is agreed that the Guild shall be entitled to injunctive relief against Buyer in the event such payments are not made.

"If the Buyer shall sell, transfer, assign or otherwise dispose of its rights in such material to any person or company with headquarters in the United States, it may obtain from the party acquiring such rights a separate agreement in the same form (including this sentence) as this Assumption Agreement, and will notify the Guild thereof, together with the name and address of the transferee, and deliver to the Guild a copy of such Assumption Agreement; it being the intent hereof that the obligations set forth in this Assumption Agreement shall be continuing obligations on the part of such subsequent owners of such material so headquartered in the United States.

---

[76]   The parties agree that all Assumption Agreements shall include the applicable credit obligations of the WGA collective bargaining agreement, if any, governing the writer's employment and/or the acquisition of the literary material which is the subject matter of the Assumption Agreement. The term "Assumption Agreements," as used in this paragraph, means those Assumption Agreements required by the Basic Agreement.

ARTICLE 15 - TELEVISION EXHIBITION RERUNS & FOREIGN TELECASTS OF TV MOTION PICTURES
B - TELEVISION        113

BUYER

Date: _____

By _____
                    (Please print name and title)

Address: _____

The Company agrees to give notice to the Guild of such sale, transfer or assignment of
the nature above mentioned, with the name and address of the Buyer, and to deliver to
the Guild an executed copy of such Assumption Agreement. An inadvertent failure on
the part of the Company to comply with any of the provisions of this Article 15.B.8. shall
in no event constitute a default by the Company hereunder or a breach of this Basic
Agreement, provided that such failure is cured promptly after notice thereof from the
Guild.

Upon delivery of such Assumption Agreement, Company, or any subsequent owner
obtaining the execution of such an assumption agreement, shall not be further liable to
the Guild or any writer for the keeping of any such records or the payment of such
additional compensation, or for compliance with credit obligations insofar as they relate
to reruns and foreign telecasting of Such Picture. The Guild agrees to look exclusively
to the party last executing such an assumption agreement for the keeping of such
records, payment and compliance with credit obligations. If a company with
headquarters outside the United States is a subsidiary of the Company, or the
Company is the distributor of Such Picture for such a company, then, for the purposes
of this Article 15.B.8., such company shall be deemed to be headquartered only in the
United States.

9.    [Deleted.]

10.   Use of excerpts

The use of an excerpt from a television motion picture shall be deemed a run or foreign
telecast of such motion picture hereunder, except in the following circumstances:

a.    When used for promotional, trailer, news or review purposes; provided, however,
      that the length of such excerpt(s) shall not exceed five (5) minutes in length for a
      program less than ninety (90) minutes in length, nor exceed ten (10) minutes in
      length for a program ninety (90) minutes or more in length. For purposes of this
      subparagraph, a *"promotional"* use of an excerpt shall be for the purpose of
      advertising or publicizing the specific program or serial or series from which the
      excerpt is taken.

b.    When used as a so-called "stock shot" (as customarily understood in the industry
      - *i.e.*, shots excluding dialogue or identifiable characters).

c.    When used for purposes of recapping the story to date in the context of a serial,
      multi-part program, episodic series, unit series or anthology; provided, however,
      that if such recap shall exceed ninety (90) seconds in length when used on a
      program less than sixty (60) minutes in total length, or exceed three (3) minutes
      in length when used on a program sixty (60) minutes or longer in total length,
      Company shall pay to the credited writer(s) of the program(s) from which the

erpts in the recap were taken an aggregate o..._..me-only sum equal to $195.00 ($205.00 effective May 2, 2010) for each minute or portion thereof by which the recap exceeds such length limitation; and provided, further, that no such recap shall exceed (without being deemed a run or foreign telecast as set forth above) five (5) minutes in length for a program less than ninety (90) minutes in length nor exceed ten (10) minutes in length for a program ninety (90) minutes or more in length.

d.    When used as a flashback in the context of multi-part series, episodic series, unit or anthology series or a one-time show or a prime time serial; provided, however, that if such flashback shall exceed thirty (30) seconds in length, Company shall pay to the credited writer(s) of the program(s) from which the excerpts in the flashback were taken an aggregate, one-time-only sum equal to $195.00 ($205.00 effective May 2, 2010) for each minute or portion thereof by which the flashback exceeds such length limitation; and provided, further, that no such flashback shall exceed (without being deemed a run or foreign telecast as set forth above), four hundred (400) feet of 35mm film containing not less than two (2) scenes or two hundred (200) feet of 35mm film containing one (1) scene, or the equivalent in running time of the foregoing if 16mm film or video tape is used. For purposes of this subparagraph, a *"flashback"* use of an excerpt shall be for the purpose of informing viewers of past developments to explain or advance the current story being told.

dd.    For any use on television of excerpts not within the exceptions provided for in subparagraphs a. through d. above nor subparagraph e. below, or if such excerpts are otherwise within subparagraphs c. and d., but the aggregate running time of such excerpts from a single program exceeds the maximum applicable footage lengths, the Company shall pay the following aggregate one-time-only sum to the writer or writers determined by the Guild to be entitled to such compensation and prorated as determined by the Guild:

|  |  | 2/13/08- 5/1/10 | 5/2/10- 5/1/11 |
|---|---|---|---|
| (1) | Ten (10) seconds or less of excerpts | $347 | $364 |
| (2) | Over ten (10) seconds but not more than two (2) minutes of excerpts | $1,049 | $1,101 |
|  | or the applicable rerun fee; whichever is less. |  |  |
| (3) | over two (2) minutes but not more than ten (10) minutes of excerpts: |  |  |
|  | for the first two (2) minutes | $1,049 | $1,101 |
|  | for each minute or portion thereof in excess of two (2) minutes | $173 | $182 |
|  | or the applicable rerun fee; whichever is less. |  |  |
| (4) | Over ten (10) minutes of excerpts from such program | the applicable rerun fee | |

In no event shall less than $347.00 ($364.00 effective May 2, 2010) be paid for the use of excerpts from a single program.

---

In addition, if ten percent (10%) (15% in the case of a thirty (30) minute program) or more but fifty percent (50%) or less of the running time of a program is comprised of excerpts from television motion pictures, or from theatrical and television motion pictures, and including excerpts used as flashbacks, Company shall pay for the use of such excerpts pursuant to Article 15.A.3.j. (if applicable) and this subparagraph dd. For the purposes of this subparagraph and subparagraph e. below, the "running time" of a program excludes commercials, title sequences and a recap up to and including 400 feet of 35mm film or equivalent.

e.  For "compilation" television programs utilizing excerpts from television motion pictures, or from theatrical and television motion pictures, the Company will pay, for such use, to the credited writer(s) of the excerpted material, prorated as determined by the Guild, an aggregate one-time-only sum equal to two and one-half (2½) times the applicable thirty (30) minute minimum (and for this purpose, minimum is deemed to be the story and teleplay minimum set forth in Article 13.B.7.d. if the compilation is for network prime time) for each thirty (30) minutes of overall program length in which compilations are used. Exhibition of excerpts from television motion pictures in such compilation television programs shall not be deemed reruns or other use of the television motion pictures from which the excerpts are taken and the payments pursuant to this subparagraph relating to compilations shall not reduce or affect any other payments which may become due to the writer for the use of the television motion pictures from which such excerpts are taken. Payments pursuant to this subparagraph to the writers of theatrical excerpts shall be in lieu of the excerpt payments set forth in Article 15.A.3.j.

For purposes of this subparagraph, a "*compilation*" television program is a program the running time of which is comprised of more than fifty percent (50%) of excerpts, including excerpts used as flashbacks.

If such compilation television program includes excerpts which are not from "MBA-covered" programs, then the amount of time of the non-covered excerpts shall be subtracted from the running time of the entire program; and,

(1)  If the MBA-covered excerpts are more than fifty percent (50%) of the remainder, the Company shall pay the compilation rate for such program pursuant to this Article 15.B.10.e. For purposes of calculating the appropriate compilation rate, the length of the program shall be determined based on the length of the remainder of the program utilizing the program lengths delineated in Article 13.B.7. In no event may the calculation be based on less than fifty percent (50%) of the length of the entire program; or,

(2)  If fifty percent (50%) or less of the remainder of the program is MBA-covered excerpts, Articles 15.A.3.j. and 15.B.10.dd. will apply.

For the purposes of this subparagraph, the term "MBA-covered" includes excerpts from programs written pursuant to a WGA-PBS Agreement.

This compilation provision shall be applicable to excerpts derived from any television programs and any theatrical motion pictures utilizing literary material subject to any Guild collective bargaining agreement, prior or current, excluding only literary material the rights to which have reverted to the writer (for example, under the 1968 WGA Television Freelance MBA with the networks). Use of excerpts from programs to which such reversion of rights has occurred shall be subject to individual negotiation with the writers involved. When the Guild determines its allocation of payments for a compilation program, the allocation will be made as if the writers to whom rights had reverted were entitled to share

---

**ARTICLE 15 - TELEVISION EXHIBITION RERUNS & FOREIGN TELECASTS OF TV MOTION PICTURES**
**B - TELEVISION**

...he allocation and, thereafter, funds to which the writers would have been entitled will be repaid to the Company by the Guild within thirty (30) days of the time within which the Company pays the Guild the lump sum allocation. If there is a dispute as to whether rights have reverted, the Guild, if it is aware of such dispute prior to making such payment, will hold the amount applicable to such dispute in escrow in a trust account pending the resolution of such dispute.

In the case of such dispute, the writer may elect to submit the matter to arbitration under the procedures set forth in Article 11.C. in lieu of any other remedy. The only parties to such arbitration shall be the writer and the Company. If the arbitrator rules that the rights in dispute have reverted, and if the excerpt is used, the writer will be entitled to a total of twice the amount he/she would have received (pursuant to the Guild's allocation) if the rights had not reverted. The foregoing shall be the sole damages or other relief available to the writer if arbitration is elected. Any amount paid from the escrow account referred to above shall be deducted from the amount due from the Company.

f.   The production company which actually produces the program containing excerpts requiring payment shall be obligated to make such payment, but if such company is not signatory to this Basic Agreement, Company shall remain liable for payments due hereunder.

ff.  If an excerpt from a free television motion picture is used on pay television or videodiscs/videocassettes, as such terms are used in Appendix B, or basic cable as defined in Appendix C, such use shall be treated in the same manner as though the excerpt were used on free television.

The use of an excerpt from a television motion picture in an interactive program shall be governed by the provisions of Article 64.

g.   Except for payments required to be made pursuant to subparagraph e. above, no compensation shall be payable pursuant to this subparagraph 10. to a writer of a television motion picture from which an excerpt is derived if such writer writes material for and receives writing credit on the program into which such excerpt is inserted. If two (2) or more writers are entitled to share the additional compensation provided for in subparagraph c., d., or dd. above, the Guild shall determine the allocation among said writers.

h.   If an excerpt is used in a local program and the program is broadcast in no more than one (1) market, the payment for such use shall be sixty percent (60%) of the amount provided in this Article 15.B.10. If the program is broadcast later in another market, the writer(s) shall be paid the remaining forty percent (40%).

I.   If writers entitled to payments under Article 15.B.10. of this Basic Agreement cannot be identified by name, the Company shall pay the required amount in full to the Guild to be distributed by the Guild to all the credited writer(s) of the television motion picture(s) from which the excerpted material was taken. The Company shall use its best efforts to provide the Guild with sufficient information to insure that the number of credited writers to whom such payments are distributed is as low as possible.

11.  [Deleted.]

12.  Small Accountings. With regard to all residual payments required under this Article 15.B., the Company may accrue such payments until the aggregate is equal to one hundred fifty dollars ($150.00), at which time the payment provision of the appropriate paragraph shall be effective, except that in any event all accrued amounts of less than one hundred fifty dollars ($150.00) due to the writer shall be paid no later than thirty (30) days following the close of the calendar year in which accrued. Nothing herein

shall relieve the Company of its obligation to make the accounting reports required elsewhere herein.

13.    Additional Compensation for Theatrical Exhibition

In the event a television motion picture, based upon literary material to which this Basic Agreement applies, is exhibited theatrically, the writer or writers employed thereon who receive story and teleplay screen credit therefor shall be paid additional compensation as follows:

a.    If the television motion picture is exhibited theatrically outside of the United States, an amount which in the aggregate shall not be less than the total minimum compensation applicable to such literary material as specified in Article 13.B.7.a., b., c. and e. of the Basic Agreement, or not less than the total minimum compensation applicable to such literary material as specified in Article 13.A.1. hereof, whichever is greater;

b.    If the television motion picture is exhibited theatrically in the United States, or both in the United States and in a foreign country or territory, an amount which in the aggregate is not less than one hundred fifty percent (150%) of the total minimum compensation applicable to such literary material as specified in Article 13.B.7.a., b., c. and e. of the Basic Agreement, or not less than the total minimum compensation applicable to such literary material as specified in Article 13.A.1. hereof, whichever is greater.

c.    There is to be no duplication of the payments provided for in subparagraphs a. and b. above; *i.e.*, if the initial theatrical release of the television motion picture takes place outside of the United States and payment is made pursuant to subparagraph a. above, then, upon the subsequent theatrical release of the television motion picture in the United States, the amount payable to the writer will be the difference between the amount provided for in subparagraph a. above and the amount provided for in subparagraph b. above, and conversely, if the initial theatrical release of the television motion picture takes place in the United States and payment is made pursuant to subparagraph b. above, then no additional compensation will be payable if the television motion picture is subsequently released theatrically outside of the United States. For the purposes of subparagraphs a. and b. above, if two (2) or more television motion pictures are combined for theatrical release, the applicable minimum provided for in Article 13.A.1. shall be the minimum applicable to one (1) theatrical motion picture of the cost of the combined television motion pictures. Such additional compensation shall be paid regardless of whether such motion picture is exhibited alone or as a part of or in combination with other motion pictures; and if such motion picture is combined with other television motion pictures, the additional compensation for such theatrical release shall be not less than the total minimum compensation applicable to the writing of all such television motion pictures or parts thereof which have been so combined. If more than one writer shares the story or teleplay credit, then all of the writers sharing each credit shall be considered a unit and shall participate equally and receive in the aggregate the theatrical exhibition payment applicable thereto, except that in the case of a comedy-variety program, the Guild shall determine the proportions in which such participating writers will share the theatrical exhibition payment, will notify the Company thereof and Company will make payments accordingly.

d.    Such additional compensation for theatrical exhibition shall be payable whenever such television motion picture (in whole or in substantial part) is placed in any theatrical exhibition.

e.    All payments of such additional compensation for theatrical exhibition shall be made promptly by check payable to the order of the writer entitled thereto, and if

**ARTICLE 15 - TELEVISION EXHIBITION RERUNS & FOREIGN TELECASTS OF TV MOTION PICTURES**
**B - TELEVISION**

...paid to the writer at the time of employment s... be delivered to Guild for forwarding to such writer, and compliance herewith shall constitute payment to the writer.

f.   The Company, at its option, may make the additional payment for theatrical exhibition at the time of the employment of the writer or at any time prior to the time the same is due (but only if the agreement between the Company and the writer with respect thereto is set forth in the writer's individual contract); provided that only such part of the compensation initially paid to the writer as shall exceed twice the applicable minimum compensation may be applied in prepayment of additional compensation for theatrical exhibition.

g.   Any exhibition of a motion picture, other than through the medium of free television or as covered by Article 51 (Supplemental Markets), shall constitute a theatrical exhibition and (subject to the provisions of Appendix C) payment for such theatrical exhibition shall be as herein provided, except that this shall not apply to showings where no fee or admission charge is paid by the viewing audience.

If the Company licenses or grants to any third party the right to place in theatrical exhibition a television motion picture produced after March 1, 1981, which exhibition is to be before a viewing audience which pays no fee or admission charge to view the same, Company will pay to the writer(s) entitled to story and/or teleplay credit an amount equal in the aggregate to five percent (5%) of the gross amounts received by Company derived therefrom; provided, however, the sums paid to the writer(s) hereunder shall in no event exceed the applicable amount otherwise payable to such writer(s) under the provisions of subparagraph 13. had there been a fee or admission charge paid by the viewing audience. When Company licenses or grants any such right to a subsidiary or other related entity, the gross amounts referred to in the preceding sentence shall be the amounts specifically paid to the Company subject to there having been good faith bargaining between the Company and such subsidiary or related entity. Company shall account to the writer(s) entitled to payments hereunder on no less than an annual basis; provided that no accounting need be made for any twelve (12) month period following the twelve (12) month period during which the Company received no gross amounts with respect thereto. There shall be no duplication of the payments provided for in this subparagraph and the payments provided for in any other provision of subparagraph 13. That is, any payment made under this subparagraph shall be credited against any payment which may become due the writer(s) under all other provisions of subparagraph 13. Conversely, if a theatrical release payment is made to the writer(s) under the provisions of subparagraph 13. other than under this subparagraph, then no further sum shall be payable under this subparagraph.

If a television motion picture is exhibited at a film festival or a charitable event and an admission fee is charged, but no monies are paid to the Company or the Company's licensee in consideration of the use of the motion picture, no payment shall be due under the provisions of this Article 15.B.13.

h.   With respect to a television motion picture or multi-part program whose aggregate length as initially broadcast on television is more than four (4) hours and which is exhibited theatrically in condensed form, for purposes of this subparagraph 13., the total minimum compensation applicable to such literary material as specified in Article 13.B.7.a., b., c., and e. shall be specially determined as follows:

(1)   If said motion picture is exhibited theatrically outside of the United States, said minimum shall be based on the actual length of the motion picture in

in condensed, theatrical-release form but not less than four (4) times the applicable sixty (60) minute minimum;

    (2)    If said motion picture is exhibited theatrically in the United States, or both in the United States and in a foreign country or territory, said minimum shall be based on the actual length of the motion picture in its condensed, theatrical-release form, but no less than the sum of (a) four (4) times the applicable sixty (60) minute minimum plus (b) one-half of the difference between (I) the minimum applicable to the program in its initially broadcast length and (ii) four (4) times the applicable sixty (60) minute minimum.

The provisions set forth above in subparagraph 13. relating to non-duplication of payments shall also apply to the foregoing special provisions.

    i.    If the Company shall sell, transfer, assign or otherwise dispose of its theatrical exhibition rights in any television motion picture, it shall obtain from the buyer a separate agreement in substantially the form prescribed with respect to reruns, requiring the buyer to comply with the provisions of this Basic Agreement with respect to additional compensation payable to the writer for theatrical exhibition of the motion picture. Upon obtaining such agreement, Company shall not be further liable to the Guild or writer for the payment of additional compensation for theatrical exhibition.

    j.    The excerpting of so-called "stock shots" by Company from a television motion picture for transposition to and use in an otherwise separately produced theatrical motion picture shall not be deemed to be an exercise of the theatrical exhibition rights by Company within the meaning of this subparagraph 13. For any other use of excerpts from a television motion picture in a theatrical motion picture, the Company shall pay the following aggregate one-time-only sum to the writer or writers determined by the Guild to be entitled to such compensation and prorated as determined by the Guild:

|  |  | 2/13/08-<br>5/1/10 | 5/2/10-<br>5/1/11 |
|---|---|---|---|
| (1) | Thirty (30) seconds or less of excerpts | $437 | $459 |
| (2) | Over thirty (30) seconds but not over two (2) minutes of excerpts | $870 | $914 |
| (3) | Over two (2) minutes of excerpts: |  |  |
|  | --   for the first two (2) minutes | $870 | $914 |
|  | -   and, for each minute or portion thereof in excess of two (2) minutes | $347 | $364 |

    k.    If Company shall produce a motion picture budgeted at $125,000.00 or more intended primarily for television release and it shall thereafter release such motion picture theatrically in any country in the world, Company shall pay to writer any amount by which the established flat deal theatrical motion picture minimum for such motion picture at the time of its production shall exceed the total of the minimum applicable compensation and minimum theatrical exhibition payments required to be made hereunder. The established flat deal theatrical motion picture minimum shall be the compensation set forth in Article 13.A. hereof.

ARTICLE 15 - TELEVISION EXHIBITION RERUNS & FOREIGN TELECASTS OF TV MOTION PICTURES
B - TELEVISION

14.  Additional Compensation for Certain Use of Material to which Separated Rights Do Not Apply

Except as hereinbelow specifically provided, the Company shall have the right to use the literary material written for a serial, episodic series, unit series, or one-time television program in any field or medium whatsoever without any obligation to pay to the writer(s) thereof additional compensation.  Additional compensation shall be paid to the writer of a story or (subject to the next sentence hereof) teleplay or story and teleplay for an established serial or episodic series, or for a unit series or one-time television program to which separated rights do not apply (and when specific use is made of the writer's material, rather than, for example, the source material only), as provided in this subparagraph 14., provided that the terms of this Basic Agreement relating to rights in material apply to such story, teleplay or story and teleplay as provided in Article 2 of this Basic Agreement.  If such a teleplay be based upon a story in the public domain or upon a story owned by the Company, the writer of such teleplay shall not be entitled to any payments under the provisions of this subparagraph 14., except as provided in subparagraph I. below.  A writer employed to rewrite or polish a teleplay written by another person shall not be entitled to any payments under this subparagraph 14.  If more than one writer qualifies for additional compensation under this subparagraph 14., the Guild shall determine the division of such additional compensation among them.

Such additional compensation shall be as follows:

a.  If Company produces a theatrical motion picture based upon such material, it will pay to the writer whichever is the greater of (1), (2) or (3) below:

(1)  

| Effective | |
|---|---|
| 2/13/08-5/1/09 | $8,213 |
| 5/2/09-5/1/10[77] | $8,500 |
| 5/2/10-5/1/11[78] | $8,798 |

(2)  Two percent (2%) of the above-the-line costs (excluding all theatrical script writing costs and deducting from the above-the-line costs the following arbitrary amount representing the value of the underlying rights):

| Effective | |
|---|---|
| 2/13/08-5/1/09 | $7,225 |
| 5/2/09-5/1/10[79] | $7,478 |
| 5/2/10-5/1/11[80] | $7,740 |

(3)  the applicable minimum compensation for a screenplay under the then current Basic Agreement.

b.  If Company licenses or grants to any third party the right to use the material as the basis for a theatrical motion picture, it shall require such third party to agree in writing to pay to the writer the greater of the amount set forth in subparagraph

---

[77]  See footnote 2 on page 52
[78]  See footnote 3 on page 52
[79]  See footnote 2 on page 52
[80]  See footnote 3 on page 52

14.a.(1)-(2) above, and such undertaking by the third party will relieve the Company of any obligations to the writer in connection with such license or grant.

c.   If Company produces a radio program based upon such material, it will pay to the writer the following:

| Effective | For Each National Radio Network Broadcast | For Each Regional Radio Network Broadcast | Unlimited Right to Use in Syndication Any Transcription Made of a Program |
|---|---|---|---|
| 2/13/08-5/1/09 | $411 | $271 | $271 |
| 5/2/09-5/1/10[81] | 425 | 280 | 280 |
| 5/2/10-5/1/11[82] | 440 | 290 | 290 |

d.   If the Company licenses or grants to any third party the right to use the material as the basis for a radio program, Company will pay to the writer an amount equal to fifty percent (50%) of Company net receipts therefrom. The net receipts to the Company shall be computed by deducting from the gross amounts paid to the Company on account of such license or sale of the radio rights all royalties, license fees or participations which the Company is contractually obligated to pay by reason of the license or grant of the radio rights, together with agents' commissions, if any, on the license or grant of such radio rights.

e.   If Company exercises the dramatic rights in such material by producing a play on the speaking stage, it will pay to the writer an amount equal to one percent (1%) of the gross box office receipts of the play.

f.   If the Company licenses or grants to any third party the right to use the dramatic rights in the material, Company will pay to the writer an amount equal to twenty-five percent (25%) of the gross receipts derived by the Company from the license or sale of such rights.

g.   If the Company licenses or grants to any third party or exercises itself the publication rights to such material (other than publication rights customarily granted for advertising or publicizing the exploitation of any other rights in the material), Company will pay to the writer an amount equal to twenty-five percent (25%) of the Company's net receipts derived therefrom.

If the Company licenses or grants to any third party, or exercises itself, the right to produce or reproduce such material on phonograph records, cartridges, compact devices or any other devices which are audio only, Company will pay to the writer or writers as a group an amount equal to that fraction of twenty-five percent (25%) of the Company's net receipts derived from the licensing, grant or use of the literary material which is equal to the fraction of the overall material in the applicable audio device which such material constitutes. Notwithstanding the foregoing, if such material constitutes more than fifty percent (50%) of the overall material in the applicable audio device, the Company will pay the writer or writers as a group an amount equal to twenty-five percent (25%) of the Company's net receipts derived therefrom. For purposes of this subparagraph g., the Company's net receipts in each instance shall be computed by deducting from the gross amounts paid to the Company or its licensing agent, whether affiliated or otherwise, with respect to the licensing, grant or use of such material, all costs, expenses and charges incident thereto, including a distribution or servicing fee by

---

[81]   See footnote 2 on page 52

[82]   See footnote 3 on page 52

ARTICLE 15 - TELEVISION EXHIBITION RERUNS & FOREIGN TELECASTS OF TV MOTION PICTURES
B - TELEVISION

Company (which will include any and all subcontribution or subservicing fees), which fee shall be reasonably in accordance with customary distribution or servicing fees charged in the industry. When Company licenses or grants any such rights to a subsidiary or other related entity, the gross amounts referred to in the preceding sentence shall be the amounts specifically paid to the Company for such license, grant or use, subject to there having been good faith bargaining between the Company and such subsidiary or related entity. Company shall account to the writer(s) entitled to payments under this subparagraph g. on no less than an annual basis; provided that no accounting need be made for any twelve (12) month period following the twelve (12) month period during which the Company received no gross amounts with respect to the applicable audio device.

h.      Character payments

(1)    (a)    If the writer introduces a new character in the serial or episodic series, and the characterization of such character is fully developed and fully described in the material written by the writer, and from such development and description the character appears to be unique and the principal creation of the writer, and if the Company uses such character as the central character with a continuing role in a new and different serial- or episodic-type free television series, the Company will pay to the writer the sum specified in the following table for each episode of such new and different series produced and broadcast, provided that such writer shall be entitled only to sixty percent (60%) of said amount for fifteen (15) minute episodes, but shall be entitled to one hundred ninety percent (190%) of said amount for sixty (60) minute episodes and two hundred fifty percent (250%) of said amount for ninety (90) minute or longer episodes. Said applicable amount shall be paid in the same manner as provided in subparagraph 2. of Article 16.B. with respect to television series sequel rights and rerun payments will be made in accordance with Article 15.B., the "applicable minimum compensation" for such purpose being said applicable amount.

For such characters in literary material written hereunder by writer during

| | |
|---|---|
| 2/13/08-5/1/09 | $1,704 |
| 5/2/09-5/1/10[83] | $1,764 |
| 5/2/10-5/1/11[84] | $1,826 |

The character payments provided by this subparagraph (1)(a) shall not apply if any writer, including the creator of the character, is entitled under Article 16.B. to separation of rights in the new and different serial or episodic series. However, if separation of rights does exist in the new and different serial or episodic series and the writer who previously introduced the central character is not a participant in such separated rights, said writer alternatively shall be paid, with respect to each episode of the new serial or series in which the character appears, the lesser character payment which now applies to a principal character used in subsequent episodes of the same series in which it is introduced.

---

[83]     See footnote 2 on page 52

[84]     See footnote 3 on page 52

ARTICLE 15 - TELEVISION EXHIBITION RERUNS & FOREIGN TELECASTS OF TV MOTION PICTURES
B - TELEVISION    123

(b)   If the writer introduces a new character in the serial or episodic series, and the characterization of such character is fully developed and fully described in the material written by the writer, and from such development and description the character appears to be unique and the principal creation of the writer, and if the Company uses such character as the central character with a continuing role in a new and different serial- or episodic-type series produced pursuant to Appendix B of this Basic Agreement, the Company will pay to the writer the following amounts as a one-time payment for each episode of such new and different series produced and broadcast:

| Program Length | 2/13/08-5/1/09 | 5/2/09-5/1/10[85] | 5/2/10-5/1/11[86] |
|---|---|---|---|
| 15 minutes or less | $1,000 | $1,035 | $1,071 |
| 30 minutes or less (but more than 15) | 1,997 | 2,067 | 2,139 |
| 60 minutes or less (but more than 30) | 2,997 | 3,102 | 3,211 |
| 90 minutes or longer | 3,996 | 4,136 | 4,281 |

Said applicable amount shall satisfy all obligations of the Company to such writer, and no additional sum or sums shall be payable by reason of any use of such episodes.

The character payments provided by this subparagraph (1)(b) shall not apply if any writer, including the creator of the character, is entitled under Article 16.B. to separation of rights in the new and different serial or episodic series. However, if separation of rights does exist in the new and different serial or episodic series produced pursuant to Appendix B and if the writer who previously introduced the central character is not a participant in such separated rights, said writer alternatively shall be paid, with respect to each episode of the new serial or series in which the character appears, the lesser character payment which now applies to a principal character used in subsequent episodes of the same series in which it is introduced.

(2)   If a writer for an established episodic series creates a principal character who is distinct and identifiable, and is fully developed and fully described in the material written by the writer, and from such development and description the character appears to be unique and other than generic and the principal creation of the writer, the Company will pay such writer the sum specified in the following table for each subsequent episode of such series in which the character appears.

For such characters in literary material written hereunder by writer during

| | |
|---|---|
| 2/13/08-5/1/09 | $486 |
| 5/2/09-5/1/10[87] | 503 |
| 5/2/10-5/1/11[88] | 521 |

---

[85]   See footnote 2 on page 52
[86]   See footnote 3 on page 52
[87]   See footnote 2 on page 52
[88]   See footnote 3 on page 52

ARTICLE 15 - TELEVISION EXHIBITION RERUNS & FOREIGN TELECASTS OF TV MOTION PICTURES
B - TELEVISION

Commencing with the 2005-2006 television season, the foregoing payments shall be submitted to the Guild's Residuals Department no later than sixty (60) days following the completion of principal photography of the last episode of the season.

The character shall not be deemed unique, as required by the foregoing, if the character is played by an actor who plays himself or herself, or plays an established alter ego.

Company shall be liable for no more than four (4) such payments (or no more than an amount equal to four (4) such payments) for characters on any one (1) episode, unit or program and the writer(s) of the pilot script for any such series shall not be eligible for such payments at all with respect to characters in such pilot script subsequently used in episodes of the series.

Uses of a character in separate episodes of a multi-part closed-end series shall not constitute the use of the character in a new and different episode for the purposes of this Agreement, if the writer who created the character is a participating writer on the subsequent episode.

The character payments provided for by this subparagraph (2) are not subject to rerun payments.

(3)    Payments for use of a character which meets the criteria of this Article 15.B.14.h., but which is introduced in a unit of a unit series or a one-time free television program to which separation of rights does not apply, shall also be made as follows:

    (a)    If used as the central character with a continuing role in a new and different serial or episodic series to which separation of rights does not apply, the same character payment as provided in the applicable table in subparagraph (1) above; or

    (b)    If used as a principal character in a new and different unit of a unit series or in a new and different one-time television program, to which separation of rights does not apply, the same character payment as provided in the table in subparagraph (2) above.

(3.1)    Payments for use of a character which meets the criteria of Article 15.B.14.h. but which is introduced in a unit of a unit series or a one-time program produced pursuant to Appendix B of this Basic Agreement, to which program or series separation of rights does not apply, also shall be made as follows:

    (a)    If used as the central character with a continuing role in a new and different serial or episodic series produced pursuant to Appendix B, to which separation of rights does not apply, the same character payment as provided in the table in subparagraph (1)(b), above, or

    (b)    If used as a principal character in a new and different unit of a unit series or in a new and different one-time program produced pursuant to Appendix B to which separation of rights does not apply, the same character payment as provided in the table in subparagraph (2) above.

(3.2)    If a writer introduces a new character in a serial or episodic series, and the characterization of such character is fully developed and fully described in the material written by the writer, and from such development and

---

ARTICLE 15 - TELEVISION EXHIBITION RERUNS & FOREIGN TELECASTS OF TV MOTION PICTURES
B - TELEVISION    125

description the character appears to be unique and a principal creation of the writer, and if the Company uses such character as a principal character in a theatrical motion picture, the Company will make the following one-time-only payment to such writer for each theatrical motion picture in which such character is used:

| | |
|---|---|
| 2/13/08-5/1/09 | $8,708 |
| 5/2/09-5/1/10[89] | 9,013 |
| 5/2/10-5/1/11[90] | 9,328 |

The character payments provided by this subparagraph (3.2) shall not apply:

(a)    if the creator of the character is also the writer of the screenplay containing such character; or

(b)    if the creator of the character is entitled to separation of rights under Article 16.B. in the serial or episodic series from which the character was taken.

The foregoing payment shall be made within thirty (30) days after release of such theatrical motion picture.

(4)    A dispute between writers as to who created such a character shall be determined by the Guild in accordance with its credit arbitration proceedings.

(5)    If the Company licenses or grants to any third party the right to use such a new character in the manner described in this subparagraph h., the Company will require such third party to agree in writing to pay to the writer the amounts hereinabove provided, and such undertaking by the third party will relieve the Company of any obligations to the writer in connection with such license or grant.

i.    In the event that such a teleplay is used for a live television broadcast, and no writer is employed to rewrite, adapt or revise such teleplay for the live broadcast, the provisions of Article 13.B.7.o. shall apply.

j.    In the event that a writer is employed to rewrite, adapt or revise such material for a live television broadcast, and such rewritten, adapted or revised material shall be used for a live television broadcast, the provisions of Article 13.B.7.o. shall apply.

k.    [Deleted.]

l.    The writer of a teleplay based upon a story in the public domain shall be entitled to payments under the foregoing provisions of this subparagraph 14. if such teleplay is substantially used by Company in any field or medium referred to in said provisions and such public domain story was suggested by the writer in a written proposal made to Company by the writer and the use in question otherwise meets the conditions set forth in this subparagraph 14.  In addition:

---

89    See footnote 2 on page 52
90    See footnote 3 on page 52

---

ARTICLE 15 - TELEVISION EXHIBITION RERUNS & FOREIGN TELECASTS OF TV MOTION PICTURES
B - TELEVISION